ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS (225196)
LONNIE A. BROWNE (293171)
SEAN C. MCGUIRE (319521)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
lbrowne@rgrdlaw.com
smcguire@rgrdlaw.com

LEVI & KORSINSKY, LLP
ADAM M. APTON (SBN 316506)
ADAM C. MCCALL (SBN 302130)
DAVID C. JAYNES (SBN 338917)
445 South Figueroa Street, 31st Floor
Los Angeles, CA  90071
Telephone:  213/985-7290
212/363-7171 (fax)
aapton@zlk.com
amccall@zlk.com
djaynes@zlk.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN RYAN, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:22-cv-07939-ODW(AGRx) (Consolidated) |
| Plaintiff, | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| FIGS, INC., HEATHER HASSON, CATHERINE SPEAR, JEFFREY D. LAWRENCE, DANIELLA TURENSHINE, J. MARTIN WILLHITE, TULCO, LLC, THOMAS TULL, SHEILA ANTRUM, MICHAEL SOENEN, GOLDMAN SACHS & CO. LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CREDIT SUISSE SECURITIES (USA) LLC, BOFA SECURITIES, INC., COWEN AND COMPANY, LLC, | |
| [Caption continued on following page.] | <u>DEMAND FOR JURY TRIAL</u> |

GUGGENHEIM SECURITIES, LLC,  )
KEYBANC CAPITAL MARKETS      )
INC., OPPENHEIMER & CO. INC., )
PIPER SANDLER & CO., TELSEY  )
ADVISORY GROUP LLC,          )
ACADEMY SECURITIES, INC., R. )
SEELAUS & CO., LLC, SAMUEL A. )
RAMIREZ & COMPANY, INC., and )
SIEBERT WILLIAMS SHANK & CO., )
LLC,                         )
                             )
                             )
                Defendants.  )
                             )

4875-0160-4700.v1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION AND NATURE OF THE ACTION ..................................... 1

II.   JURISDICTION AND VENUE ....................................................................... 3

III.  EXCHANGE ACT CLAIMS .......................................................................... 4

      A.   THE PARTIES ...................................................................................... 4

           1.   Plaintiffs ..................................................................................... 4

           2.   FIGS Defendants ........................................................................ 5

           3.   Tulco Defendants ....................................................................... 8

      B.   FACTUAL BACKGROUND ................................................................ 9

           1.   Company Background ................................................................. 9

                a.   FIGS Designs Its Products In-House but Relies on
                     Suppliers in Asia and South America to
                     Manufacture the Company's Inventories ......................... 9

                b.   FIGS' Financial Performance Is Heavily
                     Dependent on Demand Planning and Inventory
                     Management ................................................................... 10

           2.   FIGS Experienced Explosive Revenue Growth During
                the COVID-19 Pandemic, Predominantly from Sales of
                FIGS' "Core" Products .............................................................. 11

                a.   FIGS' Pre-IPO Merchandising Strategy Focused
                     on a Small Number of "Core Styles" ............................. 11

                b.   FIGS' Focus on "Core Styles" Sales Results in
                     Explosive Growth During the COVID-19
                     Pandemic ....................................................................... 13

           3.   Prior to the IPO, FIGS Departed from Its Low-Risk
                Core-Product Merchandising Model ......................................... 14

           4.   Defendants Portrayed FIGS as an Industry Disruptor,
                Capable of Reliably Predicting Demand and Efficiently
                Managing Its Supply Chain ...................................................... 17

           5.   FIGS' Public Offerings ............................................................. 18

4875-0160-4700.v1

Page

     a.    Tulco and Tull Sold 22 Million Shares in the IPO While the Company Sold Less than 5 Million ............... 19

     b.    Just Three Months After the IPO, Spear, Hasson, Tulco, and Tull Sold over 10 Million Shares Worth over $412 Million in an SPO ......................................... 21

  6.    Post-Offering Events ................................................. 24

     a.    FIGS' Shift in Strategy Away from Core Products and Its Inability to "Reliably Predict Buying Patterns" Resulted in Ballooning Inventories ............... 24

     b.    FIGS' Sales Revenues Suffered from the Company's Shift Away from Its Core Product Merchandising Strategy and Its Inability to Reliably Predict Buying Patterns ..................................... 27

     c.    FIGS' Margins Fell to Near Zero After Incurring Additional Expenses Due to Its Departure from Its Core-Product Strategy and Inability to Reliably Predict Buying Patterns ................................................. 28

     d.    FIGS' Operating Cash Flows Plummeted as a Result of the Company's Departure from Its Low-Risk Core-Product Strategy and Inability to Reliably Predict Buying Patterns ................................... 31

  7.    The Tulco Defendants Maintained Significant Control over FIGS ..................................................................... 32

  8.    Internal Turmoil at FIGS Caused Management and Director Departures ................................................... 36

C.    DEFENDANTS' SCHEME TO PUMP AND DUMP FIGS STOCK ................................................................................. 37

D.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ................................................................................. 40

  1.    FIGS' IPO Offering Documents ............................... 41

4875-0160-4700.v1

1

2

**Page**

3

4          a.   FIGS Did Not Maintain Low Inventory Risk
               Because the Company Could Not Reliably Predict

5              Buying Patterns .................................................... 42

6          b.   FIGS Used Air Freight More Frequently and for
               Reasons Other than Disclosed in the IPO Offering

7              Documents .......................................................... 47

8      2.   Q2 2021 Form 10-Q and Earnings Call ....................... 47

9          a.   FIGS Could Not Make "Accurate Predictions"
               About Product Demand ........................................ 48

10

11         b.   FIGS' Use of Air Freight Was More Frequent and
               for Reasons Other than Disclosed ....................... 49

12

13     3.   FIGS' SPO Offering Documents ................................ 50

14         a.   FIGS Misrepresented Its Ability to Reliably
               Predict Buying Patterns and Maintain Low

15             Inventory Risk .................................................... 51

16         b.   FIGS Used Air Freight More Frequently and for
               Reasons Other than Disclosed in the SPO Offering

17             Documents .......................................................... 54

18     4.   Q3 2021 Form 10-Q and Earnings Call ....................... 55

19         a.   FIGS Did Not Maintain Low Inventory Risk
               Because the Company Could Not Reliably Predict

20             Buying Patterns and Was Rapidly Developing
               New Products for Which Demand Had Not Been

21             Established .......................................................... 55

22         b.   FIGS Used Air Freight More Frequently and for
               Reasons Other than Disclosed ............................. 58

23

24     5.   January 10, 2022 ICR Conference .............................. 60

25         a.   FIGS Did Not Have Consistent Gross Margins and
               Profitability Arising from Its Core Products

26             Strategy .............................................................. 61

27         b.   FIGS Used Air Freight More Frequently and for
               Reasons Other than Disclosed ............................. 62

28

- iii -

**Page**

6.   2021 Form 10-K and March 8, 2022 Earnings Call ................. 63

     a.   Defendants' Claims that FIGS Maintained Low Inventory Risk Were False and Misleading Because the Company Could Not Reliably Predict Buying Patterns ............................................................. 64

     b.   FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed ................................... 68

E.   The Truth Continues to Emerge ................................................... 70

   1.   Q1 2022 Form 10-Q and May 12, 2022 Earnings Call ............ 70

   2.   February 28, 2023 Earnings Announcement ............................ 71

F.   ADDITIONAL SCIENTER ALLEGATIONS ................................... 72

   1.   FIGS' False and Misleading Statements Concerned Core Operations About Which the Individual Defendants Said They Had Deep, Institutional Knowledge ............................... 73

   2.   FIGS' Data Analytics and Access to Real Time Data Provided Defendants with Knowledge that Their Statements Were False and Misleading .................................... 74

   3.   Spear's and Turenshine's Admissions During FIGS' May 12, 2021 Earnings Call Reporting Q1 2022 Results Support Scienter ....................................................................... 78

   4.   Defendants Profited Handsomely from Their False and Misleading Statements ............................................................ 81

     a.   Hasson and Spear Received Considerable Increases in Compensation and Equity Awards from the IPO .................................................................. 81

     b.   The Lock-Up Provisions Pursuant to the IPO Motivated Defendants to Inflate the Stock Price .......... 81

     c.   The Individual Defendants' Motivation to Take FIGS Public and Benefit from Massive Insider Trading Further Supports a Strong Inference of Scienter .................................................................... 82

- iv -

**Page**

     5.    Executive Departures and Turnover Support a Strong Inference of Scienter................................................................ 85

         a.    Lawrence's Rapid Departure from FIGS Shortly After the IPO and SPO Further Supports an Inference of Scienter ....................................................... 85

         b.    Varelas' Unexplained Resignation from the FIGS' Board Supports a Strong Inference of Scienter.............. 86

         c.    Hasson's Abrupt Resignation from Her Position as Co-CEO as the Truth of the Fraud Was Revealed Supports a Strong Inference of Scienter........................ 87

         d.    Extremely High Executive and Employee Turnover Rates Support a Strong Inference of Scienter ................................................................... 88

   G.    LOSS CAUSATION AND ECONOMIC LOSS................................ 89

     1.    November 10, 2021 Partial Corrective Disclosure.................. 90

     2.    December 10, 2021 Partial Corrective Disclosure ................. 92

     3.    May 12, 2022 Partial Corrective Disclosure ........................... 94

     4.    February 28, 2023 Final Corrective Disclosure ...................... 98

   H.    PRESUMPTION OF RELIANCE................................................... 102

COUNT I ................................................................................................... 103

For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against the Exchange Act Defendants ......................................................... 103

COUNT II .................................................................................................. 104

For Violation of §20(a) of the Exchange Act Against the Individual Exchange Act Defendants, Tulco, and Tull ................................................ 104

COUNT III.................................................................................................. 105

For Violation of  §20A of the Exchange Act Against the Founder Defendants, Tulco, and Tull for Insider Selling.......................................... 105

IV.    NON-FRAUD SECURITIES ACT CLAIMS ........................................... 108

Page

A. BACKGROUND TO THE SECURITIES ACT CLAIMS .............. 109

B. SECURITIES ACT DEFENDANTS................................................ 109

    1. Director Defendants.................................................. 110

    2. Underwriter Defendants ........................................... 110

C. THE IPO OFFERING DOCUMENTS WERE FALSE AND MISLEADING.................................................................................. 113

    1. FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Established ........................................ 114

    2. FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the IPO Offering Documents.......... 119

D. THE SPO OFFERING DOCUMENTS WERE FALSE AND MISLEADING.................................................................................. 120

    1. FIGS Misrepresented Its Ability to Reliably Predict Buying Patterns or Maintain Low Inventory Risk ................. 120

    2. FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the SPO Offering Documents.......... 123

E. THE IPO AND SPO OFFERING DOCUMENTS VIOLATED ITEM 303 AND ITEM 105 ........................................................... 124

COUNT IV ........................................................................................ 126

For Violation of §11 of the Securities Act Against FIGS, the Tulco Defendants, Hasson, Spear, Lawrence, the Director Defendants, and Underwriter Defendants ................................................................... 126

COUNT V.......................................................................................... 128

For Violation of §12(a)(2) of the Securities Act Against FIGS, Hasson, Spear, Tulco and Tull.............................................................. 128

COUNT VI ........................................................................................ 130

For Violation of §15 of the Securities Act Against Hasson, Spear, Lawrence, and the Tulco Defendants.......................................................... 130

4875-0160-4700.v1

**Page**

V.    SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO
      NOT APPLY ........................................................................................ 131

VI.   CLASS ACTION ALLEGATIONS ........................................................ 132

VII.  PRAYER FOR RELIEF ......................................................................... 134

VIII. JURY DEMAND ................................................................................... 134

4875-0160-4700.v1

# I.     INTRODUCTION AND NATURE OF THE ACTION

1.     Court-appointed Lead Plaintiffs, Dr. Ronald Hoch ("Hoch"), City of Pensacola Police Officers' Retirement Plan ("City of Pensacola"), City of Warren Police and Fire Retirement System ("City of Warren"), Kissimmee Utility Authority Employees' Retirement Plan ("Kissimmee"), and Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach") (collectively, "Plaintiffs"), bring this action individually and on behalf of a class consisting of all persons or entities other than Defendants (defined below, *see* §II.A., *infra*) who purchased or otherwise acquired: (i) FIGS, Inc. ("FIGS" or the "Company") Class A common stock pursuant and/or traceable to the Company's IPO conducted on or around May 27, 2021 (the "IPO Class"); (ii) FIGS Class A common stock pursuant and/or traceable to the Company's SPO conducted on or around September 16, 2021 (the "SPO Class"; together with the IPO Class, the "Securities Act Classes"); and/or (iii) FIGS Class A common stock between May 27, 2021 and February 28, 2023, inclusive (the "Class Period") (the "Exchange Act Class"), and were damaged thereby.  Plaintiffs seek to recover damages caused by Defendants' violations of the federal securities laws and to pursue claims arising under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b), 20A, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.[1]

---

[1]     Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things: (i) review and analysis of FIGS' public filings with the Securities and Exchange Commission ("SEC"); (ii) review and analysis of Defendants' other public statements, including FIGS' press releases and interviews that Defendants participated in with various news outlets; (iii) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning FIGS and the industry in which it operates; and (iv) review of pertinent court filings.  Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of Defendants.  Plaintiffs believe that

- 1 -

2.     FIGS is a seller of medical scrubs and other healthcare-focused apparel.  In 2021, FIGS went public on the promise that it utilized precise data analytics, demand forecasting, and supply chain and inventory management techniques to deliver high-quality medical scrubs via online sales directly to healthcare professionals while maintaining minimal inventory, tight control of supply chains, low overhead, and high customer retention.

3.     FIGS was led to market by its two co-founders and co-CEOs who, in concert with Tulco LLC, had total voting control over the Company and led the charge to promote to investors that such a data-driven business model would disrupt the scrubwear apparel industry.  They were extremely successful, raising $580.5 million in FIGS' IPO and $412.7 million in an SPO just over three months later.

4.     But of the nearly one billion dollars raised in the two offerings, only $96 million – *less than ten percent* – went to FIGS.  The vast majority of the proceeds went to Tulco and the CEOs – Heather Hasson and Catherine Spear.  Unknown to the market, the IPO and SPO were cornerstones of a years-long scheme by Defendants to buy out other private shareholders at artificially low prices, make exaggerated statements about FIGS' data analytics capabilities, go public, pump the stock, pocket over $1 billion in proceeds, and leave public investors holding the bag.

5.     The scheme worked.  Both before and after the IPO and SPO, FIGS and its founders and executives exaggerated the Company's capabilities in order to pump the stock price while selling over a billion dollars of their *personal* stock into a market they had worked hard to overheat.  Eventually, FIGS was forced to reveal massive inventory bloat, supply chains in chaos, ballooning shipping costs, and product margins that had diminished to near zero.  *Virtually none* of the data analytics

---

substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

4875-0160-4700.v1

and demand forecasting capabilities the Company had claimed to rely on formed the basis of Defendants' actual operating decisions.

6.      FIGS stock was offered at $22 per share in the IPO and $40.25 per share in the SPO; by the end of the Class Period, after the truth was finally revealed, the price had collapsed to just $6.76 per share.  Plaintiffs now seek damages on behalf of themselves and the Class.

## II.    JURISDICTION AND VENUE

7.      The claims asserted herein arise under §§11, 12(a), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l, and 77o, and §§10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1, and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District under §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b)-(d). The Company maintains its principal executive offices in Santa Monica, California, which is located in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint (the "Consolidated Complaint"), Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

III.    **EXCHANGE ACT CLAIMS**

    A.    **THE PARTIES**

        1.    **Plaintiffs**

        11.    Plaintiff Dr. Ronald Hoch purchased FIGS Class A common stock in the IPO as well as during the Class Period and has been damaged thereby, as set forth in the attached updated Private Securities Litigation Reform Act of 1995 ("PSLRA") certification accompanying this Consolidated Complaint.

        12.    Plaintiff City of Pensacola Police Officers' Retirement Plan is a public pension fund in Pensacola, Florida, with over $100 million in assets and hundreds of plan participants. Pensacola purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the attached updated PSLRA certification accompanying this Consolidated Complaint.

        13.    Plaintiff City of Warren Police and Fire Retirement System is a public pension fund in Warren, Michigan. Warren has approximately $275 million in assets under management and hundreds of plan participants. Warren purchased FIGS Class A common stock in the IPO as well as during the Class Period and has been damaged thereby, as set forth in the attached updated PSLRA certification accompanying this Consolidated Complaint.

        14.    Plaintiff Kissimmee Utility Authority Employees' Retirement Plan is a public pension fund in Kissimmee, Florida. Kissimmee provides benefits for full-time employees of the Kissimmee Utility Authority and their eligible beneficiaries, with over $100 million in assets under management and over 500 plan participants. Kissimmee purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the attached updated PSLRA certification accompanying this Consolidated Complaint.

        15.    Plaintiff Pompano Beach Police & Firefighters' Retirement System is a public pension fund in Pompano Beach, Florida. Pompano has over $200 million in

assets under management and over 500 plan participants.  Pompano purchased FIGS Class A common stock in the SPO as well as during the Class Period and has been damaged thereby, as set forth in the attached updated PSLRA certification accompanying this Consolidated Complaint.

## 2. FIGS Defendants

16.     Defendant FIGS, Inc. is a Delaware Corporation with principal executive offices located at 2834 Colorado Avenue, Suite 100, Santa Monica, California.  FIGS is a direct-to-consumer ("DTC") brand that designs, markets, and sells fitted healthcare apparel for medical professionals.  The Company's products include scrubs and other medical clothing and associated products.  As of December 31, 2022, FIGS had 313 employees.  FIGS' Class A common stock trades on the NYSE under the ticker symbol "FIGS."

17.     Defendant Heather Hasson ("Hasson") is the Co-Founder and Executive Chairman of FIGS.  She served as Co-Chief Executive Officer ("CEO") and director of the Company from its founding in 2013 until August 4, 2022.  On August 4, 2022, Hasson's title and role transitioned to Executive Chair.  Hasson reviewed and signed both the IPO Registration Statement and the SPO Registration Statement.  As co-CEO, Hasson signed the Company's Forms 10-Q and 10-K, and regularly spoke at events and on conference calls on behalf of the Company.

18.     Defendant Catherine "Trina" Spear ("Spear") is the Co-Founder and CEO of FIGS and has been a member of its Board of Directors (the "Board") since 2013.  Spear served as co-CEO, alongside Hasson, from FIGS' founding in 2013 through August 4, 2022.  Spear reviewed and signed both the IPO Registration Statement and the SPO Registration Statement.  As co-CEO, Spear signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Class Period, and regularly spoke at events and on conference calls on behalf of the

Company.  Hasson and Spear are referred to collectively herein as the "Founders" or "Founder Defendants."

19.     Defendant Jeffrey D. Lawrence ("Lawrence") was FIGS' Chief Financial Officer ("CFO") from December 2020 to December 2021.  Lawrence reviewed and signed both the IPO Registration Statement and the SPO Registration Statement.  While CFO, Lawrence signed the Company's Forms 10-Q, 10-K, 8-K, and certain press releases issued during the Class Period, and regularly spoke on conference calls on behalf of the Company.

20.     Defendant Daniella Turenshine ("Turenshine") has been FIGS' CFO since December 2021.  Prior to her role as CFO, Turenshine served as FIGS' Senior Vice President of Finance and Strategy from November 2018 to December 2021.  As CFO, Turenshine signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Class Period, and regularly spoke at events and on conference calls on behalf of the Company.

21.     Defendant J. Martin Willhite ("Willhite") has been a member of the FIGS Board since February 2019.  Willhite has also served as Vice Chairman of Tulco since July 2017.  Willhite reviewed and authorized his signature on the IPO Registration Statement and SPO Registration Statement.  Willhite also signed the Company's Forms 10-K.  Furthermore, at all relevant times, Willhite was simultaneously operating within the scope of his authority as a representative agent of Tulco.

22.     Defendants identified above in ¶¶17-21 are referred to herein as the "Individual Exchange Act Defendants" (together with FIGS and the Tulco Defendants (defined below), the "Exchange Act Defendants").

23.     Each of the Individual Exchange Act Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future

- 6 -

business prospects, as alleged herein.  In addition, the Individual Exchange Act Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

24.    As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Exchange Act Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the Individual Exchange Act Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.    The Individual Exchange Act Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Exchange Act Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Exchange Act Defendant is responsible for the accuracy

of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

### 3. Tulco Defendants

26. Defendant Tulco, LLC ("Tulco") is a venture capital investment firm founded and controlled by Thomas Tull. At all relevant times, Tulco controlled a significant percentage of FIGS' voting interest through its ownership of FIGS common stock. Given its substantial holding of FIGS' common stock, Tulco had the power to control, and did control, FIGS prior to and during the Class Period. In addition, Tulco maintained a seat on FIGS' Board throughout the Class Period, with Willhite having served on the Board since February 2019. Willhite also had the power to control, and did control, FIGS during the Class Period (*see also* ¶¶109-119, *infra*). In addition, A.G. Lafley ("Lafley"), a Tulco director since September 2017, joined FIGS' Board in April 2022.

27. Defendant Thomas Tull ("Tull") is the Founder, Chairman, and CEO of Tulco and has the power and authority to control Tulco. At the time of the IPO and throughout the Class Period, Tull controlled a significant percentage of FIGS' voting interest through his personal ownership and Tulco's ownership of FIGS common stock. Given his and Tulco's substantial holding of FIGS' common stock, Tull had the power to control, and did control, FIGS at the time of the IPO and during the Class Period.

28. Defendants Tulco, Tull, and Willhite, identified in ¶¶21, 26-27, *supra*, are together identified as the "Tulco Defendants." Willhite is a Tulco Defendant because he held a seat on FIGS' Board in his official capacity as Tulco's Vice Chairman.

**B.     FACTUAL BACKGROUND**

**1.     Company Background**

29.    Founded in 2013 by Hasson and Spear, FIGS is a retailer of medical scrubs and other healthcare apparel.  FIGS' core "scrubwear" styles generate nearly all the Company's revenues.  The Company has also expanded its product lines to include lab coats, jackets, and vests and other related "medical apparel" and "lifestyle" products.

30.    FIGS' scrubs, as well as its supplemental products, are positioned as premium products and are priced accordingly.  Where a generic set of scrubs can be purchased for between $20 and $30,[2] FIGS' core scrub pants retail for $48 per pair and core scrub tops retail for $38, for a total of $86 per set.

31.    Defendants tout FIGS products' "Technical Comfort," referring to a combination of functionality, comfort, and design.  These factors supposedly differentiate FIGS' scrubs from other products in the healthcare apparel marketplace and justify their premium price tags.

32.    As a DTC company, FIGS bypasses third-party retailers by selling directly to end customers; 98% of its sales come from its website and mobile application.  According to FIGS, at the time of its IPO, about 60% of its customers were repeat customers.

**a.     FIGS Designs Its Products In-House but Relies on Suppliers in Asia and South America to Manufacture the Company's Inventories**

33.    FIGS does not manufacture any of the products that it designs and sells.  Rather, the Company utilizes a network of suppliers throughout Asia and South America to manufacture both its raw materials and final products.

---

[2]    *See, e.g.*, Just Love Women's Six Pocket Medical Scrubs Set (V-Neck with Cargo Pant), https://tinyurl.com/7pf2w368 (priced at $19.99 as of March 29, 2023).

34.     The vast majority of FIGS' products are manufactured by two companies in China, though it also works with manufactures in Southeast Asia and South America.

35.     FIGS, therefore, relies on both ocean shipping and air freight to import its end products to the Company's distribution facility in City of Industry, California. Ocean shipping is generally less expensive than air freight but features a longer lead time for the products to reach the Company's distribution facility.

36.     According to the IPO and SPO Offering Documents (defined below), FIGS' "primary method of freight-in" is ocean shipping, and it only used "more expensive air freight" in limited circumstances such as responding to purported COVID-19 disruptions.

**b.     FIGS' Financial Performance Is Heavily Dependent on Demand Planning and Inventory Management**

37.     At its core, FIGS is an apparel company and operates within the consumer goods sector.  As with all consumer goods companies, inventory management is critical to FIGS' operations, and converting inventory into sales in a timely matter is essential for optimizing liquidity and operational cash flows. Inventory that is not properly balanced against demand creates costs and risks.

38.     Inventory shortages create difficulty in meeting customer demand, which can lead to lost sales opportunities, customer dissatisfaction, and a loss of repeat purchasers.  Shortages can also lead to increased shipping costs as companies scramble to hurriedly meet demand, oftentimes reverting to air freight.

39.     Conversely, excess inventory carries higher costs arising from increased storage, maintenance, and fulfillment demands, amongst others.  In the apparel industry, in particular, inventory may become obsolete as fashion trends evolve, which requires inventory to be sold at discounted prices, a particularly undesirable outcome for premium brands such as FIGS.

4875-0160-4700.v1

40.     To manage inventory, consumer goods companies rely on a technique known as "demand planning."  The demand planning process involves collecting, organizing, analyzing, and modeling historical data and current trends, and then making supply chain decisions in accordance with that data.  Modern demand planning is optimized by using specially designed software and analytics tools to achieve supply equilibrium.

41.     According to FIGS, its DTC strategy enabled data capabilities that set it apart from its competition and permitted it to predict buying patterns and manage inventory: "Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers **and reliably predict buying patterns**.  This leads to operational efficiencies throughout our supply chain, inventory management and new product development."

**2.     FIGS Experienced Explosive Revenue Growth During the COVID-19 Pandemic, Predominantly from Sales of FIGS' "Core" Products**

**a.     FIGS' Pre-IPO Merchandising Strategy Focused on a Small Number of "Core Styles"**

42.     FIGS' traditional merchandising model relied on a limited set of basic scrub products: thirteen (13) core styles in six (6) core colors (hereinafter referred to as FIGS' "core products" or "core scrub" products).  FIGS' core products consisted of three or four basic pant and top silhouettes each for men and women, respectively. FIGS' six core scrub colors are commonly worn in a variety of medical settings and comporting with color codes at many medical facilities: black, navy, graphite, ceil blue, royal blue, and burgundy.  FIGS' core products are available for purchase year-round and are non-seasonal.

43.     FIGS' core scrub products are uniforms, intended to be worn every day.  As Spear explained, "[FIGS'] strategy with these core styles is to have a steady supply of products that health care professionals come back all year round to replenish."

- 11 -

44.     FIGS' "replenishment" strategy mitigated inventory risk by creating a reliable sourcing and merchandising model, resulting in three primary benefits.  First, forecasting demand for FIGS' core products was simple.  Customers replenish their core scrub products at regular intervals, creating low volatility and predictable "recurring purchase" patterns, and the year-round demand for core scrubs in core colors eliminated FIGS' need to account for seasonal fluctuations.  Moreover, FIGS had seven years of historical demand data for its core products to support the Company's forecasting of its core products.

45.     Second, FIGS' core-product strategy mitigated the risk of obsolescence, thereby simplifying inventory management.  For instance, if FIGS stocked too much of a particular SKU, surplus items could readily be rolled over to the next period and future orders adjusted accordingly, thereby reducing overstocks and out-of-stocks ("stockouts").  Additionally, FIGS' strategy mitigated obsolescence risks associated with shipping delays.  In the event of an en-route ocean freight delay, the Company could air freight in additional product without concern that the increased volume would make the initial order unsaleable.  With respect to non-core items, by contrast, inventory overstock can necessitate promotional discounts and other potentially costly impacts.

46.     Third, the core-product "replenishment" strategy mitigated the risk of expending resources on the development of new products that were undesirable to consumers.  Demand for FIGS' core products was well-established by the time of the IPO, but if a new product turned out to have little appeal to consumers, the Company could be left holding unsaleable inventory and unable to recover sunk costs.

47.     Thus, FIGS' core-product strategy enabled the Company to maintain appropriate inventory levels regardless of the Company's demand planning sophistication.

4875-0160-4700.v1

### b. FIGS' Focus on "Core Styles" Sales Results in Explosive Growth During the COVID-19 Pandemic

48. During the COVID-19 pandemic, demand for core scrub products substantially increased, with more medical professionals choosing to wear scrubs and hospitals requiring scrub changes between patients. According to one survey of physicians, nurse practitioners, and physician's assistants, the proportion of clinicians wearing scrubs in outpatient settings during the pandemic increased from 24% to 85.4%.[3] A study of hospital doctors showed that 76% changed their work attire during the COVID-19 pandemic to scrubs.[4] Moreover, with doctors and nurses changing scrubs between each patient to avoid spreading infection – sometimes up to 40 times a day – demand for scrubs increased substantially.[5]

49. At the same time, online shopping became increasingly important to consumers because of pandemic-related restrictions on store hours and in-person gatherings, and the extended shifts that healthcare workers were working, making FIGS' DTC model particularly attractive.[6]

---

[3]   Janet Chao and Yan Lee, *When Was the Last Time You Wore a White Coat?*, KevinMD.com (Dec. 21, 2022), https://www.kevinmd.com/2022/12/when-was-the-last-time-you-wore-a-white-coat.html#:~:t.

[4]   Nordrum, O.L., Aylward, P. & Callaghan, M. *Hospital Doctors' Attire During COVID-19 and Beyond: Time for a Permanent Change*, Ir J Med Sci 191, 2445–2447 (2022), https://doi.org/10.1007/s11845-022-02922-1.

[5]   *How a Promising Scrubs Startup Found Itself Poised to Tackle the Pandemic*, Forbes (May 1, 2020), https://tinyurl.com/4773euyz.

[6]   *See* Norman Shaw, et al., *Online Shopping Continuance After COVID-19: A Comparison of Canada, Germany and the United States, Journal of Retail and Consumer Services* (Nov. 2022) ("[T]here were 37% of the USA sample who were experienced shoppers prior to the pandemic, increasing to 60% during the pandemic, but then dropping down to 55% after the pandemic."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9379614/.

50.    As a direct result of increased demand for its core scrub products and the shift to online sales, FIGS saw explosive growth in 2020.  In March 2020, when COVID-19 first hit the United States in earnest, FIGS' orders doubled,[7] and net revenues more than doubled year-over-year from $110 million in 2019 to $263 million in 2020.

51.    From 2018 to 2020, revenue grew nearly 400%, from $55 million in 2018 to $260 million in 2020.  During that period, the majority of sales and revenue were generated from core scrubs.  In 2020, for example, approximately 82% of FIGS' net revenues came from core scrub products.  Even on the days when FIGS launched new, limited-edition styles, 90% of the Company's sales came from core products.

### 3.    Prior to the IPO, FIGS Departed from Its Low-Risk Core-Product Merchandising Model

52.    In early 2021, prior to the IPO, FIGS pivoted away from its low-risk merchandising strategy that was focused on core products and began developing a plethora of new styles each quarter.  Over the course of 2021 alone, FIGS launched at least 100 new styles, exclusive of its core scrub products, and designed and produced numerous others for later launch.

53.    When FIGS refers to "styles," it can mean a completely new product like sweater knits and puffer jackets, or a variation on an existing product, such as a slim version of the men's Tansen pant.  When FIGS introduces a style, the Company considers it a new product, as noted by both Hasson and Spear – meaning that demand for that specific product typically has not yet been proven or demonstrated at the time of the launch.

54.    Defendants introduced this "new style" strategy that departed from a merchandising model based on "core" scrubwear because, as Hasson and Spear said,

---

[7]   Madeline Berg, "*Mission Critical? With Coronavirus Pandemic, Scrubs Maker Figs Steps Up Efforts to Spiff Up the Hospital Ward*," Forbes (Apr. 28, 2020), https://tinyurl.com/3pv9n7t8.

4875-0160-4700.v1

FIGS needed to "innovate" to continue creating high-quality products for healthcare professionals. For instance, during the August 12, 2021 Earnings Call, Hasson said, "Product innovation is the lifeblood of FIGS." Similarly, Spear remarked that FIGS "may innovate or die" during the November 10, 2021 Earnings Call. However, while Hasson and Spear touted customers excitement concerning new products, they failed to mention that FIGS lacked, or had departed from, any data-driven analytics solutions that it claimed could predict demand and buying patterns and maintain inventory efficiency.

55. The shift in strategy was dramatic. By the end of 2021, FIGS had produced more than 100 new styles. During the Company's March 8, 2022 Earnings Call, Spear emphasized that FIGS "launched over 100 new styles across all categories in 2021." Hasson took it further, noting that the Company would continue its production momentum:

> And what we do is we create functional high-quality products to outfit our health care professionals from head to toe. And so we did that in 2021 in spades, right, 100 new styles. And I think our product innovation velocity, I think it's unlike many other companies, and we're continuing to build on that in 2022.

56. But the Company's non-core inventories drastically increased throughout 2021 and 2022, with many new styles not selling well. By the end of Q2 2022, despite core styles making up 80% of revenues, the Company held just as much core as non-core inventory: "Of the remaining inventory in our warehouse, approximately 50% is in core styles and core colors . . . ."

57. In sharp contrast to its low-risk core-products focus, FIGS' pivot to generating a multitude of new styles per quarter created extremely risky conditions with respect to demand planning and inventory management – despite the Company advertising repeatedly that its demand planning and inventory management were second to none in the industry.

4875-0160-4700.v1

58.     Pursuant to the new strategy, the Company began placing purchase orders for products and styles for which demand had not been demonstrated, creating risk that inventory would not sell or would take a long time to convert from inventory into sale.  As the Company forayed into completely new product categories like baseball caps, scarves, and tote bags, the predictive value of historical purchase data diminished.  Attempts to enter new markets like "off-shift" loungewear also created an entirely new competitive dynamic, wherein FIGS was competing with established loungewear brands for market share.

59.     Moreover, the new products included many products that, unlike scrubs, are seasonal, such as jackets and coats.  Seasonal goods require more reliable supply chain controls because their launch dates cannot simply be pushed forward or backward – if a shipment of down-alternative puffer coats is delayed until Spring, for example, the products likely will not be sold until multiple quarters later, if at all.

60.     The longer inventory takes to convert into sales, the more expensive holding costs are.  Thus, stocking non-core products without the ability to predict demand created risk of overstocking and of incurring increased warehousing costs.  Overstocked inventory, in turn, creates risk of restricted cash flows, potentially delaying investments or repayment of debt.  With time, overstocked inventory of non-core products can become obsolete, necessitating inventory discounting and promotional pricing.

61.     Moreover, FIGS' fast-paced diversification into such a wide slew of products caused significantly increased expenses to be incurred regardless of how well the products sold.  These included expenses associated with the design and marketing of the new products.  Whereas FIGS already had designs for its core products, new product design and innovation requires large, dedicated teams of personnel and new product types require teams with different specialties and areas of expertise.  Likewise, marketing new products requires significant expenditure.  Accordingly, FIGS' expanded product pipeline created both high risk and high costs for the

4875-0160-4700.v1

Company *especially* where FIGS simultaneously lacked, or did not utilize, data-driven technologies and solutions that could reliably forecast demand and control inventories.

### 4. Defendants Portrayed FIGS as an Industry Disruptor, Capable of Reliably Predicting Demand and Efficiently Managing Its Supply Chain

62.    Prior to the IPO, FIGS claimed that it had data analytics that created efficiencies throughout every aspect of its business.  According to FIGS' SEC filings, including the IPO and SPO Offering Documents, FIGS was able to procure hundreds of data attributes associated with millions of customers because of its DTC model. Further, FIGS touted a centralized Data Science team that could utilize the data the Company harvested from its customers to drive decision making throughout the Company and build proprietary data science solutions applied to key functions including marketing and customer experience, product, supply chain, merchandising, and inventory management.

63.    FIGS purportedly used the harvested data in conjunction with management systems, such as Flexport and Whiplash's warehouse management system ("WMS"), to manage its supply chain, inventory, warehouse, fulfillment, distribution, and freight operations.  Through Flexport and Whiplash's WMS, FIGS was supposed to have real time insight into transport trajectory and inventory levels at the Company's fulfilment center, respectively.  For example, in a September 19, 2022 partnership video, Spear highlighted that Flexport provided "a real time platform to see, you know, where the products are at any given time."[8]  Spear made sure to mention that FIGS had had that capability for at least "a number of years."  Similarly, Whiplash's WMS purportedly provided the Company with "real-time inventory

---

[8]    Flexport, *FIGS | Flexport.org Impact Partner Spotlight*, YouTube (Sept. 19, 2022), https://www.youtube.com/watch?v=Sz_vs5YpkRU.

- 17 -

visibility"[9] for the inventory that the Company had on hand at FIGS' sole fulfillment center.[10]

64.    Defendants also claim that FIGS benefitted from its relationship with Shopify, an e-commerce platform that can integrate with websites of DTC sellers such as FIGS. Through Shopify, FIGS purportedly has access to data concerning product performance and sales metrics that are "up to date" within about a minute, including, *inter alia*, gross sales, returns, starting and ending inventory quantities, days of inventory on hand, and sell-through rates.[11]

65.    Though FIGS publicly claimed that it was using such data capabilities to reliably predict buying patterns, determine inventory needs, create supply chain efficiencies, and anticipate optimal times for product launch down to the day and time, behind the scenes, FIGS was unexpectedly relying on air freight to bring in products, delaying product launches, and running out of core products while inventory levels were simultaneously ballooning as a result of the Company's departure from its core products strategy (*see* §III.B.6., *infra*).

### 5.    FIGS' Public Offerings

66.    In 2021, after experiencing significant revenue growth from the COVID-19 pandemic but before the market was aware of the Company's shift away from its core-product strategy and its inability to reliably predict buying patterns,

---

[9]    RyderEcommerce by Whiplash, https://whiplash.com/capability/distribution/ (last visited Mar. 29, 2023).

[10]    FIGS' fulfillment center is located in the City of Industry, California and operated by FIGS' third-party logistics partner, Whiplash f/k/a/ Port Logistics Group. *See* FIGS, *What I don't want to use the prepaid label?*, https://tinyurl.com/mr49ceaz (last visited Apr. 5, 2023).

[11]    Shopify Help Center, *Inventory Reports*, https://tinyurl.com/mr4b8wap (last visited Apr. 5, 2023); Shopify Help Center, *Sales Reports*, https://tinyurl.com/cfmade9x (last visited Apr. 5, 2023).

4875-0160-4700.v1

FIGS, Tulco, and Tull sold shares of the Company's stock to the public in FIGS' IPO that closed on June 1, 2021; then, a little more than three months later, Hasson, Spear, Tulco, and Tull sold shares of the Company's stock in a secondary public offering on September 20, 2021.

**a.    Tulco and Tull Sold 22 Million Shares in the IPO While the Company Sold Less than 5 Million**

67.    On May 5, 2021, FIGS filed its Registration Statement on Form S-1 with the SEC for purposes of facilitating its IPO.  Following a series of comments from the SEC, the Company amended its Registration Statement on May 20, 2021, and again on May 24, 2021 (collectively, the "IPO Registration Statement").

68.    When Defendants announced the launch of FIGS' IPO on May 20, 2021, they anticipated that the share price would be between $16 per share and $19 per share.  Initially, the offering included a total of 22.5 million shares of its Class A common stock, and only 5,875,000 were being offered by the Company.  The remaining 16,625,000 shares were being sold by Tulco and Tull.  The Underwriter Defendants also had a 30-day option to purchase an additional 3,375,000 shares of Class A common stock from Tulco and Tull.

69.    On May 26, 2021, Defendants announced an IPO price of $22 per share – well above the $16-19 per share range initially anticipated – and raised the number of shares of Class A common stock in the offering from 22.5 million to approximately 26.4 million.  Although the size of the offering increased, the number of shares sold by FIGS actually *decreased*, from 5,875,000 in the draft prospectus to 4,636,364 in the final IPO Prospectus.  Meanwhile, Tulco and Tull offered 21,749,999 shares in the offering, up from 16,625,000 in the initial draft.  The Underwriter Defendants' 30-day option to purchase additional shares increased from a total of 3,375,000 to 3,957,954 shares – all of which were offered by Tulco and Tull.

4875-0160-4700.v1

70. The SEC declared the IPO Registration Statement effective on May 26, 2021.

71. Thereafter, Spear and Hasson participated in a series of media appearances designed to boost FIGS' valuation and business prospects heading into the IPO.

72. On May 27, 2021, Spear appeared on the television show Bloomberg Markets. During the interview Spear touted FIGS as a "massive opportunity" with a $12 billion market in the US and $79 billion global market. She further highlighted that FIGS had $263 million in net revenue from only 2% of market share. Given that, according to Spear, the Company had a "really long runway ahead of it."[12]

73. That same day, Spear and Hasson appeared on CNBC's Squawk on the Street wherein the first question concerned the size of FIGS' potential market. In response, Spear once again touted that the healthcare apparel market in the United States is a $12 billion market and $79 billion globally. She went on to suggest that those markets understated FIGS' potential, given that FIGS offered lifestyle apparel in addition to scrubs and healthcare apparel, and because net revenues of $263 million in 2020 represented just 2% market share. She further noted that they were "just getting started for what's to come for FIGS."[13]

74. Spear and Hasson also appeared on Yahoo! Finance's IPO Power Hour on May 27, 2021. When asked how she saw the "growth forecast for the next couple years at FIGS," Spear boasted that the Company was on a trajectory to grow by 100%

---

[12] Crystal Tse, *Medical Scrubs Maker Figs Jumps in Debut After Upsized IPO*, Bloomberg (May 27, 2021), https://www.bloomberg.com/news/articles/2021-05-27/medical-scrubs-maker-figs-upsized-ipo-raises-581-million.

[13] Squawk on the Street, *Co-CEOs of Scrubs-maker Figs on going public and the outlook for the brand*, CNBC (May 27, 2021), https://www.cnbc.com/video/2021/05/27/co-ceos-of-scrubs-maker-figs-on-going-public-and-the-outlook-for-the-brand.html.

4875-0160-4700.v1

year-over-year post pandemic, stating in relevant part: "We've grown the business every year over 100% since we founded the Company in 2013.  We did grow during the pandemic 140% year-over-year.  But, you know, this was all the trajectory that we were on before the pandemic and we look to continue on this trajectory post the pandemic."[14]

75.     On May 28, 2021, Defendants filed a Prospectus on Form 424B4 (collectively with the IPO Registration Statement, the "IPO Offering Documents"), which represented that the Company was offering 4,636,364 shares of FIGS' Class A common stock and Tulco and Tull were offering an additional 21,749,999 shares of FIGS' Class A common stock for $22.00 per share.

76.     On June 1, 2021, Defendants announced the closing of the Company's IPO wherein FIGS, Tulco, and Tull offered 30,344,317 shares of its Class A common stock, which included the full exercise of the underwriters' option to purchase an additional 3,957,954 shares.  Minus underwriting fees and other costs, the total amount raised in the IPO was approximately $546 million, with less than $96 million going to the Company and the vast majority of the amount raised, approximately ***$450 million***, going to Tulco and Tull.

77.     Unbeknownst to investors, the IPO Offering Documents contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein not materially misleading.

**b.     Just Three Months After the IPO, Spear, Hasson, Tulco, and Tull Sold over 10 Million Shares Worth over $412 Million in an SPO**

78.     On September 14, 2021, Defendants issued a press release announcing that FIGS would conduct a secondary offering through which Tulco, Tull, Hasson,

---

[14]  IPO Power Hour, *Update 2-Scrubs maker FIGS valued at $4.57 bln in stellar debut*, Yahoo! Finance (May 27, 2021), https://www.yahoo.com/video/81-medical-equipment-maker-figs-160812520.html.

4875-0160-4700.v1

and Spear would sell 8,826,703 shares of FIGS' Class A common stock into the market.  The Underwriter Defendants also had a 30-day option to purchase an additional 1,324,005 shares.  That same day, Defendants filed the Registration Statement on Form S-1 with the SEC for purposes of facilitating the SPO.

79.  The SPO was designed solely to benefit Hasson, Spear, Tulco, and Tull as the selling stockholders.  Indeed, the September 14, 2021 announcement expressly stated that "FIGS will not receive any proceeds from the sale of shares in the offering."[15]  Hasson, Spear, and Tulco and Tull were able to sell their shares in the SPO through an early release from their IPO lock-up agreements that was only possible due to an increase in FIGS' stock price.

80.  According to the September 14, 2021 Registration Statement, the lock-up agreement covering Tulco's, Tull's, Hasson's, and Spear's shares expired immediately prior to trading on August 27, 2021.  This freed up 15% of the aggregate number of shares of common stock owned by each holder or issuable upon exercise of vested equity awards owned by each holder for sale because each of the following were met: (i) FIGS published its first quarterly financial results after the IPO, which occurred on August 12, 2021; (ii) 90 days had passed since May 28, 2021, when the IPO prospectus was filed (*i.e.*, August 26, 2021); and (iii) the closing price of FIGS' Class A common was at least 33% greater than the IPO share price (*i.e.*, $22) for at least 10 trading days in any 15-day consecutive trading day period, which occurred on or about June 14, 2021.[16]

81.  On September 15, 2021, Defendants filed with the SEC a Registration Statement on Form S-1MEF, adding an additional 104,284 shares of Class A common

---

[15]  FIGS, *FIGS Announces Secondary Offering of Class A Common Stock* (Sept. 14, 2021), https://ir.wearfigs.com/news/news-details/2021/FIGS-Announces-Secondary-Offering-of-Class-A-Common-Stock/default.aspx.

[16]  The lock-up agreement expired after the latest of these conditions occurred.

1  stock to the SPO. That same day, Defendants published a press release announcing
2  that Hasson, Spear, Tulco, and Tull were offering 8,917,385 shares of FIGS' Class A
3  common at $40.25 per share. The shares available for the Underwriter Defendants to
4  purchase also increased from 1,324,005 to 1,337,607 shares. Even with the increased
5  share value, the Company would still "not receive any proceeds from the sale of
6  shares in the offering."

7       82. On September 17, 2021, Defendants filed a Prospectus on Form 424B4
8  (the "SPO Prospectus" and, collectively with the September 14, 2021 Form S-1 and
9  the September 15, 2021 Form S-1MEF, the "SPO Offering Documents").

10       83. The SPO Offering Documents contained untrue statements of material
11  fact and omitted material facts required by governing regulations and necessary to
12  make the statements therein not materially misleading.

13       84. On September 20, 2021, Hasson, Spear, Tulco, and Tull completed the
14  SPO. Through the SPO, and upon the underwriters' decision to exercise their option
15  to purchase additional shares, Hasson and Spear sold 3,888,322 shares of FIGS Class
16  A common stock at a price of $40.25 per share, resulting in total proceeds of
17  $156,504,960.50. Further, Tulco and Tull sold 6,366,670 shares of FIGS Class A
18  common stock at a price of $40.25 per share, resulting in proceeds of $256,258,468.
19  The following chart details the amount of shares sold and the proceeds gained by
20  Hasson, Spear, Tulco, and Tull:

| Defendant | Transaction Date | Direct Indirect | Price | Shares Sold | Proceeds |
|---|---|---|---|---|---|
| Hasson | 20-Sep-21 | Direct | $40.25 | 2,419,998 | $97,404,920 |
| Spear | 20-Sep-21 | Indirect | $40.25 | 1,468,324 | $59,100,041 |
| Tulco and Tull | 20-Sept-21 | Indirect | $40.25 | 6,366,670 | $256,258,468 |

4875-0160-4700.v1

6.    **Post-Offering Events**

a.    **FIGS' Shift in Strategy Away from Core Products and Its Inability to "Reliably Predict Buying Patterns" Resulted in Ballooning Inventories**

85.    FIGS' pivot from its core-product strategy and its inability to reliably predict buying patterns, caused excessive inventory buildup.  FIGS' days of inventory outstanding increased in nearly every quarter from the IPO onward, reaching an average of 365 days during Q3 2022, as shown in Figure A, below.  FIGS' ideal inventory level, as Defendants later acknowledged on February 28, 2023, is around 16 to 20 weeks of supply (*i.e.*, 112 to 140 days).

**Figure A**



86.    Days of inventory outstanding measures a company's effectiveness at inventory management.  Ideally, a consumer goods company strives to keep days of inventory outstanding low, because housing inventory is costly and selling inventory quickly usually correlates with higher profit margins on goods sold.  When a company's days of inventory outstanding increases, it indicates that the company may be selling product more slowly than new product is coming in, causing accumulation of obsolete inventory.

4875-0160-4700.v1

87.     In FIGS' case, ballooning inventories reflected the Company's focus on developing a significant number of new styles per quarter and secretly lacking, or not utilizing, data driven solutions to forecast demand and control inventories.  Where the Company's early core-product focus had obviated the need for sophisticated demand planning tools, FIGS' fast-paced diversification strategy caused far riskier stocking and supply chain decisions.  Some of FIGS' new product offerings did not sell well, others sold slower than expected, and many were seasonal, complicating demand planning and causing overstocking.  Defendants' decision to shift away from core products to a high-risk merchandising model for which sophisticated demand planning tools were necessary proved disastrous for FIGS' inventory stocks where such tools did not exist, or otherwise were not utilized.

88.     By Q2 2021, FIGS' inventory growth had outpaced its sales growth and by Q2 2022 its net inventory actually exceeded its net sales, as depicted in Figure B below.

**Figure B**



4875-0160-4700.v1

89.     FIGS' inventory eventually grew too expensive to be housed at FIGS' City of Industry warehouse.   As a result, the Company required additional warehousing space, driving up costs of goods sold ("COGS") and pressuring margins.

90.     Figure C below demonstrates that FIGS' rising days of inventory outstanding did not result from macro factors.   Indeed, FIGS' days of inventory outstanding both exceeded and outpaced comparable companies, including DTC apparel retailers like Revolve, athleticwear retailer Lululemon (to which the Company regularly compares itself), and other uniform brands like Cintas.   Where FIGS saw days of inventory outstanding climb as high as a full calendar year, levels at competitor companies experiencing the same macro environment remained around the industry average of 100-160 days.

**Figure C**



91.     It wasn't until late 2022 and early 2023 that Defendants began to take concrete steps to manage their inventory problems.   Acknowledging their overstock issue, Defendants committed on their Q3 2022 earnings call to "work[ing] diligently to get inventory back in line" – including through promotional strategies, likely to be

costly to the Company both as a result of reduced revenue from sales and with respect to its premium brand positioning.

92.     On their Q4 2022 Earnings Call in February 2023, Defendants announced an ideal inventory range with a max of 20 weeks – more than 200 days below then-current levels – and promised to continue "to work toward getting inventory aligned with sales growth."  Defendants further disclosed that at least 40 percent of its ballooning inventory was of non-core products.

93.     Defendants also announced on the Q4 2022 Earnings Call that they had begun targeted efforts to reduce inventory of non-core products, which were at higher risk of obsolescence.  These products included substantial inventory in non-core colors, because, as Defendants acknowledged on the call, "lower-than-expected demand for our color launches[] led to heightened inventory levels."  To that end, as Turenshine explained at the KeyBanc Emerging Technology Summit on March 8, 2023, the Company was aiming to "bring back things that we've launched before and mix it with our core portfolio in ways that feel really new and exciting for the customer" in order to reduce existing inventory.

94.     In sum, FIGS' shift away from its core-product strategy and failure to utilize data analytics had devastating financial impacts on the Company, especially FIGS' sales, margins, and operating cash flows.

**b.     FIGS' Sales Revenues Suffered from the Company's Shift Away from Its Core Product Merchandising Strategy and Its Inability to Reliably Predict Buying Patterns**

95.     In addition to causing inflated inventories, FIGS' pivot toward developing and launching an extreme number of new styles for which demand had not been validated caused the Company to lose revenue when ***core products were out-of-stock***.  Specifically, the Company experienced stockouts of core products throughout 2022 while inventory levels of non-core products were exploding.

4875-0160-4700.v1

96.     In a May 12, 2022 Earnings Call, Spear acknowledged that FIGS had failed "to keep core products in stock" during Q1 2022 and that "[a]s a result, [FIGS'] Q1 revenue growth was lower than expected," though Spear attempted to blame supply chain issues.

97.     During the same Earnings Call, Daniella Turenshine also acknowledged the lack of core products had caused FIGS to lose sales during the quarter, stating: "Q1 revenue growth came in lower than planned, primarily due to the supply chain challenges affecting our scrubwear products that [Spear] discussed earlier."

98.     During the May 12, 2022 Earnings Call in which Spear acknowledged that "we're limited in our ability to keep in stock two of our most popular core franchise styles," Turenshine explained that "these inventory constraints are the primary factor affecting our [reduced] outlook for the full year."

99.     Despite Spear and Turenshine's assertion that the lost revenues from core products were the result of uncertainty in the supply chain, FIGS' stockouts were the result of the Company departing from the low-risk, data-driven, core-product strategy described in the IPO Offering Documents and exacerbated by the Company's inability to reliably predict buying patterns, which left the Company out of stock of its core products.   These stockouts cost the Company sales and caused it to incur additional expenses as it rushed to mitigate shortages.

**c.     FIGS' Margins Fell to Near Zero After Incurring Additional Expenses Due to Its Departure from Its Core-Product Strategy and Inability to Reliably Predict Buying Patterns**

100.   FIGS experienced significant increases to its expenses as a result of departing from its core-product strategy and inability to reliably predict buying patterns.  In particular, these expenses arose from increased air freight warehousing, and inventory obsolescence costs.

4875-0160-4700.v1

101.   ***First***, the Company incurred significant expense, particularly in 2021 and the first half ("1H") 2022, as a result of its heavy reliance on air freight to ship products from its manufacturers in Asia.  Defendants openly acknowledged from the outset that air freight was more expensive on a per-unit basis than ocean freight and that reliance on air freight in 2020 – due to the COVID-19 pandemic – increased FIGS' costs of goods sold and negatively impacted its gross margins.  But while Defendants billed their air freight reliance in the IPO Registration Statement as a stopgap measure to address COVID-19-related delays facing ocean freight providers primarily in Vietnam, Defendants actually relied on air freight as a measure of first resort to compensate for inadequate demand planning.

102.   Defendants disclosed the costs of FIGS' excessive air freight in a series of disclosures beginning on November 10, 2021, when Defendants held an earnings call for the third quarter of 2021 and admitted that the Company spent approximately $1 million on air freight in the third quarter and anticipated spending $8 to $10 million more on air freight during the fourth quarter, which was already half way over.  On May 12, 2022, Defendants held an earnings call for the first quarter of 2022 and revealed a decrease in gross margins was attributable to "higher air freight spend as well as increased ocean and air freight rates."

103.   ***Second***, the Company incurred significant inventory holding expenses. FIGS' departure from its low-risk merchandising strategy in conjunction with the Company's undisclosed lack of, or failure to utilize, data driven demand forecasts caused FIGS to accrue massive amounts of inventory that needed to be warehoused. This necessitated that FIGS obtain additional warehousing leases and incur additional warehousing and fulfillment expenses.

104.   FIGS' selling expenses rose commensurately.  On FIGS' Q3 2022 Earnings Call, Tureshine discussed a 5% increase in selling expenses as a percentage of net revenues as compared with the same period the prior year, attributing the increase "primarily . . . to higher costs within fulfillment, including warehouse storage

- 29 -

necessary to house inventory we pulled forward."   In FIGS' earnings call the following quarter, Turenshine again addressed increased selling expense, stating that it was "largely due to warehouse storage necessary to house inventory we pulled forward."

105.   ***Third***, FIGS' margins suffered even further when the Company implemented promotional pricing measures, like those described by Defendants during the Q3 2022 Earnings Call as tool to "get inventory back in line."   FIGS' promotional pricing measures, combined with increasing expenses related to air freight and inventory holding costs, drove FIGS' previously healthy margins to near zero, as shown below in Figure D.[17]

**Figure D**



---

[17]   Q2 2021 margins in Figure D have been normalized to remove the expenses that FIGS explicitly identified in its Q2 2021 Form 10-Q as being related to the IPO.

- 30 -

4875-0160-4700.v1

### d. FIGS' Operating Cash Flows Plummeted as a Result of the Company's Departure from Its Low-Risk Core-Product Strategy and Inability to Reliably Predict Buying Patterns

106.   FIGS' departure from its low-risk core-product strategy and undisclosed inability to reliably predict demand using data driven solutions is perhaps most evident in the Company's rapidly declining operational cash flows.  As shown below in Figure E, the Company's operating cash flows plummeted in 2022.

**Figure E**



107.   The drastic decline in FIGS' operating cash flows is primarily attributable to the Company's departure from its focus on core products and its inability to reliably predict buying patterns.

108.   Specifically, as discussed in ¶¶85-94, *supra*, FIGS' purchases of inventories in 2022 outpaced the Company's sales.  Additionally, a large portion of those inventories were not core products, resulting in lost sales opportunities when core products were out-of-stock.  Moreover, the Company's supposedly sophisticated and data-driven demand planning and inventory management capabilities were limited, and the ballooning non-core inventories were not selling and caused FIGS to

- 31 -

incur additional expenses relating to warehousing.  Accordingly, FIGS' cash flows from operations plummeted when new inventory purchases and new expenses drastically outpaced sales revenues.

### 7. The Tulco Defendants Maintained Significant Control over FIGS

109.   When looking for an investment, Tulco aims for companies that have "a clear path to $100 million of revenue within three years of investment," operating in "big sectors . . . within addressable markets that are ripe for disruption."[18]  The Tulco Defendants further "seek[] to make ***control investments***" that "enable[e] [the company to] work alongside management teams and implement operational and strategic initiatives to drive growth."[19]

110.   Tulco itself characterizes the relationships it develops with its partners as "hands-on":

> While these companies operate independently, ***Tulco partners with them at the highest management level to provide operational support and execute their strategic objectives***.  By bringing together a long-term strategic vision with deep technological expertise, ***Tulco provides*** a superior alternative to traditional funding through ***a hands-on operational approach*** and supportive and flexible capital structure.[20]

111.   Beginning in 2017, Tull began buying out FIGS' early investors.  For instance, in June 2017, Tull, through Tull Family Trust, entered into a Stock Purchase Agreement with Miracle Ventures I, LP wherein he purchased 137,852 shares of FIGS

---

[18]   Commonwealth of Pennsylvania Public School Employees' Retirement System, *Public Investment Memorandum* at 1, Tulco, LLC (Oct. 4, 2018), https://www. psers.pa.gov/About/Board/Resolutions/Documents/2018/Res58.pdf.

[19]   *Id.* at 2.

[20]   Tulcoholdings.com, *Who We Are*, Tulco, LLC, https://www.tulcoholdings. com/about/ (last visited Apr. 6, 2023).

4875-0160-4700.v1

1  for $249,491.45.  Tull continued acquiring early investors' shares until he remained as

2  the Company's sole outside investor.

3       112.  On January 23, 2018, FIGS announced that Tulco was providing it

4  with $65 million in new funding.  A portion of that $65 million investment was used

5  to buy out the existing investors.  FIGS purportedly also utilized funds from the

6  investment to advance the Company's technology and to speed up the company's

7  existing pipeline and international expansion.  Indeed, in the January 23, 2018

8  announcement, Tull emphasized that "[d]ata analytics, machine learning and artificial

9  intelligence are helping to transform traditional industries.  FIGS is using these tools

10  to reimagine the workwear category and we couldn't be happier with the results."  He

11  further recounted, in an April 28, 2020 article published by Forbes, that he sought to

12  turn FIGS into the technology company it purports to be today, stating in relevant part,

13  "[t]here was a point I said to them, 'you guys are a tech company, you just don't know

14  it yet.'"[21]

15       113.  Significantly, Tulco's expertise is in the application of advanced data

16  science, and it targets companies ready to scale with the adoption of leading edge and

17  proprietary technologies – some of the very areas FIGS emphasized in selling itself to

18  the public through its IPO and SPO.

19       114.  In an August 12, 2021 interview with the *Los Angeles Times*, Spear

20  described FIGS' relationship with Tull and his involvement in the Company as

21  follows:

22      He's an entrepreneur, right?  And he understands the things that matter.

23      So some investors are very focused on the output.  And a lot of investors

24      are focused on input.  How do you drive results, not just send me the

25      report after the quarter.  I think Thomas has a good balance of both,

---

26  [21]  Madeline Berg, *Mission Critical? With Coronavirus Pandemic, Scrubs Maker Figs*

27  *Steps Up Efforts to Spiff Up the Hospital Ward*, FORBES (Apr. 28, 2020), https://

28  tinyurl.com/3pv9n7t8.

4875-0160-4700.v1

1    saying, "Hey, what do you guys need help with?  And I'm here to be
2    your partner."[22]

3        115.   Spear's account downplayed the Tulco Defendants' significant control
4    over FIGS.

5        116.   According to the October 23, 2020 Amended and Restated
6    Stockholder's Agreement between Hasson, Spear, Tulco, and Tull ("2020
7    Stockholder's Agreement"), FIGS could not undertake any of the following actions,
8    *inter alia*, without "first obtaining the affirmative approval of the Tulco Director" or
9    "until such time as a majority of the members of the Board are designated by Tulco or
10   the Tulco Director":

11       (a)   "any material change to the lines of business conducted by the
12   Company and its subsidiaries";

13       (b)   "any approval of the Budget of the Company for any Fiscal Year
14   or any amendment, modification or supplement thereto";

15       (c)   any material deviation from the then-current Budget, including, for
16   the avoidance of doubt, any unbudgeted expenditures in excess of 20% of the
17   aggregate amount of budgeted expenditures in such Budget";

18       (d)   "any award, determination or payment by the Company or any of
19   its subsidiaries of any bonus or other discretionary or incentive compensation to a
20   Founder";

21       (e)   "any amendment, restatement, replacement, or modification of any
22   employment agreement or restrictive covenant agreement with any Founder,
23   including, without limitation, any modification to any compensation arrangements
24   with any Founder";

25

26   [22]   Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times
27   (Aug. 12, 2021), https://www.latimes.com/   business/story/2021-08-12/figs-trina-
     spear-heather-sasson-interview.
28

4875-0160-4700.v1

(f)     "the undertaking of a firm commitment underwritten initial public offering under the Securities Act of any Securities or other equity interests in the Company or the direct listing of the Company on a securities exchange (an 'IPO')";

(g)     "any commencement, termination, compromise or settlement of any material litigation, lawsuit, action, dispute or other proceeding or otherwise assuming any material liability, or agreeing to the provision of any equitable relief, by the Company";

(h)     "any amendment, modification, repeal or waiver of any provision of the Organizational Documents or the organizational documents of any subsidiaries of the Company";

(i)     "any Company Sale or other reorganization, merger, share exchange, share transfer, consolidation, business combination or similar transaction"; or

(j)     "the liquidation, winding up or dissolution of the Company or filing of any voluntary petition in bankruptcy or insolvency."

117.    The 2020 Stockholder's Agreement also described three circumstances under which the Tulco Defendants could fill board vacancies for its own seat and those of the founders: (i) if one founder (*i.e.*, Hasson or Spear) was no longer on the Board, then the remaining founder and the Tulco Director sitting on the Board (*i.e.*, Willhite) would fill the vacancy unanimously; (ii) if neither founder remained on the Board, then the Tulco Director would appoint someone to fill the vacancy; and (iii) if the Tulco Director no longer served on the Board, then Tulco would appoint someone to fill the vacancy.

118.    According to the Voting Agreement by and among FIGS, Hasson, Spear, Tulco, and certain related parties ("the Voting Agreement"), which was entered into contemporaneously with and became effective immediately after FIGS' IPO, Hasson, Spear, and Tulco were required to vote all of their shares in favor of the election or re-election of the Tulco Director that was duly nominated for election or

- 35 -

re-election to the Board "[f]or as long as the aggregate number of outstanding shares of Common Stock held by Tulco and its Permitted Transferees represent[ed] at least 10% of the aggregate number of outstanding shares of all classes of Common Stock." Under the Voting Agreement, Hasson, Spear, and Tulco were also required to vote all of their shares against any attempts to remove Hasson, Spear, or the Tulco Director from the Board.

119.   Prior to FIGS' IPO, the Tulco Defendants exercised majority control (51.1%) of the total voting power of the Company's shareholders.   Furthermore, throughout the entire Class Period, the Voting Agreement had the effect of concentrating the majority of the voting power of FIGS' outstanding capital stock with Hasson, Spear, Tulco, and Tull.

### 8.   Internal Turmoil at FIGS Caused Management and Director Departures

120.   FIGS experienced significant upheaval within its leadership after it went public.   Key executives, who were not parties to the voting agreement, and independent directors departed.

121.   Christopher Varelas ("Varelas") joined FIGS' Board in connection with the IPO.   As a "controlled company" beholden to its Founders and Tulco, FIGS had just three independent directors (out of a total of six directors) immediately after the IPO and Varelas held the important position of "lead independent director."   In the role of lead independent director, he was responsible for presiding over periodic meetings of the independent directors and serving as a liaison between the chairperson of the Board and the independent directors, among other duties. Varelas was on each of the Board's three committees and served as head of the Audit Committee. Curiously though, after only a few months on the job, on August 8, 2021, he resigned. The press release announcing Varelas' departure was unusual in describing his resignation as "not a result of any disagreement with the Company, known to an executive officer of the Company."

4875-0160-4700.v1

122.   Similarly, on December 10, 2021, before the market opened, FIGS announced the unexpected departure of Lawrence, effective December 24, 2021, less than one year after he became CFO.

123.   Lawrence's quick exit was unusual in and of itself, but the timing was particularly curious given that Lawrence left almost $6 million on the table by leaving when he did.   Lawrence would have had over 500,000 FIGS shares vesting and exercisable pursuant to stock options granted when he became CFO on his one-year anniversary with the Company, *i.e.*, December 31, 2021.  By not sticking around for just one week longer, he lost out on 236,803 of these shares.

124.   In response to this news, the price of FIGS stock declined by $6.57 per share, or over 21%, from a closing price of $31.22 per share on December 9, 2021, to a closing price $24.65 per share on December 10, 2021, on unusually high trading volume.

## C.   DEFENDANTS' SCHEME TO PUMP AND DUMP FIGS STOCK

125.   During the Class Period, the Founder Defendants and Tulco Defendants engaged in a scheme to defraud FIGS investors, selling the public on advanced data, and unique inventory and supply chain management capabilities that the Company didn't have (or didn't utilize) in an attempt to artificially inflate FIGS' share price and provide themselves with an opportunity to sell over $1 billion of stock at a significant premium.

126.   According to Defendants, in the apparel industry, "the distribution model is almost as important as the products themselves."  FIGS claimed that it had mastered its model, finely calibrating supply to demand in ways that were unparalleled by its competitors.  Supposedly, this was possible because of FIGS' DTC model and unique data analytics, which allowed the Company to leverage real-time insights about customer behaviors and preferences provided by the DTC model. Indeed, as disclosed in the IPO Offering Documents, FIGS claimed its data-driven

4875-0160-4700.v1

1  model allowed the Company to even pinpoint the optimal day of the week and time of
2  day to launch new materials.

3      127.   These false and misleading claims were bolstered by FIGS' partnership
4  with Tulco.  Tulco established the model for FIGS to follow, and through "its hands-
5  on operational approach" to funding, supposedly implemented this model at FIGS:

6      Tulco enables companies to unlock rapid, sustainable growth through the
7      application of advanced data science.  Tulco identifies industries with
8      static business models and takes material stakes in companies ready to
9      scale with the adoption of leading edge and proprietary technologies.[23]

10     128.   According to a complaint filed in the Southern District of New York,
11 Defendants' scheme to defraud began well before the Class Period.  Plaintiff in the
12 lawsuit, *Miracle Ventures I, LP v. Catherine Spear, Heather Hasson, & FIGS INC.*,
13 No. 1:21-cv-08941 (LGS), claims that Tulco's funding of FIGS was procured by
14 deceit, with Hasson and Spear inducing early stage investors in or around April 2017
15 to sell their FIGS stock to Tulco without disclosing plans for Tulco to make
16 significant additional cash injections into the Company and eventually take the
17 Company public.  This allowed Tulco and Tull to buy in cheap.

18     129.   In total, immediately prior to the IPO, Tulco held 57.9% of all
19 outstanding FIGS stock (Class A and Class B shares) and controlled 51% of the voting
20 rights.  Together, Hasson, Spear, and Tulco held 88% of the voting rights in the
21 Company, causing FIGS to be considered a "controlled company" within the meaning
22 of the corporate governance standards of the NYSE.  Further, they controlled the
23 Board immediately after the IPO with three of six seats and a voting agreement
24 between them that ensured each would remain a permanent fixture on the Board.  As a
25 result of these facts, and others described in more detail herein, *see* §III.B.7., *supra*,

26

27 [23]    Tulcoholdings.com, *Who We Are*, Tulco, LLC, https://www.tulcoholdings.
28 com/about/ (last visited Apr. 6, 2023).

4875-0160-4700.v1

1  Defendants had tremendous power over the Company, which they used to effectuate

2  their scheme to pump up FIGS share value and cash out as quickly as they could.

3       130.    Defendants didn't hesitate to seize their exit opportunity. COVID-19

4  injected significant consumer capital into the market through government stimulus

5  checks and also forced a shift in buying habits, channeling potential customers online

6  to FIGS. This was evident to some analysts that noted in connection with the IPO that

7  certain of FIGS' competitors were the beneficiaries of a COVID "pull forward." To

8  be sure, after COVID-19 hit, FIGS experienced tremendous growth in 2020 and 2021

9  as the Company prepared for its IPO, but Defendants assured investors the growth was

10  a result of their superior product and ability to reliably and predictably deliver that

11  product to customers.

12       131.    The payout to Defendants was enormous, with Tulco and Tull earning

13  $565 million from the sale of its shares in the IPO. This value dwarfed the money

14  earned by the Company in the IPO, which totaled a mere $96 million. True to plan,

15  Tulco and Tull continued their exit and sold off a little more than 6 million additional

16  shares for proceeds of over $255 million in the SPO. In short, less than four months

17  after the IPO, despite FIGS' claim of "deploy[ing] AI and data analytics to drive

18  disruptive growth" and being poised, if Defendants were to be believed, to experience

19  still more growth, within four months of FIGS going public the Tulco Defendants

20  pocketed over $800 million in proceeds. On March 21, 2022, less than a year after the

21  IPO and when the stock was below the $22 IPO price, Tulco distributed its remaining

22  shares to its members.

23       132.    Hasson and Spear, for their part, began to cash out in the SPO. The

24  circumstances of the SPO are particularly telling. As FIGS itself admitted, insider

25  sales of a substantial number of shares of FIGS stock was a significant risk to the

26  Company and likely to put tremendous downward pressure on the stock price. Lock-

27  up agreements, such as the ones that Hasson, Spear, Tulco, and Tull entered into in

28  connection with the IPO, are designed to mitigate some of this risk. Yet, less than

- 39 -

four months after the IPO, having sold the investing public on FIGS' unique DTC model and data capabilities, and with FIGS' share price inflated to a near-Class Period high by such promises, Hasson, Spear, Tulco, and Tull received an early release from their lock-up agreements and sold over ten million FIGS shares in the SPO.

133.  FIGS' share price has never recovered.  Hasson, Spear, Tulco, and Tull unloaded over $400 million of FIGS stock in the SPO at $40.25 per share.   On September 16, 2021, the day after the SEC deemed the SPO Registration Statement effective, FIGS shares closed at a price of $42.42 per share.  FIGS share price has experienced a consistent and precipitous decline ever since, only topping $42.42 per share once (on November 5, 2021), falling permanently below $30 by December 10, 2021, and falling below its IPO price by January 2022.

134.  Hasson and Spear were able to wrest still more cash out of their holdings in the next few months before the scheme began to unravel.  *See* §III.F.4., *infra* (detailing Hasson's and Spear's Class Period sales).  The truth about FIGS began to leak into the market, and the Company's promises about its DTC model and data capabilities proved illusory as merchandising problems plagued the Company and inventory levels ballooned.

## D.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

135.  Throughout the Class Period, FIGS was: (i) engaged in a high-risk merchandising model that included developing numerous new styles per quarter for which demand was untested, and: (a) was either failing to consider data and analytics in making purchase orders; or (b) did not have the data capabilities to reliably predict demand; (ii) relying heavily on expensive air freight in order to compensate for inadequate demand planning; (iii) experiencing rising levels of inventory, including of non-core products; and (iv) incurring significant costs related to each of the above. To conceal these issues from investors and to artificially inflate and maintain inflation

4875-0160-4700.v1

of the Company's share price, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents throughout the Class Period.  These material misstatements and omissions created the false impression that FIGS had a highly effective, low-risk merchandising model supported by unusually sophisticated data-related capabilities and a set of non-discretionary core styles, which enabled it to effectively manage inventory and primarily utilize ocean freight for freight-in except under exceptional circumstances such as those created by COVID-19.

136.   Plaintiffs assert that all statements set forth below that are bolded and italicized were materially false and/or misleading for the reasons set forth therein. Non-bolded and non-italicized statements are included for context.

### 1.   FIGS' IPO Offering Documents

137.   Unbeknownst to investors, the IPO Offering Documents contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein not materially misleading.

138.   First, the IPO Offering Documents misrepresented that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products rather than rapid development of hundreds of new products.

139.   Second, the IPO Offering Documents misrepresented that air freight was being used only as a response to supply chain disruptions arising from the COVID-19 pandemic, failing to disclose the true frequency and additional reasons FIGS utilized the more expensive shipping method.

140.   The IPO Offering Documents were signed by Hasson, Spear, and Lawrence.  Willhite, acting within the scope of his authority as a director of FIGS and

as a representative agent of Tulco, also authorized his signature on the IPO Offering Documents.

### a. FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns

141.   In the IPO Offering Documents, FIGS portrayed itself as a data-focused company with advanced data-tracking capabilities.  These capabilities were presented as unique assets that differentiated FIGS from its competition.  For example, under a boldface header on the second page reading "***We Leverage Data Science to Connect with and Serve Our Community***," the Company claimed:

> ***We develop proprietary and customized data solutions designed to optimize our product innovation, inventory analytics, marketing efforts and operational efficiency***.  We maintain . . . Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the Company.  ***This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes***.

142.   The Company repeatedly claimed that its access to customer data allowed for accurate demand prediction: "***Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns***."

143.   The Company also claimed to pay particular attention to "***demographic, geographic and psychographic data that enables us to reliably predict buying patterns, leading to operational efficiencies throughout our supply chain, inventory management and new product development***."

144.   The Company also emphasized for investors that FIGS was a low-risk company due to its primary business being uniforms rather than more discretionary

- 42 -

4875-0160-4700.v1

apparel: "***Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***."

145.   Similarly, the Company claimed that it could minimize inventory risk by being careful with its purchasing decisions.  Under a boldface heading reading "***Highly Effective Merchandising and Product Launch Model***," the Company claimed: "For our limited edition colors and styles, ***we utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity***."  The Company continued: "***This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency***."

146.   The Company made the following representations in a paragraph under the boldface header "***Supply Chain***":

> ***We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping.  This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics).  By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency***.

147.   Additionally, the Company made the following representations in a paragraph under the boldface header "***Merchandising and Inventory Management***":

> Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers.  ***This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.  It also enables us to manage purchasing and inventory effectively and efficiently***.  We use data-driven models to

- 43 -

1     *predict and anticipate demand for our products.    The high*
2     *concentration of core scrub sales enables our merchandising and*
3     *inventory models to be highly predictive, which reliably extends to*
4     *limited edition product launches through advanced data science*
5     *techniques.    Through our customer and demand predictions, we are*
6     *able to anticipate optimal times for launch, including day of week and*
7     *time of day*.

8     148. In the Management Discussion and Analysis section of the IPO
9 Offering Documents, the Company made the following misrepresentation:

10     We have a highly efficient merchandising model. ***Due to the non-***
11     ***discretionary, replenishment nature of healthcare apparel, we***
12     ***maintain low inventory risk driven by a high volume of repeat***
13     ***purchases and a focus on our core scrubs offerings***. In 2020, we
14     generated 82% of net revenues from our 13 core scrubwear styles, 5% of
15     net revenues from limited edition scrubwear styles, and the remaining
16     13% from our lifestyle apparel and other non-scrub offerings.

17     149. The statements identified in ¶¶141-148 above were false and
18 misleading when made because FIGS moved away from healthcare apparel that was
19 non-discretionary and subject to replenishment, could not reliably predict buying
20 patterns, and did not have operational efficiencies or low inventory risk arising from
21 the Company's data analytics capabilities and the Company's core product strategy, as
22 evidenced by the following:

23     (i) Rather than relying upon its data analytics and non-
24 discretionary core products which were subject to replenishment to maintain inventory
25 efficiency, FIGS was engaged in the rapid development of hundreds of new products
26 for which demand had not been demonstrated;

27     (ii) FIGS' shift in focus away from its core products strategy in
28 tandem with the Company's lack of data analytics solutions that optimized purchasing

- 44 -

1  decisions and maintained inventory efficiency, resulted in average days of inventory
2  outstanding increasing significantly before the IPO and throughout the Class Period;

3            (iii)    Defendants either did not have the data analytics capability
4  to reliably predict demand and buying patterns or they were not using the data
5  analytics to properly predict demand and efficiently operate FIGS' supply chain.
6  Otherwise, FIGS would have neither experienced ballooning inventory throughout the
7  Class Period nor needed to unexpectedly use air freight; and

8            (iv)    The Company needed to use air freight for unexpected
9  shipping needs because even if the Flexport system allowed tracking freight in real
10  time, the Company did not have, as it had claimed, the capacity to anticipate optimal
11  launch times to launch products, down to the day of the week and time of day.

12       150.   The Company's claims regarding its low inventory risk arising from
13  FIGS' robust customer data analytics capabilities, ability to anticipate demand and
14  reliably predict buying patterns, supply chain and inventory management, reliance on
15  core scrub styles, and DTC strategy were important to analysts and investors.
16  Analysts pointed to exactly these factors as being crucial to the Company's business.
17  For example, on June 21, 2021, Barclays initiated coverage and issued an analyst
18  report in which they rated the stock Overweight, and wrote: "As a DTC brand, FIGS
19  continues to reap the benefit of having ***near-perfect data*** – on its customers and
20  purchasing behavior."

21       151.   Similarly, BofA initiated coverage the same day, rated the stock Buy,
22  and wrote: "[FIGS'] digitally native nature allows ***data-driven management of***
23  ***inventory, and a reliance on high margin core scrubs*** reduces fashion risk."

24       152.   Ditto Cowen, which also initiated coverage that day with an
25  Outperform rating, and wrote: "***Data-driven*** marketing and consumer engagement
26  have created a powerful community." Under a boldface heading reading "***Multi-***
27  ***Faceted Durable Competitive Advantages***," Cowen continued: "Customer data
28  enables FIGS to acquire and retain consumers at high rates with declining customer

- 45 -

acquisition cost (CAC) and rising retention – NPS is 81. . . .   Co-founder led management team has built a talented team across finance, merchandising, ***data science and supply chain***.”   Cowen also pointed to FIGS’ “Data science driven decision making and intelligent replenishment,” and said: “The DTC model offers direct contact with its customer base across its website, app, marketing, storytelling, and engagement – a key competitive advantage over many of its peers.”  Cowen also said: “FIGS makes use of data science to segment its customers, identify underpenetrated regions domestically and outline the path to global expansion, along with using AI for its intelligent replenishment model tied to an individual’s buying preference.”

153.   In fact, Credit Suisse, Guggenheim, Oppenheimer, Piper Sandler, and Telsey Advisory Group all initiated coverage on June 21, 2021 with a rating of “Buy,” “Outperform,” or “Overweight,” and they all mentioned FIGS’ insight into customer data in some capacity in their coverage notes that day:

| Analyst | Example Comment |
|---|---|
| Credit Suisse | “FIGS uses the consumer insight data advantages it generates being a DTC brand to look deep into the mind of its core consumer, and it leverages those data to drive a rapid pace of innovation in better fitting, more fashionable, and more functional healthcare workwear.” |
| Guggenheim | “The company is focused on utilizing data science to expand its customer community, elevate its customer experience and drive intelligent replenishment.” |
| Oppenheimer | “As a technology-enabled DTC brand, FIGS is disrupting the $79B-plus healthcare apparel industry that has historically consisted of thousands of small brick & mortar retailers lacking a strong digital presence.” |
| Piper Sandler | “The company’s ***biggest competitive advantage*** is its digital-only model and superior data collection and analytics.” |
| Telsey Advisory Group | “Through its direct-to-consumer digital model, the company has the ability to use data analytics to understand its customers’ preferences while identifying opportunities for underpenetrated markets.” |

4875-0160-4700.v1

**b.** **FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the IPO Offering Documents**

154.   In the IPO Offering Documents, the Company acknowledged that certain air freight expenditures had been higher than planned, but indicated that this was a temporary effect of the pandemic and was not expected to last:

> Certain of the Company's suppliers experienced delays and shutdowns due to the COVID-19 pandemic. ***In order to manage the impact of these disruptions*** and meet its customers' expectations, ***the Company increased the use of more costly air freight during 2020 and during the three months ended March 31, 2021***, which increased cost of goods sold. The Company has not experienced the pandemic's adverse impacts in any additional material respect.

155.   The statements identified in ¶154 above were false and misleading when made, because Defendants falsely attributed FIGS' "increased" "use of more costly air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain. Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

**2.     Q2 2021 Form 10-Q and Earnings Call**

156.   On August 12, 2021, FIGS announced its Q2 2021 results on SEC Form 10-Q signed by Spear, Hasson, and Lawrence, and hosted an investor conference call (the "Q2 2021 Earnings Call") in which the Defendants again misrepresented FIGS' ability to predict demand, commitment to a core products strategy, and use of air freight.

- 47 -

### a. FIGS Could Not Make "Accurate Predictions" About Product Demand

157. During the Q2 2021 Earnings Call, Spear stated the following: By having a direct relationship with our customers, we have access to hundreds of data attributes associated with millions of customer accounts. . . . And *by understanding their buying patterns, we're able to make increasingly accurate predictions about the products they're likely to buy, how often they're likely to buy them and the quantities they're likely to buy them in*.

158. On that same call, in response to an analyst question regarding the Company's use of air freight, Lawrence assured analysts that "*[w]e have a very well-healed [sic] and sophisticated inventory planning capabilities*."

159. The statements identified in ¶¶157-158 above were false and misleading when made because FIGS could not accurately predict demand and did not have "very well-healed and sophisticated inventory planning capabilities," as evidenced by the following:

(i) Rather than relying upon its data analytics and non-discretionary subject to replenishment core products to increase the predictability of demand and maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated;

(ii) FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period;

(iii) Defendants either did not have the data analytics capability to reliably predict demand and buying patterns or they were not using the data analytics to properly predict demand and efficiently operate FIGS' supply chain.

4875-0160-4700.v1

Otherwise, FIGS would have neither experienced ballooning inventory throughout the Class Period nor needed to unexpectedly use air freight; and

(iv)   The Company needed to use air freight for unexpected shipping needs because even if the Flexport system allowed tracking freight in real time, the Company did not have, as it had claimed, the capacity to anticipate optimal launch times to launch products, down to the day of the week and time of day.

### b.   FIGS' Use of Air Freight Was More Frequent and for Reasons Other than Disclosed

160.   In the Form 10-Q released on August 12, 2021, Defendants made the following false and misleading representation:

We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. ***In order to manage the impact of these disruptions*** and meet our customers' expectations, ***we have from time to time used faster but more expensive air freight*** during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

161.   During the earnings call on that same day, in response to an analyst question regarding the Company's use of air freight, Lawrence replied: "***We have a very well-healed [sic] and sophisticated inventory planning capabilities*** . . . . [G]oing forward, ***on the other side of the pandemic, again, given our inventory plan and capabilities we have today***, continued investments that we'll do there, ***this is largely going to be ocean in the out-years***." Furthermore, despite the Company ***already*** utilizing air freight that was eroding margins, Lawrence also speculatively claimed

- 49 -

1   that FIGS "***could see downward pressure on gross margin, if we choose to air freight***
2   ***in the products*** that we know our customers love."

3       162.   The above statements identified in ¶¶160-161 were false and
4   misleading when made because Defendants falsely attributed FIGS' increased use of
5   "more expensive air freight" to COVID-related disruptions, when in reality
6   Defendants utilized air freight as a routine method of operations to compensate for
7   their inability to properly predict demand trends and efficiently operate FIGS' supply
8   chain.  Additionally, if the Company had the capacity to anticipate optimal times to
9   launch products down to the day of the week and time of day, then, combined with its
10  ability to track freight in real time using the Flexport system, it would not have needed
11  to use air freight for unexpected shipping needs.

### 3.    FIGS' SPO Offering Documents

13      163.   A little more than three months after Defendants sold 30.3 million
14  shares to the public in the IPO, Hasson, Spear, Tulco, and Tull sold an additional 10.1
15  million shares in an SPO.  The SPO Offering Documents contained untrue statements
16  of material fact and omitted material facts required by governing regulations and
17  necessary to make the statements therein not materially misleading.

18      164.   Specifically, the SPO Offering Documents reiterated and perpetuated
19  the earlier misrepresentations that FIGS maintained low inventory risk, purportedly
20  because the Company had data analytics capabilities that permitted FIGS to "reliably
21  predict buying patterns" and "anticipate demand" and because FIGS was supposedly
22  operating a "lower-risk merchandising strategy" focused on its core products rather
23  than rapid development of hundreds of new products.

24      165.   The SPO Offering Documents were signed by Spear, Hasson, and
25  Lawrence.  Willhite authorized his signature on the SPO Offering Documents, acting
26  within the scope of his authority as a representative agent of Tulco.

27

28

4875-0160-4700.v1

### a.   FIGS Misrepresented Its Ability to Reliably Predict Buying Patterns and Maintain Low Inventory Risk

166.   In the SPO Offering Documents, FIGS repeated multiple claims it had made in the IPO Offering Documents, such as:

*Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns.   This leads to operational efficiencies throughout our supply chain, inventory management and new product development*.

167.   The Company continued to emphasize the tech-forward and data-heavy nature of its operations:

We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the company.  *This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes*.

168.   Management's discussion of their business in the SPO Offering Documents also emphasized FIGS' ability to manage its manufacturing, supply chain, and inventory.  They wrote:

We directly and actively manage every step of our product development and production process to ensure that our extremely high quality standards are met.  *We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings*.

- 51 -

169.   In the SPO Offering Documents, FIGS further claimed, beneath a boldface header reading "***Our Data Analytics***":

In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey. ***These extensive data sets are used to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management***, marketing and customer experience.

170.   Under the boldface heading "***Supply Chain***," they continued:

***We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping.   This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics).   By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency***.

171.   In the next paragraph, underneath the boldface heading "***Merchandising and Inventory Management***," the Company claimed:

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers. ***This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.   It also enables us to manage purchasing and inventory effectively and efficiently.   We use data-driven models to predict and anticipate demand for our products.   The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science***

- 52 -

4875-0160-4700.v1

*techniques.  **Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day.***

172.  The statements identified in ¶¶166-171 above were false and misleading when made because FIGS moved away from its core healthcare apparel that was non-discretionary and subject to replenishment, and did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy, as evidenced by the following:

(i)  Rather than relying upon its data analytics and non-discretionary core products which were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated;

(ii)  FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period;

(iii)  Defendants either did not have the data analytics capability to reliably predict demand and buying patterns or they were not using the data analytics to properly predict demand and efficiently operate FIGS' supply chain. Otherwise, FIGS would have neither experienced ballooning inventory throughout the Class Period nor needed to unexpectedly use air freight; and

(iv)  The Company needed to use air freight for unexpected shipping needs because even if the Flexport system allowed tracking freight in real time, the Company did not have, as it had claimed, the capacity to anticipate optimal launch times to launch products, down to the day of the week and time of day.

- 53 -

b.   **FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the SPO Offering Documents**

173.   In addition, the SPO Offering Documents contained the following false and misleading statement, reiterated several times in substantially similar form, with respect to the Company's use of air freight and the reasons therefore:

> We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. ***In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight*** during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

174.   The above statement identified in ¶173 was false and misleading because Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain.  Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

- 54 -

4875-0160-4700.v1

### 4.   Q3 2021 Form 10-Q and Earnings Call

175.   On November 10, 2021, the Company released Q3 2021 results on SEC Form 10-Q, signed by Hasson, Spear, and Lawrence, and held a conference call the same day (the "Q3 2021 Earnings Call").  The Company reported that Adjusted EBITDA margin had declined from 33.5% to 21.6% quarter-over-quarter, and COGS had increased from $20.1 million to $28 million, which the company attributed partially to "faster but more expensive air freight" and partially to an increase in order volume.

176.   During the Q3 2021 Earnings Call, and in the Form 10-Q, Hasson, Spear, and Lawrence made false and misleading statements designed to downplay the impact of increased air freight and reassure investors that FIGS' maintained low inventory risk due to its core products strategy and data analytics capabilities.  These statements maintained artificial inflation in the price of FIGS' Class A common stock.

**a.     FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Established**

177.   In the Management Discussion and Analysis of Financial Condition and Results of Operations section of the Form 10-Q, the Company wrote:

We have a highly efficient merchandising model.  ***Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***.

178.   Also in the Form 10-Q, the Company wrote:

***[T]he majority of our revenue is generated by our core scrubs styles in core colors, which are in demand year-round.  As a result, we have been able to produce our raw materials and finished products farther***

- 55 -

1    *in advance and hold greater inventory without significant risk of*
2    *obsolescence or exposure to seasonality*.

3    179.   In response to a question about the Company's supply chain, Spear
4    said:

5    [W]e're a uniform company, which means that our customers need our
6    products in order to do their jobs, so demand is predictable.  *We have a*
7    *non-seasonal business and we have a replenishment-driven business.*
8    *This gives us an incredible amount of visibility into the products we*
9    *need to make when we need to make them and the quantities in which*
10   *to make them in.  So in turn, that allows us to lock in costing and*
11   *capacity and bring in goods farther in advance*.

12   180.   She continued:

13   [W]e're a direct-to-consumer company.  Because of that, we're able to
14   forecast even more accurately and farther in advance because we have a
15   direct relationship with our 1.7 million customers. *And we have all this*
16   *data that helps us to know what product they need and when they need*
17   *it.  This allows us to provide 12- to 18-month rolling forecasts to our*
18   *suppliers, and it also means we could adjust our calendar and launch*
19   *schedule*, if there is any delay.

20   181.   Similarly, in response to a question from an analyst about FIGS'
21   supply chain, Spear once again claimed:

22   And from a demand side, our health care professionals are demanding
23   FIGS products and we're seeing that demand.

24       And so what we've done, and that's really why we made that
25   decision for – in the fourth quarter, where we're bringing – we're
26   utilizing air freight more, to get those products for our health care
27   professionals, would we be able to see more revenue if we were able to
28   get more products?  Potentially.  But I think what we've done is we

- 56 -

1    forecasted a really healthy growth rate coupled with profitability that is
2    best in class to be able to meet the demand that we're seeing.

3    But we're continually evaluating that. **_And I think one of the_**
4    **_unique things that we also have here at FIGS is that ability to forecast_**
5    **_that demand in a really accurate way because we're DTC, because_**
6    **_we're data-driven_**.

7    182. The statements identified in ¶¶177-181 above were false and
8    misleading when made because FIGS did not have low inventory risk arising from the
9    Company's data analytics capabilities and the Company's core product strategy, as
10   evidenced by the following:

11   (i)     Rather than relying upon its data analytics and its non-
12   discretionary core products that were subject to replenishment to maintain inventory
13   efficiency, FIGS was engaged in the rapid development of hundreds of new products
14   for which demand had not been demonstrated;

15   (ii)     FIGS' shift in focus away from its core products strategy in
16   tandem with the Company's lack of data analytics solutions that optimized purchasing
17   decisions and maintained inventory efficiency, resulted in average days of inventory
18   outstanding increasing significantly before the IPO and throughout the Class Period;

19   (iii)     Defendants either did not have the data analytics capability
20   to reliably predict demand and buying patterns or they were not using the data
21   analytics to properly predict demand and efficiently operate FIGS' supply chain.
22   Otherwise, FIGS would have neither experienced ballooning inventory throughout the
23   Class Period nor needed to unexpectedly use air freight; and

24   (iv)    The Company needed to use air freight for unexpected
25   shipping needs because even if the Flexport system allowed tracking freight in real
26   time, the Company did not have, as it had claimed, the capacity to anticipate optimal
27   launch times to launch products, down to the day of the week and time of day.

28

4875-0160-4700.v1

        **b.**    **FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed**

183.   In the ***Risks Related to Our Business*** section of the Form 10-Q, the Company wrote:

> [T]he ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, port congestion, increased ocean freight rates and labor shortages.  As a result, certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, have experienced delays and shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic.  ***In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight***, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future, including in the fourth quarter of 2021.

184.   On the earnings call the same day, Lawrence falsely attributed the purportedly temporary need for increased air freight usage in the quarter to the COVID-19 pandemic and seasonality:

> From a supply chain perspective, we are monitoring the rapidly evolving macro challenges surrounding inbound freight, especially with the upcoming holiday season.  As Trina mentioned, ***given these challenges, we proactively made the decision to air freight more goods during Q4 based on the demand for our products, coupled with the reality of operating a global supply chain in a COVID-19 world***.

185.   Another analyst gave the Company an explicit invitation to clarify the air freight issue, asking if "the $8 million to $10 million of incremental air freight"

was "a run rate that we should think about into next year" or whether FIGS expected it to "dissipat[e] as peak season passes." Spear replied:

> I mean, *we really don't see that at all as a run rate* and this is a *transitory strategic decision* that we've made. So going into 2022, we are doing a lot on our end to navigate this. And it's not just that we see the world opening up and the supply chain pressures easing, also, *we've made very big moves in terms of bringing in more inventory earlier*.

186. Another analyst pressed:

> So that once we get past the air freight inflation in the fourth quarter, maybe it sticks around in the first quarter, you will be doing a higher mix of units on ocean and that should be economically beneficial to where you were in the past? Or is that an incorrect assumption?

187. And Spear replied:

> The assumption of moving actually the fourth quarter, we're taking a bit of a hit on air freight, right? *We look to move those units going forward to ocean as we bring our goods in earlier. So that assumption will be – is correct*.

188. Lawrence, too, agreed:

> And as we think about getting into 2022, our prepared remarks, we don't have a crystal ball, but we're pretty confident that we're going to see less air freight overall than we're seeing it in Q4 as we get into '22.
>
> *So we don't think it's going to be air freight business ongoing. That was really just a reaction to the in-transit issues that everyone's having*.

189. The above statements identified in ¶¶183-188 above were false and misleading when made because Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for

their inability to properly predict demand trends and efficiently operate FIGS' supply chain.  Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

190.   These claims mattered to analysts.   For example, the next day, Barclays reiterated its price target and said: "We note the company raised its demand forecast for 4Q21 and is *only turning to air freight in order to meet this demand*." Accordingly, Barclays "expect[ed] freight headwinds to subside in 1H22 and in our opinion reverse in 2H22.  *Despite the intense air freight pressure to meet higher-than-expected demand*, what is most important is the underlying growth in the brand awareness among healthcare workers."

191.   Similarly, BofA Securities wrote: "Increased air freight cost *to position inventory for holiday demand* will likely weigh on 4Q gross margin. . . .  We view the decision to bring more inventory earlier via air despite the higher cost as a competitive advantage as FIGS will have enough product to meet demand while others might not."

192.   Oppenheimer also maintained its "Outperform" rating and wrote: "As we examine closely recent trends at FIGS, we come away impressed with the ability of management to continue to execute well upon key, underlying strategic initiatives, all the while navigating successful various macro challenges, including persistently elevated shopping costs [*sic*]."

### 5.   January 10, 2022 ICR Conference

193.   On January 10, 2022, the Company released unaudited and preliminary financial results for Q4 and FY 2021, and delivered a presentation at the 24th Annual ICR Conference.

194.   During the ICR Conference, Turenshine and Spear made materially false and misleading statements regarding the stability of FIGS' business and

- 60 -

4875-0160-4700.v1

profitability arising from its core products strategy and regarding FIGS' continuing use of air freight.

### a. FIGS Did Not Have Consistent Gross Margins and Profitability Arising from Its Core Products Strategy

195.   Turenshine emphasized FIGS' core products strategy as key to FIGS's stability of margins and profitability, stating in relevant part:

So I've been a part of building this business and really have a deep understanding of the drivers of our gross margin and really firmly believe that ***many of the structural advantages that we get from being a replenishment uniform business are what are going to be able for us to deliver on that 70%-plus gross margin***. So we've been very consistent in this metric, even as we've continued to innovate and really build out the lifestyle portion of our business. ***And we've been able to maintain it despite a lot of the macro supply chain challenges that we've been facing recently***. So it gives us a lot of confidence in our ability to be able to continue to do that.

A lot of this comes from, as I mentioned, the structural advantages that we have in our business. ***So we're a uniform replenishment business***. 90% of our fabrication – 90% of our revenue is from the same fabrication. ***80% is from the same 13 core scrubber styles***. So we get a lot of scale and costing efficiencies as we grow, and we're able to take those benefits and ***really put them back into innovating in the lifestyle product and building out some of those categories while not seeing a change in kind of the overall gross margin***.

196.   The statements identified in ¶195 above were false and misleading when made because FIGS did not have low inventory risk arising from Company's core product strategy, as evidenced by the following:

- 61 -

(i)     Rather than relying upon its data analytics and non-discretionary core products which were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products; and

(ii)     FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period.

### b.     FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed

197.   During the ICR Conference, Spear and Turenshine attempted to downplay FIGS' reliance on air freight.  For instance, Spear emphasized that the Company's use of air freight had reached its "peak," stating in relevant part:

> I think in terms of the business, from a supply chain perspective, we saw in the fourth quarter we utilized air freight to get our goods in, and we're happy that we did that.  We met the demand, right?  And we were able to get our products in to meet the demand and get them to our health care professionals.  ***Going forward – and we really do view that as the peak.  And so we've moved a lot of the shipments to ocean freight***.  We have seen rates be a bit elevated or continue to be a little bit elevated on that front.  ***But going forward, we're excited to utilize more ocean and really continue to navigate and be best-in-class as it relates to operational excellence and supply chain excellence***.

198.   Turenshine agreed, saying: "But what I can tell you is that ***we really do see Q4 as a peak in terms of air freight spend***.  And for the full year 2022, we do not anticipate needing to use the same level of air freight that we did in the prior year."  She went on:

4875-0160-4700.v1

*[S]o we are reducing the amount of air freight that we're using, and this is also because we put strategies in place in Q4 to be able to do that, right*?

199.   The statements in ¶¶197-198 above were false and misleading when made because in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain.  Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

200.   Analysts believed Defendants' claims regarding air freight delivered at the ICR Conference.  Barclays wrote: "We do believe that supply chain issues will peak in 4Q21 and get modestly better in 1Q22 and beyond, bearing in mind that about 80% of FIGS's sales come from core, long shelf life styles."  Tesley wrote: "Coming out of 2021, *FIGS is shifting away from air freight* to back to ocean transit."  And Guggenheim said: "In terms of incremental supply chain costs, the company is optimistic that [this past quarter] was a peak for air freight costs, moving more shipments to ocean freight."

### 6.    2021 Form 10-K and March 8, 2022 Earnings Call

201.   On March 8, 2022, the Company submitted a Current Report on Form 8-K to the SEC, signed by Turenshine, with its press release and shareholder letter attached.  The Company also held an investor call that day, and released its Annual Report for the year ended 2021 on Form 10-K two days later, which was signed by Hasson, Spear, Turenshine, and Willhite, among others.

4875-0160-4700.v1

a. **Defendants' Claims that FIGS Maintained Low Inventory Risk Were False and Misleading Because the Company Could Not Reliably Predict Buying Patterns**

202.   During the earnings call, Spear affirmed that the Company's core products strategy was key to maintaining a low-risk inventory model, stating in relevant part:

> *The fact that half of our revenues are seasonless, enables us to produce large volumes further in advance and hold greater quantities in our warehouse with almost no inventory risk compared to traditional apparel companies.  These differentiators are incredibly important because as transit times fluctuate, freight rates rise and labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%.*

203.   Spear also touted the advantages that FIGS' core product strategy afforded the Company during the earnings call, stating in relevant part: "Our business is unique.  *It's nondiscretionary and replenishment-driven, meaning greater predictability and consistency.  This is a critical advantage for us* compared to other consumer brands as almost 75% of our revenue is retained in the next year, providing a solid base for us to build upon as we grow."

204.   In the 2021 Annual Report, the Company also emphasized that "[w]e have *developed a highly effective merchandising strategy, anchored by our recurring, functional offering of 13 core scrubwear styles*, which represented over 80% of our net revenues in 2021."

205.   In reiterating that FIGS had "a highly efficient merchandising model," the 2021 Annual Report further noted that "due to the non-discretionary, replenishment nature of healthcare apparel, [it] maintain[ed] low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

4875-0160-4700.v1

206.    The Company represented that its "***DTC strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising, customer acquisition and retention, demand forecasting and inventory optimization, leading to operational efficiencies throughout our supply chain, inventory management and new product development***."

207.    The 2021 Annual Report also noted: "As a successful DTC brand with a highly effective merchandising model, we benefit from structurally advantaged product margins."

208.    With respect to its "limited edition colors and styles," the 2021 Annual Report highlighted FIGS' "disciplined buying approach," stating in relevant part:

> ***[W]e utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity***.  We launch limited edition colors, limited edition styles or new products almost every week, driving recurring traffic to our digital platform where customers often purchase limited edition products along with our core offerings.  These launches not only drive interest in the limited edition products themselves, they also drive our core business.  ***This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency***.

209.    The 2021 Annual Report continued touting the Company's "Merchandising and Inventory Management," stating in relevant part:

> Through our customer ontology, we develop precisely defined customer segments and a mosaic representation of our customers.  This approach enables us to understand buying behaviors, preferred DTC channels, product preferences and decision drivers.  ***It also enables us to manage purchasing and inventory effectively and efficiently.  We also use data-driven models to predict demand for our products.  The high***

- 65 -

4875-0160-4700.v1

*concentration of core scrubwear sales enables our models to be highly predictive, which reliably extends to limited edition launches, and we are able to anticipate optimal times for launch, including day of week and time of day*.

210. The Form 10-K filed on March 10, 2022 also included several speculative and contingent risk factors for risks that already transpired:

*If we are unable to accurately forecast customer demand, manage our inventory and plan for future expenses, our results of operations could be adversely affected*.

We base our current and future inventory needs and expense levels on our operating forecasts and estimates of future demand.  To ensure adequate inventory supply, we must be able to forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . .  Accordingly, *if we fail to accurately forecast customer demand, we may experience excess inventory levels or a shortage of products available for sale*.  Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer and could impair the strength and premium nature of our brand.

211. The statements identified in ¶¶202-210 above were false and misleading when made because FIGS did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy, as evidenced by the following:

(i)    FIGS had already begun to experience excess inventory levels – as they admitted eight weeks later and as will be discussed further in §§III.E.1. and III.G.3., *infra*;

- 66 -

4875-0160-4700.v1

(ii)     Only three weeks later, during an earnings call on May 12, 2022, Turenshine admitted that "we began to experience impacts on our business in early March." Further, Spear indicated on the call that "since early March, we've seen an intense and persistent surge in the volatility of ocean transit times for receiving our products, largely due to vessels being unexpectedly rerouted by carriers while in transit";

(iii)     Rather than relying upon its data analytics and non-discretionary core products which were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated;

(iv)     FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period;

(v)     Defendants either did not have the data analytics capability to reliably predict demand and buying patterns or they were not using the data analytics to properly predict demand and efficiently operate FIGS' supply chain. Otherwise, FIGS would have neither experienced ballooning inventory throughout the Class Period nor needed to unexpectedly use air freight; and

(vi)     The Company needed to use air freight for unexpected shipping needs because even if the Flexport system allowed tracking freight in real time, the Company did not have, as it had claimed, the capacity to anticipate optimal launch times to launch products, down to the day of the week and time of day.

212.   The Company's statements regarding supply chain and inventory mattered to analysts. For example, BofA wrote in its research note issued on March 9: "Inventory was up 73% exiting the quarter, two-thirds of which was due to in-transit inventory with the rest actual warehoused inventory; this is in line with peers, ***and most are evergreen products***."

4875-0160-4700.v1

213.   Similarly, Guggenheim wrote on March 9, 2022: "The non-discretionary nature of FIGS' business is primarily replenishment driven, ***allowing for greater predictability and consistency when it comes to inventory management***, as almost 75% of revenue is retained in the next year."

### b.   FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed

214.   With respect to air freight, the 2021 Annual Report indicated that FIGS used it as a mere stopgap measure to respond to COVID-19 and related macro conditions, stating in relevant part:

The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays and unreliability, port congestion, increased ocean and air freight rates and labor shortages.

\*     \*     \*

In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time, and may continue from time to time, to ship goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. ***We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future***.

215.   Similarly, the 2021 Annual Report stated:

The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, reliability and capacity issues, port congestion, increased ocean and air freight rates and labor shortages. . . .

- 68 -

4875-0160-4700.v1

As we seek to timely and cost effectively fulfill orders and ship products to our customers, we have been able to continue to produce our products without significant disruptions and have taken successful measures to mitigate these macroeconomic challenges to which we are not immune. For example, to meet our customers' expectations, we have from time to time shipped goods earlier when possible and adjusted shipments to alternate origin and destination ports to avoid delays. *We have also from time to time used faster but more expensive air freight in the quarter and year ended December 31, 2021, which increased our cost of goods sold*.

*Our replenishment-driven model has also been a key part of our ability to navigate these challenges*. Nearly 90% of our production utilizes our main scrubwear fabric technology FIONx and *almost half of our revenue is generated by our core scrubwear styles in core colors, which are in demand year-round*. As a result, we have been able to produce our raw materials and finished products farther in advance and *hold greater inventory without significant risk of obsolescence or exposure to seasonality*.

We believe we have managed effectively through COVID-19 logistical challenges. *We nevertheless expect we will continue to contend with* elevated ocean and *air freight rates,* unpredictable ocean transit times and other COVID-19 related logistical challenges.

216. The statements identified in ¶¶214-215 above were false and misleading when made because Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain. Additionally, if the Company had the capacity to anticipate optimal times to

- 69 -

4875-0160-4700.v1

launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs. Furthermore, as discussed in §III.G., *infra*, the Company later disclosed that it was heavily reliant on air freight and had continued to incur high air freight costs, contrary to Defendants' assertions here.

### E.   The Truth Continues to Emerge

#### 1.   Q1 2022 Form 10-Q and May 12, 2022 Earnings Call

217.   On May 12, 2022, after the market closed, FIGS issued a press release announcing disappointing financial results for the first quarter of 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K. The press release revealed that FIGS' gross margin was 71.2%, which represented a 0.4% year-over-year decrease. The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates," which it claimed was "partially offset by improvements in product costing."

218.   The press release also revealed that FIGS slashed its expected net revenues, gross margin, and EBITDA despite having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 earnings call. The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to $530 million based purportedly on "supply chain challenges and broader macroeconomic factors, including high inflation and shifts in consumer spending patterns." The Company previously expected gross margin to be 70% or greater but lowered it to 67 to 68% "primarily due to a significant increase in the Company's use of air freight to help mitigate supply chain challenges." While Adjusted EBITDA was previously expected to be upwards of 20%, the Company adjusted its expectations margin to 16 to 18%.

219.   During the Company's earnings call that same day, Spear revealed that the Company lacked the visibility into inventory management that they professed to

4875-0160-4700.v1

have, which resulted in the use of expensive air freight for less in-demand products while new color launches and stocked-out styles remained on ocean freight, as described further at ¶¶300-308, *infra*.

## 2.   February 28, 2023 Earnings Announcement

220.   On February 28, 2023, FIGS issued a press release announcing disappointing financial results for the fourth quarter and full year 2022 ("FY2022 PR") that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The FY2022 PR revealed that FIGS had a 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year of year with Q4 2021 and 9.1% compared year of year with FY2022.  FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment increase.

221.   The FY2022 PR further revealed a dismal financial outlook for 2023 with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11%-12%.  Recognizing that these disappointing results stood in stark contrast to their Class Period misstatements, Turenshine attempted to allay investor concerns for the Company's future in the FY2022 PR, stating in relevant part:

> Our growth outlook for 2023 is not representative of the growth we believe we can achieve long term.  That is why we plan to keep investing while managing our business prudently through near term macro and cost challenges.  We remain a distant leader in our industry and we are confident that we can accelerate growth and deliver adjusted EBITDA margin expansion in the future.

222.   In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023, on unusually high trading volume.  In comparison, on the same day, the CRSP Total Market Index declined only

4875-0160-4700.v1

0.40% and the S&P 500 Apparel, Accessories and Luxury Goods Index decreased only 0.12%.

## F.   ADDITIONAL SCIENTER ALLEGATIONS

223.   As alleged herein, the Exchange Act Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   The Exchange Act Defendants participated in the fraudulent scheme alleged herein by virtue of their: (i) receipt of information reflecting the true facts regarding FIGS' management, operations, and competitive landscape; (ii) control over, receipt of, and/or modification of FIGS' allegedly materially misleading misstatements; and/or (iii) associations with the Company, which made them privy to confidential proprietary information concerning FIGS.

224.   The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Exchange Act Defendants.   Given their executive-level positions with FIGS, the Individual Exchange Act Defendants controlled the contents of FIGS' public statements during the Class Period.   The Individual Exchange Act Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.   Due to their positions and access to material non-public information, the Individual Exchange Act Defendants knew or recklessly disregarded that the adverse facts specified herein had

- 72 -

1  not been disclosed to and were being concealed from the public and that the positive

2  representations that were being made were false and misleading.

3      225.  Plaintiffs also allege that scienter of the Individual Exchange Act

4  Defendants (who, as directors and executive officers of the Company, knew or

5  recklessly ignored facts related to the core operations of FIGS) can be imputed to

6  FIGS and Tulco.

7          **1.  FIGS' False and Misleading Statements Concerned
              Core Operations About Which the Individual
8              Defendants Said They Had Deep, Institutional
              Knowledge**
9

10     226.  FIGS does one thing: sell health care apparel. Without question, selling

11  core scrubs is the Company's core operation.  Prior to the IPO in 2020, approximately

12  82% of FIGS' net revenues came from core scrub products.  Hasson reiterated that, in

13  2021, "[o]ver 80% of our business is core scrubs" during the Company's March 8,

14  2022 Earnings Call.  The Exchange Act Defendants also consistently emphasized

15  throughout the Class Period that FIGS' business was dependent on its core scrubs

16  (*see, e.g.*, ¶¶144, 147-148, 151, 168, 171, 177-178, 195, 204, 209, *supra*).

17     227.  Every facet of FIGS' business was therefore aimed at selling core

18  scrubs to its customer base. During a November 5, 2021 interview with Tech

19  Thursday Podcast, Hasson expressly stated that "the number one thing is to make sure

20  FIGS is delivered to our healthcare professionals so we will do anything and

21  everything so that happens no matter what."[24]  To that end, Hasson and Spear were

22  directly involved in managing every aspect of selling FIGS' core scrubs to customers.

23     228.  Defendants admitted as much throughout the Class Period,

24  highlighting that, as a "founder-led" company, Hasson and Spear were deeply

25  involved in the Company's operations and had "deep institutional knowledge

26  ───────────────
[24]  Tech Thursday Podcast, *Tech Thursday Episode 8: Chat with Heather Hasson*

27  *About FIGS* (Nov. 5 , 2021), https://shows.acast.com/60a5e01cc3fa8f0012954d7a/

28  episodes/tech-thursday-episode-8-chat-with-heather-hasson-about-figs.

4875-0160-4700.v1

regarding all aspects of our Company." And as the Company explained, its "culture, strategic vision and operational execution are driven by [its] visionary co-founders and co-Chief Executive Officers, Heather Hasson and Trina Spear." Hasson and Spear were described as being "critical to the development of [FIGS's] business, future vision and strategic direction."

229. Spear and Hasson acknowledged the same publicly. For instance, in an August 12, 2021 interview with the *Los Angeles Times*, Spear recounted that she and Hasson "manage every single process" in their supply chain and noted that it "is a really, really important part of [their] business."[25] In line with this, Spear explained that FIGS had the ability to track where their products were in real time (*see* ¶63, *supra*; ¶238, *infra*).

230. Accordingly, Spear's and Hasson's admitted personal knowledge of, and involvement in, FIGS' core business is strong evidence that they both knew that the false statements detailed herein were materially false and misleading when made and/or were reckless in making those statements.

231. Given the importance of healthcare apparel to FIGS, and particularly the Company's core scrubs, the remaining Exchange Act Defendants can also be presumed to have knowledge of adverse facts related to FIGS' operations, supply chain, merchandising, and inventory management.

### 2. FIGS' Data Analytics and Access to Real Time Data Provided Defendants with Knowledge that Their Statements Were False and Misleading

232. Throughout the Class Period, FIGS sold its core scrubs to consumers through its DTC digital platform. This DTC model purportedly "differentiate[d]" the Company from other health care apparel manufacturers and "industry incumbents"

---

[25] Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times (Aug. 12, 2021), https://www.latimes.com/business/story/2021-08-12/figs-trina-spear-heather-sasson-interview.

because it allowed FIGS to collect data on its customers that it could then use to optimize its business. As the Company explained:

> Data is an essential and embedded capability throughout our organization. We have centralized Data Science and Data Engineering teams and decentralized Data Analysts working directly within each key functional area. This approach enables the harvesting and management of extensive data, the development of a suite of proprietary tools, and the direct and rapid application of data science in core operating activities and decision – making process throughout the company.

233. To that end, throughout the Class Period, the Exchange Act Defendants claimed that FIGS' "DTC Strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising, customer acquisition and retention, demand forecasting and inventory optimization." FIGS then used the extensive data it harvested "to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management, marketing and customer experience."

234. Indeed, the Exchange Act Defendants touted FIGS' supply chain data analytics in the IPO Offering Documents and throughout the Class Period, stating in relevant part:

> We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics). By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency.

- 75 -

235.    FIGS also purported to use "demographic, geographic and psychographic data . . . to reliably predict buying patterns," which the Company claimed "lead[s] to operational efficiencies throughout [its] supply chain [and] inventory management."  The Exchange Act Defendants represented throughout the Class Period that this customer data enabled FIGS to "manage purchasing and inventory effectively and efficiently," "to predict and anticipate demand for our products," and to utilize "customer and demand predictions . . . to anticipate optimal times for launch, including day of week and time of day."

236.    In a November 10, 2021 Earnings Call, Spear summed up the advantages that being a DTC company creates for forecasting, supply management, and launch scheduling, stating in relevant part:

> [FIGS is] a direct-to-consumer company.  Because of that, we're able to forecast even more accurately and further in advance because we have a direct relationship with our 1.7 million customers.  And we have all this data that helps us to know what product they need and when they need it.  This allows us to provide 12- to 18-month rolling forecasts to our suppliers, and it also means we could adjust our calendar and our launch schedule, if there is any delay.

237.    During the same earnings call, Spear expanded on the reasons FIGS had clear visibility into its supply chain.  Specifically, Spear emphasized the fact that FIGS was: (i) a uniform company; (ii) with a consistent fabrication and style profile; and (iii) using a DTC model that gave the Company advantages that, in her words, "allow us to be highly efficient from a production and supply chain standpoint and allow us to weather any macro challenges much better than other companies."

238.    Similarly, in a September 19, 2022 partnership video, Spear lauded FIGS' "incredible" partnership with the business Flexport, which provided the Company with real time data regarding the current status of each purchase order, its expected delivery, and the transport trajectory, stating in relevant part:

- 76 -

Through our partnership with Flexport, ***and it's been a number of years
now***, and it's been an incredible partnership.  We have this dedicated
account team, as well as dedicated ocean and air experts that have helped
us develop strategies, navigating, finding alternative routes, finding the
ways to get products to the people that need them.

*      *      *

What's really incredible about Flexport is the technology ***where we have
a real time platform to see, you know, where the products are at any
given time.  We have over a hundred active shipments, and so being
able to see where they are, and when they're going to arrive and where
they're going, is, you know, is incredibly important***.[26]

239.    The Exchange Act Defendants also had "real-time inventory
visibility"[27] through the Whiplash WMS for the inventory that the Company had on
hand at FIGS' sole fulfillment center as well as visibility into product performance
and real time sales metrics including, *inter alia*, gross sales, returns, starting and
ending inventory quantities, days of inventory on hand, and sell through rates, through
its Shopify e-commerce platform-based website.

240.    Moreover, FIGS' data capabilities were not simply talking points for
the Individual Exchange Act Defendants.  They were well attuned to and spoke in
great detail about the Company's supply chain and inventory management prior to the
IPO and throughout the Class Period.  *See, e.g.*, §III.D., *supra*.

241.    Defendants' access to data for each stage of their products' lifecycle,
which supposedly allowed them to predict demand, know inventory levels they had on
hand, and review FIGS' freight location in real-time, is strong evidence that the

---

[26]   Flexport, *FIGS | Flexport.org Impact Partner Spotlight*, YouTube (Sept. 19, 2022),
https://www.youtube.com/watch?v=Sz_vs5YpkRU.

[27]   RyderEcommerce by Whiplash, https://whiplash.com/capability/distribution/ (last
visited Mar. 29, 2023).

- 77 -

Exchange Act Defendants knew that the statements concerning demand, air freight, inventory, and the associated financial metrics detailed herein (*see* §III.D., *supra*) were materially false and misleading when made and/or were made with reckless disregard for the truth. On the other hand, if the Company did not have the ability to use data to manage every aspect of its products' lifecycles as the Exchange Act Defendants assured investors, then the Exchange Act Defendants' statements concerning these abilities were knowingly false and misleading.

### 3. Spear's and Turenshine's Admissions During FIGS' May 12, 2021 Earnings Call Reporting Q1 2022 Results Support Scienter

242. On March 8, 2022, with just three short weeks left before the end of Q1 2022, FIGS held an earnings call to address its Q4 and YE2021 results and discuss the current quarter and year ahead. With supply chain disruptions of key interest for analysts, Spear stated:

> *The fact that half of our revenues are seasonless, enables us to produce large volumes further in advance and hold greater quantities in our warehouse with almost no inventory risk compared to traditional apparel companies. These differentiators are incredibly important because as transit times fluctuate, freight rates rise and labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%.*

243. Spear doubled down during the question and answer portion of the call, reiterating the Company's ability to sidestep any supply chain or logistics landmines and meet previous guidance for the quarter and year: "Going into your second question, so yes, as we mentioned, *gross margin, we're seeing a lot of headwinds still feel really confident in our ability to be above 70-plus percent*."

- 78 -

244.   Similarly, in response to an analyst question about shipping and logistics pressures, Hasson promised the Company's planned product launch schedule would not be impacted:

[Nagel:] That's perfect.  Then my follow-up question, and I think we've discussed this in the past against the backdrop of the supply chain disruptions.  ***Are the product – are you pushing ahead with your normally planned product launches for '22?***

[Hasson:] ***Yes.  I mean I think one of the amazing things about how we've navigated the supply chain is that we get our products, we get them into our warehouse, and we get them to our customers***.  And you've seen that over the past 2 years.  I don't know another company that's navigated the supply chain challenge better than FIGS.  And you see that in the numbers, and it's a testament to this incredible team that we have here.

245.   Yet, when the Company disclosed results for Q1 2022 on May 12, 2022, a very different picture of the quarter emerged.  FIGS missed key projections for the quarter (*see* §III.E.1., *supra*; §III.G.3., *infra*), decreased guidance for the remainder of the year, and misleadingly blamed the setbacks, in large part, on the volatility in ocean shipping times and the resulting need to increasingly rely on air freight.

246.   The Company initially announced 2022 financial guidance, which consisted of net revenues between $550 and $560 million, gross margin of 70% or higher, and an adjusted EBITDA margin of 20% or higher, in its March 8, 2022 press release.  At that time, Q1 2022 was three weeks away from being complete, so Defendants could not have learned much more in the last three weeks of the quarter that they didn't already know on March 8, 2022.

247.   Indeed, Spear and Turenshine admitted as much during the May 12, 2022 Earnings Call.  Spear revealed that in "early March" the Company had "reduced

4875-0160-4700.v1

our visibility into when our products will arrive."  Spear also explained, "**supply chain disruptions have intensified significantly since the beginning of March**."

248.   Credit Suisse AG analyst Michael Charles Binetti noted during the earnings call that the Company "[m]ust have [had] a fairly significant downturn at the end of the quarter" given that revenues came in lower than the full quarter guidance provided just two months earlier.  When he asked for additional cadence around what FIGS saw through the quarter, Turenshine admitted the Company began to experience impacts in early March though she misleadingly attributed it to transit volatility, stating in relevant part:

We began to experience impacts on our business **in early March**.  We started to really see increased unreliability and volatility around transit times.  And the biggest impact for the quarter was a color launch that was planned for the end of the quarter that actually moved into Q2.  So that had the largest impact for what we saw in Q1.

249.   Moreover, as they reiterated throughout the Class Period, Spear and Hasson had access to data analytics that provided them with a current picture of their financial results for the quarter up to that point and data concerning where all of FIGS' products were in real time.

250.   Analysts picked up on the suspicious timing of the supposed Q1 freight issues and FIGS' failure to guide on the issues at the time of the March 8, 2022 Earnings Call.  For example, Morgan Stanley doubted Defendants' explanations for the Q1 miss and decreased guidance for Q2 and full year.  As it explained in its May 13, 2022 report titled "Bruised: Lower PT to $12," Morgan Stanley stated "FIGS provided guidance on March 8th with ~3 weeks of the quarter left to go and we would have expected management to have visibility into inventory availability."  Blaming the miss and decreased guidance on supply chain issues also ran counter to what Morgan Stanley was hearing from others, with generally "improving, not worsening, supply chain and freight commentary since late March."  In no uncertain terms,

4875-0160-4700.v1

Morgan Stanley explained "[w]hile management claims the lower revenue outlook is entirely supply chain driven (late deliveries and out of stocks), we believe there is more at play here."

### 4. Defendants Profited Handsomely from Their False and Misleading Statements

#### a. Hasson and Spear Received Considerable Increases in Compensation and Equity Awards from the IPO

251.   Prior to the IPO, Hasson and Spear amassed significant equity in the Company in the form of RSUs and stock options.  Hasson and Spear were each granted RSU awards covering 300,580 shares of FIGS' common stock on June 26, 2020, and stock options covering 1,137,340 shares of FIGS' common stock on September 16, 2020.

252.   In connection with the IPO, Hasson's outstanding stock options, including from the September 16, 2020 issuance, were approved for accelerated vesting.

253.   Additionally, Hasson and Spear each entered into amended and restated employment agreements in connection with the Company's IPO wherein each founder received $7,500,500 in nonqualified stock options and $2,500,000 in RSUs, both of which would be based on the IPO price.

254.   Pursuant to their respective Amended and Restated Employment Agreements, Hasson and Spear would each also receive a $350,000 increase in annual salary from $650,000 to $1,000,000.

#### b. The Lock-Up Provisions Pursuant to the IPO Motivated Defendants to Inflate the Stock Price

255.   FIGS' IPO included a lock-up agreement with the underwriters that would prevent directors, officers, and substantial stockholders from selling stock for 180 days or the day after FIGS released two quarterly financial results, whichever

- 81 -

1   came first.  The expiration of the lock-up would have been in late November 2021,

2   and not until after FIGS's November 10, 2021 quarterly earnings release.

3       256.  An exception to the lock-up for up to 15% of the aggregate number of

4   shares owned by each of FIGS' directors, officers, and substantial stockholders,

5   including Hasson and Spear, occurred if FIGS' stock price appreciated.  Specifically,

6   the exception took effect on the third trading day following the date that FIGS Class A

7   common stock traded at least 33% greater than the IPO price for at least 10 trading

8   days in any 15-day consecutive trading day period.  Because only Tulco and Tull and,

9   to a much lesser extent, the Company profited from the IPO, Spear and Hasson were

10  keen to meet the early exception to the lock-up prior to the planned November 10,

11  2021 financial results release.

12      257.  Accordingly, Hasson and Spear were motivated to issue the false and

13  misleading statements in the IPO Offering Documents and throughout the Class

14  Period to boost FIGS' stock price and trigger the exception to the lock-up agreement.

15      258.  Hasson and Spear took their first opportunity to off-load FIGS stock in

16  connection with the SPO where Hasson sold almost 15% of her holdings (the most

17  that she was permitted to sell), and Spear sold nearly 9% of her holdings.  Tulco and

18  Tull sold another 10% of their holdings in the SPO.

19
20
21
    **c.**    **The Individual Defendants' Motivation to Take FIGS Public and Benefit from Massive Insider Trading Further Supports a Strong Inference of Scienter**

22      259.  Defendants were motivated to engage in their fraudulent course of

23  conduct to allow Hasson, Spear, Tulco, and Tull to sell shares of their FIGS common

24  stock at inflated prices, which yielded them nearly a billion dollars during the Class

25  Period:

26
27
28

4875-0160-4700.v1

| Defendant(s) | Date of Sale(s) | Number of Shares | Price | Proceeds |
|---|---|---|---|---|
| Hasson | 20-Sep-21 | 2,419,998 | $40.25 | $97,404,920 |
| | 15-Nov-21 | 75,164 | $34.29 | $2,577,374 |
| | 29-Nov-21 | 2,904 | $32.79 | $95,222 |
| | 2-Dec-21 | 71,292 | $30.60 | $2,181,535 |
| **Total** | | **2,569,358** | | **$102,259,051** |
| | | | | |
| Spear | 20-Sep-21 | 1,468,324 | $40.25 | $59,100,041 |
| | 15-Nov-21 | 89,060 | $34.29 | $3,053,867 |
| | 29-Nov-21 | 3,540 | $32.79 | $116,077 |
| | 2-Dec-21 | 84,889 | $30.60 | $2,597,603 |
| **Total** | | **1,645,813** | | **$64,867,588** |
| | | | | |
| Tulco and Tull | 1-Jun-21 | 25,707,953 | $22.00 | $565,574,966 |
| | 20-Sep-21 | 6,366,670 | $40.25 | $256,258,468 |
| **Total** | | **32,074,623** | | **$821,833,434** |

260. The highly suspicious amounts and timing of Tulco's, Tull's, Hasson's, and Spear's insider trading supports a strong inference that they timed their respective trading with knowledge of the alleged fraud and intended to benefit from FIGS' artificially inflated trading price before the market understood the truth of FIGS' inventory and supply chain issues.

261. Tulco and Tull benefitted the most, selling over 25 million FIGS shares in the IPO, which represented nearly 30% of Tulco's FIGS stock, in the IPO for over $565 million in proceeds. The $565 million represented 82.5% of the IPO proceeds, leaving the Company with only $95 million, before paying underwriting fees, from the IPO to operate FIGS going forward.

262. Tulco and Tull offloaded FIGS stock again three months later in the SPO. This time Tulco and Tull sold over six million shares, more than 10% of its holdings, at close to the stock's all-time high price, receiving more than $255,000,000 in proceeds. The September trades were made with only ten days remaining in the Company's fiscal Q3 2021. The third quarter results were later announced on November 10, 2021, and caused the first stock drop related to the false and misleading statements.

263.   On March 21, 2022, Tulco and Tull distributed the remaining FIGS stock to its members in-kind on a pro-rata basis.  Tulco distributed 27,426,398 shares to Tull and 3,147,432 shares to Willhite, around 47.2% and 5.4% respectively of Tulco's 58,000,932 shares.  As such, Tull's pro-rata share of Tulco's Class Period stock sales was around $386,000,000 and Willhite's pro-rata share was around $44,000,000.

264.   Hasson and Spear made their transactions on the same dates during the Class Period.  Not only are the extraordinary proceeds from their sales suspicious, but the percentage of shares sold in the SPO and the timing of their final three sales are highly suspicious.  On September 20, 2021, Hasson sold nearly 15% of her FIGS holdings and Spear sold nearly 9% of her FIGS holdings pursuant to the SPO. According to the IPO lock-up provisions, each was only permitted to sell a maximum of 15% of their shares.  Hasson collected over $97,000,000 and Spear collected nearly $60,000,000 in proceeds.  Both Hasson and Spear continued to offload shares prior to the December 9, 2021 announcement that CFO Lawrence was abruptly leaving the Company prior to completing the year-end financials.

265.   The timing of Lawrence's departure was a complete shock to the market and caused FIGS shares to drop over 23% on December 10, 2021.  Less than a month prior to the announcement, Hasson and Spear each made three separate sales of FIGS stock, one of which was merely a week prior to the announcement.   On November 15, 2021, Hasson and Spear sold over $2,500,000 and $3,000,000 in FIGS stock, respectively.  On November 29, 2021, Hasson and Spear sold over $95,000 and $116,000, respectively.   And on December 2, 2021, less than a week prior to announcing Lawrence's departure and the stock dropping over 23%, Hasson sold over $2,000,000 and Spear sold over $2,500,000 in FIGS stock.

266.   Subsequent to offloading nearly a billion dollars in FIGS stock by December 2021, none of the Defendants sold another share of stock during the Class

- 84 -

Period while the stock was declining.  Tulco's and Tull's last sale was in the SPO and Hasson's and Spear's final Class Period sales were on December 2, 2021.

**5.  Executive Departures and Turnover Support a Strong Inference of Scienter**

**a.  Lawrence's Rapid Departure from FIGS Shortly After the IPO and SPO Further Supports an Inference of Scienter**

267.   Seven short months after FIGS went public, and less than a year after he joined the Company, Lawrence departed.  The departure was highly unusual for a number of reasons.  Most significantly, Lawrence walked away from a significant amount of FIGS stock that would have vested on his one-year anniversary with the Company (*i.e.*, on December 31, 2021 – just a week after his December 24, 2021 departure).

268.   In connection with beginning his employment with FIGS, Lawrence was granted a stock option for 2,047,212 shares that vested over a four-year period at an exercise price of $6.03 per share.  The agreement provided that 25% (or 511,803) shares would vest on the first anniversary of Lawrence's start date.

269.   In exchange for executing a non-compete agreement and a release of claims, Lawrence received, among other things, slightly more than half of the shares, as well as 12 months of continued salary payment and COBRA benefits.   The Company's December 10, 2021 Form 8-K disclosing Lawrence's departure stated as follows:

The Company anticipates that Mr. Lawrence will be eligible to receive severance payments and benefits in accordance with the terms of his existing offer letter with the Company, subject to his timely execution and non-revocation of a release of claims in the Company's favor, including: (i) continued payment of base salary for twelve (12) months following the date of termination; and (ii) up to twelve (12) months of Company-paid COBRA continuation.  In connection with

4875-0160-4700.v1

his departure from the Company, Mr. Lawrence also entered into an agreement with the Company containing a non-competition provision, in exchange for (i) the accelerated vesting and exercisability of 275,000 shares of the Company's Class A common stock subject to the stock option granted to Mr. Lawrence in December 2020 and (ii) the extension of the exercise period of Mr. Lawrence's outstanding stock options to the first anniversary of the Effective Date.

270.   By leaving when he did, Lawrence left 236,803 shares on the table – valued at a premium over the exercise price and totaling $5,965,067.57.

271.   Though he previously explained, in connection with the commencement of his employment with the Company, that "[i]t was going to take something really special to get me back in the chair relatively quickly," Lawrence determined almost as quickly that FIGS was not it.   The peculiar timing of the departure was not lost on the investing public, who punished the stock, causing it to plummet from a closing price of $31.22 on December 9, 2021 to $24.65 on December 10, 2021 (*see* ¶¶120-124, *supra*; ¶¶287-294, *infra*).

272.   Similarly, analysts were "surprised with the timing of the early retirement" and commented that it "happened much sooner than we anticipated." Cowen, for one, noted: "The surprise departure of Jeff Lawrence raises uncertainty into next year."

**b.   Varelas' Unexplained Resignation from the FIGS' Board Supports a Strong Inference of Scienter**

273.   Varelas joined FIGS' Board in connection with the Company's IPO. He served as: (i) the lead independent director on FIGS' Board; (ii) Chair of the Audit Committee; (iii) a member of the Compensation Committee; and (iv) a member of the Nominating and Governance Committee.

274.   Varelas' term was set to expire after the Company's third annual meeting of stockholders (*i.e.*, 2024).   On August 8, 2021, only days before the Company issued its first financial results as a publicly traded company, Varelas abruptly resigned from the Board, effective immediately.   Varelas' quick departure supports a strong inference of scienter.

### c.   Hasson's Abrupt Resignation from Her Position as Co-CEO as the Truth of the Fraud Was Revealed Supports a Strong Inference of Scienter

275.   On August 4, 2022, FIGS issued a press release, concurrently filed with the SEC on Form 8-K, announcing that Hasson resigned as co-CEO and co-principal executive officer of the Company as of August 2, 2022.   The Company further stated that the Board "appointed" Hasson as Executive Chair of the Board effective August 4, 2022.

276.   In an earnings call held that same day, Spear fielded a question from Piper Sandler analyst Ed Yruma about Hasson's resignation, emphasizing that the change in leadership would be "a great thing for the Company" and "provide a lot of clarity," as follows:

In terms of Heather and myself, Heather has always been incredibly – really an expert of – product genius, creative genius.   This is really where she adds the most value.   She's going to really focus on product innovation, and I'm going to be focused on the strategic direction and overseeing the day-to-day operations of the business.

*I think this is a great thing for the company.   I do, to your point, think it's going to allow us to move very quickly, being nimble and provide a lot of clarity, both internally and externally*.

277.   This statement by Spear was in stark contrast to the way Spear and Hasson described their co-CEO arrangement earlier in the Class Period.   For example, in an interview conducted by the *Los Angeles Times* published in August 2021,

4875-0160-4700.v1

Hasson stated: "I believe that having two at the helm, you're able to run a lot faster, you're able to be more efficient. And you're also able to home [sic] in on certain things. Like if I'm not doing something, Trina could just jump in there. I don't have to do it, and vice versa."[28]

278. Hasson's departure as the truth regarding Defendants' fraud was unraveling supports a strong inference of scienter.

### d. Extremely High Executive and Employee Turnover Rates Support a Strong Inference of Scienter

279. The Company experienced an unusually high degree of employee turnover, including executive turnover, throughout the Class Period. Interviews conducted by Spruce Point Capital Management ("Spruce Point") confirm high turnover rates. One former executive interviewed by Spruce Point reported that while she was there "we started building out this VP level of the organization below Trina and Heather. A CFO. A VP of Customer Experience from Fashion Nova. A VP of Product, all of them totally normal and capable people. None of them lasted a year."

280. Employee reviews on Glassdoor likewise affirm high turnover rates. A February 16, 2023 one-star review by a former employee states: "[a]nyone with any real talent and backbone leaves this [company] in 1 year maximum." Multiple reviews, including reviews posted on July 27, 2022, May 23, 2022, and July 8, 2020 called the company a "revolving door." One June 27, 2022 review states, "[h]igh turnover just go to LinkedIn to see new CBO every 8 months, lack of direction. Not a family don't believe the cool aid they try to sell you on." Even a 4-star review posted on June 29, 2022 by a then-current employee observed that "[s]ome departments are extremely chaotic and experience heavy turnover (even with leadership)." And as far

---

[28] Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times (Aug. 12, 2021), https://www.latimes.com/business/story/2021-08-12/figs-trina-spear-heather-sasson-interview.

back as June 13, 2019, a reviewer posted: "I've never been at a company that has experienced so much turn over.  Turn over [*sic*] says it all.  Since I've been here, I think we've turned over about a fourth of the workforce.  Our product team has been dismantled. Our finance team barely exists at this point.  Customer service and production have seen several rounds of terminations – not sure if they were voluntary."

281.   The high degree of employee turnover, particularly amongst executives, supports a strong inference of scienter.

## G.   LOSS CAUSATION AND ECONOMIC LOSS

282.   As detailed herein, during the Class Period, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of FIGS' Class A common stock.  This scheme operated as a fraud or deceit on Class Period purchasers of FIGS' Class A common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When the Exchange Act Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of FIGS' Class A common stock declined significantly as the prior artificial inflation came out of the price of FIGS' Class A common stock.

283.   By concealing from investors the adverse facts detailed herein, the Exchange Act Defendants presented a misleading picture of FIGS' business, prospects, and operations.  The Exchange Act Defendants' false and misleading statements had the intended effect and caused FIGS Class A common stock to trade at artificially inflated levels throughout the Class Period, from a debut price of $22 per share and a Class Period high of $50.10 per share on June 30, 2021, FIGS stock fell to a closing price of $6.76 per share on March 1, 2023, representing a nearly 70% drop from the IPO price and an 86.5% from its most inflated point.

4875-0160-4700.v1

284.   As a result of their purchases of FIGS' Class A common stock at artificially inflated prices during the Class Period, Plaintiffs and the other members of the Exchange Act Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

285.   Each time the truth about the Company was revealed to the market, the price of FIGS' Class A common stock fell significantly.  The declines began to remove the inflation from the price of FIGS' Class A common stock, causing real economic loss to investors who had purchased FIGS' Class A common stock during the Class Period.  The declines in the price of FIGS' Class A common stock when the corrective disclosures came to light were a direct result of the nature and extent of the Exchange Act Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in FIGS' Class A common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Exchange Act Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

286.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Exchange Act Class was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of FIGS' Class A common stock and the subsequent significant decline in the value of these Class A common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### 1.   November 10, 2021 Partial Corrective Disclosure

287.   On November 10, 2021, FIGS filed a Form 8-K announcing its financial results for the three and nine months ended September 30, 2021, in which the Company raised its 2021 full year net revenues outlook to $410 million, compared to its previous outlook of $395 million.  The third quarter Form 8-K announced that the

4875-0160-4700.v1

1  Company would be holding an earnings conference call that same day ("Q3 2021

2  Earnings Call").

3      288.   Notwithstanding the Company's increase in guidance, FIGS revealed

4  information during the Q3 2021 Earnings Call that partially corrected the Exchange

5  Act Defendants' repeated material misrepresentations and omissions concerning

6  FIGS' ability to: (i) manage and mitigate impacts to its supply chain; and (ii) predict

7  and meet customer demand (*see* ¶¶175-192, *supra*).  Specifically, FIGS revealed that

8  it anticipated "significant[] impact[s] [to FIGS'] gross margin for Q4" based on a

9  "proactive[] . . . decision to air freight more goods during Q4."

10      289.   Lawrence nevertheless attempted to downplay the impacts by limiting

11  the Q4 financial impact to "approximately $8 million to $10 million in air freight" and

12  further representing that the Company "anticipate[d] more favorable shipping

13  dynamics as [it] enter[ed] 2022."

14      290.   In response to a question from analyst Lorraine Corrine Maikis

15  Hutchinson of BofA Securities regarding whether the $8 million to $10 million would

16  be the run rate moving into 2022, Spear echoed Lawrence, stating in relevant part:

17      I mean, ***we really don't see that at all as a run rate and this is a***

18      ***transitory strategic decision that we've made***.  So going into 2022, we

19      are doing a lot on our end to navigate this.  And it's not just that we see

20      the world opening up and the supply chain pressures easing, also, we've

21      made very big moves in terms of bringing in more inventory earlier.

22      291.   In response to this news, the price of FIGS Class A common stock

23  declined by $4.88 per share, or over 12%, from a closing price of $38.98 per share on

24  November 10, 2021, to a closing price of $34.10 per share on November 11, 2021, on

25  unusually high trading volume.  In comparison, on the same day, the CRSP Total

26  Market Index increased 0.16% and the S&P 500 Apparel, Accessories and Luxury

27  Goods Index increased 1.55%.

28

4875-0160-4700.v1

1    292.   The news was only a partial disclosure of the fraud because Lawrence

2  and Spear continued efforts to downplay the impact of increased air freight. Moreover,

3  these efforts were designed to and did assuage analyst and investors' concerns.

4    293.   Barclays, for instance, published a report titled "3Q21 Earnings

5  Results: Brand Strength and Demand Remain Robust; Reiterate OW" the following

6  day wherein it echoed Lawrence and Spear's representation that reliance on air freight

7  would be short term, stating in relevant part:

8    ***Demand increasing above initial FY21 plan even as near-term***

9    ***air freight pressures 4Q margins****. . . .*  We note the company raised its

10    demand forecast for 4Q21 and is only turning to air freight in order to

11    meet this demand.  We expect freight headwinds to subside in 1H22 and

12    in our opinion reverse in 2H22.  Despite the intense air freight pressure

13    to meet higher-than-expected demand, what is most important is the

14    underlying growth in brand awareness among healthcare workers.

15    294.   Rather than only utilizing air freight to "meet higher-than-expected

16  demand," unbeknownst to investors, the Exchange Act Defendants abandoned their

17  purportedly data-driven predictive inventory plans and core product strategy, and were

18  using air freight as a routine method of operations to compensate for the inability to

19  properly predict demand trends and efficiently operate FIGS' supply chain.

20          **2.    December 10, 2021 Partial Corrective Disclosure**

21    295.   With the pre-IPO pivot away from its core products strategy

22  supposedly anchored by data driven forecasts, FIGS' inventory had extended from

23  160 days outstanding to an average of 216 days outstanding in the short time

24  Lawrence served as the Company's CFO.  Lawrence further observed that FIGS'

25  mounting inventory was on track to exceed the Company's net sales.  On December

26  10, 2021, before the market opened, FIGS announced that Lawrence would be

27  resigning effective December 24, 2021, less than one year after becoming CFO.

28

4875-0160-4700.v1

296.    In response to this news, the price of FIGS stock declined by $6.57 per share, or over 21%, from a closing price of $31.22 per share on December 9, 2021, to a closing price $24.65 per share on December 10, 2021, on unusually high trading volume.  In comparison, the same day, the CRSP Total Market Index increased 0.71% and the S&P 500 Apparel, Accessories and Luxury Goods Index decreased only 0.19%.

297.    To stave off any investor concern around Lawrence's abrupt departure, FIGS emphasized that his retirement was "mutually agreeable" and reaffirmed guidance in private discussions with analysts.  For instance, on December 10, 2021, Barclays published a report titled "Surprise Retirement of CFO Jeff Lawrence" emphasizing surprise around the timing of his departure but reiterating assurances by FIGS' management that it was amicable, stating in relevant part:

> While we knew there would ultimately be a transition of the CFO role in the future, we are surprised with the timing of the early retirement of Jeff Lawrence effective 12/24/21.  Upon speaking with management, it is clear that the decision was mutually agreeable, albeit earlier than expected, with compensation for Mr. Lawrence's contribution to FIGS (12 month salary & accelerated vesting of shares).

298.    On December 10, 2021, Piper Sandler published a report titled "Shares in Penalty Box Following Sooner-Than-Expected CFO Departure," similarly emphasizing the abrupt nature of Lawrence's departure and intimating that there were discussions of whether the departure was linked to financial reporting or guidance:

> While we believe transition was the long-term plan of the company, it has happened *much sooner* than we anticipated.  Having talked with coCEO Trina Spear, we took away three key messages: 1) his retirement is not a result of any disagreement related to matters of financial reporting or operations; 2) [management] remains comfortable with the FY21 guidance . . . .

- 93 -

299.   The Company's denial that its CFO's departure was linked to disagreements related to financial reporting or guidance maintained artificial inflation in the stock.  Despite characterizing Lawrence's departure as a "retirement" in the Form 8-K filed on December 10, 2021, Lawrence in fact assumed another position at a different company in August 2022 and, as of the date of this filing, is continuing to work.

### 3.   May 12, 2022 Partial Corrective Disclosure

300.   On May 12, 2022, after the market closed, FIGS issued a press release announcing disappointing financial results for the first quarter of 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The press release revealed that FIGS' gross margin was 71.2%, which represented a 0.4% year-over-year decrease.  The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates."

301.   The press release also revealed that FIGS slashed its expected net revenues, gross margin, and Adjusted EBITDA margin despite having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 Earnings Call.  The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to $530 million based purportedly on "supply chain challenges and broader macroeconomic factors, including high inflation and shifts in consumer spending patterns."  The Company also lowered 2022 gross margins from 70% or over to 67 to 68%, "primarily due to a significant increase in the Company's use of air freight *to help mitigate supply chain challenges*."  While Adjusted EBITDA margin was previously expected to be upwards of 20%, the Company adjusted its expectations to 16 to 18%.

302.   During the Company's earnings call that same day, Spear revealed that the Company lacked the visibility into inventory management that they professed to have, which resulted in the expensive air freight of less in-demand products while new

- 94 -

1   color launches and stocked out styles remained on ocean freight, stating in relevant
2   part:

> Now I'd like to share more about what we're seeing with our supply chain and customers since we last spoke to you in early March. As you may remember, beginning in Q3 of 2021, *we began implementing mitigation strategies to help us get ahead of port congestion and longer transit time. We adjusted our transit time assumption, increased our weeks of supply for our core colors – our core styles and core colors, and when necessary, utilized additional air freight. We built our 2022 plan based on these mitigation strategies and believe we were positioned well to navigate these challenges effectively.* We also expect to have less reliance on air freight in 2022 than we had, had at the end of 2021.

> However, since early March, we've seen an intense and persistent surge in the volatility of ocean transit times for receiving our products, largely due to vessels being unexpectedly rerouted by carriers while in transit. Shipping times began to vary, ranging from as fast as 30 days to upwards of 120 days, and it's difficult to see this unpredictability ending soon. The lack of reliability has – it reduced our visibility into when our products will arrive, and without predictability, we are less able to mitigate these issues with longer lead times alone.

> This has impacted our ability to keep core products in stock and execute our color and product drops that fuel our growth. As a result, our Q1 revenue growth was lower than expected as we had to shift the planned color launch out of the quarter, and we're limited in our ability to keep in stock 2 of our most popular core franchise styles.

303.   Credit Suisse AG analyst Michael Charles Binetti noted during the earnings call that the Company "[m]ust have [had] a fairly significant downturn at the

4875-0160-4700.v1

1    end of the quarter" given that revenues came in lower than the full quarter guidance

2    provided just two months earlier.  When he asked for additional cadence around what

3    FIGS saw through the quarter, Turenshine admitted the Company began to experience

4    impacts in early March, stating in relevant part:

5        We began to experience impacts on our business in early March.  We

6        started to really see increased unreliability and volatility around transit

7        times.  And the biggest impact for the quarter was a color launch that

8        was planned for the end of the quarter that actually moved into Q2.  So

9        that had the largest impact for what we saw in Q1.

10        304.   Worse, even though the Exchange Act Defendants knew that these

11    impacts were occurring in early March, on the March 8, 2022 Earnings Call, Hasson

12    assured investors the Company could navigate supply chain issues and would not

13    move any planned product launches:

14        [Nagel:] That's perfect.  Then my follow up question, and I think we've

15        discussed this in the past against the backdrop of the supply chain

16        disruptions.  Are the product – are you pushing ahead with your

17        normally planned product launches for '22?

18        [Hasson:] Yes.  I mean I think one of the amazing things about how

19        we've navigated the supply chain is that we get our products, we get

20        them into our warehouse, and we get them to our customers.  And

21        you've seen that over the past 2 years.  I don't know another company

22        that's navigated the supply chain challenge better than FIGS.

23        305.   On the May 12, 2022 Earnings Call, despite the fact that Q1 2022 was

24    nearly over when Hasson assured investors that the Company was moving forward

25    with product launches as planned, Turenshine blamed the Q1 results on the supply

26    chain:

27        Yes.  So as it relates to what we saw with the color launch and

28        supply chain in the first quarter, a couple of factors for supply chain

- 96 -

1  challenges in the first quarter, the first of which was the color launch that
2  moved out.  But we were also out of stock on some of our key core
3  franchises like our high-waisted Zamora and Yola.  And so I'm not
4  giving exact numbers, but the majority of the impact that we saw in the
5  first quarter was related to the supply chain challenges.  And we do
6  believe that the macroeconomic factors were impacting us to a lesser
7  extent, and that's what we expect to see in our full year outlook and how
8  we're modeling it in our full year outlook.

9  306.   In response to this news, the price of FIGS stock declined by $3.21 per
10  share, or nearly 25%, from a closing price of $12.85 per share on May 12, 2022, to a
11  closing price of $9.64 per share on May 13, 2022, on unusually high trading volume.
12  In comparison, on the same day the CRSP Total Market Index increased 2.67% and
13  the S&P 500 Apparel, Accessories and Luxury Goods Index increased 2.61%.

14  307.   FIGS' stock remained artificially inflated because the Exchange Act
15  Defendants failed to fully disclose the Company's inability to forecast demand and
16  control inventories, particularly in light of Defendants' risky decision to deviate from
17  the Company's core products strategy.

18  308.   Indeed, analysts continued to be misled by the extent and magnitude of
19  the Exchange Act Defendants' false and misleading assertions.  For instance, in its
20  May 13, 2022 report, titled "Shaky Start to 2022," Credit Suisse cited FIGS' core
21  strategy for why it "remain[ed] positive," stating in relevant part:

22  **Why We Remain Positive**: Backing up, FIGS is still a highly
23  differentiated "disruptor" with low market share (~4%) and strong
24  consumer awareness momentum to fuel strong growth for several years
25  despite 2 major supply chain missteps in the last 3 quarters.  ***The
26  category is solid – with structural job growth, solid/predictable
27  replacement cycles, and less sensitivity to fashion cycles that should
28  offer better stability if FIGS can stabilize its supply chain and generate***

- 97 -

*buy in that its medium-term targets are conservative.* . . . While we lower our target multiple, we maintain our Outperform rating on our view that ***FIGS should still be able to grow profitably for several years once current supply chain headwinds abate***.

### 4.    February 28, 2023 Final Corrective Disclosure

309.    On February 28, 2023, FIGS filed its Annual Report on Form 10-K for the year ended December 31, 2022.  In the Form 10-K, the Company wrote: "[W]e also continued to experience elevated inventory on hand, as a result of improvements in ocean transit times *and sales below our expectations earlier in the year, which in turn resulted in increased costs associated with storing such inventory*."   The Company also issued a press release that day, announcing disappointing financial results for the fourth quarter and full year 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The FY2022 PR revealed FIGS' 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year-over-year with Q4 2021 and 9.1% compared year-over-year with FY2022.  FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment increase.  Additionally, the Company revealed on its balance sheet that its net inventory had exploded from $86 million to $177 million year-over-year.  The FY2022 PR further revealed a dismal financial outlook for 2023 with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11-12%.

310.    In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023, on unusually high trading volume.  In comparison, on the same day, the CRSP Total Market Index declined only 0.40% and the S&P 500 Apparel, Accessories and Luxury Goods Index decreased only 0.12%.

- 98 -

311.   Analysts reacted negatively to FIGS' massive inventory stockpile and the anticipated length of time that the Company projected it would take to sell-through.   For instance, in its February 28, 2023 report, titled "2023 Guide Overshadows 4Q Beat, Inflection Pushed to 2024," Credit Suisse expressed its "disappoint[ment] with FIGS' inventory management" and balked, "given the very basic nature of the core category," at FIGS' expectation that resolving the inventory backlog would take a full year, stating in relevant part:

> We're disappointed with FIGS' inventory management *(given FIGS had significant time to adjust to slowing order frequency metrics).  And we're disappointed that FIGS still plans to end 2023 with ~25 weeks of supply vs 16-20 normalized target range*.  While the company thinks inventory will peak in 1Q, we're disappointed a full year will go by without inventories being back to normal (particularly given the very basic nature of the core category.

312.   Similarly, in its March 1, 2023 report, titled "4Q22 Earnings Review: 2023 Growth Algorithm Breaks Down," Barclays echoed that FIGS' "[e]xcess[ive] inventory may take the majority of the year to clear through" and further noted that the sizeable inventory ran "counter-cycle to the vast majority of the retail sector," stating in relevant part:

> FIGS embarks on a "corrective transition year" as growth story breaks down.  We see further potential risk to sales and margin drivers.  *FIGS's growth algorithm has broken down beginning last quarter, as sales trends in early 4Q22 dropped off considerably against a backdrop of worsening inventory (which is counter-cycle to the vast majority of the retail sector)*.  Slowing demand, poor reception to color newness, slowing core product turns, and end-of-quarter inventory +107% y/y all point to 2023 as a "corrective transition year" with lack of visibility on the what the FIGS model looks like in a post-COVID world.  *Our*

- 99 -

4875-0160-4700.v1

*primary concerns remain: 1) increasing Customer Acquisition Costs (CAC); 2) longer replenishment cycles; 3) "crowding out" of the consumer wallet by inflationary pressure; 4) the need for heightened promos; and 5) inventory levels that may take several quarters to a year to right size*. Sales growth in 4Q22 of 13% is projected to fall to low-single-digit growth in 1Q23 before accelerating modestly to mid-single-digit growth for all of FY23.

\*      \*      \*

*Excess inventory may take the majority of the year to clear through. Inventory remains elevated (up over 100% y/y) with need for promotions.  Absolute inventory on the balance sheet came in $178 million at the end of 4Q22.  Based on our proprietary inventory analysis, FIGS has posted five consecutive quarters of negative sales-to-inventory growth*.  In FY4Q22, the Inventory Management Spread was (11007) basis points and worsened from (9929) basis points in the prior quarter.  4Q22 sales growth was +13% versus average inventory growth +123%.  FIGS's GMROI has worsened for five consecutive quarters, and its OMROI has worsened for four consecutive quarters.

313.  BofA Securities emphasized that FIGS' "[l]ackluster guidance disappoints despite a sales beat" in its March 1, 2023 report, titled "Customer purchasing patterns change with challenging macro backdrop."  The report expressly cited FIGS "[o]verhang on costs from inv[entory]," stating in relevant part:

Overhang on costs from inv; continuing to invest for LT

GM declined 170bp to 68.2% reflecting higher promotions and product mix shift, higher ocean freight costs, partly offset by lower air usage. Inventory was up 107% exiting the quarter; the composition includes 60% basics and 15% new launches, *but the overage is expensive to manage and clear: extra warehousing costs required to*

4875-0160-4700.v1

1     *house excess inventory will be a 250/180bp headwind in 1Q/2Q23.*

2     *Mgmt sees 2023 as an investment year* and continues to invest for LT

3     growth: new fabric and technological uses will result in launches in

4     2024. Mgmt plans for slight G&A deleverage in F23 given investments

5     in software, personnel, resources, and international growth. There will

6     also be $16-18mn (400-500bpE of pressure per quarter) of investments

7     in 2H23-1H24 in warehousing and efficiencies. We model GM -200bp

8     to 68.1% in F23.

9        314.  Morgan Stanley questioned whether FIGS had "Spoiled?" in its March

10  1, 2023 report and further suggested that more than macro issues were at play for the

11  Company's inventory surplus, stating in relevant part:

12     While we think there is some conservatism embedded in the guide, and

13     we expected 1Q to be the weakest of the year, *the implied revenue*

14     *growth and margin deterioration through the remainder as the year*

15     *(especially as compares ease), suggests to us there may be more than*

16     *'COVID give back' and macro issues at play*. The inventory overhang

17     and strategy is most concerning to us, with inventory +107% y/y at the

18     end of 4Q vs. the +LSD 1Q and +MSD FY23 revenue growth guidance.

19     Although FIGS has less obsolescence risk than a traditional apparel

20     retailer, ~40% of this inventory is in non-core scrub styles and colors

21     that will require higher discounting rates in order to clear through, likely

22     pressuring gross margin through the course of the year. *But we also*

23     *worry the magnitude of core style/core color inventory relative to the*

24     *level of demand FIGS is currently seeing is also at risk of markdowns,*

25     *as we've already seen FIGS run 20% off core styles in 1QTD*.

26     *Where to Go From Here?: FIGS is now squarely a show-me*

27     *story. Management needs to regain investor confidence which could*

28     *take several quarters. Additionally, we question whether or not FIGS*

*needs a multi-year investment cycle to right size the infrastructure and talent for the size of the company that FIGS has grown into over the last three years*.  We previously thought the normalized top-line growth rate of the business was mid-teens to 20% at a high teens to 20% EBITDA margin . . . but now believe it may be low- to mid-teens at a mid-teens margin.  We stay Equal-weight on a wide range of potential outcomes from here, but see a negative risk/reward skew as we find it difficult to turn more constructive until FIGS works through its inventory overhang.

## H.   PRESUMPTION OF RELIANCE

315.   At all relevant times, the market for FIGS Class A common stock was an efficient market for the following reasons, among others:

(a)   FIGS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)   as a regulated issuer, FIGS filed periodic public reports with the SEC and the NYSE;

(c)   FIGS regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   FIGS was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

316.   As a result of the foregoing, the market for FIGS common stock promptly digested current information regarding FIGS from all publicly available

- 102 -

1   sources and reflected such information in the price of FIGS common stock.  Under

2   these circumstances, all purchasers of FIGS common stock during the Class Period

3   suffered similar injury through their purchase of common stock at artificially inflated

4   prices and a presumption of reliance applies.

5        317.   A Class-wide presumption of reliance is also appropriate in this action

6   under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406

7   U.S. 128 (1972), because the Exchange Act Class' claims are, in large part, grounded

8   on the Exchange Act Defendants' material misstatements and/or omissions.  Because

9   this action involves the Exchange Act Defendants' failure to disclose material adverse

10  information regarding the Company's business operations and financial prospects –

11  information that the Exchange Act Defendants were obligated to disclose – positive

12  proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts

13  withheld be material in the sense that a reasonable investor might have considered

14  them important in making investment decisions.  Given the importance of the Class

15  Period material misstatements and omissions set forth above, that requirement is

16  satisfied here.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against the Exchange Act Defendants

18       318.   Plaintiffs repeat and reallege each and every allegation contained

above as if fully set forth herein.

22       319.   During the Class Period, the Exchange Act Defendants named herein

employed a scheme to defraud and disseminated or approved the materially false and

misleading statements specified above, which they knew or deliberately disregarded

were misleading in that they contained misrepresentations and failed to disclose

material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading.

320.   The Exchange Act Defendants knowingly and recklessly made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, thereby inflating the price of FIGS common stock during the Class Period.

321.   In addition, the Founder Defendants and the Tulco Defendants: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of FIGS common stock during the Class Period, including by selling over $980,000,000 in FIGS stock during the Class Period while in possession of material non-public information ("MNPI") concerning FIGS' operations, obtained by virtue of their positions as corporate insiders at FIGS, which included, *inter alia*, FIGS' deficiencies in data analytics capabilities and/or reliance on air freight.

322.   Plaintiffs and the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FIGS common stock. Plaintiffs and the Exchange Act Class would not have purchased FIGS common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements and the Founder Defendants, Tulco, and Tull's scheme to artificially inflate FIGS' stock.

323.   As a direct and proximate result of the aforementioned Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of FIGS common stock during the Class Period.

# COUNT II

### For Violation of §20(a) of the Exchange Act Against
### the Individual Exchange Act Defendants, Tulco, and Tull

324.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

- 104 -

4875-0160-4700.v1

325.   The Individual Exchange Act Defendants, Tulco, and Tull acted as controlling persons of FIGS within the meaning of §20(a) of the Exchange Act.

326.   By virtue of their positions as officers and/or directors of FIGS, and/or their beneficial ownership of FIGS common stock, the Individual Exchange Act Defendants had the power and authority to, and did, cause FIGS to engage in the wrongful conduct alleged.

327.   Tulco and Tull also acted as controlling persons of FIGS within the meaning of §20(a) of the Exchange Act by virtue of their share of ownership, power to appoint directors, including through the appointment and service of Tulco-associated personnel Willhite and Lafley as directors, and direct involvement in the day-to-day affairs of FIGS, as further described above, *see* §III.B.7.  As a result of the foregoing, Defendants had the power and authority to, and did, cause FIGS to engage in the wrongful conduct alleged.

328.   As a direct and proximate result of the Individual Exchange Act Defendants', Tulco's, and Tull's wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of FIGS common stock during the Class Period.

329.   By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

### COUNT III

**For Violation of  §20A of the Exchange Act Against the
Founder Defendants, Tulco, and Tull for Insider Selling**

330.   Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

331.   Count III is brought pursuant to §20A of the Exchange Act against the Founder Defendants, Tulco, and Tull on behalf of those members of the Exchange Act Class who traded contemporaneously with Defendants and were damaged by Defendants' insider trading (the "Insider Trading Class").

- 105 -

332.   As set forth in Count I herein, the Founder Defendants, Tulco, and Tull violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder by selling shares of FIGS stock while in possession of MNPI obtained by reason of their positions as FIGS insiders to sell over $980,000,000 in FIGS stock during the Class Period.  The Founder Defendants, Tulco, and Tull's sales of FIGS common stock were made contemporaneously with Plaintiffs' purchases of FIGS securities during the Class Period and with purchases by the other members of the Insider Trading Class.

333.   Hasson made the following sales:

| Defendant | Date of Sale | Amount | Price |
|---|---|---|---|
| Hasson | September 20, 2021 | 2,419,998 | $40.25 |
| Hasson | November 15, 2021 | 75,164 | $34.29 |
| Hasson | November 29, 2021 | 2,904 | $32.79 |
| Hasson | December 2, 2021 | 71,292 | $30.60 |

334.   Hasson's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|---|---|---|---|
| Kissimmee | November 17, 2021 | 220 | $33.03 |
| Kissimmee | November 18, 2021 | 310 | $31.29 |
| Kissimmee | December 2, 2021 | 140 | $30.13 |
| Kissimmee | December 3, 2021 | 290 | $30.84 |
| Kissimmee | December 3, 2021 | 440 | $29.93 |
| Pensacola | November 11, 2021 | 70 | $32.54 |
| Pensacola | November 17, 2021 | 280 | $33.03 |
| Pensacola | November 18, 2021 | 400 | $31.29 |
| Pensacola | December 2, 2021 | 170 | $30.13 |
| Pensacola | December 3, 2021 | 370 | $30.84 |
| Pensacola | December 3, 2021 | 560 | $29.93 |
| Warren | November 19, 2021 | 100 | $31.90 |
| Warren | November 19, 2021 | 200 | $31.98 |
| Pompano | September 16, 2021 | 435 | $42.22 |
| Pompano | September 16, 2021 | 2,638 | $40.25 |
| Pompano | December 7, 2021 | 272 | $32.99 |
| Pompano | December 7, 2021 | 358 | $33.32 |

335.   Spear made the following sales:

- 106 -

4875-0160-4700.v1

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Spear | September 20, 2021 | 1,468,324 | $40.25 |
| Spear | November 15, 2021 | 89,060 | $34.29 |
| Spear | November 29, 2021 | 3,540 | $32.79 |
| Spear | December 2, 2021 | 84,889 | $30.60 |

336.   Spear's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Purchase | Amount | Price |
|-----------|------------------|--------|-------|
| Kissimmee | November 17, 2021 | 220 | $33.03 |
| Kissimmee | November 18, 2021 | 310 | $31.29 |
| Kissimmee | December 2, 2021 | 140 | $30.13 |
| Kissimmee | December 3, 2021 | 290 | $30.84 |
| Kissimmee | December 3, 2021 | 440 | $29.93 |
| Pensacola | November 11, 2021 | 70 | $32.54 |
| Pensacola | November 17, 2021 | 280 | $33.03 |
| Pensacola | November 18, 2021 | 400 | $31.29 |
| Pensacola | December 2, 2021 | 170 | $30.13 |
| Pensacola | December 3, 2021 | 370 | $30.84 |
| Pensacola | December 3, 2021 | 560 | $29.93 |
| Warren | November 19, 2021 | 100 | $31.90 |
| Warren | November 19, 2021 | 200 | $31.98 |
| Pompano | September 16, 2021 | 435 | $42.22 |
| Pompano | September 16, 2021 | 2,638 | $40.25 |
| Pompano | December 7, 2021 | 272 | $32.99 |
| Pompano | December 7, 2021 | 358 | $33.32 |

337.   Tulco and Tull made the following sales:

| Defendant | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Tulco and Tull | June 1, 2021 | 25,707,953 | $22.00 |
| Tulco and Tull | September 20, 2021 | 6,366670 | $40.25 |

338.   Tulco's sales were made contemporaneously with the following purchases by Plaintiffs:

| Plaintiff | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Warren | May 27, 2021 | 1,200 | $22.00 |
| Hoch | June 1, 2021 | 1675 | $31.98 |
| Hoch | June 1, 2021 | 100 | $31.978 |

- 107 -

| Plaintiff | Date of Sale | Amount | Price |
|-----------|--------------|--------|-------|
| Hoch | June 1, 2021 | 400 | $31.75 |
| Hoch | June 1, 2021 | 99 | $31.9205 |
| Hoch | June 1, 2021 | 157 | $31.92 |
| Hoch | June 1, 2021 | 170 | $31.9107 |
| Hoch | June 1, 2021 | 10 | $31.9108 |
| Hoch | June 1, 2021 | 116 | $31.88 |
| Hoch | June 1, 2021 | 100 | $31.84 |
| Hoch | June 1, 2021 | 100 | $31.83 |
| Hoch | June 1, 2021 | 86 | $31.82 |
| Hoch | June 1, 2021 | 206 | $31.79 |
| Hoch | June 1, 2021 | 500 | $31.77 |
| Hoch | June 1, 2021 | 1100 | $31.7399 |
| Hoch | June 1, 2021 | 181 | $31.73 |
| Pompano | September 16, 2021 | 2,638 | $40.25 |
| Pompano | September 16, 2021 | 435 | $42.22 |

339.    Plaintiffs and members of the Insider Trading Class who purchased shares of FIGS securities contemporaneously with sales by the foregoing defendants suffered damages because: (i) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the Exchange Act as alleged herein; and (ii) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the materially false and misleading statements and concealment alleged herein.

IV.    NON-FRAUD SECURITIES ACT CLAIMS

340.    The claims set forth below in Counts IV-VI allege violations of §§11, 12(a)(2), and 15 of the Securities Act ("Securities Act Claims").  These Securities Act Claims are based solely on strict liability and negligence – *i.e.*, not intentional or reckless conduct.  This section incorporates solely ¶¶1, 7-21, 26-124, and expressly disclaims any allegations of fraud, scienter, or recklessness pled herein in connection with the Exchange Act Claims.  As such, these Securities Act claims are presented separate and apart from Counts I-III.

4875-0160-4700.v1

## A.   BACKGROUND TO THE SECURITIES ACT CLAIMS

341.   In connection with the Company's May 2021 IPO and September 2021 SPO, FIGS issued prospectuses and registration statements (respectively, the IPO Offering Documents and SPO Offering Documents).  Under the Securities Act, FIGS, the individuals who signed the IPO and SPO Offering Documents, and the underwriters to the IPO and SPO, are liable jointly and severally for materially false or misleading statements or omissions in the IPO and SPO Offering Documents.

342.   The IPO Offering Documents issued in connection with the May 2021 IPO contained false and misleading statements, which misrepresented the business and value of FIGS.  The Securities Act Defendants (defined in ¶¶345-370, *infra*) priced the May 2021 IPO at $22 per share.

343.   The SPO Offering Documents issued in connection with the September 2021 SPO also contained false and misleading statements, which misrepresented the business and value of FIGS.  Defendants priced the September 2021 SPO at $40.25 per share.

344.   The Securities Act Claims seek to recover such losses suffered by members of the Securities Act Classes who purchased shares of FIGS common stock pursuant or traceable to the false and misleading IPO and SPO Offering Documents.

## B.   SECURITIES ACT DEFENDANTS

345.   FIGS, Hasson, Spear, Lawrence, Willhite, Tulco, and Tull, *see* ¶¶16-19, 21, 26-28, *supra*, are realleged as defendants for the Securities Act Claims.  FIGS is the registrant of the securities sold in the IPO and SPO.  Hasson, Spear, Lawrence, and Willhite signed the IPO and SPO Offering Documents.  In addition, Tulco and Tull were controlling persons of FIGS throughout the Class Period, including in connection with the IPO and SPO, as alleged above, ¶¶109-119.

- 109 -

1.     **Director Defendants**

346.   The Securities Act Claims are also brought against current and former FIGS' Board members identified below, who each signed the IPO and SPO Offering Documents at issue, and/or were named as directors in the registration statements for the IPO and SPO.

347.   Defendant Sheila Antrum ("Antrum") has been a member of the FIGS' Board since May 2021, when she joined in connection with the IPO.  Antrum reviewed and authorized her signature on the negligently prepared, false and misleading SPO Offering Documents.

348.   Defendant Michael Soenen ("Soenen") has been a member of the FIGS' Board since May 2021, when he joined in connection with the IPO.  Soenen reviewed and authorized his signature on the negligently prepared, false and misleading SPO Offering Documents.

349.   Collectively Willhite, Antrum, and Soenen are referred to herein as the "Director Defendants."

2.     **Underwriter Defendants**

350.   The Securities Act Claims are also brought against the below underwriters for the IPO and SPO.

351.   Under the terms and subject to the conditions in the IPO underwriting agreement, the underwriters named below severally agreed to purchase, and FIGS and Tulco agreed to sell, the number of shares indicated below, for which the underwriters collectively were paid approximately $6,120,000.48 in discounts and commissions, excluding exercise of any over-allotment option:

| Underwriters | Numbers of Shares |
| --- | --- |
| Goldman Sachs & Co. LLC | 8,300,062 |
| Morgan Stanley & Co. LLC | 6,961,342 |
| Barclays Capital Inc. | 3,748,416 |
| Credit Suisse Securities (USA) LLC | 3,748,416 |
| BofA Securities, Inc. | 967,500 |
| Cowen and Company, LLC | 447,469 |

- 110 -

4875-0160-4700.v1

| Underwriters | Numbers of Shares |
|---|---|
| Guggenheim Securities, LLC | 447,469 |
| KeyBanc Capital Markets Inc. | 447,469 |
| Oppenheimer & Co. Inc. | 447,469 |
| Piper Sandler & Co. | 447,469 |
| Telsey Advisory Group LLC | 181,406 |
| Academy Securities, Inc. | 60,469 |
| R. Seelaus & Co., LLC | 60,469 |
| Samuel A. Ramirez & Company, Inc. | 60,469 |
| Siebert Williams Shank & Co., LLC | 60,469 |
| Total | 26,386,363 |

352. Under the terms and subject to the conditions in the SPO underwriting agreement, the underwriters named below severally agreed to purchase, and Hasson, Spear, and Tulco agreed to sell, the number of shares indicated below, for which the underwriters collectively were paid approximately $12,573,513 in discounts and commissions, excluding exercise of any over-allotment option:

| Underwriters | Numbers of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 2,764,390 |
| Morgan Stanley & Co. LLC | 2,318,520 |
| Barclays Capital Inc. | 1,248,434 |
| Credit Suisse Securities (USA) LLC | 1,248,434 |
| BofA Securities, Inc. | 356,695 |
| Cowen and Company, LLC | 164,972 |
| Guggenheim Securities, LLC | 164,972 |
| KeyBanc Capital Markets Inc. | 164,972 |
| Oppenheimer & Co. Inc. | 164,972 |
| Piper Sandler & Co. | 164,972 |
| Telsey Advisory Group LLC | 66,880 |
| Academy Securities, Inc. | 22,293 |
| R. Seelaus & Co., LLC | 22,293 |
| Samuel A. Ramirez & Company, Inc. | 22,293 |
| Siebert Williams Shank & Co., LLC | 22,293 |
| Total | 8,917,385 |

353. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") served as an underwriter for the IPO and SPO.

354. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO and SPO.

4875-0160-4700.v1

355.   Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the IPO and SPO.

356.   Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter for the IPO and SPO.

357.   Defendant BofA Securities, Inc. ("BofA"), served as an underwriter for the IPO and SPO.

358.   Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the IPO and SPO.

359.   Defendant Guggenheim Securities, LLC ("Guggenheim") served as an underwriter for the IPO and SPO.

360.   Defendant KeyBanc Capital Markets Inc. ("KeyBanc"), served as an underwriter for the IPO and SPO.

361.   Defendant Oppenheimer & Co. Inc. ("Oppenheimer"), served as an underwriter for the IPO and SPO.

362.   Defendant Piper Sandler & Co. ("Piper Sandler"), served as an underwriter for the IPO and SPO.

363.   Defendant Telsey Advisory Group LLC ("Telsey") served as an underwriter for the IPO and SPO.

364.   Defendant Academy Securities, Inc. ("Academy"), served as an underwriter for the IPO and SPO.

365.   Defendant R. Seelaus & Co., LLC ("R. Seelaus") served as an underwriter for the IPO and SPO.

366.   Defendant Samuel A. Ramirez & Company, Inc. ("A. Ramirez"), served as an underwriter for the IPO and SPO.

367.   Defendant Siebert Williams Shank & Co., LLC ("Siebert") served as an underwriter for the IPO and SPO.

368.   Collectively Goldman Sachs, Morgan Stanley, Barclays, Credit Suisse, BofA, Cowen, Guggenheim, KeyBanc, Oppenheimer, Piper Sandler, Telsey,

4875-0160-4700.v1

Academy, R. Seelaus, A. Ramirez, and Siebert are referred to herein as the "Underwriter Defendants." The Underwriter Defendants together with FIGS, Hasson, Spear, Lawrence, Tulco, Tull, and the Director Defendants are referred to herein as the "Securities Act Defendants."

369. The Underwriter Defendants are responsible for the false and misleading statements in the IPO Offering Documents and SPO Offering Documents. The Underwriter Defendants assisted FIGS, Hasson, Spear, Lawrence, and the Tulco Defendants in planning the IPO and SPO and were required to conduct an adequate and reasonable investigation into the business and operations of the Company in order to participate in the IPO and SPO – a process known as "due diligence" investigation. During the course of their investigation, the Underwriter Defendants had continual access to confidential corporate information concerning FIGS' operations and commercial prospects.

370. In addition to virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with FIGS' lawyers, management, and top executives and made joint decisions with them regarding: (i) the terms of the IPO and SPO, including the price at which FIGS shares would be sold to the public; (ii) the strategy to best accomplish the IPO and SPO, (iii) the information to be included in the IPO Offering Documents and SPO Offering Documents; and (iv) responses to be made to the SEC in connection with its review of the IPO Offering Documents and SPO Offering Documents.

## C.    THE IPO OFFERING DOCUMENTS WERE FALSE AND MISLEADING

371. Unbeknownst to investors, the IPO Offering Documents contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein not materially misleading.

372. First, the IPO Offering Documents misrepresented that FIGS maintained low inventory risk, purportedly because the Company had data analytics

4875-0160-4700.v1

capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising model" focused on its core products rather than rapid development of hundreds of new products.

373.   Second, the IPO Offering Documents misrepresented that air freight was being used only as a response to supply chain disruptions arising from the COVID-19 pandemic, failing to disclose the true frequency and additional reasons FIGS utilized the more expensive shipping method.

374.   The IPO Offering Documents were signed by Hasson, Spear, and Lawrence. Willhite, acting within the scope of his authority as a director of FIGS and as a representative agent of Tulco, also authorized his signature on the IPO Offering Documents.

### 1.   FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Established

375.   In the IPO Offering Documents, FIGS portrayed itself as a data-focused company with advanced data-tracking and analytics capabilities.  These capabilities were presented as unique assets that differentiated FIGS from its competition.  For example, under a boldface header on the second page reading "***We Leverage Data Science to Connect with and Serve Our Community***," the Company claimed:

> We develop proprietary and customized data solutions designed to optimize our product innovation, inventory analytics, marketing efforts and operational efficiency.  We maintain Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the Company.  ***This approach enables us to*** gather and manage extensive data, and ***rapidly and directly apply***

- 114 -

1    *that data to* deliver customer insights and ***improve our core operating***

2    ***activities and decision-making processes***.

3         376.    The Company repeatedly claimed that its access to customer data

4    allowed for accurate demand prediction: "***Our DTC strategy also gives us access to***

5    ***valuable real-time customer data that allows us to*** better acquire and retain customers

6    and ***reliably predict buying patterns***."

7         377.    The Company also claimed to pay particular attention to

8    "***demographic, geographic and psychographic data that enables us to reliably***

9    ***predict buying patterns, leading to operational efficiencies throughout our supply***

10   ***chain, inventory management and new product development***."

11        378.    The Company also emphasized for investors that FIGS was a low-risk

12   company due to its primary business being uniforms rather than more discretionary

13   apparel: "***Due to the non-discretionary, replenishment nature of healthcare apparel,***

14   ***we maintain low inventory risk driven by a high volume of repeat purchases and a***

15   ***focus on our core scrubs offerings***."

16        379.    Similarly, the Company claimed that it could minimize inventory risk

17   by being careful with its purchasing decisions.  Under a boldface heading reading

18   "***Highly Effective Merchandising and Product Launch Model***," the Company

19   claimed: "For our limited edition colors and styles, ***we utilize a disciplined buying***

20   ***approach*** with shallow initial buys and ***data-driven repurchasing decisions*** to

21   ***minimize inventory risk while creating scarcity***."  The Company continued: "***This***

22   ***innovative, lower-risk merchandising strategy drives recurring demand while***

23   ***maintaining inventory efficiency***."

24        380.    The Company made the following representations in a paragraph under

25   the boldface header "***Supply Chain***":

26        ***We have built a proprietary integration for our product lifecycle from***

27        ***purchase order to manufacturing to shipping.  This deep integration***

28        ***enables extensive management and oversight of the product flow and***

4875-0160-4700.v1

*also fuels a variety of prediction models (inventory planning and analytics).  By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency*.

381.   Additionally, the Company made the following representations in a paragraph under the boldface header "***Merchandising and Inventory Management***":

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers.  ***This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.  It also enables us to manage purchasing and inventory effectively and efficiently.  We use data-driven models to predict and anticipate demand for our products.  The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques.  Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day***.

382.   In the Management Discussion and Analysis section of the IPO Offering Documents, the Company made the following misrepresentation:

We have a highly efficient merchandising model.  ***Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***.  In 2020, we generated 82% of net revenues from our 13 core scrubwear styles, 5% of net revenues from limited edition scrubwear styles, and the remaining 13% from our lifestyle apparel and other non-scrub offerings.

- 116 -

4875-0160-4700.v1

383.   The statements identified in ¶¶375-382 above were false and misleading when made because FIGS could not reliably predict buying patterns and did not have operational efficiencies or low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy, as evidenced by the following:

(i)     Rather than relying upon its data analytics and non-discretionary core products which were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated;

(ii)    FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period;

(iii)   Defendants either did not have the data analytics capability to reliably predict demand and buying patterns or they were not using the data analytics to properly predict demand and efficiently operate FIGS' supply chain. Otherwise, FIGS would have neither experienced ballooning inventory throughout the Class Period nor needed to unexpectedly use air freight; and

(iv)    The Company needed to use air freight for unexpected shipping needs because even if the Flexport system allowed tracking freight in real time, the Company did not have, as it had claimed, the capacity to anticipate optimal launch times to launch products, down to the day of the week and time of day.

384.   The Company's claims regarding its low inventory risk arising from FIGS' robust customer data analytics capabilities, ability to anticipate demand and reliably predict buying patterns, supply chain and inventory management, reliance on core scrub styles, and DTC strategy were important to analysts and investors. Analysts pointed to exactly these factors as being crucial to the Company's business. For example, on June 21, 2021, Barclays initiated coverage and issued an analyst

- 117 -

report in which they rated the stock Overweight, and wrote: "As a DTC brand, FIGS continues to reap the benefit of having ***near-perfect data*** – on its customers and purchasing behavior."

385.   Similarly, BofA initiated coverage the same day, rated the stock Buy, and wrote: "[FIGS'] digitally native nature allows ***data-driven management of inventory, and a reliance on high margin core scrubs*** reduces fashion risk."

386.   Ditto Cowen, which also initiated coverage that day with an Outperform rating, and wrote: "***Data-driven*** marketing and consumer engagement have created a powerful community."   Under a boldface heading reading "***Multi-Faceted Durable Competitive Advantages***," Cowen continued: "Customer data enables FIGS to acquire and retain consumers at high rates with declining customer acquisition cost (CAC) and rising retention – NPS is 81. . . .   Co-founder led management team has built a talented team across finance, merchandising, ***data science and supply chain***."   Cowen also pointed to FIGS' "Data science driven decision making and intelligent replenishment," and said: "The DTC model offers direct contact with its customer base across its website, app, marketing, storytelling, and engagement – a key competitive advantage over many of its peers."   Cowen also said: "FIGS makes use of data science to segment its customers, identify underpenetrated regions domestically and outline the path to global expansion, along with using AI for its intelligent replenishment model tied to an individual's buying preference."

387.   In fact, Credit Suisse, Guggenheim, Oppenheimer, Piper Sandler, and Telsey Advisory Group all initiated coverage on June 21, 2021 with a rating of "Buy," "Outperform," or "Overweight," and they all mentioned FIGS' insight into customer data in some capacity in their coverage notes that day:

| Analyst | Example Comment |
|---|---|
| Credit Suisse | "FIGS uses the consumer insight data advantages it generates being a DTC brand to look deep into the mind of its core consumer, and it leverages those data to drive a rapid pace of |

- 118 -

| Analyst | Example Comment |
|---|---|
| | innovation in better fitting, more fashionable, and more functional healthcare workwear." |
| Guggenheim | "The company is focused on utilizing data science to expand its customer community, elevate its customer experience and drive intelligent replenishment." |
| Oppenheimer | "As a technology-enabled DTC brand, FIGS is disrupting the $79B-plus healthcare apparel industry that has historically consisted of thousands of small brick & mortar retailers lacking a strong digital presence." |
| Piper Sandler | "The company's *biggest competitive advantage* is its digital-only model and superior data collection and analytics." |
| Telsey Advisory Group | "Through its direct-to-consumer digital model, the company has the ability to use data analytics to understand its customers' preferences while identifying opportunities for underpenetrated markets." |

### 2.   FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the IPO Offering Documents

388.  In the IPO Offering Documents, the Company acknowledged that certain air freight expenditures had been higher than planned, but indicated that this was a temporary effect of the pandemic and was not expected to last:

> Certain of the Company's suppliers experienced delays and shutdowns due to the COVID-19 pandemic.  *In order to manage the impact of these disruptions* and meet its customers' expectations, *the Company increased the use of more costly air freight during 2020 and during the three months ended March 31, 2021*, which increased cost of goods sold.  The Company has not experienced the pandemic's adverse impacts in any additional material respect.

389.  The statements identified in ¶388 above were false and misleading when made, because Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain. Additionally, if the Company had the capacity to anticipate optimal times to launch

- 119 -

products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

### D.   THE SPO OFFERING DOCUMENTS WERE FALSE AND MISLEADING

390.   A little more than three months after Defendants sold 30.3 million shares to the public in the IPO, Hasson, Spear, Tulco, and Tull sold an additional 10.1 million shares in an SPO.  The SPO Offering Documents contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein not materially misleading.

391.   Specifically, the SPO Offering Documents reiterated and perpetuated the earlier misrepresentations that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products rather than rapid development of hundreds of new products.

392.   The SPO Offering Documents were signed by Spear, Hasson, and Lawrence.  Willhite authorized his signature on the SPO Offering Documents, acting within the scope of his authority as a representative agent of Tulco.

### 1.   FIGS Misrepresented Its Ability to Reliably Predict Buying Patterns or Maintain Low Inventory Risk

393.   In the SPO Offering Documents, FIGS repeated multiple claims it had made in the IPO Offering Documents, such as:

> ***Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns.  This leads to operational efficiencies throughout our supply chain, inventory management and new product development***.

394.    The Company continued to emphasize the tech-forward and data-heavy nature of its operations:

> We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the company. ***This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to*** deliver customer insights and ***improve our core operating activities and decision-making processes.***

395.    Management's discussion of their business in the SPO Offering Documents also emphasized FIGS' ability to manage its manufacturing, supply chain, and inventory.  They wrote:

> We directly and actively manage every step of our product development and production process to ensure that our extremely high quality standards are met. ***We have a highly efficient merchandising model.*** ***Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***.

396.    And then, beneath a boldface header reading "***Attractive Financial Profile Driving Robust Growth, Profitability and Cash Flow Generation***," the SPO Offering Documents stated: "As a successful DTC brand with a highly effective merchandising model, we benefit from structurally advantaged product margins. Through our DTC strategy, we leverage data in our marketing initiatives to drive efficient customer acquisition and retention, which has contributed to our rapid growth and strong profitability."

397.    In the SPO Offering Documents, FIGS further claimed, beneath a boldface header reading "***Our Data Analytics***":

> In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey.

4875-0160-4700.v1

*These extensive data sets are used to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management*, marketing and customer experience.

398.   Under the boldface heading "*Supply Chain*," they continued:

*We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping.  This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics).  By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency*.

399.   In the next paragraph, underneath the boldface heading "*Merchandising and Inventory Management*," the Company claimed:

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers.  *This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.  It also enables us to manage purchasing and inventory effectively and efficiently.  We use data-driven models to predict and anticipate demand for our products.  The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques.  Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day*.

400.   The statements identified in ¶¶393-399 above were false and misleading when made because FIGS did not have low inventory risk arising from the Company's data analytics capabilities and the Company's core product strategy, as evidenced by the following:

(i)      Rather than relying upon its data analytics and non-discretionary core products which were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated;

(ii)     FIGS' shift in focus away from its core products strategy in tandem with the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency, resulted in average days of inventory outstanding increasing significantly before the IPO and throughout the Class Period;

(iii)    Defendants either did not have the data analytics capability to reliably predict demand and buying patterns or they were not using the data analytics to properly predict demand and efficiently operate FIGS' supply chain. Otherwise, FIGS would have neither experienced ballooning inventory throughout the Class Period nor needed to unexpectedly use air freight; and

(iv)    The Company needed to use air freight for unexpected shipping needs because even if the Flexport system allowed tracking freight in real time, the Company did not have, as it had claimed, the capacity to anticipate optimal launch times to launch products, down to the day of the week and time of day.

## 2.      FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the SPO Offering Documents

401.   In addition, the SPO Offering Documents contained the following false and misleading statement, reiterated several times in substantially similar form, with respect to the Company's use of air freight and the reasons therefore:

We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. ***In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight*** during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future.

402.   The above statement identified in ¶401 was false and misleading when made because Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions, when in reality Defendants utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain.  Additionally, if the Company had the capacity to anticipate optimal times to launch products down to the day of the week and time of day, then, combined with its ability to track freight in real time using the Flexport system, it would not have needed to use air freight for unexpected shipping needs.

### E.    THE IPO AND SPO OFFERING DOCUMENTS VIOLATED ITEM 303 AND ITEM 105

403.   In addition to the misstatements and omissions set forth above, the IPO and SPO Offering Documents were false and misleading when issued because they failed to disclose material information that was required to be disclosed pursuant to the regulations governing their preparation.

404.   Specifically, Item 105 required the IPO and SPO Offering Documents to provide "a discussion of the material factors that make an investment in the

4875-0160-4700.v1

registrant or offering speculative or risky." 17 C.F.R. §229.105(a).  Although the IPO and SPO Offering Documents included a discussion of risk factors, that discussion was materially incomplete and therefore misleading.  In addition, Item 303 required the IPO and SPO Offering Documents to "[d]escribe any known trends or uncertainties that have had or that [the Company reasonably expects are] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(b)(2)(ii).

405.  In negligent violation of Item 105 and Item 303, the IPO and SPO Offering Documents failed to disclose the significant problems with FIGS's merchandising and production processes, specifically, that: (i) FIGS did not have sophisticated data analytics, or, if it did, was not using those sophisticated data analytics to reliably predict demand for its new and existing products; and (ii) its shift throughout 2021 away from non-discretionary core products which were subject to replenishment, and toward a greater and growing number of new styles for which demand was not established created extreme risk that FIGS would be ill-equipped to reliably predict customer demand, especially in the absence of data driven forecasting solutions.

406.  As a result of the foregoing, FIGS was increasingly dependent on expensive air freight to ship its products, lost sales due to stockouts resulting from the Company's deviation from its core-style strategy, and suffered from skyrocketing costs associated with ballooning inventory levels as increasing numbers of new products failed to find a market.  The Company's data capabilities – or the lack of such capabilities – and processes for making new product decisions and rolling out new styles were known to management, presented uncertainty, and made investment in FIGS speculative and risky.  This is particularly so since FIGS is an apparel company, and as such, as the Company itself admitted, predictably manufacturing and delivering its apparel to customers is vital to the Company's success; failure to do so would, and did, compromise FIGS's revenue and earnings.

- 125 -

4875-0160-4700.v1

# COUNT IV

## For Violation of §11 of the Securities Act Against FIGS, the Tulco Defendants, Hasson, Spear, Lawrence, the Director Defendants, and Underwriter Defendants

407.   Plaintiffs repeat and reallege ¶¶340-406 above as if fully set forth herein.

408.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all members of the Securities Act Classes who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and who were damaged thereby.

409.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a §11 claim.

410.   The IPO Offering Documents and the SPO Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

411.   Defendants named in this Count are strictly liable to Plaintiffs and members of the Securities Act Classes for the misstatements and omissions in the IPO Offering Documents and the SPO Offering Documents.

412.   FIGS is the registrant for the shares of FIGS stock, and as such, is strictly liable for the false and misleading statements in the IPO and SPO Offering Documents.  The Tulco Defendants are "partners" of FIGS for purposes of a §11 claim, issued shares in the IPO and SPO, and their representative, Willhite, signed the IPO and SPO Offering Documents in his capacity as a Director.  The Underwriter Defendants were responsible for the contents and dissemination of the Offering

- 126 -

Documents used in the IPO and SPO for which they served as underwriters. *See* ¶¶350-370, *supra*. The Tulco Defendants, Hasson, Spear, and Lawrence, as well as the Director Defendants, were responsible for the contents and dissemination of the Offering Documents they signed. *Supra*, ¶¶17-19, 26-28, 346-347.

413. None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Offering Documents and the SPO Offering Documents were true and without omissions of any material facts and were not misleading.

414. By reason of the conduct alleged herein, each defendant violated §11 of the Securities Act.

415. Plaintiffs Dr. Hoch, Warren, and Pompano and/or members of the Securities Act Classes acquired FIGS stock in or traceable to the IPO and/or SPO in which shares were offered and/or sold pursuant to the above-described Offering Documents.

416. The value of FIGS common stock has declined substantially as a result of the Securities Act Defendants' violations, causing damage to those members of the Securities Act Classes that purchased or otherwise acquired FIGS common stock in and/or traceable to the IPO and/or SPO.

417. At the time of their purchases of FIGS common stock, Plaintiffs and other members of the Securities Act Classes were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Consolidated Complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the IPO and the SPO and the time Plaintiffs commenced this action.

4875-0160-4700.v1

# COUNT V

## For Violation of §12(a)(2) of the Securities Act
## Against FIGS, Hasson, Spear, Tulco and Tull

418.    Plaintiffs repeat and reallege ¶¶340-406 above as if fully set forth herein.

419.    This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Securities Act Classes who purchased or otherwise acquired FIGS Class A common stock in and pursuant to the IPO and/or SPO and who were damaged thereby.

420.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiffs do not allege that FIGS, Hasson, Spear, or Tulco acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

421.    FIGS was a seller, offeror, and/or solicitor of purchasers of its common stock pursuant to the defective Offering Documents and directly solicited the purchase of its common stock through the means of the Offering Documents.

422.    Hasson and Spear (for the Offering Documents that they signed, ¶¶17-18), and Hasson, Spear, Tulco, and Tull (for the Offering Documents used in offerings for which they were selling shareholders, ¶¶68, 79) were sellers, offerors, and/or solicitors of purchasers of FIGS common stock pursuant to the defective Offering Documents, and directly solicited the purchase of FIGS common stock through the means of the Offering Documents.  Acts of solicitation included participating in the preparation of, or signing, the false and misleading Offering Documents, and/or selling shares of stock pursuant to the false and misleading Offering Documents.

423.    By means of the defective Offering Documents used to complete the IPO and SPO, FIGS, Hasson, Spear, Tulco, and Tull issued, promoted, and sold FIGS

- 128 -

1   stock to Plaintiffs and other members of the Securities Act Classes for their own

2   benefit and the benefit of those associated with them.

3        424.   The IPO Offering Documents and SPO Offering Documents contained

4   untrue statements of material fact and omitted other facts necessary to make the

5   statements not misleading, and failed to disclose material facts, as set forth above.

6   None of the defendants named herein made a reasonable investigation or possessed

7   reasonable grounds for the belief that the statements contained in the Offering

8   Documents were true and without omissions of material facts and were not

9   misleading.

10       425.   Less than one year has elapsed since the time that Plaintiffs discovered,

11  or could reasonably have discovered, the facts upon which this Consolidated

12  Complaint is based.  Less than three years has elapsed since the time that the securities

13  at issue in this Consolidated Complaint were bona fide offered to the public.

14       426.   Plaintiffs Dr. Hoch, Warren, and Pompano and/or members of the

15  Securities Act Classes acquired FIGS stock in the IPO and SPO in which shares were

16  offered and/or sold pursuant to the above-described Offering Documents.  At the time

17  of their purchases, plaintiffs Dr. Hoch, Warren, and Pompano and members of the

18  Securities Act Classes were without knowledge of the facts concerning the

19  misstatements and omissions alleged herein and could not have reasonably discovered

20  those facts prior to the disclosures herein.

21       427.   Plaintiffs and other members of the Securities Act Classes have

22  sustained damages, as the value of FIGS stock purchased or otherwise acquired

23  pursuant to the materially false and misleading Offerings Documents has declined

24  substantially from the dates of the offerings to the date of this filing.

25       428.   By the reason of the foregoing, FIGS, Hasson, Spear, and Tulco are

26  liable for violations of §12(a)(2) of the Securities Act to Plaintiffs and the other

27  members of the Securities Act Classes who purchased FIGS common shares in and

28  pursuant to the IPO and/or SPO, and who were damaged thereby.

4875-0160-4700.v1

429.   Accordingly, members of the Securities Act Classes who hold the common stock issued pursuant to the defective Offering Documents have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to Defendants sued herein, and members of the Securities Act Classes who have sold their common stock that was issued pursuant to the defective Offering Documents seek damages to the extent permitted by law.

**COUNT VI**

**For Violation of §15 of the Securities Act Against Hasson, Spear, Lawrence, and the Tulco Defendants**

430.   Plaintiffs repeat and reallege ¶¶340-406 above as if fully set forth herein.

431.   This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Securities Act Classes who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and who were damaged thereby.

432.   This Count does not sound in fraud.  With respect to this Count, Plaintiffs do not claim that any of the Defendants committed intentional acts or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent.  This claim is based on strict liability and negligence.

433.   Hasson, Spear, and Lawrence were controlling persons of FIGS by virtue of their positions as directors and/or senior officers of FIGS, and each was involved in the day-to-day operations of the Company prior to the IPO and SPO. Hasson, Spear, and Lawrence were also involved in reviewing and providing the disclosures in the IPO and SPO Offering Documents, had the ability to control the contents thereof, and/or otherwise participated in the process which allowed the sale of the shares of FIGS Class A common stock to be successfully completed.

434.   The Tulco Defendants acted as controlling persons of FIGS within the meaning of §15 of the Securities Act.  By reason of their voting power, ownership,

4875-0160-4700.v1

rights as against FIGS, and/or specific acts, Tulco and Tull had the power to control FIGS' operations and its decision-making processes.   In addition, Tulco's representative Willhite served on FIGS' Board throughout the Class Period.   By reason of such control, as further detailed above in ¶¶109-119, which are incorporated by reference herein, the Tulco Defendants are liable under §15 of the Securities Act.

435.   As set forth above, FIGS violated §§11 and 12(a)(2) of the Securities Act in connection with the IPO and SPO.  By virtue of the conduct alleged herein, Hasson, Spear, Lawrence, Tulco, and Tull are liable for the above-stated wrongful conduct and are liable to Plaintiffs and the Securities Act Classes for damages suffered.

## V.   SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

436.   Neither the statutory safe harbor provided for forward-looking statements under the PSLRA nor the bespeaks caution doctrine apply to any of the allegedly false statements pled in this Consolidated Complaint.   The statements alleged to be false and misleading herein all relate to then existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Furthermore, to the extent that either the statutory safe harbor or bespeaks caution doctrine is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FIGS who knew that the statement was false when made.

## VI.   CLASS ACTION ALLEGATIONS

437.   Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired: (i) FIGS Class A common stock pursuant and/or traceable to the Company's IPO conducted on or around May 27, 2021; (ii) FIGS Class A common stock pursuant and/or traceable to the Company's SPO conducted on or around September 16, 2021; and/or (iii) FIGS Class A common stock between May 27, 2021 and February 28, 2023, inclusive (collectively, the "Classes").

438.   Excluded from the Classes are Defendants and members of their immediate families, the officers, and directors of the Company, at all relevant times, and members of their immediate families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity in which Defendants have or had a controlling interest.

439.   The members of the Classes are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FIGS Class A common stock was actively traded on the NYSE.  While the exact number of members in each Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Classes.  Record owners and other members of the Classes may be identified from records maintained by FIGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

440.   Plaintiffs' claims are typical of the claims of the members of the Classes as all members of each Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

4875-0160-4700.v1

441.   Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class and securities litigation.

442.   Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)   whether Defendants made inaccurate statements and/or omitted material information in the IPO Offering Documents and SPO Offering Documents;

(b)   whether Defendants' statements misrepresented and omitted material facts about FIGS' business, operations and management;

(c)   whether Defendants' misrepresentations and omissions violated federal securities laws;

(d)   for the Exchange Act Class only, whether the Exchange Act Defendants made inaccurate statements and/or omitted material information in communicating with investors throughout the Class Period;

(e)   for the Exchange Act Class only, whether the Individual Exchange Act Defendants acted with scienter;

(f)   for the Exchange Act Class only, whether the price of FIGS Class A common stock was artificially inflated because of the Individual Exchange Act Defendants' conduct described herein; and

(g)   for the Exchange Act Class only, whether members of the Class have sustained damages and the proper measure of damages.

443.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

- 133 -

4875-0160-4700.v1

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## VIII.  JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  April 10, 2023

ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS
LONNIE A. BROWNE
SEAN C. MCGUIRE


                          s/ Ryan A. Llorens
                    RYAN A. LLORENS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
lbrowne@rgrdlaw.com
smcguire@rgrdlaw.com

Lead Counsel for Lead Plaintiff Public
Pension Plans and the Class

- 134 -

DATED:  April 10, 2023

LEVI & KORSINSKY, LLP
SHANNON L. HOPKINS (*pro hac vice*)
GREGORY M. POTREPKA (*pro hac vice*)
MORGAN M. EMBLETON
RACHEL BERGER


s/ Shannon L. Hopkins
SHANNON L. HOPKINS

1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/992-4523
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
rberger@zlk.com

LEVI & KORSINSKY, LLP
ADAM M. APTON (SBN 316506)
ADAM C. MCCALL (SBN 302130)
DAVID C. JAYNES (SBN 338917)
445 South Figueroa Street, 31st Floor
Los Angeles, CA  90071
Telephone:  213/985-7290
212/363-7171 (fax)
aapton@zlk.com
amccall@zlk.com
diaynes@zlk.com

Lead Counsel for Lead Plaintiff Dr. Hoch
and the Class

SUGARMAN SUSSKIND BRASWELL
   & HERRERA, P.A.
ROBERT A. SUGARMAN
PEDRO A. HERRERA
150 Alhambra Circle, Suite 725
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)
sugarman@sugarmansusskind.com
herrera@sugarmansusskind.com

CHRISTIANSEN & DEHNER, P.A.
SCOTT R. CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL  34240
Telephone:  941/377-2200
941/377-4848 (fax)

- 135 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

VANOVERBEKE, MICHAUD
   & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel for Lead Plaintiff

- 136 -

## CERTIFICATION OF RONALD HOCH PURSUANT TO
## FEDERAL SECURITIES LAWS

I, Ronald Hoch ("Plaintiff"), duly certify and say, as to the claims asserted under the federal securities laws, that:

1.   I have reviewed the Consolidated Class Action Complaint for Violation of the Federal Securities Laws ("Consolidated Complaint") and authorize its filing.

2.   I did not purchase or otherwise acquire the securities that are the subject of this action at the direction of Plaintiff's counsel, or in order to participate in this private action or any other litigation under the federal securities laws.

3.   I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   My transactions in securities of FIGS, Inc., which are the subject of this litigation, during the class period alleged in the Consolidated Complaint are set forth in the chart contained in the Schedule A attached hereto.

5.   Other than in this private action, within the last three (3) years I have not sought to serve, nor have I served, as a class representative in any action filed under the federal securities laws.

6.   I have not accepted and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, unless ordered or approved by the Court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury that the foregoing is true and correct.

Executed: April 10, 2023

By: _____

Ronald Hoch

## CERTIFICATION OF RONALD HOCH PURSUANT TO
## FEDERAL SECURITIES LAWS

### <u>SCHEDULE A</u>

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 06-01-2021 | P | 1675 | $ 31.9800 |
| 06-01-2021 | P | 100 | $ 31.9780 |
| 06-01-2021 | P | 400 | $ 31.7500 |
| 06-01-2021 | P | 99 | $ 31.9205 |
| 06-01-2021 | P | 157 | $ 31.9200 |
| 06-01-2021 | P | 170 | $ 31.9107 |
| 06-01-2021 | P | 10 | $ 31.9108 |
| 06-01-2021 | P | 116 | $ 31.8800 |
| 06-01-2021 | P | 100 | $ 31.8400 |
| 06-01-2021 | P | 100 | $ 31.8300 |
| 06-01-2021 | P | 86 | $ 31.8200 |
| 06-01-2021 | P | 206 | $ 31.7900 |
| 06-01-2021 | P | 500 | $ 31.7700 |
| 06-01-2021 | P | 1100 | $ 31.7399 |
| 06-01-2021 | P | 181 | $ 31.7300 |
| 06-10-2021 | P | 4900 | $ 35.4999 |
| 06-10-2021 | P | 100 | $ 35.4600 |
| 06-22-2021 | P | 3000 | $ 44.1465 |
| 07-01-2021 | P | 4000 | $ 46.0000 |
| 07-14-2021 | P | 3000 | $ 41.0000 |
| 07-21-2022 | P | 20000 | $ 09.8100 |
| 08-25-2022 | P | 15102 | $ 11.3800 |
| 08-25-2022 | P | 3770 | $ 11.3700 |
| 08-25-2022 | P | 728 | $ 11.3600 |
| 08-25-2022 | P | 400 | $ 11.3550 |
| 09-27-2022 | P | 20000 | $ 09.2200 |
| 11-21-2022 | S | -100 | $ 05.8150 |
| 11-21-2022 | S | -300 | $ 05.8100 |
| 11-21-2022 | S | -100 | $ 05.7950 |
| 11-21-2022 | S | -3294 | $ 05.7900 |
| 11-21-2022 | S | -300 | $ 05.7850 |
| 11-21-2022 | S | -9804 | $ 05.7800 |
| 11-21-2022 | S | -300 | $ 05.7750 |
| 11-21-2022 | S | -27263 | $ 05.7700 |
| 11-21-2022 | S | -100 | $ 05.7602 |
| 11-21-2022 | S | -800 | $ 05.7601 |
| 11-21-2022 | S | -16157 | $ 05.7600 |
| 11-21-2022 | S | -300 | $ 05.7550 |
| 11-21-2022 | S | -21182 | $ 05.7500 |
| 01-18-2023 | P | 17532 | $ 08.4200 |

## CERTIFICATION OF RONALD HOCH PURSUANT TO
## FEDERAL SECURITIES LAWS

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 01-18-2023 | P | 968 | $ 08.4100 |
| 01-18-2023 | P | 100 | $ 08.4050 |
| 01-18-2023 | P | 200 | $ 08.4000 |
| 01-18-2023 | P | 100 | $ 08.3950 |
| 01-18-2023 | P | 1100 | $ 08.3900 |
| 01-30-2023 | S | -1533 | $ 08.5750 |
| 01-30-2023 | S | -18467 | $ 08.5700 |
| 02-07-2023 | P | 1757 | $ 09.3290 |
| 02-07-2023 | P | 16227 | $ 09.3200 |
| 02-07-2023 | P | 1616 | $ 09.3100 |
| 02-07-2023 | P | 400 | $ 09.3050 |
| 02-15-2023 | P | 14522 | $ 09.6500 |
| 02-15-2023 | P | 5478 | $ 09.6400 |

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

City of Pensacola Police Officers' Retirement Plan ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re ON24, Inc. Sec. Litig.*, No. 4:21-cv-08578 (N.D. Cal.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 4ᵗʰ day of April, 2023.

City of Pensacola Police Officers'
Retirement Plan

By: _____
    Shawn Thompson, Chairman

FIGS

SCHEDULE A

SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/19/2021 | 710 | $37.81 |
| 08/23/2021 | 460 | $35.70 |
| 08/25/2021 | 230 | $35.70 |
| 10/04/2021 | 320 | $36.33 |
| 10/07/2021 | 273 | $37.19 |
| 10/08/2021 | 5 | $37.13 |
| 10/08/2021 | 62 | $37.23 |
| 10/11/2021 | 200 | $35.97 |
| 10/11/2021 | 230 | $35.34 |
| 10/11/2021 | 230 | $35.95 |
| 10/15/2021 | 390 | $35.98 |
| 10/18/2021 | 240 | $35.38 |
| 10/28/2021 | 220 | $32.92 |
| 11/11/2021 | 70 | $32.54 |
| 11/17/2021 | 280 | $33.03 |
| 11/18/2021 | 400 | $31.29 |
| 12/02/2021 | 170 | $30.13 |
| 12/03/2021 | 370 | $30.84 |
| 12/03/2021 | 560 | $29.93 |
| 12/13/2021 | 420 | $25.39 |
| 12/13/2021 | 970 | $25.52 |
| 12/14/2021 | 20 | $25.02 |
| 12/14/2021 | 50 | $24.88 |
| 12/14/2021 | 350 | $25.03 |
| 12/15/2021 | 210 | $24.57 |
| 12/17/2021 | 207 | $24.32 |
| 01/05/2022 | 10 | $25.33 |
| 01/05/2022 | 50 | $25.32 |
| 01/05/2022 | 90 | $25.41 |
| 01/05/2022 | 180 | $25.48 |
| 01/10/2022 | 310 | $23.05 |
| 01/27/2022 | 72 | $20.47 |
| 03/01/2022 | 190 | $14.46 |
| 03/01/2022 | 350 | $14.78 |
| 04/21/2022 | 510 | $16.82 |
| 04/22/2022 | 60 | $15.78 |
| 04/22/2022 | 560 | $15.75 |
| 05/05/2022 | 480 | $14.96 |
| 05/09/2022 | 550 | $12.85 |
| 06/17/2022 | 151 | $7.50 |
| 10/04/2022 | 314 | $9.47 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 09/13/2021 | 10 | $43.54 |
| 07/12/2022 | 900 | $9.57 |
| 07/18/2022 | 1,620 | $10.10 |
| 07/21/2022 | 30 | $9.84 |
| 07/21/2022 | 200 | $9.76 |
| 07/21/2022 | 1,050 | $9.77 |
| 07/21/2022 | 1,640 | $10.13 |
| 07/28/2022 | 990 | $9.93 |
| 10/05/2022 | 830 | $9.04 |
| 10/14/2022 | 1,050 | $7.66 |
| 10/17/2022 | 910 | $7.55 |
| 10/18/2022 | 730 | $7.82 |
| 10/19/2022 | 700 | $7.09 |
| 10/24/2022 | 864 | $6.54 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

City of Warren Police and Fire Retirement System ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*City of Warren Police & Fire Ret. System. v. World Wrestling Entertainment, Inc., Inc.*, No. 1:20-cv-02031 (S.D.N.Y.)
*Collinsville Police Pension Board v. Discovery, Inc.*, No. 1:22-cv-08171 (S.D.N.Y.)
*Waswick v. Torrid Holdings Inc.*, No. 2:22-cv-08375 (C.D. Cal.)

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 6th day of April, 2023.

City of Warren Police and Fire Retirement System

By:    _Scott D. Salyer_

Its:    _Chairman_

FIGS

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/27/2021 | 1,200 | $22.00 |
| 06/04/2021 | 200 | $31.24 |
| 06/07/2021 | 100 | $31.00 |
| 07/29/2021 | 100 | $36.93 |
| 07/29/2021 | 200 | $36.96 |
| 08/24/2021 | 200 | $35.06 |
| 08/25/2021 | 200 | $35.51 |
| 08/26/2021 | 100 | $35.80 |
| 10/15/2021 | 200 | $36.36 |
| 10/27/2021 | 200 | $33.98 |
| 11/19/2021 | 100 | $31.90 |
| 11/19/2021 | 200 | $31.98 |
| 12/14/2021 | 200 | $25.24 |
| 01/07/2022 | 400 | $22.79 |
| 01/19/2022 | 100 | $21.55 |
| 01/19/2022 | 300 | $21.84 |
| 05/13/2022 | 700 | $9.71 |
| 09/26/2022 | 100 | $8.96 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 12/22/2022 | 4,800 | $6.71 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Kissimmee Utility Authority Employees' Retirement Plan ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.  Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _6th_ day of April, 2023.

Kissimmee Utility Authority Employees'
Retirement Plan

By:     _____
Its:    Chairman

By:     _____
Its:    Secretary

FIGS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 08/19/2021 | 540 | $37.81 |
| 08/23/2021 | 350 | $35.70 |
| 08/25/2021 | 180 | $35.70 |
| 10/04/2021 | 250 | $36.33 |
| 10/07/2021 | 209 | $37.19 |
| 10/08/2021 | 4 | $37.13 |
| 10/08/2021 | 47 | $37.23 |
| 10/11/2021 | 150 | $35.97 |
| 10/11/2021 | 180 | $35.34 |
| 10/11/2021 | 180 | $35.95 |
| 10/15/2021 | 310 | $35.98 |
| 10/18/2021 | 189 | $35.38 |
| 10/28/2021 | 170 | $32.92 |
| 11/11/2021 | 50 | $32.54 |
| 11/17/2021 | 220 | $33.03 |
| 11/18/2021 | 310 | $31.29 |
| 12/02/2021 | 140 | $30.13 |
| 12/03/2021 | 290 | $30.84 |
| 12/03/2021 | 440 | $29.93 |
| 12/09/2021 | 2,180 | $34.32 |
| 12/13/2021 | 500 | $25.39 |
| 12/13/2021 | 1,140 | $25.52 |
| 12/14/2021 | 30 | $25.02 |
| 12/14/2021 | 60 | $24.88 |
| 12/14/2021 | 410 | $25.03 |
| 12/15/2021 | 250 | $24.57 |
| 12/17/2021 | 243 | $24.32 |
| 01/05/2022 | 10 | $25.33 |
| 01/05/2022 | 60 | $25.32 |
| 01/05/2022 | 110 | $25.41 |
| 01/05/2022 | 210 | $25.48 |
| 01/10/2022 | 370 | $23.05 |
| 01/27/2022 | 78 | $20.47 |
| 03/01/2022 | 230 | $14.46 |
| 03/01/2022 | 410 | $14.78 |
| 04/21/2022 | 600 | $16.82 |
| 04/22/2022 | 70 | $15.78 |
| 04/22/2022 | 670 | $15.75 |
| 05/05/2022 | 570 | $14.96 |
| 05/09/2022 | 660 | $12.85 |
| 06/17/2022 | 161 | $7.50 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 07/12/2022 | 1,060 | $9.57 |
| 07/18/2022 | 1,910 | $10.10 |
| 07/21/2022 | 50 | $9.84 |
| 07/21/2022 | 230 | $9.76 |
| 07/21/2022 | 1,230 | $9.77 |
| 07/21/2022 | 1,940 | $10.13 |
| 07/28/2022 | 1,160 | $9.93 |
| 10/05/2022 | 920 | $9.04 |
| 10/14/2022 | 1,160 | $7.66 |
| 10/17/2022 | 1,010 | $7.55 |
| 10/18/2022 | 810 | $7.82 |
| 10/19/2022 | 780 | $7.09 |
| 10/24/2022 | 971 | $6.54 |

Prices listed are rounded up to two decimal places.

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

Pompano Beach Police & Firefighters' Retirement System ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint filed in this matter. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.  Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Ng v. Berkeley Lights, Inc.*, No. 3:21-cv-09497 (N.D. Cal.)
*Leventhal v. Chegg, Inc.*, No. 5:21-cv-09953 (N.D. Cal.)
*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, No. 1:22-cv-01167 (E.D.N.Y.)
*Pompano Beach Police and Firefighters' Retirement System v. Olo Inc.*, No. 1:22-cv-08228 (S.D.N.Y.)

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _____ 10th day of April, 2023.

Pompano Beach Police & Firefighters'
Retirement System

By: _Paul O'Connell_
A2FA5888E2EC461...
Paul O'Connell, Chairman

FIGS

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 09/16/2021 | 435 | $42.22 |
| 09/16/2021 | 2,638 | $40.25 |
| 12/07/2021 | 272 | $32.99 |
| 12/07/2021 | 358 | $33.32 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/01/2021 | 310 | $34.29 |
| 12/10/2021 | 42 | $27.12 |
| 12/10/2021 | 1,567 | $26.66 |
| 12/10/2021 | 1,784 | $25.20 |

Prices listed are rounded up to two decimal places.

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on April 10, 2023, I authorized the

3  electronic filing of the foregoing with the Clerk of the Court using the CM/ECF

4  system which will send notification of such filing to the email addresses on the

5  attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of

6  the foregoing via the United States Postal Service to the non-CM/ECF participants

7  indicated on the attached Manual Notice List.

8
  s/ Ryan A. Llorens
9  RYAN A. LLORENS

10  ROBBINS GELLER RUDMAN
   & DOWD LLP
11  655 West Broadway, Suite 1900
   San Diego, CA  92101-8498
12  Telephone:  619/231-1058
   619/231-7423 (fax)
13
   Email:  RyanL@rgrdlaw.com
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4875-0160-4700.v1

# Mailing Information for a Case 2:22-cv-07939-ODW-AGR Sean Ryan v. FIGS, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **Peter Jacob Brody**
  pbrody@cooley.com,efilingnotice@cooley.com,cestrada@cooley.com,efiling-notice@ecf.pacerpro.com

- **Lonnie A Browne**
  lbrowne@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Gregory E Del Gaizo**
  GdelGaizo@robbinsllp.com,notice@robbinsllp.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Shannon L. Hopkins**
  shopkins@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **Winston Ping Hsiao**
  winston.hsiao@skadden.com

- **John T Jasnoch**
  jjasnoch@scott-scott.com,scott-scott@ecf.courtdrive.com,tharo@scott-scott.com,efile@scott-scott.com

- **David C Jaynes**
  djaynes@zlk.com,shalliday@zlk.com,ecf@zlk.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Ryan A. Llorens**
  ryanl@rgrdlaw.com,RyanL@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,bengfelt@rgrdlaw.com

- **Sean C McGuire**
  smcguire@rgrdlaw.com,slandry@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Peter Bradley Morrison**
  peter.morrison@skadden.com,DLMLCLAC@skadden.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Robert Henderson O'Leary**
  bob.oleary@morganlewis.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,tprzybylowski@pomlaw.com,jlopiano@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@po

- **Kevin M Papay**
  kevin.papay@morganlewis.com

- **Gregory M. Potrepka**
  gpotrepka@zlk.com,ecf@zlk.com,shopkins@zlk.com

- **John Warren Rissier**
  warren.rissier@morganlewis.com,bernice.worley@morganlewis.com

- **Brian J Robbins**
  brobbins@robbinsllp.com,notice@robbinsllp.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com,lrosen@ecf.courtdrive.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

- **Craig Wallace Smith**
  csmith@robbinsllp.com,notice@robbinsllp.com

- **Heather Marie Speers**
  hspeers@cooley.com,efilingnotice@cooley.com,daland@cooley.com,efiling-notice@ecf.pacerpro.com

- **Michael C. Tu**
  mctu@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com,mhuston@cooley.com

- **Jonathan Daniel Uslaner**
  jonathanu@blbglaw.com,juslaner@gmail.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)