**O**

# United States District Court
# Central District of California

| | |
|---|---|
| SEAN RYAN, | Case No. 2:22-cv-07939-ODW (AGRx) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT [98 & 100]** |
| FIGS, INC. et al., | |
| Defendants. | |

## I.    INTRODUCTION

This is a putative class action for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") as well as non-fraudulent securities violations under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act").   On November 11, 2022, Plaintiff Sean Ryan filed his initial Complaint against Defendants FIGS, Inc. along with individual Defendants Heather Hasson, Catherine Spear, Jeffrey D. Lawrence, Daniella Turenshine, and J. Martin Willhite.[1]   (Compl., ECF No. 1.)   The case was thereafter consolidated with *City of Hallandale Beach Police Officers and Firefighters Personnel Retirement Trust v. FIGS, Inc. et al.*, No. 2:22-cv-08912-ODW (KSx).   (Min. Order, ECF No. 64.)   The Parties

---

[1] Defendants Heather Hasson, Catherine Spear, Jeffery D. Lawrence, Daniella Turenshine, and J. Martin Willhite are referred to herein as the "Individual Exchange Act Defendants."

designated Ryan's case as the lead case and designated Plaintiffs Ronald Hoch and Public Pension Plans[2] as the Lead Plaintiffs.  (Joint Stip., ECF No. 58.)

Plaintiffs filed their consolidated Class Action Complaint on April 10, 2023. (Class Action Compl. ("CAC"), ECF No. 88.)   In their consolidated complaint, Plaintiffs added Tulco, LLC, and Thomas Tull[3] as defendants for all claims, and, for Securities Act violations only, Plaintiffs added Sheila Antrum, Michael Sonen, and all Underwriters[4] involved in FIGS, Inc.'s Initial Public Offering ("IPO") and Secondary Public Offering ("SPO").  (*Id.*)

In the Class Action Complaint, Plaintiffs set forth six causes of action against Defendants for (1) violations of section 10(b) of the Exchange Act and Securities and Exchange Commission rule 10b-5; (2) violations of section 20(a) of the Exchange Act; (3) violations of section 20(a) of the Exchange Act against insider trading; (4) violations of section 11 of the Securities Act; (5) violations of section 12(a)(2) of the Securities Act; and (6) violations of section 15 of the Securities Act.  (CAC ¶¶ 318–339, 407– 435.)   Plaintiffs allege that these violations occurred between May 27, 2021, and February 28, 2023 (the "Class Period").  (*Id.* ¶ 1.)

On May 25, 2023, Defendants Tulco, Tull, FIGS, and all individually named Defendants moved to dismiss the Class Action Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (Tulco Mot., ECF

---

[2] "Public Pension Plans" refers to multiple public pension plans suing on behalf of the pension plan members.  The Public Pension Plans designation includes the following named plaintiffs: City of Pensacola Police Officers' Retirement Plan, City of Warren Police and Fire Retirement System, Kissimmee Utility Authority Employees' Retirement Plan, and Pompano Beach Police & Firefighters' Retirement System.

[3] Defendants Tulco, LLC, Thomas Tull, and J. Martin Willhite when grouped together are referred to herein as the "Tulco Defendants."

[4] The named Underwriters ("Underwriter Defendants") are as follows: Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Credit Suisse Securities (USA) LLC, BofA Securities, INC., Cower and Company, LLC, Guggenheim Securities, LLC, KeyBanc Capital Markets Inc., Oppenheimer & Co. Inc., Piper Sandler & Co., Telsey Advisory Group LLC, Academy Securities, Inc., R. Seelaus & Co., LLC, Samuel A. Ramirez & Company, Inc., and Seibert Williams Shank & Co., LLC.

No. 98; FIGS Mot., ECF No. 100.)   The Underwriter Defendants joined Defendants Tulco, Tull, and FIGS in their motions to dismiss.  (Underwriter Joinder, ECF No. 103.) Plaintiffs opposed all motions to dismiss, and Defendants responded.  (Opp'n, ECF No. 105; Tulco Reply, ECF No. 108; FIGS Reply, ECF No. 106.)

For the reasons below, the Court **GRANTS** Defendants' motions **WITH LEAVE TO AMEND.**[5]

## II.   BACKGROUND

The Class Action Complaint has over 108 pages of alleged background information.  The Court briefly summarizes the relevant facts.

Defendant FIGS is an apparel company that sells fitted athleisure-style scrubs and related clothing to medical professionals using an online, direct-to-consumer ("DTC") business model.  (CAC ¶¶ 29–32.)  The company rose to prominence during the COVID-19 pandemic due to heightened demand for medical scrub products and a global shift to online sales.  (*Id.* ¶¶ 42–51.)  Throughout the Class Period, FIGS claimed to operate a robust customer data collection and analytic system to "better acquire and retain customers[,] reliably predict buying patterns," and improve "core operating activities and decision-making processes."  (*Id.* ¶¶ 41, 166–167.)  FIGS also represented its merchandising model as a risk-mitigation "core product strategy" centered on the seasonless nature of scrubs and a repeat customer base comprised of medical professionals.  (*Id.* ¶¶ 42–43, 147–149.)  The instant action centers on alleged securities fraud and misconduct committed by all named Defendants during the IPO, SPO, and general Class Period, ultimately resulting in the decline of FIGS stock price and economic loss to Plaintiffs.  (*See generally id.*)

Defendants Heather Hasson and Catherine Spear are Co-Founders of FIGS and served as Co-CEOs during the Class Period.  (*Id.* ¶¶ 17–18.)  Defendant Jeffrey D. Lawrence was the CFO of FIGS during the Class Period from December 2020 to

---

[5] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

December 2021. (*Id*. ¶ 19.) Defendant Daniella Turenshine replaced Lawrence as the CFO of FIGS in December 2021 and remained CFO for the remaining duration of the Class Period. (*Id*. ¶ 20.) Defendant J. Martin Willhite is a member of the FIGS Board and has served as Vice Chairman of Tulco since July 2017. (*Id*. ¶ 21.) Each of the aforementioned Defendants held positions as officers, directors, and controlling persons of FIGS and controlled SEC filings, press releases, and other public statements during the Class Period. (*Id*. ¶ 25.) Defendant Tulco, LLC is a venture capital investment firm that controlled a significant percentage of FIGS' voting interest by holding a substantial portion of FIGS' common stock during the Class Period. (*Id*. ¶ 26.) Defendant Thomas Tull is Tulco's Founder, chairman, and CEO. (*Id*. ¶ 27.)

Plaintiffs are investors who acquired FIGS Class A common stock during the Class Period between May 27, 2021, and February 28, 2023. (*Id*. ¶ 1.) Plaintiffs allege FIGS, Tulco, Tull, and the Individual Exchange Act Defendants committed Exchange Act violations in two ways. First, Plaintiffs allege these Defendants schemed to artificially increase the price of FIGS securities for the purpose of selling stocks quickly to gain windfall profits (the "pump-and-dump" scheme). (*Id*. ¶¶ 125–134.) Second, Plaintiffs allege these Defendants misled investors with false statements and omissions during the Class Period ultimately leading to Plaintiffs' economic losses. (*Id*. ¶¶ 135–222.) Regarding the alleged Security Act violations, Plaintiffs assert FIGS, Hasson, Spear, the Tulco Defendants, the Underwriter Defendants, and various other Individual Exchange Act Defendants mislead Plaintiffs with false statements and omissions as well as providing false and misleading IPO and SPO documents that violated Items 105 and 303 of SEC Regulation S-K[6]. (*Id.*)

---

[6] Regulation S-K is a SEC regulation that outlines how registrants should disclose material qualitative descriptors of their business on registration statements, periodic reports, and any other filings. *See generally* 17 C.F.R. § 229.10.

## A. Exchange Act Violations

First, Plaintiffs allege the pump-and-dump scheme began in 2017 when Defendants Hasson, Spear, Tulco, and Tull allegedly induced early-stage investors to sell their shares of FIGS stock to Tulco for significantly lower prices. (*Id*. ¶ 128.) This resulted in Hasson, Spear, and Tulco jointly holding 88% of FIGS' voting rights. (*Id*. ¶¶ 128–129.) Upon gaining majority control of FIGS voting rights and in connection with the IPO, a voting agreement was created reelecting Hasson, Spear, and Willhite—Tulco's representative—to the FIGS Board of Directors. (*Id*. ¶¶ 128–130.) With control of the FIGS Board, Hasson, Spear, and the Tulco Defendants allegedly engaged in a scheme to artificially inflate FIGS' share prices by misrepresenting to the public that FIGS possessed and used advanced data analytics and "unique inventory and supply chain management capabilities." (*Id*. ¶ 125.) These data analytic systems and management capabilities were allegedly touted as ways FIGS could weather macroeconomic pressures and provide insight into possible market behavior. (*Id*. ¶¶ 125–126.) Additionally, Defendants promised investors a product strategy focusing on a core set of medical scrub products that would provide consistent predictable revenue from a base of repeat customers. (*Id*. ¶¶ 43–46.)

On May 26, 2021, Defendants priced FIGS' IPO of 26.4 million shares at $22.00 per share. (*Id*. ¶ 69.) FIGS and Tulco sold over thirty million shares and gained $546 million by the IPO's closing. (*Id*. ¶ 76.) During the SPO, FIGS' shares were valued at $40.25 per share, and Hasson, Spear, and Tulco sold another ten million shares for over $412 million by the SPO's closing. (*Id*. ¶ 84.) Plaintiffs highlight that while the IPO and SPO resulted in nearly $1 billion of FIGS stock sold, only $96 million—less than ten percent of the overall gains—went to FIGS for company operations. (*Id*. ¶¶ 76, 131.)

Second, Plaintiffs allege FIGS, Tulco, Tull, and the Individual Exchange Act Defendants issued a series of material misstatements and omitted material facts in FIGS' "public filings, press releases and other documents throughout the Class Period"

to conceal issues from investors and artificially inflate and maintain inflation of FIGS' share price (*Id.* ¶ 135.)

Following the public offerings, FIGS, Tulco, Tull, and the Individual Exchange Act Defendants allegedly continued to misrepresent FIGS' data capabilities, financial performance, and market strategies to the public and investors. (*Id.* ¶¶ 135–136.) On various earnings calls during the Class Period, multiple individual Defendants apparently assured investors that the FIGS' core product strategy would be able to deliver on promised revenue margins despite "COVID-19 macro supply chain challenges." (*Id.* ¶¶ 195, 179–181, 185–188, 195, 197–198.) FIGS and the Individual Exchange Act Defendants allegedly made similar claims on their SEC filing Form 10-K and other public filings. (*Id.* ¶¶ 202–209.) However, according to Plaintiffs, these assurances and reports were far from reality. (*See generally id.*) Plaintiffs claim that, throughout the Class Period, FIGS, Tulco, Tull, and the Individual Exchange Act Defendants were instead:

> "(i) [E]ngaged in a high-risk merchandising model that included developing numerous new styles per quarter for which demand was untested, and: (a) was either failing to consider data and analytics in making purchase orders; or (b) did not have the data capabilities to reliably predict demand; (ii) relying heavily on expensive air freight in order to compensate for inadequate demand planning; (iii) experiencing rising levels of inventory, including of non-core products; and (iv) incurring significant costs related to each of the above.

(*Id* ¶ 135.)

These discrepancies were revealed to investors through four sets of disclosures from November 10, 2021, to February 28, 2023. (*Id.* ¶¶ 88, 121–123, 270, 287–288, 289–290, 295, 297–299, 300–02, 309.) The disclosures covered multiple topics ranging from diminished gross margins due to increased costs of transporting supplies by airfreight, the departure of Lawrence as FIGS' CFO, and lack of product inventory

management increasing storage and overall operational costs.  (*Id.*)  Plaintiffs allege that these misrepresentations and fraudulent conduct are directly responsible for Plaintiffs' economic losses and the decline in value of FIGS' Class A stock from $42.25 per share when purchased during the SPO to $6.76 per share following the corrective disclosures on March 1, 2023.  (*Id.* ¶¶ 309–312.)

### B. Securities Act Violations

Plaintiffs' Securities Act allegations assert that FIGS' IPO and SPO Documents (collectively, the "Registration Statements") contained "untrue statements of material fact and omitted material facts required by governing regulation and necessary to make the statements therein not materially misleading."  (*Id.* ¶¶ 371, 390.)  The Registration Statements allegedly misrepresented that FIGS maintained a low-risk product line because FIGS possessed data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand."  (*Id.* ¶¶ 372–401.)  Additionally, the IPO Offering Documents apparently focused on FIGS' commitment to their core scrub-wear product line as opposed to the reality of FIGS' true intentions to branch out and develop hundreds of new high-risk products.  (*Id.*)  Furthermore, Plaintiffs contend the IPO Offering Documents misrepresented that air freight was being used "only as a response to supply chain disruptions arising from the COVID-19 pandemic," and failed to disclose the actual frequency and additional reasons why FIGS chose to use air shipping methods.  (*Id.*)

Finally, Plaintiffs allege the FIGS Registration Statements were false and misleading when issued because "they failed to disclose material information require to be disclosed pursuant to the regulations governing their preparation."  (*Id.* ¶ 403.)  For Item 105, the Registration Statements apparently failed to provide the requisite "discussion of the material factors that make an investment in the registrant or offering speculative or risky."  (*Id.* ¶ 404 (quoting 17 C.F.R. § 229.105(a)).)  Plaintiffs allege the Item 105 risk factor discussion was "materially incomplete and therefore misleading."  (*Id.*)  Similarly, Plaintiffs allege that the Registration Statements failed to comply with

Item 303, which requires the Registration Statements to "[d]escribe any known trends or uncertainties that have had or that [FIGS reasonably expects are] likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." (*Id.* (quoting 17 C.F.R. § 229.303(b)(2)(ii)).)  Plaintiffs claim the Registration Statements failed to both include material uncertainties and disclose significant problems with FIGS' merchandising and production processes. (*Id.* ¶ 405.)

## III.   LEGAL STANDARD

### A.   Rule 12(b)(6) Generally

A court may dismiss a complaint under the Federal Rules of Civil Procedure ("Rule") Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  To survive a dismissal motion, a complaint need only satisfy the "minimal notice pleading requirements" of Rule 8(a)(2). *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003).  Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a claim must be "plausible on its face" to avoid dismissal).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001).  However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Ultimately, there must be sufficient factual allegations "to give fair notice and to enable the opposing party to defend itself effectively," and the "allegations that are taken as true must plausibly

suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

Because Plaintiffs in this action allege that Defendants fraudulently violated federal securities laws, Plaintiffs' initial burden is heightened by the "dual pleading requirements of [Rule] 9(b) and the [Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

**B.    Pleading Fraud Under Rule 9(b)**

Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "A pleading satisfies Rule 9(b) if it identifies 'the who, what, when, where, and how' of the misconduct charged." *MetroPCS v. SD Phone Trader*, 187 F.Supp.3d 1147, 1150 (S.D. Cal. 2016) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). The plaintiff must "set forth more than the neutral facts necessary to identify the transaction." *Vess*, 317 F.3d at 1106. "The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.*

**C.    Pleading Requirements Under the PSLRA**

Securities fraud claims must also meet a higher pleading standard under the PSLRA. Under the PSLRA, a securities fraud plaintiff must plead "(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000). Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (alterations in original) (quoting 15 U.S.C. §§ 78u–4(b)(1)–(2)).

## IV.   REQUEST FOR JUDICIAL NOTICE

FIGS and the Tulco Defendants request that the Court take judicial notice of twenty-four exhibits.  (Tulco Req. Judicial Notice ("Tulco RJN"), ECF No. 97; FIGS Req. Judicial Notice ("FIGS RJN"), ECF No. 102.)   Plaintiffs do not oppose either request for judicial notice.  The Tulco Defendants ask the Court to take judicial notice of four exhibits: (1) a public voting agreement publicly filed as a Form 10-K exhibit filed with the Securities Exchange Commission ("SEC") on March 22, 2022; (2) an amended restated stockholder agreement; (3) Tulco's Form 4 reflecting trades of FIGS common stock; and (4) Tull's Form 4 reflecting trades of FIGS common stock. (*See* Tulco RJN Exs. 1–4.)   FIGS seeks judicial notice of twenty exhibits, grouped generally into seven categories: (1) transcripts of earnings calls from November 2021 to February 2023; (2) FIGS' Form 10-K; (3) several of FIGS' Forms 10-Q ranging from 2021 to 2022; (4) FIGS' 2021 Form S-1 A Registration Statements; (5) news articles regarding FIGS leadership and success; (6) presentation slides relating to financial strategies; and (7) Hasson's and Spear's Form 4s reflecting trades of FIGS common stock.  (*See* FIGS RJN Exs. A–T.)

Although district courts generally may not consider evidence outside of the pleadings when ruling on a motion to dismiss under Rule 12(b)(6), *see United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003), a court may properly consider evidence outside of the pleadings if it is properly subject to judicial notice or is incorporated by reference into the pleadings.  *Lee*, 250 F.3d at 689.  As is particularly relevant to Defendants' motions, the Court may properly take judicial notice of SEC filings, as they are "public disclosure documents required by law to be filed." *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998) (taking judicial notice of SEC filings, even those "not specifically mentioned" in the complaint).

Courts may also consider material incorporated by reference into the complaint as true for purposes of a motion to dismiss under Rule 12(b)(6) where the plaintiff refers to the material extensively or it forms the basis of the plaintiff's claims.  *Ritchie*,

342 F.3d at 908; *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1159 (C.D. Cal. 2007) (taking judicial notice of a document where security fraud plaintiffs' claims were "predicated upon" the document); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 864 (N.D. Cal. 2004) (recognizing press releases submitted in opposition to a motion to dismiss under Rule 12(b)(6) via both judicial notice and incorporation by reference).

As Plaintiffs object to neither the Tulco RJN nor the FIGS RJN, and the materials in both RJNs fall into the above categories, the Court **GRANTS** both RJNs and considers the materials appended thereto for the purposes of these motions.

## V.   DISCUSSION

Plaintiffs assert their first cause of action against FIGS, Tulco, Tull, and the Individual Exchange Act Defendants, for violating section 10(b) and rule 10b 5 of the Exchange Act.  Plaintiffs assert their second cause of action against the Individual Exchange Act Defendants, Tulco, and Tull for control person liability under section 20(a) of the Exchange Act.  Plaintiffs assert their third cause of action against Hasson, Spear, Tulco, and Tull for insider trading under section 20(a) under the Exchange Act. Plaintiffs assert their fourth cause of action against FIGS, Hasson, Spear, Lawrence, Antrum, Sonen, Willhite, Tulco, Tull, and the Underwriter Defendants for violating Section 11 of the Securities Act and violating Item 105 and 303 of SEC Regulation S-K.  Plaintiffs assert their fifth cause of action against FIGS, Hasson, Spear, Tulco, and Tull for violating section 12(a)(2) of the Securities Act.  Plaintiffs assert their sixth cause of action against Hasson, Spear, Lawrence, and the Tulco Defendants for violating section 15 of the Securities Act.  Defendants oppose all claims.  The Court addresses each cause of action in order.

## A.   Violations of Section 10(b) of the Exchange Act

Plaintiffs assert their first cause of action against FIGS, Tulco, Tull, and the Individual Exchange Act Defendants (Hasson, Spear, Lawrence, Turenshine, and Willhite) for allegedly employing devices, schemes, and artifices to defraud Plaintiffs

by disseminating or approving materially false and misleading statements, failing to disclose and or omitting material facts necessary to make statements not misleading, and selling FIGS Class A Stock while in possession of material non-public information ("MNPI") in violation of section 10(b) and rule 10b-5.  (CAC ¶ 321.)

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Pursuant to this section, the SEC promulgated rule 10b-5, which makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 240.10b-5.

The "elements that must be pleaded to state a claim for securities fraud are strenuous but well established." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). A plaintiff must plead and prove the following elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

FIGS, Tulco, Tull, and the Individual Exchange Act Defendants move to dismiss Plaintiffs' first cause of action on the grounds that the Class Action Complaint fails to sufficiently allege elements of falsity, scienter, and loss causation.  (Tulco Mot. 7–8; FIGS Mot. 2–3.)  For the reasons below, the Court finds that Plaintiffs fail to sufficiently plead scienter under Rule 9(b) and the PSLRA.  As a result, Plaintiffs do not meet the

requisite elements necessary to allege a violation under section 10(b).  Accordingly, the Court finds it unnecessary to address the elements of falsity or loss causation for the purpose of this Order.

To successfully allege "scienter" under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  A "strong inference" under 15 U.S.C. § 78u-4(b)(2)(A) "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 314 (2007).  "In [the Ninth C]ircuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness."  *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 937 (9th Cir. 2023) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1136 (9th Cir. 2017)).  A defendant acts with the required state of mind, or scienter, only if she makes false or misleading statements either intentionally or with deliberate recklessness.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).  "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (quoting *Zucco*, 552 F.3d at 991).

When analyzing the sufficiency of a plaintiff's scienter pleadings, a court must first "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter."  *N.M. State Inv. Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir. 2011) (quoting *Zucco*, 552 F.3d at 991–92).  Second, "if no individual allegation is sufficient . . . the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness."  *Id.*

Upon review, the underlying factual allegations in the consolidated Class Action Complaint do not adequately establish a strong inference of scienter.  Plaintiffs allege scienter under five separate theories: (a) core operations; (b) access to data; (c) misleading statements; (d) sale of stocks; and (e) executive departures.  The Court considers each of Plaintiffs' scienter theories in turn.

a.   Core operations

Plaintiffs first rely upon the "core operations" theory of scienter, alleging the Individual Exchange Act Defendants admitted to having "deep institutional knowledge regarding all aspects of [FIGS]."  (CAC ¶ 228.)

Under the core operations theory of proving scienter, "[w]here a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  As the Ninth Circuit notes, "[p]roof under this theory is not easy."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014).  To establish scienter under the core operations theory, "[a] plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports."  *Id.*  In "rare circumstances" a plaintiff may establish scienter under the core operations theory by pleading with particularity specific events of such prominence "that it would be 'absurd' to suggest that management was without knowledge of the matter."  *Killinger*, 542 F.3d at 786.

In the present case, Plaintiffs allege multiple instances of Hasson and Spear publicly stating they were either "deeply involved" or managed the day-to-day operations of FIGS during the Class Period.  (CAC ¶¶ 227–229.)  Plaintiffs claim that Hasson and Spear's statements of company involvement provide strong evidence that either: (1) Hasson and Spear knew the alleged false statements were materially false

and misleading when made; or (2) Hasson and Spear were reckless when making those statements.  (*Id.* ¶ 230.)

In response, FIGS and the Individual Exchange Act Defendants argue that Hasson's and Spear's statements are being taken out of context and were not in reference to the alleged misleading misstatements and omissions.  (FIGS Mot. 28–29.) FIGS and the Individual Exchange Act Defendants argue these statements were instead related to "labor abuses in the supply chains of other apparel companies."  (*Id.* at 29.) Here, the Court finds Plaintiffs fail to provide any substantively particularized allegations or facts beyond Hasson's and Spear's blanket public statements of involvement.  These broad statements of involvement do not rise to the level of specificity required to establish a strong inference of scienter, as discussed in *Police Retirement System of St. Louis*.  759 F.3d at 1051.  Currently, Plaintiffs' core operation allegations support only a "mere inference of [the defendants'] knowledge of all core operations" and do not rise to the required level necessary to establish scienter.  *See Killinger*, 542 F.3d at 785 (internal quotation marks omitted).  The Court requires far more clear statements made by defendants indicating scienter—not "selectively chosen" out of context remarks—in Plaintiffs' pleadings.

Plaintiffs ultimately conclude their core operations theory of scienter by arguing that the remaining Individual Exchange Act Defendants, FIGS, Tulco, and Tull can be "presumed to have knowledge of adverse facts related to FIGS' operations, supply chain, merchandising, and inventory management."  (CAC ¶ 231.)  In response, Defendants Tulco and Tull argue that the core operations theory does not apply to them because there are no particularized allegations in the Class Action Complaint that Tulco or Tull "had any responsibility or control over FIGS' day-to-day operations.  (Tulco Mot. 11.)

The Court agrees with Defendants.  Plaintiffs rely solely on statements made by Hasson and Spear to impute scienter onto the remaining Individual Exchange Act Defendants, FIGS, Tulco, and Tull.  Even assuming *arguendo* that Hasson's and Spear's

statements gave rise to a strong inference of scienter, Plaintiffs' broad-strokes-attempt to impute scienter to all other Defendants fails to meet the scienter requirements under the core operations theory and the heightened particularity requirements of the PSLRA. *See In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 872 (noting the assumption that officers have knowledge of certain information by virtue of their position within the company would reduce pleading scienter to "boilerplate assertions, which would defeat the PSLRA's requirement that scienter be pled with particularity").    The allegations in the Class Action Complaint regarding FIGS generally, Tulco's, Tull's, and the remaining Individual Exchange Act Defendants' roles at FIGS are far from the requisite "specific admissions from top executives that they are involved in every detail of the company." *Daou*, 411 F.3d at 1022 (noting even "allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports" are insufficient to establish a strong inference of scienter).  Plaintiffs may not presume "that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors." *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 593 (9th Cir. 1995).

Accordingly, after reviewing all 443 paragraphs of the 136-page Class Action Complaint, the Court finds Plaintiffs fail to plead sufficient particularized facts regarding FIGS', Tulco's, Tull's, and the Individual Exchanges Defendants' actual exposure to the information underlying the allegedly misleading statements to sufficiently plead scienter under a core operations theory. *Police Ret. Sys.*, 759 F.3d at 1062 (finding plaintiff did not adequately allege scienter where the complaint "lacked allegations of specific admissions by the individual defendants regarding their involvement with [the company's] operations").

> b.    Access to data

Next, Plaintiffs allege FIGS, Tulco, Tull, and the Individual Exchange Act Defendants had access to multiple data analytic systems which gave them knowledge

of FIGS' less-than-favorable financial, supply-chain, and inventory-level status during the Class Period. (CAC ¶¶ 63, 180–181, 229, 232–241.) Plaintiffs claim Defendants— through their possession of this data—knew the FIGS' public statements made concerning "demand, air freight, inventory," and associated financials were "materially false and misleading when made and/or were made with reckless disregard for the truth." (*Id.* ¶ 241.) Plaintiffs alternatively assert that "if [FIGS] did not have the ability to manage every aspect of its products' lifecycles as the [Defendants] assured investors, then the [Defendants] statements concerning these abilities were knowingly false and misleading." (*Id.*) In response, FIGS and the Individual Exchange Act Defendants argue that Plaintiffs fail to sufficiently plead scienter under this theory because Plaintiffs do not provide or allege the specific contents of the purported data. Defendants further assert that under the "access to data" theory, Plaintiffs' scienter allegations regarding data access "can only support an inference of scienter where Plaintiffs specifically plead 'the contents of . . . of the purported data,' so the Court can 'ascertain whether there is any basis for the allegations that [Defendants] had actual or constructive knowledge' their statements were false or misleading when made." (FIGS Mot. 30 (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002)).)

Here, Plaintiffs again rely on statements made by Hasson and Spear to impute knowledge and data access capabilities onto all other Defendants in this cause of action. Plaintiffs are correct that Hasson and Spear made statements relating to FIGS' employment of multiple data analytic systems. However, Plaintiffs fail to identify any uncontroverted data, inconsistent with FIGS' public statements, that Hasson or Spear learned from these analytics. *In re Wet Seal*, 518 F. Supp. 2d at 1174 (finding allegations that defendants had access to real time reports allegedly showing the company's deteriorating financial condition were insufficient because plaintiffs failed to allege any specific data that the individual defendants learned from these reports that was inconsistent with the company's public statements); *see also Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1034 (N.D. Cal. 2012) (concluding that a complaint

failed to allege scienter because "[a]lthough plaintiff refer[red] to the existence of sales and shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no hard numbers or other specific information"). Currently, Plaintiffs' factual allegations of data access merely amount to a possible inference of recklessness, but do not rise to the state of mind necessary to establish scienter under the PSLRA.

Similarly, Plaintiffs fail to allege specific instances or particularized facts regarding the remaining Individual Exchange Act Defendants', Tulco's, and Tull's access to similar information. Plaintiffs' make an attenuated allegation that Tulco and Tull employed a "hands-on operational approach" with FIGS management that would grant the two Defendants access to knowledge of data analytics at FIGS. (Opp'n 29.) Plaintiffs do not allege any particularized facts that state Tulco or Tull had access to the data analytics at FIGS. Without particularized facts implicating each accused defendant in this cause of action, the Court declines to make inferential leaps relating to data access and knowledge of falsity. Any such conclusions would be in direct contradiction to the heightened pleading requirements demanded by the PSLRA.

Accordingly, the Court finds Plaintiffs' allegations of Defendants' data access fall short of establishing scienter.

c.   March and May 2022 Earnings Calls

Plaintiffs next assert that Spear's and Turenshine's statements during FIGS' March 2022 earnings call misled Plaintiffs by painting a very positive image of FIGS' financial, supply-chain, and inventory status going into Q1 2022. (CAC ¶¶ 242–250.) However, the May 2022 earnings call disclosed the actual Q1 results, which were far less positive than promised during the March 2022 earnings call. (*Id.* ¶ 245.) Plaintiffs then cite to various underwriter analysts' suspicions insinuating that there may be "more at play" regarding Defendants' alleged excuses for the large difference in March 2022 Q1 projections versus May 2022 Q1 results. (*Id.* ¶ 250.) In response, FIGS and the Individual Exchange Act Defendants provided the transcript of the March 2022 earnings call and argue that they provided proactive disclosures to place investors on

notice of possible risks.  (FIGS Mot. 29; *see* Decl. Heather Speers ISO FIGS Mot. ("Speers Decl.") Ex. E, ECF No. 101.)  After reviewing the March 2022 earnings call transcript, the Court finds Defendants did, in fact, provide proactive disclosures.  (*Id.*) While the disclosures are not expressly forefront, their existence negates any strong inference of fraudulent intent or deliberate recklessness.  *Tellabs*, 551 U.S at 314 (holding that a strong inference under 15 U.S.C. § 78u-4(b)(2)(A) "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent").  Accordingly, the Court does not find a strong inference of scienter based on the earnings calls.

d.   Sale of Stocks

Next, Plaintiffs claim Hasson's, Spear's, Tulco's, and Tull's stock sales during the Class Period raise a strong inference of scienter.

Stock sales by corporate insiders "[are] suspicious only when [they are] 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 621 (9th Cir. 2017) (quoting *Zucco*, 552 F.3d at 1005).  To make this determination, courts look to three factors: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*  The Court addresses each factor in turn.

First, to raise suspicion around the amount and percentage of stocks sold, a plaintiff must demonstrate that defendants sold the overwhelming majority of their shares.  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp*., 320 F.3d 920, 939 (9th Cir. 2003) (holding that nine individual defendants selling at least 88% of their total security holdings raised suspicion).  "The greater percentage of stock sold, the greater likelihood a court will infer scienter."  *In Re Alteryx, Inc. Sec. Litig.*, No. 21-cv-01540-DOC (JDEx), 2021 WL 4551201, at *4 (C.D. Cal. June 17, 2021).  There are "novel situations" where the "stock sales result in

a truly astronomical figure" and courts must give greater weight to the monetary return instead of the percentage of stocks sold. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (determining that an individual defendant who sold $900 million in stock raised suspicion, even though it only represented 2.1% of his total securities holding).

Plaintiffs rely heavily on *Nursing Home Pension Fund, Local 144 v. Oracle Corp.* ("*Oracle*") in asserting that the near $1 billion combined total of proceeds Defendants made from selling FIGS stock supports finding the "novel situation" justifying an "overwhelming inference of scienter." (Opp'n 22.) In *Oracle*, the Ninth Circuit found the stock sales of an individual defendant to be suspicious, rather than the combined total of multiple defendants' stock sales as Plaintiffs argue here. *See Oracle*, 380 F.3d at 1232. Therefore, the Court considers Hasson's, Spear's, Tulco's, and Tull's individual stock sales to determine whether suspicion exists.

Plaintiffs allege that during the Class Period, Hasson sold over $97 million in stocks and Spear sold over $60 million. (CAC ¶¶ 84, 259.) Unlike *Oracle*, these are not "astronomical figures," 380 F.3d at 1232, and the Court therefore places greater weight on the percentage of holdings sold to infer scienter. Plaintiffs allege Hasson sold "almost 15% of her total holdings," and Spear sold "nearly 9% of her total holdings." (CAC ¶¶ 84, 259.) These percentages do not raise suspicion of scienter. *See Metzler*, 540 F.3d at 1067 (concluding that selling 37% of total stock holding is not high enough to support an inference of scienter).

Regarding Tulco and Tull, the Court finds the combined total of $821 million in stocks sold to be in the realm of "astronomical" as contemplated in *Oracle*, and therefore suspicious on its face. *See* 380 F.3d at 1232. However, this imprecise suspicion alone does not support a strong inference of scienter. *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002) (holding that, although a sale of stocks was suspicious, a strong inference was not raised because analysis of the remaining factors

1    did not raise suspicion).  As Plaintiffs fail to plead the individual amount of stock Tulco
2    and Tull sold, the Court is unable to find a strong inference of scienter based thereon.

3            Second, when the timing and circumstances of a sale seem "calculated to
4    maximize the personal benefit from undisclosed inside information," courts are more
5    likely to infer scienter.  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).  In the
6    present case, Plaintiffs argue Hasson and Spear "sold over $4.5 million of stock [in
7    December,] . . . less than a week before the Company announced Lawrence's departure,
8    causing FIGS' share price to decline over 23%."  (Opp'n 27.)  FIGS and the Individual
9    Exchange Act Defendants argue there was nothing suspicious about the timing of
10   Hasson's and Spear's December stock sales because the sales were tax related.  (FIGS
11   Mot. 31–32.)  The Court reviewed Hasson's and Spear's Form 4 tax filings and finds
12   their December sale of stocks were not overtly suspicious.  (Speers Decl. Exs. S–T); *In
13   re NVIDIA Corp. Sec. Litig.*,768 F.3d 1046, 1058 n.10 (9th Cir. 2014) (noting when
14   individual defendant's Form 4s are incorporated by reference and "assumed to be true
15   for purposes of a motion to dismiss, . . . both parties—and the Court—are free to refer
16   to any of its contents").

17           In contrast, the timing of Tulco's September 2021 stock sale raises a degree of
18   suspicion indicating scienter.  Plaintiffs allege Tulco sold stocks approximately two
19   months prior to Defendants' first corrective disclosure in November 2021.  (Opp'n 26–
20   27; CAC ¶ 262.)  Similar courts in this district have held that selling stocks within
21   months of corrective disclosures *may* support an inference of scienter.  *See Baron v.
22   Hyrecar Inc.*, No. 2:21-cv-06918-FWS (JCx), 2022 WL 17413562, at *15 (C.D. Cal.
23   Dec. 5, 2022).  As such, the Court determines that Plaintiffs have established the timing
24   of Tulco's September 2021 stock trade to be suspicious.  However, as the Court has
25   cautioned throughout this section, one suspicious factor alone does not support a strong
26   inference of scienter, and therefore Plaintiffs fail to meet that requirement as to Tulco.

27           Regarding Tull, Plaintiffs do not allege that Tull made any individual stock sales.
28   Accordingly, the Court cannot make a determination as to whether the timing and

circumstances of Tull's stock sales raise an inference of suspicion until Plaintiffs provide sufficient factual allegations.

Third, stock sales "[are] suspicious only when [they are] 'dramatically out of line with prior trading practices.'" *City of Dearborn*, 856 F.3d at 621. Plaintiffs do not allege prior trading history for Hasson or Spear. (*See generally* CAC.) This is because Hasson and Spear were subject to a 180-day lock-up period which legally forbade them from trading until specific requirements were met. (*Id.* ¶¶ 255–258.) Similar courts have found that stock sales following a lack of prior trading history is not suspicious or "dramatically out of line" when individual defendants are subject to lock-up agreements. *Scheller v. Nutanix, Inc.*, 450 F. Supp. 3d 1024, 1042 (N.D. Cal. 2020) (holding the fact that neither individual had previously sold stock was not suspicious because individual defendants were subject to 180-day lock-up periods prior to the Class Period.) Regarding Tulco and Tull, the Court requires Plaintiffs to provide more information in their amended complaint as to Tulco's and Tull's prior trading history. The Court cannot make a determination on trading history given Plaintiffs' current factual allegations.

In summation, after reviewing all three stock sales factors, the Court does not find Hasson's and Spear's stock sales suspicious. The Court *does* find that Plaintiffs established an indicium of suspicion regarding Tulco's and Tull's stock sales. However, this sole indicium alone is insufficient to support a strong inference of scienter against Tulco and Tull. Therefore, Plaintiffs fail to sufficiently allege scienter under this theory.

e.   Executive Departures

Lastly, Plaintiffs allege the departure of Lawrence and Varelas, Hasson's transition from co-CEO to Executive Chair of the FIGS Board, and high employee turnover establish a strong inference of scienter. (CAC ¶¶ 267–281.)

Where sufficiently "numerous or suspicious," "resignations, terminations, and other allegations of corporate reshuffling may in some circumstances be indicative of

scienter." *Zucco*, 552 F.3d at 1002. "Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances," courts typically do not find an indication or inference of scienter. *Id.* "[T]he inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*

Prior to his departure, Lawrence served as the CFO of FIGS. (CAC ¶¶ 267–272.) Plaintiffs allege his departure from FIGS supports a strong inference of scienter because he resigned shortly before his one-year anniversary with the company leaving "a significant amount of FIGS stock that would have vested on his one-year anniversary." (*Id.* ¶ 267.) Additionally, Plaintiffs assert that FIGS categorized Lawrence's departure as a "retirement" from FIGS, but Lawrence was employed eight months later at a different company, and Plaintiffs argue this inconsistency is another indication of scienter. (Opp'n 34.) However, based on the factual allegations presented, the Court does not find Lawrence's departure to be under suspicious circumstances. While his departure as CFO may have been unexpected, the Court declines to speculate as to the reasons behind a change of leadership positions within a large corporation. Accordingly, absent additional factual allegations, Lawrence's departure alone does not establish a strong inference of scienter.

Turning to Vaerlas, while at FIGS, Varelas served as an independent director on the FIGS board, the chair of the audit committee, and a member of the compensation and governance committees. (CAC ¶ 273.) Varelas's term on the FIGS board was set to expire in 2024, however Varelas resigned in August 2021 prior to FIGS' first issue of financial results as a publicly traded company. (*Id.* ¶ 274.) Plaintiffs assert Varelas's departure from FIGS supports an inference of scienter but do not provide any other factual allegations or substantively compelling suspicious circumstances. Here, the

1  Court does not find an inference of scienter given the current set of factual allegations
2  presented by Plaintiffs. *In re Downey Sec. Litig.*, No. 2:08-cv-3261-JFW (RZx),
3  2009 WL 736802, at *11 (C.D. Cal. Mar. 18, 2009) ("A resignation or termination
4  provides evidence of scienter only when it is accompanied by additional evidence of
5  the defendant's wrongdoing."); *cf. Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F.
6  Supp. 2d 1164, 1188 (C.D. Cal. 2007) (finding support for scienter where officer
7  resigned specifically to avoid cooperating with internal investigation).

8        Regarding Hasson, Plaintiffs allege that Hasson's transition from co-CEO to
9  Executive Chair of FIGS' board coincided with Defendants' fraud beginning to unravel.
10  (CAC ¶ 278.)  But Plaintiffs offer no facts or evidence to support this claim of scienter
11  other than conflicting statements from Spear regarding the efficiency of having co-
12  CEOs. (*Id.* ¶¶ 276–277.)  Accordingly, the Court does not find any inference of scienter
13  regarding Hasson's transition from co-CEO to a more advisory role in FIGS' leadership.
14  *In re NVIDIA*, 768 F.3d at 1063 (declining to find scienter on the basis of executive
15  departures in part because "two of the three individuals remained at NVIDIA in some
16  type of advisory role").

17        Finally, as to high turnover, Plaintiffs allege FIGS experienced "an unusually
18  high degree of employee turnover . . . throughout the Class Period."  (CAC ¶ 279.)
19  Plaintiffs rely on various third-party websites such as Glassdoor and supposed
20  anonymous employees to support their allegation of scienter.  Courts typically treat
21  anonymous internet postings—like those posted on Glassdoor—as tantamount to
22  confidential witness statements.  *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F.
23  Supp. 3d 1213, 1261 (C.D. Cal. 2015).   A complaint relying on the statements of
24  confidential witnesses to establish scienter (1) must describe the confidential witnesses
25  with sufficient particularity to establish their reliability and knowledge, and (2) must
26  plead statements by confidential witnesses with sufficient reliability and personal
27  knowledge that are indicative of scienter.  *Zucco*, 552 F.3d at 995.  Accordingly, it is
28  Plaintiffs' burden to provide factual allegations supporting the reliability and personal

knowledge of third-party internet postings. *ScripsAmerica*, 119 F. Supp. 3d at 1261 (holding that, to allege scienter with internet postings, a plaintiff must plead "reliability" and "personal knowledge" to the same degree as if pleading scienter with confidential witnesses). Here, Plaintiffs fail to allege facts supporting an inference that these third-party internet postings, reviews, and articles are reliable and possess knowledge of FIGS' alleged fraudulent misconduct. As such, Plaintiffs fail to sufficiently allege a strong inference of scienter.

### f.   Holistic Evaluation of Scienter

Considering the allegations of the Class Action Complaint as a whole, the Court finds Plaintiffs have not adequately pleaded a holistic inference of scienter with respect to FIGS, Tulco, Tull, or the Individual Exchange Act Defendants.

Accordingly, the Court **GRANTS** Defendants' motions and **DISMISSES** Plaintiffs' Section 10(b) cause of action **WITH LEAVE TO AMEND**.

## B.   Violation of Section 20(a) of the Exchange Act

Plaintiffs assert their second cause of action against the Individual Exchange Act Defendants, Tulco, and Tull for control person liability under section 20(a) of the Exchange Act. Under section 20(a) of the Exchange Act, "certain 'controlling' individuals [are] also liable for violations of section 10(b) and its underlying regulations." *Zucco*, 552 F.3d at 990 (citing 15 U.S.C. § 78t(a)). A claim under section 20(a) is dependent on a primary violation of section 10(b) of the Exchange Act or rule 10b-5. *Id.* (holding the existence of a primary violation under section 10(b) is a prerequisite for control person liability under section 20(a)); *see also In re NVIDIA*, 768 F.3d at 1062 ("[A plaintiff] must first prove a primary violation of underlying federal securities laws, such as section 10(b) or rule 10b-5, and then show that the defendant exercised actual power over the primary violator."). Here, as explained above, Plaintiffs have failed to adequately plead scienter and therefore have not adequately stated a section 10(b) or rule 10b-5 violation, so there is no alleged primary

violation that could support a section 20(a) cause of action against the Individual Exchange Act Defendants.

Accordingly, the Court **GRANTS** Defendants' motions and **DISMISSES** Plaintiffs' section 20(a) cause of action **WITH LEAVE TO AMEND**.

## C.    Violation of Section 20(a) for Insider Trading

Plaintiffs bring their third cause of action—also pleaded under section 20(a) of the Exchange Act—against Hasson, Spear, Tulco, and Tull.  Section 20(a) also creates a private cause of action for 'contemporaneous' insider trading.  *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at *12 (N.D. Cal. Feb. 27, 2018). "To satisfy [section 20(a)], a plaintiff must plead (i) a predicate violation of the securities laws; and (2) facts showing that the trading activity of plaintiffs and defendants occur 'contemporaneously.'" *Id.* (internal citations omitted).  Here, as with Plaintiffs' section 20(a) claim above, Plaintiffs have failed to plead a predicate primary violation of securities laws to support their section 20(a) cause of action.  *Macomb Cnty. Emps. Ret. Sys. V. Align Tech.,* 39 F.4th 1092, 1100 n.2 (9th Cir. 2022) (pleading a violation of Section 10(b) is a "threshold issue" for a violation of section 20(a)).  Therefore, Plaintiffs fail to state a private section 20(a) cause of action against Hasson, Spear, Tulco, and Tull.

As such, the Court **GRANTS** Defendants' motions and **DISMISSES** Plaintiffs' section 20(a) cause of action **WITH LEAVE TO AMEND**.

## D.    Violation of Section 11 of the Securities Act

Plaintiffs assert their fourth cause of action against FIGS, Hasson, Spear, Lawrence, Antrum, Sonen, Willhite, Tulco, Tull and the Underwriter Defendants, for issuing Registration Statements that contained materially false or misleading statements or omissions in violation of section 11 of the Securities Act.  (CAC ¶¶ 341–344). Plaintiffs additionally assert the Registration Statements violate Item 105 and Item 303 of SEC Regulation S-K.  (*Id.* ¶ 403.)

1

   *1.    Section 11*

2      Section 11 creates a private right of action for any purchaser of a security where

3   "any part of the registration statement, when such part became effective, contained an

4   untrue statement of a material fact or omitted to state a material fact required to be stated

5   therein or necessary to make the statements therein not misleading."   15 U.S.C.

6   § 77k(a).   Under section 11, a plaintiff must plead facts proving the following two

7   elements:   "'(1) that   the   registration   statement   contained   an   omission   or

8   misrepresentation, and (2) that the omission or misrepresentation was material, that is,

9   it would have misled a reasonable investor about the nature of his or her investment.'"

10  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re*

11  *Daou Sys.,* 411 F.3d at 1027.   "By definition, a plaintiff must show that a purported

12  misstatement in a registration statement was misleading at the time the registration

13  statement was issued." *In re: Resonant Inc. Sec. Litig*., No. 2:15-cv-01970 SJO (PJWx),

14  2016 WL 1737959, at *7 (C.D. Cal. Feb. 8, 2016).   Similarly, "[a] claim under section

15  11 based on the omission of information must demonstrate that the omitted information

16  existed at the time the registration statement became effective." *Rubke*, 551 F.3d at

17  1164.

18     "Although the heightened pleading requirements of the PSLRA do not apply to

19  section 11 claims, plaintiffs are required to allege their claims with increased

20  particularity under Rule 9(b) if their complaint sounds in fraud." *Id.* at 1161.   To

21  determine whether a complaint sounds in fraud, courts must examine the complaint's

22  language and structure and assess "whether the complaint alleges a unified course of

23  fraudulent conduct and relies entirely on that course of conduct as the basis of a claim."

24  *Id*.   However, "[w]here . . . a complaint employs the exact same factual allegations to

25  allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b)

26  of the Exchange Act, we can assume that it sounds in fraud." *Id.*

27

28

a. <u>CAC Sounds in Fraud</u>

As a preliminary matter, the Court first addresses whether the Class Action Complaint, in its entirety, sounds in fraud.  "[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885–86 (9th Cir. 2012) (holding that Rule 9(b) applied when the plaintiff's section 11 claim relied on the same alleged misrepresentations as plaintiff's fraud-based section 10(b) claims even though the plaintiff "disclaimed in its complaint any allegation of fraud in connection with the section 11 cause of action").  Here, Plaintiffs assert that their section 11 claims are "based solely on strict liability and negligence—*i.e.*, not intentional or reckless conduct."  (CAC ¶ 340.)  Plaintiffs further declare "[t]his [Securities Act] section . . . expressly disclaims any allegations of fraud, scienter, or recklessness pled herein in connection with the Exchange Act claims."  (CAC ¶ 340.)  Plaintiffs argue their "Securities Act claims do not allege Defendants knew about adverse undisclosed facts or knowingly failed to disclose such facts while making the challenged statements," and therefore do not sound in fraud.  (Opp'n 50.)  Nevertheless, the Court finds the gravamen of Plaintiffs' Class Action Complaint sounds in fraud, as Plaintiffs rely on the same factual allegations of misleading false statements, misstatements, omissions, Registration Statements, and individual Defendant behavior for their Securities Act claims as in their fraud-based Exchange Act claims.  (CAC ¶¶ 1–124, 135–155, 164–174, 214–216, 341, 371–406.)

b. <u>Rule 9(b) Defendants</u>

Accordingly, the Court finds Plaintiffs' section 11 claims against FIGS, Hasson, Spear, Lawrence, Willhite, Tulco, and Tull sound in fraud and therefore must satisfy Rule 9(b).  This is because the alleged "course of conduct" to support Plaintiffs' section 11 Securities Act and fraud-based section 10(b) Exchange Act claims against these Defendants are "so substantially similar."  *In re Eventbrite, Inc. Sec. Litig.*, Case

28

No. 5:18-cv-02019-EJD, 2020 WL 2042078, at *15 (N.D. Cal. Apr. 28, 2020). Therefore, Plaintiffs' section 11 claims against FIGS, Hasson, Spear, Lawrence, Willhite, Tulco, and Tull will only survive if the complaint has "set forth what is false or misleading about [the alleged misconduct] and why [it is] false." *Rubke*, 551 F.3d at 1161. This requirement "can be satisfied 'by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.'" *Id.* (citing *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999).

Plaintiffs assert the Registration Statements were false and misleading. (CAC ¶¶ 371–389, 390–402.) The Registration Statements allegedly misrepresented that FIGS maintained a low inventory risk, "purportedly because [FIGS] had data analytics capabilities that permitted FIGS to 'reliably predict buying patterns' and 'anticipate demand' and because FIGS was supposedly operating a 'lower-risk merchandising model' focused on its core products rather than rapid development of hundreds of new products." (*Id.* ¶¶ 372, 375–382, 391, 393–399.) Next, Plaintiffs allege the Registration Statements apparently misrepresented that air freight was being used only "as a response to supply chain disruptions arising from the COVID-19 pandemic," omitting the true frequency and additional reasons FIGS utilized the more expensive shipping method. (*Id.* ¶¶ 373, 388–389, 401–402.) These documents were signed by Hasson, Spear, Lawrence, and Willhite (who was acting on behalf of Tulco). (*Id.* ¶¶ 374, 392.)

As currently pleaded, Plaintiffs' factual allegations do not meet the heightened standards required by Rule 9(b). Plaintiffs go to great lengths to describe "what" is false and misleading about Defendants' Registration Statements but fall short in their explanation on "why" a particular statement is false or misleading under Rule 9(b). *Rubke*, 551 F.3d at 1161. Rather than expend further judicial resources piecing together arguments for Plaintiffs under Rule 9(b), the Court grants Plaintiffs leave to amend their consolidated Class Action Complaint and tailor their section 11 allegations in

1   accordance with the discussion above.   Upon receipt of an amended complaint, the

2   Court will analyze Plaintiffs' amended section 11 claims against FIGS, Hasson, Spear,

3   Lawrence, Willhite, Tulco, and Tull under Rule 9(b).

c.   Rule 8(a) Defendants

5   In contrast, the Court finds Plaintiffs' section 11 claims against Antrum, Sonen,

6   and the Underwriter Defendants do not need to be pleaded with the particularity that

7   Rule 9(b) requires.   Plaintiffs do not assert fraud-based Exchange Act claims against

8   these Defendants.   The only factual allegations and claims made against Antrum, Sonen,

9   and the Underwriter Defendants are non-fraudulent and rooted in negligence.   The

10   alleged "course of conduct" Plaintiffs rely on to support the section 11 claims against

11   these Defendants is not substantially similar to the fraud-centered conduct discussed in

12   the above paragraph.   Accordingly, the Court holds the allegations against Antrum,

13   Sonen, and the Underwriter Defendants are evaluated under Rule 8(a).   *Bos. Ret. Sys.*

14   *v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846, at *4 (N.D. Cal. Aug. 7,

15   2020) (holding that, Rule 9(b) does not apply where the plaintiff "has made an effort to

16   plead a non-fraudulent basis for Section 11 liability").

17   However, Plaintiffs' Rule 8(a) claims still fail due to outstanding issues and

18   inconsistences regarding Plaintiffs' current factual allegations.   Plaintiffs provide

19   conflicting information regarding the involvement and conduct of Antrum and Sonen.

20   Initially, Plaintiffs allege Antrum and Sonen, "signed the IPO and SPO Offering

21   Documents at issue, and/or were named as directors in the registration statements for

22   the IPO and SPO."   (CAC ¶ 346.)   Then Plaintiffs state Antrum and Sonen only

23   reviewed and authorized their signatures on the SPO Offering Documents, not both.

24   (*Id.* ¶¶ 347, 348.)   The Court requires Plaintiffs clarify the inconsistencies regarding

25   Antrum's and Sonen's involvement with the IPO and SPO.

26   Plaintiffs next allege the Underwriter Defendants failed to conduct an "adequate

27   and reasonable investigation into the business operations of [FIGS]" and ultimately

28   provided false and misleading statements in the Registration Statements.   (*Id.* ¶¶ 369–

370, 384–387.)  It is plaintiff's burden to provide factual allegations that demonstrate a defendant's statement or omission in the registration statement was misleading at the time the registration statement was issued.  *In re: Resonant*, 2016 WL 1737959, at *7. Here, Plaintiffs do not clearly allege that the Underwriter Defendants' statements were misleading at the time the Registration Statements were issued.  Accordingly, Plaintiffs' Rule 8(a) claims fail.  As discussed in the above subsection, upon receipt of an amended complaint, the Court will analyze the amended section 11 claims against Antrum, Sonen, and the Underwriter Defendants under Rule 8(a).

Accordingly, the Court **DISMISSES** Plaintiffs' section 11 claims **WITH LEAVE TO AMEND**.

### 2. *Item 105 and Item 303*

Turning to Plaintiffs' Item 105 and Item 303 claims, Item 105 of SEC Regulation S-K requires that registration statements filed on Form S-1 include "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  Item 303 of SEC Regulation S-K requires that offering materials disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is *both* [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operation."  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) (internal citations omitted).  "Thus, Item 303 requires disclosure when there is knowledge of an adverse trend, material impact, and that 'the future material impacts are *reasonably likely to occur* from the present-day perspective.'"  *Berg v. Velocity Fin., Inc.*, No. 2:22-cv-06780-RGK (PLAx), 2021 WL 268250, at *9 (C.D. Cal. Jan. 25, 2021) (quoting *Steckman*, 143 F.3d at 1297).

Plaintiffs assert that "[a]lthough the [Registration Statements] included a discussion of risk factors, that discussion was materially incomplete and therefore misleading," and in violation of Item 105.  (CAC ¶ 404.)  Plaintiffs also allege Defendants negligently violated Item 105 and Item 303 in the Registration Statements because they failed to disclose:

> significant problems with FIGS's merchandising and production process, specifically, that (i) FIGS did not have sophisticated data analytics, or, if it did, was not using those sophisticated data analytics to reliably predict demand for its new and existing products; and (ii) its shift throughout 2021 away from non-discretionary core products which were subject to replenishment, and toward a greater and growing number of new styles for which demand was not established created extreme risk that FIGS would be ill-equipped to reliably predict customer demand, especially in the absence of data driven forecasting solutions.

(*Id.* ¶ 405.)  Plaintiffs claim the aforementioned misstatements and omissions resulted in an increased dependance "on expensive air freight to ship its products, lost sales due to stockouts resulting from [FIGS'] deviation from its core-style strategy, and . . . skyrocketing costs associated with ballooning inventory levels as increasing numbers of new products failed to find a market." (*Id.* ¶ 406.)  Plaintiffs further allege these facts were "known to management, presented uncertainty, and made investment in FIGS speculative and risky." (*Id.*)

FIGS and the Individual Exchange Act Defendants oppose each of Plaintiffs' allegations.  To refute the misleading data analytics allegations, Defendants argue the "alleged misrepresentations about data analytics cannot qualify as a 'trend' or 'uncertainty' under Items 303 or 105, nor would it decrease the predictive value of FIGS' reported results."  (FIGS Mot. 40.)  Defendants further state FIGS *did* disclose the "inherent uncertainty of forecasts and the increased uncertainty caused by macroeconomic factors[,]" in their IPO documents.  (*Id.* at 4–5, 40.)  In response to the alleged undisclosed shift away from core products, Defendants respond that the IPO

documents disclosed that "weekly new product launches were a staple of FIGS' prior success and a key pillar of its growth strategy." (*Id*. at 41.)

First, the Court addresses Plaintiffs' Item 303 Claim.  To state a claim for Item 303 disclosure violations, a plaintiff must allege facts demonstrating the defendant had knowledge of an adverse trend or uncertainty.  17 C.F.R. § 229.303(a)(3)(ii).  Plaintiffs allege the above facts were "known to management," but fail to offer any factual allegations indicating Defendants' concrete knowledge of the alleged adverse information.  (CAC ¶ 406.); *Terenzini v. GoodRx Holdings, Inc*., No. 8:20-cv-11444-DOC (MARx), 2022 WL 122944, at *8 (C.D. Cal. Jan. 6, 2022) (finding plaintiffs failed to allege specific facts indicating defendants' concrete knowledge of a third-party's adverse plan that would negatively affect defendants' future stock value).  Similarly, courts in this district have held that factual allegations inferring a defendant's knowledge of adverse trends do not suffice to raise a claim above a "speculative level." *Belodoff v. Netlist, Inc*., No. 8:07-cv-00677-DOC (MLGx), 2009 WL 1293690, at *11–12 (C.D. Cal. Apr. 17, 2009) (finding plaintiff's Item 303 claim alleging defendant's knowledge of adverse trends of dwindling customer demand—supported by inferential evidence (*e.g.*, excess inventory of products)—failed to raise the claim of defendant's knowledge above a speculative level).  Therefore, the Court finds the facts underlying Plaintiffs' Item 303 claim to be merely speculative and lacking sufficient factual allegations plausibly demonstrating Defendants' concrete knowledge of the alleged adverse trends at the time of filing the Registration Statements.  As such, Plaintiffs' Item 303 claim fails as to all defendants.

Next, the Court addresses Plaintiff's Item 105 Claim.  As stated above, Plaintiffs admit Defendants' Registration Statements discussed risk factors, but contend the discussion was insufficient regarding Defendants' data analytics capabilities and 2021 shift away from its core product line.  (CAC ¶¶ 404–406.)  Regarding Defendants' data analytic capabilities, Plaintiffs do not allege any factual allegations that plausibly demonstrate Defendants' alleged data analytic shortcomings.    Without factual

allegations demonstrating FIGS and the other named Defendants had knowledge of either: (1) a company-wide lack of sophisticated data analytics; or (2) the nonuse of existing data analytic capabilities—the Court does not find it necessary to require Defendants to warn against risks of which Defendants may or may not have had knowledge.  The Court declines to make inferential leaps and instead implores Plaintiffs to plead their data analytic Item 105 claim with sufficient detail and specificity.

Finally, regarding the 2021 shift away from its core product line, Defendants *did* include a discussion in the Registration Statements addressing the 2021 shift to broaden product lines as a part of a developing business strategy.  (FIGS Mot. 4–5.)  Plaintiffs do not allege that Defendants had knowledge of potential risks regarding broadening product lines at the time of disclosure.  As such, Plaintiffs fail to state a claim that would require Defendants to include speculative future-facing warnings on the subject in their Registration Statements.  Accordingly, Plaintiffs' Item 105 claim also fails.

Accordingly, the Court **DISMISSES** Plaintiffs' Item 105 and Item 303 claims **WITH LEAVE TO AMEND**.

**E.     Violation of Section 12(a)(2) of the Securities Act**

Plaintiffs bring their fifth cause of action against Defendants FIGS, Hasson, Spear, Tulco, and Tull pursuant to section 12(a)(2) of the Securities Act and on behalf of all members of the Securities Act Class who purchased FIGS Class A common stock pursuant to the IPO and/or SPO.

"Sections 11 and 12(a)(2) are 'Securities Act siblings' with similar elements.  *In re Velti PLC Sec. Litig.*, No. 13-cv-03889-WHO, 2015 WL 5736589, at *31 (N.D. Cal. Oct. 1, 2015) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010)).  "To plead a claim under Section 12(a)(2), the plaintiff must allege that (1) the defendant is a statutory seller; (2) the sale was effected by means of a prospectus or oral communication; and (3) the prospectus or oral communication contained a material misstatement or omission."  *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-0302-MRP (MANx), 2011 WL 4389689, at *8 (C.D. Cal. May 5, 2011).

"The 'misstatement or omission' requirement under Section 12(a)(2) is materially identical to that under Section 11." *In re Velti PLC*, 2015 WL 5736589, at *31.

Therefore, because the Court has already dismissed Plaintiffs' section 11 claims, the Court **DISMISSES** Plaintiffs' section 12(a)(2) cause of action on the same grounds **WITH LEAVE TO AMEND**.

**F.     Violation of Section 15 of the Securities Act**

Plaintiffs assert their sixth and final cause of action against Hasson, Spear, Lawrence, and the Tulco Defendants pursuant to section 15 of the Securities Act.

Section 15 imposes secondary liability on someone who "controls" any person who is liable for a primary violation under either section 11 or section 12 of the 1933 Act. *See, e.g.*, *In re ZZZZ Best Sec. Litig.*, No. 87-cv-3574-RSWL (Bx), 1994 WL 746649, at *6 (C.D. Cal. Oct. 26, 1994). Like section 20, section 15 imposes "controlling person" liability that cannot survive absent a primary violation. *See, e.g., In re Rigel Pharms.*, 697 F.3d at 886 ("Section 20(a) and section 15 both require underlying primary violations of the securities laws." (citing 15 U.S.C. §§ 77o, 78t(a))). Because, as explained above, Plaintiffs fail to plead adequate violations of section 11 and section 12, the Court **DISMISSES** Plaintiffs' section 15 claims as well, **WITH LEAVE TO AMEND**.

## VI.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** Defendants' Motions to Dismiss the Amended Class Action Complaint, **WITH LEAVE TO AMEND**.  (ECF No. 98; ECF No. 100.)   If Plaintiffs elect to file a First Amended Class Action Complaint ("FAC"), they shall do so within **forty-five (45)** days of the date of this Order.  If Plaintiffs file a FAC, Defendants shall file a response no later than **twenty-one (21) days** from the date Plaintiffs file the FAC.  If Plaintiffs do not timely file a FAC, then as of their deadline and without further notice this dismissal shall convert to a dismissal with prejudice.

**IT IS SO ORDERED.**

January 17, 2024

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

36