1  ROBBINS GELLER RUDMAN
    & DOWD LLP
2  RYAN A. LLORENS (225196)
   ERIKA L. OLIVER (306614)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  ryanl@rgrdlaw.com
   eoliver@rgrdlaw.com
6
   Lead Counsel for Lead Plaintiff
7
   [Additional counsel appear on signature page.]
8
9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  SEAN RYAN, Individually and on      )  Case No. 2:22-cv-07939-ODW(AGRx)
    Behalf of All Others Similarly Situated, )  (Consolidated)
12                                       )
                   Plaintiff,            )  CLASS ACTION
13                                       )
         vs.                             )  FIRST AMENDED CLASS ACTION
14                                       )  COMPLAINT FOR VIOLATIONS OF
    FIGS, INC., HEATHER HASSON,          )  THE FEDERAL SECURITIES LAWS
15  CATHERINE SPEAR, JEFFREY D.          )
    LAWRENCE, DANIELLA                   )
16  TURENSHINE, J. MARTIN                )
    WILLHITE, TULCO, LLC, SHEILA         )
17  ANTRUM, MICHAEL SOENEN,              )
    GOLDMAN SACHS & CO. LLC,             )
18  MORGAN STANLEY & CO. LLC,            )
    BARCLAYS CAPITAL INC., CREDIT        )
19  SUISSE SECURITIES (USA) LLC,         )
    BOFA SECURITIES, INC., COWEN         )
20  AND COMPANY, LLC,                    )
    GUGGENHEIM SECURITIES, LLC,          )
21  KEYBANC CAPITAL MARKETS              )
    INC., OPPENHEIMER & CO. INC.,        )
22  PIPER SANDLER & CO., TELSEY          )
    ADVISORY GROUP LLC,                  )
23  ACADEMY SECURITIES, INC., R.         )
    SEELAUS & CO., LLC, SAMUEL A.        )
24  RAMIREZ & COMPANY, INC., and         )
    SIEBERT WILLIAMS SHANK & CO.,        )
25  LLC,                                 )
                                         )
26                 Defendants.           )  DEMAND FOR JURY TRIAL
    _____)

27

28

4888-2061-5087.v1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION AND NATURE OF THE ACTION ................................ 1

II.   JURISDICTION AND VENUE ........................................................ 5

III.   CONFIDENTIAL WITNESS ACCOUNTS ....................................... 5

IV.   NON-FRAUD SECURITIES ACT CLAIMS ..................................... 13

    A.   The Securities Act Parties ........................................................ 14

        1.   Securities Act Plaintiffs ................................................ 14

        2.   Securities Act Defendants ............................................. 15

    B.   Summary of the Securities Act Claims ..................................... 24

        1.   Company Background ................................................... 25

            a.   FIGS Designs Its Products In-House but Relies on Suppliers in Asia and South America to Manufacture the Company's Inventories ................................................. 26

            b.   FIGS' Financial Performance Is Heavily Dependent on Demand Planning and Inventory Management ...................................... 27

        2.   FIGS' Pre-IPO Merchandising Strategy Focused on a Small Number of "Core Styles" ............................. 29

        3.   FIGS Experienced Explosive Revenue Growth During the COVID-19 Pandemic, Predominantly from Sales of FIGS' "Core" Products ............................ 30

        4.   FIGS Went Public Following Its Exponential COVID-19-Related Growth ........................................ 32

            a.   FIGS Went Public in May 2021 with Tulco Selling the Vast Majority of the Shares Available in the IPO ........................................ 32

            b.   Just Three Months After the IPO, Spear, Hasson and Tulco Sold over 10 Million Shares Worth over $412 Million in the SPO ....... 34

Page

5.     The Offering Documents Falsely Portrayed FIGS as Capable of Reliably Predicting Demand and Efficiently Managing Its Supply Chain...........................36

6.     Prior to the IPO, FIGS Departed from Its Low-Risk Core-Product Merchandising Model, Resulting in a Glut of Non-Core Products ....................37

7.     FIGS' Inability to Reliably Predict Demand and Effectively Manage Its Supply Chain Resulted in Routine Reliance on Costly Air Freight........................42

C.     The IPO Documents Contained Untrue Statements of Material Fact and/or Omitted Facts Necessary to Make the Statements Made Therein Not Materially Misleading .......43

1.     FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Tested or Established ............................43

a.     Reasons Why the IPO Statements Regarding Inventory and Data Analytics Were Untrue Statements and Omissions ...................46

b.     The IPO Statements Regarding Inventory and Data Analytics Were Material......................50

2.     FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the IPO Documents...................................................................52

a.     Reasons Why IPO Air Freight Statements Were Untrue Statements and Omissions .............53

b.     The IPO Air Freight Statements Were Material ..................................................................55

D.     The SPO Documents Contained Untrue Statements of Material Fact and/or Omitted Facts Necessary to Make the Statements Made Therein Not Materially Misleading .......57

1.     FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing

4888-2061-5087.v1

**Page**

New Products for Which Demand Had Not Been Tested or Established ....................................................... 57

2.  FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the SPO Documents ........................................................................ 63

COUNT I for Violation of §11 of the Securities Act Against All Securities Act Defendants ................................................................................. 66

COUNT II for Violation of §12(a)(2) of the Securities Act Against FIGS, Hasson, Spear, Tulco, and the Underwriter Defendants .............................. 69

COUNT III for Violation of §15 of the Securities Act Against Hasson, Spear, Lawrence, and the Tulco Defendants ..................................................... 72

V.   EXCHANGE ACT CLAIMS ................................................................... 73

A.   The Exchange Act Parties ............................................................. 73

1.   Exchange Act Plaintiffs ..................................................... 73

2.   Exchange Act Defendants ................................................. 74

B.   Factual Background Concerning Plaintiffs' Exchange Act Claims .................................................................................... 76

1.   FIGS' Strategy Shift and Inability to Reliably Predict Buying Patterns Caused Sales Revenues and Margins to Suffer ........................................................ 76

a.   FIGS' Core Products Stockouts Harmed the Company's Sales ................................................. 77

b.   FIGS' Margins Fell to Near Zero ....................... 78

c.   FIGS' Operating Cash Flows Plummeted .......... 80

2.   The Exchange Act Defendants Misrepresented FIGS' Core Operations and Data Analytics Capabilities .......................................................... 81

3.   The Truth Emerges ............................................................. 85

C.   The Exchange Act Defendants' False and Misleading Statements and Omissions During the Class Period ................. 87

1.   Statements Regarding Data Analytics ............................... 88

- iii -

**Page**

a.  FY 2021 Results ................................................ 88

b.  Q1 2022 Results ............................................... 94

c.  Q2 2022 Results ............................................... 98

d.  Q3 2022 Results ............................................. 102

2.  Statements Regarding Core Products Strategy ............ 107

a.  FY 2021 Results .............................................. 107

b.  Q1 2022 Results ............................................. 111

c.  Q2 2022 Results ............................................. 116

d.  Q3 2022 Results ............................................. 118

3.  Statements Regarding Air Freight Usage ..................... 120

a.  FY 2021 Results .............................................. 120

b.  Q1 2022 Results ............................................. 123

c.  Q2 2022 Results ............................................. 126

d.  Q3 2022 Results ............................................. 128

D.  Scienter Allegations .................................................. 131

1.  The Exchange Act Defendants' False and
Misleading Statements Concerned FIGS' Core
Operations ................................................................ 132

2.  The Individual Exchange Act Defendants
Acknowledged Their Deep, Institutional
Knowledge of FIGS' Core Operations ........................ 133

2.  Either FIGS' Oft-Touted Data Analytics and
Access to Real Time Data Informed the Exchange
Act Defendants that Their Statements Were False
and Misleading or the Exchange Act Defendants
Recklessly Disregarded that FIGS' Technologies
Were Incapable of Providing the Benefits that
They Falsely Claimed .............................................. 136

a.  FIGS' Data Analytics and Access to Real
Time Data Provided the Exchange Act

4888-2061-5087.v1

Page

Defendants with Knowledge that Their Statements Were False and Misleading ............ 136

b.   Confidential Witnesses Confirmed that the Exchange Act Defendants Knowingly or Recklessly Disregarded FIGS' Inability to Utilize and Gain Insight from Customer Data .................................................................. 139

3.   The Temporal Proximity Between Spear's and Turenshine's Admissions on FIGS' May 12, 2022 Earnings Call and Conflicting Reassurances Made Just Two Months Prior Support Scienter .................... 142

4.   Hasson, Spear, and Turenshine Were Aware that a Decision to Reduce Inventory of High-Waisted Core Products Caused Q1 2022 Challenges ............... 146

5.   Hasson's Abrupt Resignation from Her Position as Co-CEO as the Truth of the Fraud Was Revealed Supports a Strong Inference of Scienter ...................... 146

E.   Loss Causation and Economic Loss ....................................... 148

1.   May 12, 2022 Partial Corrective Disclosure ............... 149

2.   February 28, 2023 Final Corrective Disclosure .......... 152

F.   Presumption of Reliance ............................................................ 157

COUNT IV for Violation of §10(b) of the Exchange Act and SEC Rule 10b-5 Against the Exchange Act Defendants ........................................................ 158

COUNT V for Violation of §20(a) of the Exchange Act Against the Individual Exchange Act Defendants, Willhite, and Tulco ........................ 159

VI.   SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY ....................................................................................... 160

VII.   CLASS ACTION ALLEGATIONS .............................................. 160

VIII.   PRAYER FOR RELIEF .................................................................... 162

IX.   JURY DEMAND ................................................................................. 162

4888-2061-5087.v1

# I.   INTRODUCTION AND NATURE OF THE ACTION

1.      Court-appointed Lead Plaintiffs Dr. Ronald Hoch, City of Pensacola Police Officers' Retirement Plan, City of Warren Police and Fire Retirement System, Kissimmee Utility Authority Employees' Retirement Plan, and Pompano Beach Police & Firefighters' Retirement System (collectively, "Plaintiffs") bring this action individually and on behalf of a class consisting of all persons or entities who purchased or otherwise acquired: (i) FIGS, Inc. ("FIGS" or the "Company") Class A common stock pursuant and/or traceable to the Company's initial public offering ("IPO") conducted on or around May 27, 2021; (ii) FIGS Class A common stock pursuant and/or traceable to the Company's secondary public offering ("SPO") conducted on or around September 16, 2021; and/or (iii) FIGS Class A common stock between March 9, 2022 and February 28, 2023, inclusive (the "Class Period"), and were damaged thereby.[1]  Plaintiffs seek to recover damages caused by defendants' violations of the federal securities laws and to pursue claims arising under §§11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") and §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.[2]

---

[1]   Excluded from the Class are all defendants  named herein (defined at ¶¶43-45, 47, 49-51, 53, 65-79, 215, *infra*); members of the FIGS Defendants' (defined at ¶48, *infra*), Director Defendants' (defined at ¶52, *infra*), and Individual Exchange Act Defendants' (defined at ¶216, *infra*) immediate families; subsidiaries and affiliates of FIGS and Tulco (defined at ¶53, *infra*); any person who is or was an officer or director of FIGS or Tulco during the Class Period; any entity in which any defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

[2]   Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, but is not limited to, a review and analysis of: (i) FIGS' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) defendants' public statements, including FIGS' press releases, transcripts of FIGS senior management's conferences with investors and analysts, and defendants' interviews with various news outlets; (iii) financial analyst reports, news articles, and other commentary and analysis concerning FIGS and the medical apparel industry; (iv) review of pertinent court filings, including filings from *In re FIGS, Inc. S'holder Derivative Litig.*, C.A. No. 2024-0014-NAC (Del. Ch.), which incorporate

2.     Founded in 2013, FIGS is a direct-to-consumer ("DTC"), consumer goods company that sells medical scrubs and other healthcare-focused apparel.  In 2021, FIGS registered its IPO assuring investors that it utilized precise data analytics, demand forecasting, and supply chain and inventory management techniques to "reliably predict buying patterns" and deliver high-quality medical scrubs via online sales directly to healthcare professionals while maintaining minimal inventory risk, tight control of supply chains, low overhead, and high customer retention.  As a result of the Company's "customer and demand predictions," which were purportedly generated from "data-driven models," FIGS claimed to be able to "anticipate optimal times for launch, including day of week and time of day."

3.     Unknown to the market at the time of FIGS' IPO and SPO, the Company did not have the purported data analytics capabilities that permitted FIGS to reliably predict buying patterns and anticipate demand.  Rather, the Company was operating without a Product Lifecycle Management ("PLM") system, a system which serves as a "digital foundation"[3] for consumer goods companies by serving as the central and single source of data across multiple teams, thereby improving collaboration in real time and the speed with which products are developed, produced, and delivered.  As Confidential Witness ("CW") 2 stated, a "PLM system is everything" for an apparel company.[4]

---

information from internal FIGS documents produced in response to 8 Del. Ch. §220 books and records demands; (v) confidential witness statements; and (vi) documents cited herein.  Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to and are exclusively within the custody or control of the defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[3] Oracle, *What is PLM (Product Lifecycle Management)*? https://www.oracle.com/scm/product-lifecycle-management/what-is-plm/ (last visited Mar. 12, 2024).

[4] CW-2 was a FIGS product developer from August 2020 – February 2023.

- 2 -

4. FIGS also began to shift from a merchandising model focused on non-discretionary core products to the rapid development of hundreds of new products for which demand had not been demonstrated. CWs confirmed that FIGS' merchandising decisions were not linked to the Company's purported data analytics capabilities or ability to predict demand. For instance, CW-2 recalled that Co-Chief Executive Officers Heather Hasson and Catherine Spear started bringing in items that were "coming from their personal closets" to use as "reference samples" for FIGS products. CW-2 emphasized, "There was nothing to back up why we were developing what we were developing, a lot of times."

5. Moreover, a constant stream of disruptive last-minute changes in product orders plagued FIGS' production process and belie the Company's purported "data-driven" business model. For example, when asked whether the late changes to products were based on data analysis or customer insight, CW-2 stated: "Definitely not." As a result, leading up to and after the IPO and SPO, FIGS' inventories began to balloon and the Company was relying on faster, but more expensive, air freight to meet demand and product launch timelines.

6. By March 2022, FIGS' inability to reliably predict buying patterns and anticipate demand, in addition to its shift to producing dozens of products for which demand had not been demonstrated, caused "core" products to run out of stock and margins to deteriorate due to greater-than-expected air freight and bloated non-core inventories. Rather than publicly acknowledge these deficiencies, the Exchange Act Defendants (defined at ¶217, *infra*) materially misrepresented that, unlike its competitors, FIGS had "almost no inventory risk" and was able to "endure . . . near-term [supply chain] pressures." The Exchange Act Defendants claimed throughout 2022 that this was due to purported advanced data solutions and unique inventory and supply chain management capabilities that the Company did not have (or did not utilize).

- 3 -

7.    The Exchange Act Defendants were aware in real time that the situation was deteriorating throughout 2022.  For example, during a May 10, 2022 FIGS Board of Directors meeting attended by Hasson, Spear, and then-Chief Financial Officer Daniella Turenshine, one "Q1'22 Challenge[]" was that FIGS was "[o]ut of stock on [core] high waisted inventory as we shifted to **new** waistband."  At the same meeting, the Board discussed FIGS' "mitigation activities, such as launch calendar adjustments and increased use of air freight and the related elevated costs of air freight usage."  This included a discussion of the fact that an "[i]ncrease in air freight for rest of year to ensure more consistent deliveries will reduce gross margin."

8.    FIGS eventually revealed the massive inventory bloat, rampant air-freight shipping costs, and product margins that diminished to near zero.  ***Virtually none*** of the data analytics and demand forecasting capabilities the Company claimed to rely on formed the basis of defendants' actual operating decisions.

9.    FIGS stock was offered at $22.00 per share in the IPO and $40.25 per share in the SPO.  By the end of the Class Period, after the truth was finally revealed, the price had fallen to just $6.76 per share – a collapse from which it has not recovered.  Plaintiffs now seek damages on behalf of themselves and the Class.



- 4 -

## II.    JURISDICTION AND VENUE

10.    The claims asserted herein arise under §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l, and 77o, and §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa.

12.    Venue is proper in this District under §22 of the Securities Act, 15 U.S.C. §77v, §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b)-(d).  The Company maintains its principal executive offices in Santa Monica, California, which is located in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

13.    In connection with the acts alleged in this complaint (the "Complaint"), defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## III.   CONFIDENTIAL WITNESS ACCOUNTS

14.    Former FIGS employees have provided information demonstrating that the Company's statements contained in its IPO Documents and SPO Documents (defined at ¶¶109, 115, *infra*) were untrue statements and omissions of material fact, and the Exchange Act Defendants' remaining Class Period statements were knowingly or recklessly false and/or misleading.  These CWs include individuals formerly employed at FIGS during or immediately after the Class Period, whose accounts corroborate one another and other sources set forth herein.  The CWs provided information to Plaintiffs' counsel and/or their investigator on a confidential basis and

are particularly described by job description, responsibility, and duration of employment, thereby providing sufficient detail to establish their reliability and personal knowledge. As set forth below, the CWs' information supports an inference that FIGS' statements contained in its IPO Documents and SPO Documents were untrue statements or omissions of material fact, and the Exchange Act Defendants' remaining Class Period statements were knowingly or recklessly false and misleading.

15.     Confidential Witness No. 1 ("CW-1") joined FIGS in 2023 and worked within the Information Technology ("IT") Department. During CW-1's tenure, FIGS used Centric as its PLM system, and Snowflake as its Enterprise Risk Management ("ERM") system. Due to CW-1's role within the IT department, he/she was involved in integrating corporate strategy to integrate the various data systems at FIGS. CW-1 stated that a PLM system should be the "core of any company with a physical product."

16.     According to CW-1, the Centric application offers Basic, Intermediate, and Advanced PLM tools. During CW-1's tenure, FIGS' subscription consisted of Centric's "Basic" tools, which are generally used by new companies lacking "international policies" and with "little marketing strategy." Accordingly, for the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions. If you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting." CW-1 confirmed that FIGS was not willing to invest in more advanced demand planning tools due to cost concerns, and as a result demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off." CW-1 had "never heard of a public company at the beginner level" of Centric. In response to a question about whether FIGS could have previously possessed advanced tools that it later got rid of, CW-1 stated: "They never had them."

17.     CW-1 stated that "the way the PLM system was utilized" by FIGS personnel resulted in data not being inputted into the Centric system, and he/she estimated that Centric's database was only at "35 to 45 percent of capacity."  For example, CW-1 explained that with respect to purchase orders, a lot of information was frequently missing from Centric that was necessary for manufacturers to have. CW-1 stated there was data for colors, raw materials, trends, factories, and "tons of different channels," and "by the time you export the sheet to give to the factory, it should be complete."  However, according to CW-1, "it wasn't" and "the majority of the spreadsheet" in the PLM concerning purchase order information was "not filled in."  CW-1 recalled that operations employees "tried to retrieve reports from the PLM system, but all you saw was gaps in information."  From CW-1's perspective, such gaps in information affected budgeting and planning.

18.     CW-1 stated that FIGS' demand planning team consisted of only "one to two people," when a team of "10 to 20" was required for the level of inventory that FIGS was ordering.  CW-1 stated that he/she did not believe that FIGS "ever had" 10 to 20 demand planners, including at the time of the IPO.  CW-1 further explained that because FIGS also lacked PLM data to fall back on, the Company's PLM was of no use in helping FIGS plan for manufacturing and inventory.

19.     As a result, CW-1 stated that demand planning was performed "manually."  Instead of a systematized way of planning market demand and unit numbers, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel.  Compounding issues, CW-1 stated that the Enterprise Resource Planning ("ERP") team's Snowflake system lacked any "connectivity" to Centric (which caused errors) and none of the Company's systems were used uniformly throughout FIGS' enterprise and personnel.

20.     CW-1 emphasized that insufficient demand planning infrastructure and staffing were only part of the problem at FIGS.  According to CW-1, "There were huge leadership issues.  Workflow, communication."  CW-1 stated that throughout

- 7 -

his/her tenure FIGS did not have cross-functional meetings.  Instead, the heads of merchandising, IT, and design would routinely disagree with each other and the lack of coordination made it difficult for CW-1 to implement changes to the PLM.

21.   CW-1 stated that because of the lack of demand planning and "split second decision making," he/she observed "catastrophic workflow."  CW-1 explained that there were frequently last-minute design changes after the purchase order had already gone out.  This had a cascade of effects, including changes in information that were sent to the supplier and the warehouse, changes to shipping plans, and changes to inventory.

22.   CW-1 stated it was "laughable at best" that FIGS had integrated product lifecycle data integration with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency.  According to CW-1, "It was completely the opposite of what was really going on."  Instead, FIGS' systems "were neither proactive nor predictive."  CW-1 stated: "We were behind and had to catch up every time."  CW-1 observed that the CEO's approach to planning was to "react and figure it out after the fact."

23.   CW-1 confirmed that FIGS did not utilize any data obtained from the Company's DTC infrastructure for demand planning purposes because "having the data and utilizing the data are two completely different things."  CW-1 succinctly stated: "Could they predict buying patterns?  No."

24.   Confidential Witness No. 2 ("CW-2") joined FIGS in August 2020 and worked at the Company until approximately February 2023.  During CW-2's tenure at FIGS, CW-2 worked in product development.  At the time CW-2 left the Company, his/her title was Product Developer.  CW-2 reported to the head of Product Development.

25.   CW-2's job entailed working on product orders and communicating with the factories that manufactured FIGS products.  The merchandising team gave the products team an order for a design or collection, which included the number of pieces

- 8 -

4888-2061-5087.v1

1   to make and a deadline on when merchandising wanted to launch the items by putting

2   them on the website for sale.  CW-2 was typically given "a couple of months to do

3   projects."   Throughout CW-2's tenure, he/she "touched every product FIGS"

4   produced, including scrubs, outerwear, accessories, trim, and knitwear.

5       26.   CW-2 described the production workflow as follows: For each product,

6   CW-2 put together a bill of materials (or "BOM") for the factory partner.  Each

7   apparel item that is manufactured in a factory has a "tech pack" for it.  Each tech pack

8   included the BOM, sketches, and a set of measurements.  The measurements indicated

9   how long to make an inseam or how wide to make a leg opening, for example.  As the

10  style developed, item colors could be added to the tech pack.  The design team sent

11  sketches to the development team after the design team decided the makeup of a new

12  product line.   As the line was being developed and items were closer to being

13  produced, the product's launch dates were set by the merchandising team.

14      27.   At the beginning of development, the tech pack was sent to the factory,

15  which then sent back the first prototype.  The tech pack then "evolved" as the

16  prototypes were produced by the factory and sent back to the development team.  In

17  conjunction with that, the BOM would be updated with, for example, a type of

18  material or a change to the inseam.

19      28.   Once the launch date was established, CW-2 would work backwards with

20  the production team to set deadlines by when milestones needed to be reached, such as

21  the date when products needed to be on a vessel to arrive at FIGS' warehouse in time

22  for launch (*i.e.*, the "ex-factory" date) and when FIGS' manufacturers needed to begin

23  assembly to complete production by the ex-factory date.  The production team usually

24  calculated 90 days for transiting the items from Asia.  Once the number of days

25  needed to transport the finished products was accounted for, the factory was often left

26  with about a month to two months to make the products.  CW-2 considered these

27  deadlines to be "tight."  CW-2 also described assembling a whole production in one

28  month as "not realistic" and not "enough time" for the factories "to make great

- 9 -

1    product."  CW-2 stated that "there was never enough time" for the factory to do a

2    quality job, and CW-2 was informed by one of his/her supervisors that such individual

3    "didn't know how factories would want to work with us" because FIGS "would push

4    them to these unrealistic production timelines."

5        29.    The product group was under constant pressure to meet deadlines, with

6    much of this pressure coming from last-minute changes directed by Hasson or Spear

7    (defined at ¶¶44, 45, *infra*).  CW-2 stated that "countless times" before placing an

8    order, he/she would be told "Heather hates the fabric, or the color" and was instructed

9    to change the order.  CW-2 recalled similar accounts concerning Spear.  For example,

10   CW-2 recalled within the first couple of months of his/her employment, Spear

11   "dropped" a product line the night before it was scheduled to launch simply because

12   Spear changed her mind regarding the product and decided she "didn't like it."  As a

13   result, thousands of units of product were left "just sitting in our warehouse."  CW-2

14   stated that "things like that happened fairly often."  According to CW-2, last-minute

15   changes seemed to be an integral part of the design process at FIGS.  Whenever last-

16   minute changes occurred, CW-2 explained that it was the factories "that got cut

17   short."  CW-2 confirmed that this state of receiving last-minute change orders existed

18   prior to the IPO and intensified after it.  CW-2 described the environment at FIGS

19   throughout his/her tenure as "chaotic."

20       30.    A lot of late changes occurred at the "big final meetings of the season."

21   These meetings were led by the design and merchandising teams and were where they

22   showed the final product line.  CW-2 and the product development team "sat in" to

23   "advise on material questions, construction questions or costing."  These meetings

24   took place on a quarterly basis, approximately every three or four months.

25   Sometimes, one or both of Spear and Hasson attended these quarterly meetings which

26   resulted in "a lot of those late changes" because it was "often" the Founders' (defined

27   at ¶46, *infra*) "first time seeing the whole line together," and while changes would be

28   made, it "was always too late in the season."  If the Founders were absent from the

- 10 -

1   quarterly meetings, "there was a lot of things the team couldn't sign off on until they
2   had the Heather or Trina 'blessing' of the line or the color or whatever it was."

3       31.    CW-2 stated these late changes "one hundred percent affected the need to
4   use air freight." This was because at FIGS, launch dates were the least flexible aspect
5   of the production process, and when last-minute changes occurred, launch dates were
6   not moved. According to CW-2, that launch dates were not moved "was the
7   problem." CW-2 explained this by way of example: where a last-minute change order
8   required moving the product's "ex-factory" date from March 1, as planned, to April 1,
9   and if the launch date for that order was April 15, CW-2 stated "that's when you have
10   to air it," which was what occurred "most of the time." Air freight was faster than
11   "vessel," or ocean shipping, but was "three or four times the cost of vessels." CW-2
12   confirmed that the use of air freight at FIGS instead of vessels to ship items was done
13   "constantly in order to hit launch dates."

14       32.    According to CW-2, last-minute changes were "definitely" the reason
15   that air freight was used at FIGS throughout his/her tenure. CW-2 confirmed that
16   FIGS could have feasibly planned for the extended shipping times that resulted from
17   pandemic conditions were it not for the last-minute changes. CW-2 described ocean
18   shipping during this period as longer but still "dependable." CW-2 contrasted FIGS'
19   use of air freight with his/her current employer where air freight is used only on "rare
20   occasion" because vessel freighting is "more economical" and "very reliable."

21       33.    CW-2 confirmed that last-minute changes and rushing the manufacturing
22   often resulted in poor product quality. CW-2 offered as an example issues concerning
23   the fit of FIGS' jogger-style scrubs, one of the Company's most popular items. CW-2
24   stated that "it was a constant complaint from customers" that they had bought multiple
25   pairs of joggers in the same size and style but in different colors, yet "each jogger fits
26   differently." In short, there were "large discrepancies in fit."

27       34.    CW-2 stated that during his/her tenure at FIGS, the Company lacked its
28   touted data analytics on the products side. On the product team, CW-2 "never heard

- 11 -

about any systems that were trying to track trends or inventory levels.  It didn't seem like there were any systems in place."  With respect to production, "there were no processes at all."

35.     When asked whether the late changes were based on insights obtained through data analysis or customer insight, CW-2 stated: "Definitely not."  Rather, the changes from Hasson or Spear seemed to be based on their own personal taste or judgment rather than data.  CW-2 recalled that Spear or Hasson started bringing in items that were "coming from their personal closets" to use as "reference samples" for a FIGS product.  The reference samples were given to personnel within the design team, "who would hand it off to someone in development."  However, CW-2 emphasized, the reference samples were not things "that had been seen in the marketplace or were seen as on-trend or hearing about in the product world.  There was nothing to back up why we were developing what we were developing, a lot of times."  CW-2 stated of Hasson and Spear: "They think they're making the best decision, but I think their personal preferences started to bleed into the product we were making."  This view that product development at FIGS was based on intuition rather than data was "definitely" shared by more-senior employees, including the individuals who served as Chief Product Officer during CW-2's tenure.  In addition, if a decision came from Spear or Hasson, the understanding at the Company was that "we have to do it."  In other words, there was no room to challenge or say no to a Founder's request.

36.     CW-2 stated that FIGS lacked a PLM system for most of CW-2's tenure, and that although FIGS began to implement Centric approximately a year before CW-2 left the Company (*i.e.*, in or around February 2022), it was never fully deployed.  According to CW-2, a "PLM system is everything" for an apparel company because it "keeps all the styles" the company is designing and manufacturing and allows the factory partners to "pull" the relevant manufacturing instructions and details right from the system.  But "FIGS never had any of that."  Rather, CW-2 stated that FIGS

1  personnel used Google Slides and Microsoft Excel.  This meant that there were no

2  systems that FIGS' manufacturers could access.  Further, this lack of a PLM system

3  meant that the "history" of a product was not being retained.  CW-2 stated using Excel

4  spreadsheet documents was "not very efficient, and data can be changed easily."  CW-

5  2 did not know of any easily updated system at the Company where marketing,

6  production, and tech designs were housed.  CW-2's understanding is that, to this day,

7  Centric still has not been fully deployed and that not enough employees have been

8  trained on the use of Centric.  In addition, CW-2 never saw tools at the Company to

9  continuously assess where everything is in the supply chain from the time of inception

10  of production through when it ends up with the customer.  CW-2 explained that CW-2

11  did "works in progress" or "WIPs" at FIGS.  A WIP is an internal report that is used

12  in the development process to help the development team track where an item is "in

13  the development process."  After the approvals of the style, color, and tech packs are

14  made, the style the development team is working on "falls off the WIP."  Different

15  development team members have their own WIPs for the style they are working on.

16  CW-2 did not know of any tool or system that allowed different team members to

17  track where an item was in the development or production process "from inception to

18  in the customer's hand."

19  **IV.    NON-FRAUD SECURITIES ACT CLAIMS**

20       37.    The claims set forth below in Counts I-III allege violations of §§11,

21  12(a)(2), and 15 of the Securities Act ("Securities Act Claims").  These Securities Act

22  Claims are based solely on strict liability and negligence (*i.e.*, not intentional or

23  reckless conduct).   In bringing their Securities Act Claims, Plaintiffs expressly

24  disclaim any allegations of fraud, scienter, or recklessness pleaded below in

25  connection with their Exchange Act Claims (defined in §V., *infra*).  As such, these

26  Securities Act Claims are presented separate and apart from Counts IV and V, which

27  concern different false statements made at different points in time and different legal

28  elements.

- 13 -

A.     The Securities Act Parties

    1.     Securities Act Plaintiffs

38.     Plaintiff Dr. Ronald Hoch ("Dr. Hoch") is an individual who purchased FIGS Class A common stock pursuant and/or traceable to the IPO, as set forth in the Certification of Ronald Hoch Pursuant to Federal Securities Laws (ECF 88), and was damaged thereby.

39.     Plaintiff City of Pensacola Police Officers' Retirement Plan ("City of Pensacola") is a public pension fund in Pensacola, Florida. City of Pensacola has approximately $100 million in assets under management and hundreds of plan participants.  City of Pensacola purchased FIGS Class A common stock pursuant and/or traceable to the IPO, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88), and was damaged thereby.

40.     Plaintiff City of Warren Police and Fire Retirement System ("City of Warren") is a public pension fund in Warren, Michigan.  City of Warren has approximately $275 million in assets under management and hundreds of plan participants.  City of Warren purchased FIGS Class A common stock from an Underwriter Defendant in the IPO at the $22 offering price, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88), and was damaged thereby.

41.     Plaintiff Kissimmee Utility Authority Employees' Retirement Plan ("Kissimmee") is a public pension fund in Kissimmee, Florida. Kissimmee has over $100 million in assets under management and over 500 plan participants.  Kissimmee purchased FIGS Class A common stock pursuant and/or traceable to the IPO, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88), and was damaged thereby.

42.     Plaintiff Pompano Beach Police & Firefighters' Retirement System ("Pompano Beach") is a public pension fund in Pompano Beach, Florida.  Pompano Beach has over $200 million in assets under management and over 500 plan

1   participants.  Pompano Beach purchased FIGS Class A common stock pursuant and/or

2   traceable to the IPO and from an Underwriter Defendant in the SPO at the $40.25 SPO

3   price, as set forth in the Certification Pursuant to Federal Securities Laws signed on its

4   behalf (ECF 88), and was damaged thereby.

5          **2.**    **Securities Act Defendants**

6        43.    FIGS is a Delaware Corporation with principal executive offices located

7   at 2834 Colorado Avenue, Suite 100, Santa Monica, California.  FIGS is a DTC brand

8   that designs, markets, and sells fitted healthcare apparel for medical professionals.

9   The Company's products include scrubs and other medical clothing and associated

10  products.  FIGS is the issuer and registrant of the securities sold in the IPO and SPO.

11  FIGS' Class A common stock trades on the NYSE under the ticker symbol "FIGS."

12       44.    Defendant Heather Hasson ("Hasson") is a Co-Founder of FIGS.  Hasson

13  served as the Company's Co-Chief Executive Officer ("Co-CEO") and a member of

14  its Board of Directors (the "Board") since its founding in 2013.  On August 4, 2022,

15  Hasson's title and role transitioned to Executive Chairman.  As the Company's Co-

16  CEO, and then Executive Chairman, Hasson had the opportunity to and did review,

17  approve, and sign the IPO Documents and SPO Documents.  Hasson sold 2,419,998

18  shares of FIGS Class A common stock in the SPO.

19       45.    Defendant Catherine "Trina" Spear ("Spear") is a Co-Founder of FIGS

20  and has served as the Company's CEO and a member of the Board since its founding

21  in 2013.  As the Company's CEO, Spear had the opportunity to and did review,

22  approve, and sign the IPO Documents and SPO Documents.  Spear sold 1,468,324

23  shares of FIGS Class A common stock in the SPO.

24       46.    Hasson and Spear are collectively referred to herein as the "Founders" or

25  "Founder Defendants."

26       47.    Defendant Jeffrey D. Lawrence ("Lawrence") was FIGS' Chief Financial

27  Officer ("CFO") from December 2020 to December 2021.  As FIGS' CFO, Lawrence

28

4888-2061-5087.v1

had the opportunity to and did review, approve, and sign the IPO Documents and SPO Documents.

48.    FIGS, Hasson, Spear, and Lawrence are collectively referred to herein as the "FIGS Defendants."

49.    Defendant J. Martin Willhite ("Willhite") has been a Director on the Board since February 2019.  Willhite had the opportunity to and did review, approve, and sign, whether personally or by his duly authorized attorney-in-fact, the IPO Documents and SPO Documents.  In addition, Willhite has also served as Vice Chairman of Tulco (defined at ¶53, *infra*) since July 2017.  At all relevant times, Willhite was simultaneously operating within the scope of his authority as a representative agent of Tulco.

50.    Defendant Sheila Antrum ("Antrum") has been a Director on the Board since May 2021, when she joined upon the effectiveness of the IPO Registration Statement (defined at ¶106, *infra*).  Antrum had the opportunity to and did review, approve, and sign the Registration Statement for additional shares offered in the IPO on SEC Form S-1 on May 26, 2021 (the "May 26, 2021 Form S-1MEF").  Further, Antrum had the opportunity to and did review, approve, and sign the SPO Documents.

51.    Defendant Michael Soenen ("Soenen") has been a Director on the Board since May 2021, when he joined in connection with the IPO.  Soenen had the opportunity to and did review, approve, and sign the May 26, 2021 Form S-1MEF.  Further, Soenen had the opportunity to and did review, approve, and sign the SPO Documents.

52.    Willhite, Antrum, and Soenen are collectively referred to herein as the "Director Defendants."

53.    Defendant Tulco, LLC ("Tulco") is a venture capital investment firm founded and controlled by Thomas Tull ("Tull").  Tulco sold 25,707,953 shares of FIGS Class A common stock in the IPO and 6,366,670 shares of FIGS Class A common stock in the SPO.  At all relevant times, Tulco controlled a significant

- 16 -

percentage of FIGS' voting interest through its ownership of FIGS common stock. Given its substantial holding of FIGS' common stock, Tulco had the power to control, and did control, FIGS prior to and after the IPO and SPO and during the Class Period. In addition, Tulco maintained a seat on FIGS' Board prior to and throughout the Class Period, in which capacity Willhite, as Tulco's Vice Chairman, has served since February 2019. Willhite also had the power to control, and did control, FIGS prior to and after the IPO and SPO and during the Class Period (*see* ¶49, *supra*). In addition, A.G. Lafley ("Lafley"), a Tulco director since September 2017, joined FIGS' Board in April 2022.

54. Tulco and Willhite are collectively referred to herein as the "Tulco Defendants."

55. When looking for an investment, Tulco aims for companies that have "a clear path to $100 million of revenue within three years of investment," operating in "big sectors . . . within addressable markets that are ripe for disruption."[5] The Tulco Defendants further "seek[] to make ***control investments***" that "enabl[e] [the company to] work alongside management teams and implement operational and strategic initiatives to drive growth."[6]

56. Tulco itself characterizes the relationships it develops with its partners as "hands-on":

> While these companies operate independently, ***Tulco partners with them at the highest management level to provide operational support and execute their strategic objectives***. By bringing together a long-term strategic vision with deep technological expertise, ***Tulco***

---

[5] Commonwealth of Pennsylvania Public School Employees' Retirement System, *Public Investment Memorandum* at 1, Tulco, LLC (Oct. 4, 2018), https://www.psers.pa.gov/About/Board/Resolutions/Documents/2018/Res58.pdf.

[6] *Id.* at 2.

*provides* a superior alternative to traditional funding through *a hands-on operational approach* and supportive and flexible capital structure.[7]

57.     Significantly, Tulco's expertise is in the application of advanced data science, and it targets companies ready to scale with the adoption of leading edge and proprietary technologies – some of the very areas FIGS emphasized in selling itself to the public through its IPO and SPO.

58.     In an August 12, 2021 interview with the *Los Angeles Times*, Spear described FIGS' relationship with Tull and his involvement in the Company as follows:

> He's an entrepreneur, right?  And he understands the things that matter. So some investors are very focused on the output.  And a lot of investors are focused on input.  How do you drive results, not just send me the report after the quarter.  I think Thomas has a good balance of both, saying, "Hey, what do you guys need help with?  And I'm here to be your partner."[8]

Spear's account understated the Tulco Defendants' significant control over FIGS. According to the October 23, 2020 Amended and Restated Stockholder's Agreement between Hasson, Spear, Tulco, and Tull ("2020 Stockholder's Agreement"), FIGS could not undertake any of the following actions, *inter alia*, without "first obtaining the affirmative approval of the Tulco Director" or "until such time as a majority of the members of the Board are designated by Tulco or the Tulco Director":

(a)     "any material change to the lines of business conducted by the Company and its subsidiaries";

---

[7]   Tulcoholdings.com, *Who We Are*, Tulco, LLC, https://www.tulcoholdings.com/about/ (last visited Apr. 6, 2023).

[8]   Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times (Aug. 12, 2021), https://www.latimes.com/☐business/story/2021-08-12/figs-trina-spear-heather-sasson-interview.

- 18 -

(b)     "any approval of the Budget of the Company for any Fiscal Year or any amendment, modification or supplement thereto";

(c)     any material deviation from the then-current Budget, including, for the avoidance of doubt, any unbudgeted expenditures in excess of 20% of the aggregate amount of budgeted expenditures in such Budget";

(d)     "any award, determination or payment by the Company or any of its subsidiaries of any bonus or other discretionary or incentive compensation to a Founder";

(e)     "any amendment, restatement, replacement, or modification of any employment agreement or restrictive covenant agreement with any Founder, including, without limitation, any modification to any compensation arrangements with any Founder";

(f)     "the undertaking of a firm commitment underwritten initial public offering under the Securities Act of any Securities or other equity interests in the Company or the direct listing of the Company on a securities exchange (an 'IPO')";

(g)     "any commencement, termination, compromise or settlement of any material litigation, lawsuit, action, dispute or other proceeding or otherwise assuming any material liability, or agreeing to the provision of any equitable relief, by the Company";

(h)     "any amendment, modification, repeal or waiver of any provision of the Organizational Documents or the organizational documents of any subsidiaries of the Company";

(i)     "any Company Sale or other reorganization, merger, share exchange, share transfer, consolidation, business combination or similar transaction"; or

(j)     "the liquidation, winding up or dissolution of the Company or filing of any voluntary petition in bankruptcy or insolvency."

- 19 -

59.     The 2020 Stockholder's Agreement also described three circumstances under which the Tulco Defendants could fill board vacancies for its own seat and those of the Founders: (i) if one Founder (*i.e.*, Hasson or Spear) was no longer on the Board, then the remaining Founder and the Tulco Director sitting on the Board (*i.e.*, Willhite) would fill the vacancy unanimously; (ii) if neither Founder remained on the Board, then the Tulco Director would appoint someone to fill the vacancy; and (iii) if the Tulco Director no longer served on the Board, then Tulco would appoint someone to fill the vacancy.

60.     According to the Voting Agreement by and among FIGS, Hasson, Spear, Tulco, and certain related parties ("the Voting Agreement"), which was entered into contemporaneously with and became effective immediately after FIGS' IPO, Hasson, Spear, and Tulco were required to vote all of their shares in favor of the election or re-election of the Tulco Director that was duly nominated for election or re-election to the Board "[f]or as long as the aggregate number of outstanding shares of Common Stock held by Tulco and its Permitted Transferees represent[ed] at least 10% of the aggregate number of outstanding shares of all classes of Common Stock."  Under the Voting Agreement, Hasson, Spear, and Tulco were also required to vote all of their shares against any attempts to remove Hasson, Spear, or the Tulco Director from the Board, ensuring each would remain permanent fixtures on the Board.

61.     Prior to FIGS' IPO, the Tulco Defendants exercised majority control (51.1%) of the total voting power of the Company's shareholders and held 57.9% of all outstanding FIGS stock (Class A and Class B shares).  Even after the IPO, the Tulco Defendants continued to be the largest single shareholder of FIGS by far, controlling 44.6% of the voting power.  And the Tulco Defendants' voting power was only expected to grow (slightly to 45%) after the SPO, despite the sell-off of additional FIGS shares held by Tulco.  As indicated above, pursuant to the 2020 Stockholders' Agreement, the Tulco Defendants' affirmative approval was required prior to FIGS undertaking the process of the IPO.  Tull attended the FIGS Board

4888-2061-5087.v1

1   meeting on March 5, 2021 as FIGS was preparing to file its draft S-1 Registration

2   Statement in connection with the IPO on March 17, 2021.  The fact that FIGS engaged

3   in the lengthy and expensive process of conducting the IPO and SPO, when the Tulco

4   Defendants (along with Hasson and Spear) were the primary beneficiaries of the IPO

5   and SPO, is further evidence of the Tulco Defendants' control over FIGS.

6       62.    Furthermore, the Voting Agreement had the effect of concentrating the

7   majority of the voting power of FIGS' outstanding capital stock with Hasson, Spear,

8   and Tulco.  Indeed, at all times before and after the IPO and SPO, FIGS identified

9   itself as being "controlled" by Tulco, Hasson, and Spear within the meaning of the

10  corporate governance standards of the NYSE.

11      63.    Under the terms and subject to the conditions in the IPO underwriting

12  agreement, the underwriters named below severally agreed to purchase, and FIGS and

13  Tulco agreed to sell, the number of shares indicated below, for which the underwriters

14  collectively were paid approximately $40,054,498.44 in discounts and commissions:

| Underwriters | Numbers of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 9,545,071 |
| Morgan Stanley & Co. LLC | 8,005,543 |
| Barclays Capital Inc. | 4,310,678 |
| Credit Suisse Securities (USA) LLC | 4,310,678 |
| BofA Securities, Inc. | 1,112,625 |
| Cowen and Company, LLC | 514,589 |
| Guggenheim Securities, LLC | 514,589 |
| KeyBanc Capital Markets Inc. | 514,589 |
| Oppenheimer & Co. Inc. | 514,589 |
| Piper Sandler & Co. | 514,589 |
| Telsey Advisory Group LLC | 208,617 |
| Academy Securities, Inc. | 69,539 |
| R. Seelaus & Co., LLC | 69,539 |
| Samuel A. Ramirez & Company, Inc. | 69,539 |
| Siebert Williams Shank & Co., LLC | 69,539 |
| Total | 30,344,317 |

- 21 -

64.     Under the terms and subject to the conditions in the SPO underwriting agreement, the underwriters named below severally agreed to purchase, and Hasson, Spear, and Tulco agreed to sell, the number of shares indicated below, for which the underwriters collectively were paid approximately $14,459,539.00 in discounts and commissions:

| Underwriters | Numbers of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 3,179,048 |
| Morgan Stanley & Co. LLC | 2,666,298 |
| Barclays Capital Inc. | 1,435,699 |
| Credit Suisse Securities (USA) LLC | 1,435,699 |
| BofA Securities, Inc. | 410,199 |
| Cowen and Company, LLC | 189,718 |
| Guggenheim Securities, LLC | 189,718 |
| KeyBanc Capital Markets Inc. | 189,718 |
| Oppenheimer & Co. Inc. | 189,718 |
| Piper Sandler & Co. | 189,718 |
| Telsey Advisory Group LLC | 76,912 |
| Academy Securities, Inc. | 25,637 |
| R. Seelaus & Co., LLC | 25,637 |
| Samuel A. Ramirez & Company, Inc. | 25,637 |
| Siebert Williams Shank & Co., LLC | 25,637 |
| Total | 10,254,992 |

65.     Defendant Goldman Sachs & Co. LLC's ("Goldman Sachs") principal executive address is 200 West Street, New York, New York 10282.  Goldman Sachs served as an underwriter of FIGS' IPO and SPO.

66.     Defendant Morgan Stanley & Co. LLC's ("Morgan Stanley") principal executive address is 1585 Broadway, New York, New York 10036.  Morgan Stanley served as an underwriter of FIGS' IPO and SPO.

67.     Defendant Barclays Capital, Inc.'s ("Barclays") principal executive address is 745 7th Avenue, New York, New York 10019.  Barclays served as an underwriter of FIGS' IPO and SPO.

68.     Defendant Credit Suisse Securities (USA) LLC's ("Credit Suisse") principal executive address is 11 Madison Avenue, 11th Floor, New York, New York 10010.  Credit Suisse served as an underwriter of FIGS' IPO and SPO.

69.     Defendant BofA Securities, Inc.'s ("BofA") principal executive address is One Bryant Park, New York, New York 10036.  BofA served as an underwriter of FIGS' IPO and SPO.

70.     Defendant Cowen and Company, LLC's ("Cowen") principal executive address is 599 Lexington Avenue, 20th Floor, New York, New York 10022.  Cowen served as an underwriter of FIGS' IPO and SPO.

71.     Defendant Guggenheim Securities, LLC's ("Guggenheim") principal executive address is 330 Madison Avenue, New York, New York 10017. Guggenheim served as an underwriter of FIGS' IPO and SPO.

72.     Defendant KeyBanc Capital Markets Inc.'s ("KeyBanc") principal executive address is 127 Public Square, Cleveland, Ohio 44114.  KeyBanc served as an underwriter of FIGS' IPO and SPO.

73.     Defendant Oppenheimer & Co. Inc.'s ("Oppenheimer") principal executive address is 85 Broad Street, 22nd Floor, New York, New York 10004. Oppenheimer served as an underwriter of FIGS' IPO and SPO.

74.     Defendant Piper Sandler & Co.'s ("Piper Sandler") principal executive address is 800 Nicollet Mall, Minneapolis, Minnesota 55402.  Piper Sandler served as an underwriter of FIGS' IPO and SPO.

75.     Defendant Telsey Advisory Group LLC's ("Telsey") principal executive address is 555 Fifth Avenue, 7th Floor, New York, New York 10017.  Telsey served as an underwriter of FIGS' IPO and SPO.

76.    Defendant Academy Securities, Inc.'s ("Academy") principal executive address is 6522 3rd Avenue, 12th Floor, New York, New York 10017.  Academy served as an underwriter of FIGS' IPO and SPO.

77.    Defendant R. Seelaus & Co., LLC's ("R. Seelaus") principal executive address is 26 Main Street, Suite 300, Chatham, New Jersey 07928.  Seelaus served as an underwriter of FIGS' IPO and SPO.

78.    Defendant Samuel A. Ramirez & Company, Inc.'s ("A. Ramirez") principal executive address is 61 Broadway, 29th Floor, New York, New York 10006.  A. Ramirez served as an underwriter of FIGS' IPO and SPO.

79.    Defendant Siebert Williams Shank & Co., LLC's ("Siebert") principal executive address is 100 Wall Street, 18th Floor, New York, New York 10005.  Siebert served as an underwriter of FIGS' IPO and SPO.

80.    Goldman Sachs, Morgan Stanley, Barclays, Credit Suisse, BofA, Cowen, Guggenheim, KeyBanc, Oppenheimer, Piper Sandler, Telsey, Academy, R. Seelaus, A. Ramirez, and Siebert are collectively referred to herein as the "Underwriter Defendants."

81.    The FIGS Defendants, Director Defendants, Tulco Defendants, and Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

**B.    Summary of the Securities Act Claims**

82.    In connection with the Company's May 2021 IPO and September 2021 SPO, FIGS issued prospectuses and registration statements (respectively, the IPO Documents and SPO Documents).[9, 10]   Under the Securities Act, FIGS, FIGS'

---

[9]    The IPO Documents include the Amendment No. 2 to Form S-1 Registration Statement, filed with the SEC on May 24, 2021 and declared effective by the SEC on May 26, 2021; the May 26, 2021 Form S-1MEF which incorporated by reference the prior registration statement; and the May 26, 2021 Prospectus filed with the SEC on May 28, 2021 pursuant to Rule 424(b)(4).  *See* ¶¶106, 109, *infra*.

[10]    The SPO Documents include the Form S-1 Registration Statement, filed with the SEC on September 13, 2021 and declared effective by the SEC on September 15,

directors or partners (or those about to become directors or partners as identified in the IPO Documents and SPO Documents), the individuals who signed the IPO Documents and SPO Documents, and the underwriters to the IPO and SPO are jointly and severally liable for the untrue statements or omissions of material fact in the IPO Documents and SPO Documents.[11]

83.     The IPO Documents issued in connection with the May 2021 IPO contained untrue statements or omissions of material fact.  In particular, the IPO Documents inaccurately portrayed FIGS as a low inventory risk business model due to its supposed focus on core products and demand planning purportedly driven by sophisticated proprietary data systems that yielded effective insights and analysis. The IPO Documents also incorrectly stated the Company used costly air freight only to respond to COVID-19 pandemic-related supply chain disruptions rather than issues specific to FIGS.  The Securities Act Defendants priced the May 2021 IPO at $22.00 per share.

84.     Similar untrue statements and omissions of material fact were reiterated in the SPO Documents issued in connection with FIGS' September 2021 SPO.  The Securities Act Defendants priced the September 2021 SPO at $40.25 per share.

85.     The Securities Act Claims seek to recover such losses suffered by members of the Class who purchased shares of FIGS Class A common stock pursuant and/or traceable to the false and misleading IPO Documents and SPO Documents.

### 1.     Company Background

86.     In 2013, Hasson and Spear co-founded FIGS, a "founder-led, direct-to-consumer healthcare apparel and lifestyle brand."  The Company's core "scrubwear" styles generated the vast majority of FIGS' revenue, accounting for over 80% of the

---

2021; the Form S-1 Registration Statement that registered additional securities and incorporated by reference the prior registration statement, filed with the SEC on September 15, 2021; and the September 15, 2021 Prospectus filed with the SEC on September 17, 2021 pursuant to Rule 424(b)(4).  *See* ¶¶112, 114-115, *infra*.

[11]  *See* 15 U.S.C. §77k(a)(1)-(3), (5).

Company's net revenues in 2020.  In addition, FIGS also offers "non-scrub offerings" such as lab coats, jackets, vests, and other "medical apparel" and "lifestyle" products.

87.     FIGS' scrubs and supplemental products are positioned as premium products and rooted in "Technical Comfort," referring to a combination of functionality, comfort, and design.  These factors are touted as differentiating FIGS' scrubs from other products in the healthcare apparel marketplace and purportedly justify their premium price tags.  Where a generic set of scrubs can be purchased for between \$20 and \$30,[12] a set of FIGS' core scrub pants and top will cost consumers three or four times as much at \$86 per set.[13]

88.     As a DTC company, FIGS bypasses third-party wholesalers and retailers by selling directly to end customers.  At the time of the Company's IPO, 98% of FIGS' sales were from its website and mobile application, obviating the need for healthcare professionals to visit traditional brick-and-mortar stores to purchase their scrubs.  The Company's DTC model also allowed FIGS to engage with customers before, during, and after purchase, permitting the Company to cultivate what it described as a "Deeply Passionate, Loyal Community" of customers.  According to FIGS, at the time of its IPO, the Company had approximately 1.3 million "active" customers, about 60% of whom were repeat customers.

### a.     FIGS Designs Its Products In-House but Relies on Suppliers in Asia and South America to Manufacture the Company's Inventories

89.     FIGS does not manufacture any of the products that it designs and sells.  Instead, the Company utilizes a network of suppliers and manufacturers throughout Asia and South America to source its raw fabrics and materials and to manufacture its products.  FIGS relies heavily on two suppliers in China for the vast majority of FIGS'

---

[12]  *See, e.g.*, Just Love Women's Six Pocket Medical Scrubs Set (V-Neck with Cargo Pant), https://tinyurl.com/7pf2w368 (priced at \$19.99 as of March 29, 2023).

[13]  A pair of FIGS' core scrubs retail for \$48 per pair, while a FIGS' core scrub top retails for \$38 each.

- 26 -

fabrics and two companies in Southeast Asia to manufacture the vast majority of its products.  FIGS also works with suppliers in the Asia Pacific region and additional manufacturers in China and South America.

90.     With its supply chain and manufacturing partners located in other parts of the world, FIGS necessarily relies on freight and logistics partners to import its products by ocean or air to the Company's distribution facility in City of Industry, California.  At all relevant times, ocean shipping was less expensive than air freight but featured a longer lead time for the products to reach the Company's distribution facility.  As a result of FIGS' purported data-driven ability to predict demand, the Securities Act Defendants conveyed ocean shipping as a viable option.  According to the IPO Documents and SPO Documents, FIGS' "primary method of freight-in" was ocean shipping.  In contrast, the "more expensive air freight" was purportedly reserved for limited circumstances such as responding to COVID-19 related disruptions.

**b.   FIGS' Financial Performance Is Heavily Dependent on Demand Planning and Inventory Management**

91.     At its core, FIGS is an apparel company and operates within the consumer goods sector.   As with all consumer goods companies, inventory management is critical to FIGS' operations, and timely converting inventory into sales is essential for optimizing liquidity and operational cash flows.  Inventory that is not properly balanced against demand creates costs and risks.

92.     Inventory shortages create difficulty in meeting customer demand, which can lead to lost sales opportunities, customer dissatisfaction, and a loss of repeat purchasers.  Shortages can also lead to increased shipping costs and a scramble to hurriedly meet demand, oftentimes reverting to the quicker but more expensive air freight.

93.     Conversely, excess inventory carries higher costs arising from increased storage, maintenance, and fulfillment demands.  In the apparel industry, in particular,

inventory may become obsolete as fashion trends evolve, which requires aging inventory to be sold at discounted prices, a particularly undesirable outcome for premium brands such as FIGS.

94.     To manage inventory, consumer goods companies rely on a technique known as "demand planning."  The demand planning process involves collecting, organizing, analyzing, and modeling historical data and current trends, and then making supply chain decisions in accordance with that data.  Modern demand planning is optimized by using specially designed software and analytics tools to achieve supply equilibrium, such as a Product Lifecycle Management system.  A PLM system is designed to "manag[e] the complete journey of a product from initial ideation, development, service, and disposal."[14]  When a PLM system is fully utilized, a company "can unify your product value chain with integrated business planning and supply chain execution to help drive faster innovations and improve how products are designed, manufactured, maintained, and serviced."[15]  Both CWs confirmed the importance of a PLM system.  CW-1 stated that a PLM system should be the "core of any company with a physical product."  CW-2 similarly stated that a "PLM system is everything" for an apparel company because it "keeps all the styles" the company is designing and manufacturing and allows the factory partners to "pull" the relevant manufacturing instructions and details right from the system.

95.     According to FIGS, its DTC strategy fostered data capabilities that set it apart from its competition and permitted it to predict buying patterns and manage inventory.  In particular, the Company claimed that its "DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers *and reliably predict buying patterns*.  *This leads to operational*

---

[14]   Oracle, *What is PLM (Product Lifecycle Management)*? https://www.oracle.com/scm/product-lifecycle-management/what-is-plm/ (last visited Mar. 12, 2024).

[15]   *Id.*

4888-2061-5087.v1

*efficiencies throughout our supply chain, inventory management and new product development*." The Company even claimed that "[t]hrough our ***customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day***."

### 2. FIGS' Pre-IPO Merchandising Strategy Focused on a Small Number of "Core Styles"

96. FIGS' traditional merchandising model relied on a limited set of basic scrub products: 13 core styles in six core colors (referred to herein as FIGS' "core products," "core scrubs," or "core scrub products"). FIGS' core products consisted of three or four basic pant and top silhouettes each for men and women, respectively. FIGS' six core scrub colors are commonly worn in a variety of medical settings and comport with color codes at many medical facilities: black, navy, graphite, ceil blue, royal blue, and burgundy. FIGS' core products are available for purchase year-round and are non-seasonal.

97. FIGS' core scrub products are uniforms, intended to be worn every day. As Spear explained on November 10, 2021, "[FIGS'] strategy with these core styles is to have a steady supply of products that health care professionals come back all year round to replenish."

98. FIGS' "replenishment" strategy purportedly mitigated inventory risk by creating a reliable sourcing and merchandising model, resulting in three primary benefits. First, forecasting demand for FIGS' core products was simple. Customers replenish their core scrub products at regular intervals, creating low volatility and predictable "recurring purchase" patterns, and the year-round demand for core scrubs in core colors eliminated FIGS' need to account for seasonal fluctuations. Moreover, FIGS had seven years of historical demand data to support the Company's core products forecasting.

99. Second, the core-product "replenishment" strategy purportedly mitigated the risk of expending resources on the development of new products that were

- 29 -

1   undesirable to consumers.  Demand for FIGS' core products was well-established by

2   the time of the IPO and SPO, but if a new product turned out to have little appeal to

3   consumers, the Company could be left holding unsellable inventory and unable to

4   recover sunk costs.

5       100.   Third, FIGS' core-product strategy supposedly mitigated the risk of

6   obsolescence, thereby simplifying inventory management.  For instance, if FIGS

7   stocked too much of a particular SKU, surplus items could readily be rolled over to

8   the next period and future orders adjusted accordingly, thereby reducing overstocks

9   and out-of-stocks (or "stockouts").    Additionally, FIGS' strategy mitigated

10  obsolescence risks associated with shipping delays.  In the event of an en route ocean

11  freight delay, the Company could air freight in additional product without concern that

12  the increased volume would make the initial order unsaleable.  With respect to non-

13  core items, by contrast, inventory overstock can necessitate promotional discounts and

14  other potentially costly impacts.

15      101.   Thus, FIGS' core-product strategy enabled the Company to maintain

16  appropriate inventory levels regardless of the Company's demand planning

17  sophistication.

18          **3.     FIGS Experienced Explosive Revenue Growth During
                     the COVID-19 Pandemic, Predominantly from Sales**

19          **of FIGS' "Core" Products**

20

21      102.   FIGS was uniquely positioned to reap substantial upside from the

22  COVID-19 pandemic that started in early 2020.  Indeed, demand for FIGS' core scrub

23  products skyrocketed as more medical professionals opted to wear scrubs and

24  hospitals required scrub changes between patients.  According to one survey of

25  physicians, nurse practitioners, and physician's assistants, the proportion of clinicians

26  wearing scrubs in outpatient settings during the pandemic increased from 24% to over

27

28

- 30 -

85%.[16]  A study of hospital doctors showed that 76% changed their work attire during the COVID-19 pandemic to scrubs.[17]  Moreover, doctors and nurses were changing scrubs between each patient to avoid spreading infection – sometimes up to 40 times a day.[18]

103.   At the same time, online shopping became increasingly important to consumers because of pandemic-related restrictions on store hours and in-person gatherings.  Coupled with healthcare workers' extended shifts, FIGS' DTC model was particularly attractive to consumers looking to fill their newfound increased need for scrubs.[19]

104.   As a direct result of heightened demand for its core scrub products and the shift to online sales, FIGS saw explosive growth in 2020.  In March 2020, FIGS' orders doubled.[20]  From 2018 to 2020, revenue grew nearly 400%, from $55 million in 2018 to $260 million in 2020.  During that period, FIGS' core scrubs constituted the bulk of the Company's sales and revenue.  In 2020, approximately 82% of FIGS' net revenues came from core scrub products.  Even on days when FIGS launched new, limited-edition styles, 90% of the Company's sales came from its core products.

---

[16]  Janet Chao and Yan Lee, *When Was the Last Time You Wore a White Coat?*, KevinMD.com (Dec. 21, 2022), https://www.kevinmd.com/2022/12/when-was-the-last-time-you-wore-a-white-coat.html#:~:t.

[17]  Nordrum, O.L., Aylward, P. & Callaghan, M. *Hospital Doctors' Attire During COVID-19 and Beyond: Time for a Permanent Change*, Ir J Med Sci 191, 2445-2447 (2022), https://doi.org/10.1007/s11845-022-02922-1.

[18]  *How a Promising Scrubs Startup Found Itself Poised to Tackle the Pandemic*, Forbes (May 1, 2020), https://tinyurl.com/4773euyz.

[19]  *See* Norman Shaw, et al., *Online Shopping Continuance After COVID-19: A Comparison of Canada, Germany and the United States, Journal of Retail and Consumer Services* (Nov. 2022) ("[T]here were 37% of the USA sample who were experienced shoppers prior to the pandemic, increasing to 60% during the pandemic, but then dropping down to 55% after the pandemic."), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9379614/.

[20]  Madeline Berg, "*Mission Critical? With Coronavirus Pandemic, Scrubs Maker Figs Steps Up Efforts to Spiff Up the Hospital Ward*," Forbes (Apr. 28, 2020), https://tinyurl.com/3pv9n7t8.

### 4.   FIGS Went Public Following Its Exponential COVID-19-Related Growth

105.   Prior to its IPO, FIGS operated in the pandemic for over a year and even experienced a pandemic-induced growth.  Following multiple years of significant revenue growth, FIGS and Tulco sold shares of the Company's stock to the public in FIGS' IPO, which closed on June 1, 2021.  Then, a little more than three months later, the Founders and Tulco sold shares of FIGS' stock in the SPO, which closed on September 20, 2021.

#### a.   FIGS Went Public in May 2021 with Tulco Selling the Vast Majority of the Shares Available in the IPO

106.   On May 5, 2021, FIGS filed a registration statement on Form S-1 with the SEC for purposes of facilitating its IPO.  Following a series of comments from the SEC, the Company amended its Registration Statement on May 20, 2021, and again on May 24, 2021.  These Form S-1 and amendments are collectively referred to as the "IPO Registration Statement."  The IPO Registration Statement became effective on May 26, 2021.  That same day, FIGS filed the May 26, 2021 Form S-1MEF.

107.   On May 26, 2021, the Securities Act Defendants announced an IPO price of $22.00 per share and raised the number of shares of Class A common stock in the offering from 22.5 million to approximately 26.4 million.  Although the size of the offering increased, the number of shares sold by FIGS actually *decreased*, from 5,875,000 in the draft prospectus to 4,636,364 in the final IPO Prospectus (defined at ¶109, *infra*).  Meanwhile, Tulco offered 21,749,999 shares in the IPO, up from 16,625,000 in the initial draft.  The Underwriter Defendants' 30-day option to purchase additional shares increased from a total of 3,375,000 to 3,957,954 shares – all of which Tulco offered.

108.   Thereafter, Spear and Hasson participated in a series of media appearances designed to promote FIGS and solicit purchasers in the IPO.  On May 27, 2021, the Founder Defendants promoted the IPO on Bloomberg Markets, CNBC's

Squawk on the Street, and Yahoo! Finance's IPO Power Hour.  During the latter show, Spear boasted that the Company was on a trajectory to grow by 100% year-over-year post pandemic.  Seemingly discounting the pandemic's role in FIGS' growth, Spear stated, in relevant part: "We've grown the business every year over 100% since we founded the Company in 2013.  We did grow during the pandemic 140% year-over-year.  But, you know, this was all the trajectory that we were on before the pandemic and we look to continue on this trajectory post pandemic."[21]

109.   On May 28, 2021, FIGS filed a Prospectus on Form 424B4 ("IPO Prospectus"), which represented that the Company was offering 4,636,364 shares of FIGS' Class A common stock and Tulco was offering an additional 21,749,999 shares of FIGS' Class A common stock for $22.00 per share.  The IPO Registration Statement and IPO Prospectus are collectively referred to herein as the "IPO Documents."

110.   The IPO Documents portrayed FIGS as maintaining low inventory risk due to its focus on core products.  In addition, FIGS touted its data analytics capabilities, which permitted the Company to "reliably predict buying patterns" and "anticipate demand."  The Company also represented that air freight was used only as a response to supply chain disruptions arising from the COVID-19 pandemic or from factors beyond FIGS' control.

111.   On June 1, 2021, the Securities Act Defendants announced the closing of the Company's IPO wherein FIGS and Tulco offered 30,344,317 shares of FIGS Class A common stock, which included the full exercise of the underwriters' option to purchase an additional 3,957,954 shares.

---

[21]   IPO Power Hour, *Update 2-Scrubs maker FIGS valued at $4.57 bln in stellar debut*, Yahoo! Finance (May 27, 2021), https://finance.yahoo.com/news/1-medical-equipment-maker-figs-160812520.html.

- 33 -

**b. Just Three Months After the IPO, Spear, Hasson and Tulco Sold over 10 Million Shares Worth over $412 Million in the SPO**

112. On September 14, 2021, FIGS issued a press release announcing that the Company would conduct a secondary offering through which Tulco and the Founders would sell 8,826,703 shares of FIGS' Class A common stock into the market. The Underwriter Defendants also had a 30-day option to purchase an additional 1,324,005 shares. That same day, FIGS filed the Registration Statement on Form S-1 with the SEC for purposes of facilitating the SPO ("SPO Registration Statement").

113. The Founders and Tulco were able to sell their shares in the SPO through an early release from their IPO lock-up agreements, which was only possible due to an increase in FIGS' stock price. According to the September 14, 2021 Registration Statement, the lock-up agreement covering Tulco's, Hasson's, and Spear's shares expired immediately prior to trading on August 27, 2021. This freed up 15% of the aggregate number of shares of common stock owned by each holder or issuable upon exercise of vested equity awards owned by each holder for sale because each of the following was met: (i) FIGS published its first quarterly financial results after the IPO, which occurred on August 12, 2021; (ii) 90 days had passed since May 28, 2021, when the IPO Prospectus was filed (*i.e.*, August 26, 2021); and (iii) the closing price of FIGS' Class A common was at least 33% greater than the IPO share price (*i.e.*, $22 per share) for at least 10 trading days in any 15-day consecutive trading day period, which occurred on or about June 14, 2021.[22]

114. On September 15, 2021, FIGS filed with the SEC a Registration Statement on Form S-1MEF, adding an additional 104,284 shares of Class A common stock to the SPO ("September 2021 S-1MEF"). That same day, the Company published a press release announcing that the Founders and Tulco were offering 8,917,385 shares of FIGS' Class A common stock at $40.25 per share. The shares

[22] The lock-up agreement expired after the latest of these conditions occurred.

available for the Underwriter Defendants to purchase also increased from 1,324,005 to 1,337,607 shares.

115.   On September 17, 2021, FIGS filed a Prospectus on Form 424B4 (the "SPO Prospectus"). The SPO Registration Statement, September 2021 S-1MEF, and SPO Prospectus are collectively referred to as the "SPO Documents."

116.   By September 2021, FIGS had been operating during the pandemic for over 18 months. The SPO Documents reiterated the IPO Documents' untrue statements that FIGS maintained low inventory risk, purportedly because the Company had data analytics capabilities that permitted FIGS to "reliably predict buying patterns" and "anticipate demand" and because FIGS was supposedly operating a "lower-risk merchandising strategy" focused on its core products. The SPO also stated that air freight was only used when necessary to manage the impact of the COVID-19 pandemic or factors beyond FIGS' control.

117.   On September 20, 2021, Hasson, Spear, and Tulco completed the SPO. Through the SPO, and upon the underwriters' decision to exercise their option to purchase additional shares, Hasson and Spear sold 3,888,322 shares of FIGS Class A common stock at a price of $40.25 per share, resulting in total proceeds of $156,504,960.50. Tulco sold 6,366,670 shares of FIGS Class A common stock at a price of $40.25 per share, resulting in proceeds of $256,258,468. The following chart details the amount of shares sold and the proceeds gained by Hasson, Spear, and Tulco:

| Defendant | Transaction Date | Price | Shares Sold | Proceeds |
|-----------|------------------|-------|-------------|----------|
| Hasson | 20-Sep-21 | $40.25 | 2,419,998 | $97,404,920 |
| Spear | 20-Sep-21 | $40.25 | 1,468,324 | $59,100,041 |
| Tulco | 20-Sept-21 | $40.25 | 6,366,670 | $256,258,468 |

118.   Unbeknownst to investors at the time, FIGS' IPO Documents and SPO Documents included untrue statements and omissions of material fact concerning the

- 35 -

Company's inventory risk, core product merchandising strategy, data analytics capabilities, and use of costly air freight.

### 5. The Offering Documents Falsely Portrayed FIGS as Capable of Reliably Predicting Demand and Efficiently Managing Its Supply Chain[23]

119. Prior to the IPO, FIGS claimed that it had data analytics that created efficiencies throughout every aspect of its business. According to FIGS' Offering Documents, the Company was able to procure hundreds of data attributes associated with millions of customers because of its DTC model. Further, FIGS touted a centralized data science team that could utilize the data the Company harvested from its customers to drive decision making throughout the Company and build proprietary data science solutions applied to key functions, including marketing and customer experience, product, supply chain, merchandising, and inventory management.

120. FIGS purportedly used the harvested data in conjunction with management systems, such as Flexport and Whiplash's warehouse management system, to manage its supply chain, inventory, warehouse, fulfillment, distribution, and freight operations. Through Flexport and Whiplash's warehouse management system, FIGS was supposed to have ***real time insight into transport trajectory and inventory levels at the Company's fulfillment center, respectively***. For example, in a September 19, 2022 partnership video, Spear highlighted that Flexport provided "a real time platform to see, you know, ***where the products are at any given time***."[24] Spear claimed that FIGS had that capability for at least "a number of years."

121. FIGS publicly claimed that it was using such data capabilities to reliably predict buying patterns, determine inventory needs, create supply chain efficiencies, and anticipate optimal times for product launch down to the day of the week and time

---

[23] The "Offering Documents" refers to FIGS' IPO Documents and SPO Documents.

[24] Flexport, *FIGS | Flexport.org Impact Partner Spotlight*, YouTube (Sept. 19, 2022), https://www.youtube.com/watch?v=Sz_vs5YpkRU.

- 36 -

of day.  But behind the scenes, FIGS was relying on air freight to bring in products, delaying product launches, and running out of core products.  Indeed, even years after the IPO and SPO, FIGS still did not have (or did not utilize) these capabilities.

122.   In short, FIGS did not have the "proprietary and customized data solutions designed to optimize [its] product innovation, inventory analytics, marketing efforts and operational efficiency" that it publicly boasted.

### 6.   Prior to the IPO, FIGS Departed from Its Low-Risk Core-Product Merchandising Model, Resulting in a Glut of Non-Core Products

123.   In early 2021, prior to the IPO, FIGS pivoted away from its touted low-risk core products merchandising strategy and began developing a plethora of new styles each quarter.  Over the course of 2021 alone, FIGS launched at least 100 new styles, exclusive of its core scrub products, and designed and produced numerous others for later launch.  New "styles" can be anything from a variation on an existing product, such as a slim version of a core scrub pants, to a completely new product like sweater knits and puffer jackets.  When FIGS introduces a style, the Company considers it a new product, meaning that demand for that specific product typically has not yet been proven or demonstrated at the time of the launch.

124.   FIGS introduced this "new style" strategy because, as Hasson and Spear said, the Company needed to "innovate" to continue creating high quality products for healthcare professionals.  During the August 12, 2021 earnings call, Hassan stated: "Product innovation is the lifeblood of FIGS . . . ."  Spear similarly remarked on November 10, 2021 that FIGS "may innovate or die."  While Hasson and Spear touted customer excitement concerning new products, they omitted that FIGS lacked, or had departed from, the data-driven analytics solutions that it claimed could predict demand and buying patterns and maintain inventory efficiency when producing these "new styles."  The Securities Act Defendants negligently gave the impression that the data-

- 37 -

1  driven analytics were used to predict demand and buying patterns for the new styles,
2  too.

3       125.   The shift in strategy was dramatic.  By the end of 2021, as Spear would
4  sum up on March 8, 2022, FIGS had "launched over 100 new styles across all
5  categories in 2021."

6       126.   But the rampant new product launches did not translate into sales, and the
7  Company's non-core inventories drastically increased throughout 2020, 2021, and
8  2022.  At a March 5, 2021 Board meeting that Hasson, Spear, Willhite, Lawrence, and
9  Tull attended, the excess leftover non-core inventory was discussed.  As a result, FIGS
10  "increased [its] . . . inventory reserve to account for the increase."  By the end of Q2
11  2022, despite core styles comprising 80% of revenues, FIGS held just as much non-
12  core as core inventory: "Of the remaining inventory in our warehouse, approximately
13  50% is in core styles and core colors . . . ."

14       127.   In sharp contrast to its low-risk core-products focus, FIGS' pivot to
15  generating dozens of new styles per quarter created extremely risky conditions with
16  respect to demand planning and inventory management.  Pursuant to the new strategy,
17  the Company began placing purchase orders for products and styles for which demand
18  had not been demonstrated, creating risk that inventory would not sell or would take a
19  long time to convert from inventory into sales.  As the Company forayed into
20  completely new product categories like baseball caps, scarves, and tote bags, the
21  predictive value of historical purchase data further diminished.  Attempts to enter new
22  markets like "off-shift" loungewear also created an entirely new competitive dynamic,
23  wherein FIGS was competing with established loungewear brands for market share.

24       128.   Moreover, the new products included many seasonal items, such as
25  jackets and coats.  Seasonal goods require more reliable supply chain controls because
26  unlike core scrub products, their launch dates cannot simply be pushed forward or
27  backward.  If a shipment of down-alternative puffer coats is delayed until spring, for
28  example, the products likely will not be sold until multiple quarters later, if at all.

- 38 -

129.   A typical measurement used to assess the effectiveness of a consumer goods company's inventory management is "days of inventory outstanding."  A company strives to keep days of inventory outstanding low because housing inventory is costly and selling inventory quickly usually correlates with higher profit margins on goods sold.  An increase in a company's days of inventory outstanding indicates that the company may be selling product more slowly than new product is coming in, causing accumulation of obsolete inventory.

130.   FIGS' ideal inventory level, as the Company later acknowledged on February 28, 2023, is around 16 to 20 weeks of supply (*i.e.*, 112 to 140 days).  FIGS' pivot from its core-product strategy and its inability to reliably predict buying patterns caused excessive inventory buildup.  FIGS' days of inventory outstanding increased in nearly every quarter from the IPO onward, ballooning to 250-300% of FIGS' "ideal" level during Q3 2022, as shown in Figure A, below:

**Figure A**



131.   Inflating inventories reflected the Company's focus on developing a significant number of new styles per quarter and lacking, or not utilizing, the data-driven solutions described in the Offering Documents to forecast demand and control

4888-2061-5087.v1

inventories.  Where the Company's early core-product focus had obviated the need for sophisticated demand planning tools, FIGS' fast-paced diversification strategy caused far riskier stocking and supply chain decisions.  Some of FIGS' new product offerings did not sell well, others sold slower than expected, and many were seasonal, complicating demand planning and causing overstocking.  The Company's decision to shift away from core products to a high-risk merchandising model, for which sophisticated demand planning tools were necessary, proved disastrous for FIGS' inventory levels because the demand planning tools did not exist, or otherwise were not utilized.

132.   By Q2 2021, FIGS' inventory growth had outpaced its sales growth.  By Q2 2022, its net inventory actually exceeded its net sales, as depicted in Figure B below.

**Figure B**



133.   The longer inventory takes to convert into sales, the more expensive holding costs are.   Thus, stocking non-core products without the ability to predict demand created risk of overstocking and incurring increased warehousing costs. Overstocked inventory, in turn, creates risk of restricted cash flows, potentially delaying investments or repayment of debt.   With time, overstocked inventory of non-core products can become obsolete, necessitating inventory discounting and promotional pricing.

134.   FIGS' inventory eventually grew too expansive to be housed at its City of Industry warehouse.   As a result, the Company required additional warehousing space, driving up costs of goods sold ("COGS") and shrinking margins.

135.   FIGS' rising days of inventory outstanding resulted from its implementation of its new products strategy and a lack of demand planning, not macro-economic factors.   Indeed, FIGS' days of inventory outstanding both exceeded and outpaced comparable companies during the same time period, including DTC apparel retailers like Revolve, athleticwear retailer Lululemon (to which the Company regularly compares itself), and other uniform brands like Cintas.   Where FIGS saw days of inventory outstanding climb as high as a full calendar year, levels at competitor companies experiencing the same macro-economic environment remained around the industry average of 100-160 days.

- 41 -

**Figure C**



136. In sum, with its shift to its new merchandising model that was not supported by historical data or sophisticated demand planning, FIGS did not maintain the low inventory risk negligently touted in its IPO Documents and SPO Documents.

### 7. FIGS' Inability to Reliably Predict Demand and Effectively Manage Its Supply Chain Resulted in Routine Reliance on Costly Air Freight

137. As a result of departing from its core-product strategy, inability to reliably predict buying patterns, purchase decisions that were not predicated on customer demand, and last-minute design changes, FIGS' expenses increased significantly. In addition, such issues caused the Company to rely heavily and routinely on expensive air freight, despite the Offering Documents stating FIGS primarily used ocean shipping.

138. The Securities Act Defendants openly acknowledged from the outset that air freight was more expensive on a per-unit basis than ocean freight and that reliance

1    on air freight in 2020 – due to the COVID-19 pandemic – increased FIGS' COGS and

2    negatively impacted its gross margins.

3         139.   But while the Offering Documents described air freight reliance as a

4    stopgap measure to address COVID-19-related delays facing ocean freight providers,

5    FIGS actually used air freight as a first resort to compensate for inadequate demand

6    planning, purchase decisions that were divorced from actual customer demand, and

7    last-minute design changes.  Shortly after the IPO, but before the SPO, Hasson, Spear,

8    Soenen, Willhite, Antrum, Lawrence, and Turenshine (defined at ¶215, *infra*) attended

9    an August 10, 2021 Board meeting, during which they discussed the Company's Q2

10   2021 financial results and challenges.  The Board discussed that "in-transit times

11   [were] increasing by approximately 2 weeks" for ocean freight.  Thus, FIGS needed

12   only to leverage its oft-touted data-driven analytics to promote inventory efficiencies

13   and account for the additional two weeks that ocean shipping would take.  But instead,

14   the Company would continue "to rely on more expensive air freight" so that FIGS

15   could "hit [its] planned revenue targets," which was not identified as a reason to use

16   air freight in the Offering Documents.

### C.    The IPO Documents Contained Untrue Statements of Material Fact and/or Omitted Facts Necessary to Make the Statements Made Therein Not Materially Misleading

140.   Plaintiffs assert that all statements set forth below that are bolded and
italicized were untrue statements of material fact.  Non-bolded and non-italicized
statements are included for context.

#### 1.    FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Tested or Established

141.   FIGS' IPO Documents portrayed the Company as being data-focused
with advanced data-tracking and analytics capabilities.  These capabilities were

- 43 -

presented as unique assets that differentiated FIGS from its competition. For example, under a boldface header on the second page reading: "**We Leverage Data Science to Connect with and Serve Our Community**," the Company claimed:

> **We develop proprietary and customized data solutions designed to optimize our product innovation, inventory analytics, marketing efforts and operational efficiency**. We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the Company. **This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes**.

142. The Company repeatedly claimed that its access to customer data allowed for accurate demand prediction: "**Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns**."

143. The Company also claimed to pay particular attention to "**demographic, geographic and psychographic data that enables us to reliably predict buying patterns, leading to operational efficiencies throughout our supply chain, inventory management and new product development**."

144. The Company also emphasized for investors that FIGS was a low-risk company due to its primary business being uniforms rather than more discretionary apparel: "**Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings**."

145. Similarly, the Company claimed that it could minimize inventory risk by being careful with its purchasing decisions. Under a boldface heading reading "**Highly Effective Merchandising and Product Launch Model**," the Company claimed: "**For our limited edition colors and styles, we utilize a disciplined buying**

- 44 -

*approach with shallow initial buys and data-driven repurchasing decisions* to *minimize inventory risk while creating scarcity*."  The Company continued: "*This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency*."

146.   The Company made the following representations in a paragraph under the boldface header "*Supply Chain*":

> *We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping.  This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory planning and analytics).  By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency*.

147.   Additionally, the Company made the following representations in a paragraph under the boldface header "*Merchandising and Inventory Management*":

> Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers.  *This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.  It also enables us to manage purchasing and inventory effectively and efficiently*.  *We use data-driven models to predict and anticipate demand for our products.  The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques.  Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day*.

- 45 -

148. In the Management Discussion and Analysis section of the IPO Documents, the Company also made the following untrue statement:

We have a highly efficient merchandising model. ***Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***. In 2020, we generated 82% of net revenues from our 13 core scrubwear styles, 5% of net revenues from limited edition scrubwear styles, and the remaining 13% from our lifestyle apparel and other non-scrub offerings.

### a. Reasons Why the IPO Statements Regarding Inventory and Data Analytics Were Untrue Statements and Omissions

149. The statements identified in ¶¶141-148 above contained untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading at the time they were made. FIGS could not reliably predict buying patterns and was constantly executing highly discretionary, last-minute purchase decisions that resulted in high inventory risk, increased costs, and supply chain and product launch disruptions. Neither operational efficiencies nor low inventory risk resulted from the Company's data analytics capabilities or the Company's core product strategy, as evidenced by the following:

(a) Rather than relying upon its data analytics and non-discretionary core products that were subject to replenishment to maintain inventory efficiency, FIGS was engaged in the rapid development of hundreds of new products for which demand had not been demonstrated. Moreover, advanced data science technologies were not being used to anticipate optimal times to launch new products. According to CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment, including their own "personal closets," rather than data analysis or customer insight. Indeed, CW-2 stated: "There was nothing to back up why we were developing what

1   we were developing, a lot of times." Additionally, CW-2 recalled within the first

2   couple months of CW-2's employment, Spear "dropped" a product line the night

3   before it was scheduled to launch simply because Spear changed her mind regarding

4   the product and decided she "didn't like it." As a result, thousands of units of product

5   were left "just sitting in our warehouse." CW-2 stated that such things "happened

6   fairly often." CW-2 stated that "countless times" before placing an order, CW-2

7   would be told "Heather hates the fabric, or the color" and was instructed to change the

8   order. According to CW-2, last-minute changes seemed to be an integral part of the

9   design process at FIGS. CW-2 confirmed that this state of receiving last-minute

10  change orders existed prior to the IPO and intensified after it;

11          (b)    FIGS either did not have or was not using data analytics to reliably

12  predict demand and buying patterns and efficiently operate FIGS' supply chain,

13  evidenced by FIGS' ballooning inventory throughout 2021, increasing use of air

14  freight, and the following:

15          (i)    CW-1 stated it was "laughable at best" that FIGS had

16  integrated product lifecycle data with sophisticated demand predictions such that the

17  Company could continuously assess the supply chain and improve efficiency.

18  According to CW-1, "it was completely the opposite of what was really going on."

19  Instead, FIGS' systems "were neither proactive nor predictive." CW-1 stated: "We

20  were behind and had to catch up every time." CW-2 stated that during CW-2's tenure

21  at FIGS, the Company lacked its touted data analytics on the products side. On the

22  product team, CW-2 "never heard about any systems that were trying to track trends

23  or inventory levels. It didn't seem like there were any systems in place." With

24  respect to production, "there were no processes at all." CW-2 confirmed that FIGS

25  lacked a PLM system at the time of its IPO and did not begin to implement one until

26  in or around February 2022. As a result: there were no systems that FIGS'

27  manufacturers could access; the "history" of a product was not being retained; and

28

FIGS depended on Google Slides and Excel spreadsheets that were "not very efficient" and risked data being changed;

(ii)     Even during CW-1's tenure, which began in 2023 (*i.e.*, over one year after FIGS' IPO) the PLM system only consisted of Centric's "Basic" tools, which were generally used by new companies lacking "international policies" and "little marketing strategy." Because the PLM system was so rudimentary, according to CW-1, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel. According to CW-1, for the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions." Without these, FIGS was left to manually perform such functions. Indeed, CW-1 stated "if you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting." And CW-1 confirmed that FIGS "never had them." According to CW-1, demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off"; and

(iii)     Even if FIGS did have useful data from its DTC infrastructure, according to CW-1, it was not being utilized. CW-1 stated that "having the data and utilizing the data are two completely different things." As to whether FIGS could "predict buying patterns," CW-1 stated, "No." Further, CW-1 stated that FIGS never had a demand planning system and the demand planning team consisted of only "one to two people," compared to the "10 to 20" that was required for the level of inventory that FIGS was ordering. CW-1 stated that CW-1 did not believe that FIGS "ever had" 10 to 20 demand planners, including at the time of the IPO;

(c)     Prior to the IPO, FIGS had begun to shift away from its core-products strategy and engaged in the rapid development of hundreds of new products for which demand had not been demonstrated, in contrast to the Company's purported low inventory risk. The risky conditions associated with FIGS' strategy shift were due to: (i) the predictive value of FIGS' historical purchase data diminishing as the

- 48 -

1   Company forayed into completely new product categories; (ii) the creation of entirely
2   new competitive dynamics as FIGS entered new markets and competed with
3   established brands for market share; and (iii) the seasonal nature of many new items,
4   launch dates for which could not simply be pushed forward or backward;

5   (d)   FIGS' shift in focus away from its core products strategy and the
6   Company's lack of data analytics solutions that optimized purchasing decisions and
7   maintained inventory efficiency resulted in average days of inventory outstanding
8   beginning to increase significantly before the IPO.  At a March 5, 2021 Board
9   meeting, it was discussed that there was excess leftover non-core inventory, and as a
10  result, FIGS had to "increase[] [its] . . . inventory reserve to account for the increase";
11  and

12  (e)   The Company's frequent use of costly air freight for shipping
13  needs was due to FIGS not having, as it had claimed, a demand planning strategy that
14  was driven by sophisticated data science and non-discretionary merchandising that
15  resulted in greater efficiency and reliability, improved decision making, lower risk, or
16  the ability to plan the launch of products down to the day of the week and time of day.
17  Rather, CW-2 stated that last-minute changes were "definitely" the reason that air
18  freight was used at FIGS throughout CW-2's tenure.  CW-2 also confirmed that air
19  freight was used "most of the time" when such changes occurred.  In fact, CW-2
20  confirmed that the use of air freight at FIGS instead of vessels to ship items was done
21  "constantly in order to hit launch dates."  Additionally, according to CW-2, late
22  changes "one hundred percent affected the need to use air freight" and that FIGS
23  could have feasibly planned for the extended shipping times that resulted from
24  pandemic conditions were it not for the last-minute changes.  CW-2 described ocean
25  shipping during this time period as still "dependable."

26
27
28

4888-2061-5087.v1

<table>
<tr><td>1</td><td rowspan="2"></td></tr>
<tr><td>2</td></tr>
</table>

1
2

**b.    The IPO Statements Regarding Inventory and Data Analytics Were Material**

3
4
5
6
7
8
9
10

150.   FIGS' statements regarding its low inventory risk arising from FIGS' robust customer data analytics, ability to anticipate demand and reliably predict buying patterns, supply chain and inventory management, reliance on core scrub styles, and DTC strategy were important to analysts and investors.  Analysts pointed to exactly these factors as being crucial to the Company's business.  For example, on June 21, 2021, Barclays initiated coverage and issued an analyst report in which it rated the stock Overweight, and wrote: "As a DTC brand, FIGS continues to reap the benefit of having **near-perfect data** – on its customers and purchasing behavior."

11
12
13

151.   Similarly, BofA initiated coverage the same day, rated the stock Buy, and wrote: "[FIGS'] digitally native nature allows **data-driven management of inventory, and a reliance on high margin core scrubs** reduces fashion risk."

14
15
16
17
18
19
20
21
22
23
24
25
26
27

152.   Cowen, which also initiated coverage that day with an Outperform rating, similarly wrote: "**Data-driven** marketing and consumer engagement have created a powerful community."  Under a boldface heading reading "**Multi-Faceted Durable Competitive Advantages**," Cowen continued: "Customer data enables FIGS to acquire and retain consumers at high rates with declining customer acquisition cost (CAC) and rising retention – NPS is 81.  Co-founder led management team has built a talented team across finance, merchandising, **data science and supply chain**."  Cowen also pointed to FIGS' "[d]ata science driven decision making and intelligent replenishment," and said "[t]he DTC model offers direct contact with its customer base across its website, app, marketing, storytelling, and engagement – **a key competitive advantage over many of its peers**."  Cowen also said: "FIGS makes use of data science to segment its customers, identify underpenetrated regions domestically and outline the path to global expansion, along with using AI for its intelligent replenishment model tied to an individual's buying preference."

28

- 50 -

153.   In fact, Credit Suisse, Guggenheim, Oppenheimer, Piper Sandler, and Telsey Advisory Group all initiated coverage on June 21, 2021 with a rating of "Buy," "Outperform," or "Overweight," and mentioned FIGS' insight into customer data in some capacity in their coverage notes that day:

| Analyst | Example Comment |
| --- | --- |
| Credit Suisse | "FIGS uses the consumer insight data advantages it generates being a DTC brand to **look deep into the mind of its core consumer, and it leverages those data to drive a rapid pace of innovation in better fitting, more fashionable, and more functional healthcare workwear**." |
| Guggenheim | "The company is focused on **utilizing data science to expand its customer community, elevate its customer experience and drive intelligent replenishment**." |
| Oppenheimer | "As **a technology-enabled DTC brand**, FIGS is disrupting the $79B-plus healthcare apparel industry that has historically consisted of thousands of small brick & mortar retailers lacking a strong digital presence." |
| Piper Sandler | "The company's **biggest competitive advantage** is its digital-only model and superior data collection and analytics." |
| Telsey Advisory Group | "Data science.  FIGS collects a multitude of data points across 800 data attributes from its customers. **The data is captured and tracked across the whole order journey and informs product, supply chain, merchandising, inventory management, and marketing decisions**. . . . The company has embedded data analytics throughout the organization, with centralized data science, data engineering teams and data analysts in each functional area of the business. . . . **The company also has a proprietary integration in its supply chain over the product lifecycle from purchase order to shipping, giving the detailed insight into its product flow and inventory planning models, which drives efficiency**." |

- 51 -

4888-2061-5087.v1

**2.     FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the IPO Documents**

154.    In the IPO Documents, the Company acknowledged that certain air freight expenditures had been higher than planned, but indicated that this was a temporary effect of the pandemic and was not expected to last:

> Certain of the Company's suppliers experienced delays and shutdowns due to the COVID-19 pandemic.  ***In order to manage the impact of these disruptions and meet its customers' expectations, the Company increased the use of more costly air freight during 2020 and during the three months ended March 31, 2021, which increased cost of goods sold***.  The Company has not experienced the pandemic's adverse impacts in any additional material respect.

155.    The IPO Documents also contained hypothetical and incomplete disclosures concerning risks to FIGS' shipping arrangements, an admittedly critical component of Company's business.  The IPO Documents misleadingly stated that FIGS' shipping arrangements and ability to inbound freight ***could*** or ***may*** be impacted by disruptions beyond FIGS' control, stating in relevant part:

> ***Shipping is a critical part of our business and any changes in, or disruptions to, our shipping arrangements could adversely affect our business, financial condition and results of operations***.
>
> We currently rely on third-party global providers to deliver the products we offer on our website and mobile app. . . .  In addition, ***our ability to receive inbound inventory efficiently and ship merchandise to customers may be negatively affected by factors beyond our and these providers' control***, including pandemic, weather, fire, flood, power loss, earthquakes, acts of war or terrorism or other events specifically impacting other shipping partners, such as labor disputes, financial difficulties, system failures and other disruptions to the operations of the

- 52 -

shipping companies on which we rely.  We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.

### a.   Reasons Why IPO Air Freight Statements Were Untrue Statements and Omissions

156.   The statements identified in ¶¶154-155 above contained untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading, in that the IPO Documents falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions and to address "factors beyond" the Company's "control."  In reality, the Company utilized air freight as a routine method of operations to compensate for its inability to properly predict demand trends and efficiently operate FIGS' supply chain, and to compensate for leadership-driven, last-minute orders as evidenced by the following:

(a)   The Company needed to frequently use air freight for shipping needs because, as discussed in ¶149, FIGS did not have, as it had claimed, the customer data and demand predictions to anticipate optimal launch times to launch products, down to the day of the week and time of day.

(b)   The Company's frequent use of air freight was not beyond FIGS' control but rather resulted from Hasson's and/or Spear's last-minute design changes:

(i)   According to CW-2, the product group was under constant pressure to meet deadlines, with much of this pressure coming from last-minute changes directed by Hasson or Spear.  CW-2 stated that "countless times" before placing an order, CW-2 would be told "Heather hates the fabric, or the color" and was instructed to change the order.  CW-2 recalled similar accounts concerning Spear. CW-2 stated that "things like that happened fairly often."  According to CW-2, last-minute changes seemed to be an integral part of the design process at FIGS.  CW-2 stated that a lot of late changes occurred at the "big final meetings of the season,"

1    which took place on a quarterly basis, because it was "often" the Founders' "first time

2    seeing the whole line together," and while changes would be made, it "was always too

3    late in the season."  According to CW-2, last-minute changes were "definitely" the

4    reason that air freight was used at FIGS throughout CW-2's tenure.

5                    (ii)    CW-2 confirmed that this state of receiving last-minute

6    change orders existed prior to the IPO and intensified after it.  CW-2 described the

7    environment at FIGS throughout his/her tenure as "chaotic."  CW-2 stated that these

8    late changes "one hundred percent affected the need to use air freight" and that air

9    freight was used "most of the time" when such late changes occurred.  This was

10   because at FIGS, launch dates were the least flexible aspect of the production process,

11   and when last-minute changes occurred, launch dates were not moved.  CW-2

12   confirmed that the use of air freight at FIGS instead of vessels to ship items was done

13   "constantly in order to hit launch dates."

14                   (c)    The Company predetermined it would rely on air freight in the first

15   instance and not simply in response to the pandemic.  During a March 5, 2021 Board

16   meeting, Hasson, Spear, Willhite, Lawrence, and Tull discussed that port congestion

17   was delaying ocean freight by a mere "3 weeks."  The pandemic was not mentioned as

18   a reason for the delays.  Nevertheless, a known three-week delay could be easily

19   navigated if FIGS had the data analytics and tracking technology described in the IPO

20   Documents.  Moreover, per CW-2, FIGS could have feasibly planned for the extended

21   shipping times that resulted from pandemic conditions were it not for the last-minute

22   changes.  CW-2 described ocean shipping during this period as still "dependable."

23   But during the meeting, it was clear that the Company had already decided "time-

24   sensitive injection color style shipments" would ship via air freight when ocean

25   shipping ahead of schedule or rerouting these shipments to alternative ports was not

26   sufficient.

27

28

4888-2061-5087.v1

**b.     The IPO Air Freight Statements Were Material**

157.   FIGS' statement couching the Company's use of air freight as limited to meeting customer expectations in light of COVID-19 disruptions were important to analysts and investors.  Indeed, analysts highlighted FIGS' active involvement in managing its supply chain, including freight, as setting it apart from its peers.  For instance, on June 21, 2021, Telsey Advisory Group initiated its coverage of FIGS, emphasizing FIGS' active supply chain management and significant reliance on ocean freight under the header "What sets FIGS apart?," stating in part:

> Unlike peers who tend to rely on third-party agents to manage production, ***FIGS is actively involved in managing its entire production process end-to end in order to maintain its high standards***.  The bulk of the company's core scrubwear is produced by three manufacturing partners in nine facilities in Southeast Asia, and production for non-scrubwear is manufactured by other partners in Asia and South America.  Approximately 92% of its production uses the proprietary FIONx fabric, driving consistency and scale, and its 13 core styles (produced year-round) account for over 80% of total production.  With so much of its products being non-seasonal, the company benefits from strong vendor relationships and relatively consistent demand.  ***Around 88% of inbound freight is shipped via ocean, with the balance transported through air freight,*** all arriving at the global warehouse in Los Angeles.

158.   In their reports initiating coverage on June 21, 2021, Guggenheim and Oppenheimer discussed FIGS' supply chain and specifically noted that FIGS' use of air freight was limited to meeting demand in the face of supply chain disruptions:

| Analyst | Example Comment |
|---|---|
| Guggenheim | To transport products, FIGS has recently been utilizing air freight for 12% of its product, though we would note that typically the company would ship less than 5% via air.  Similar to many other companies, FIGS has been experiencing delays in |

| Analyst | Example Comment |
|---|---|
| | LA ports so air freight has been utilized to minimize sales disruptions. |
| Oppenheimer | Robust Gross Profit Margin Key to Cash-Generative Model. . . . In FY:19/FY:20, gross profit margins increased 360bps/50bps respectively, driving a record 72.3% gross margin in FY:20. Management indicated gross margin improvement was primarily the result of lower product costs and less discounts, consistent with trends experienced in the broader apparel industry, partially offset by an increase in freight-in, as the firm utilized more expensive air shipments to meet customer demand.<br><br>More recently, in 1Q:20, gross profit contracted 450 basis points year-on-year, primarily related to a continuation of higher freight-in costs from 2020, as FIGS utilizes more expensive air freight to meet increased customer demand. However, we do not forecast such costs to persist beyond FY:21E. |

159. On August 29, 2021, Piper Sandler issued an analyst report titled, "HQ Visit & Management Meeting Fuel Confidence in Multi-Year Opportunity" recounting the analyst's investor meeting with Hasson, Spear, Lawrence, Turenshine, and Chief Operating Officer Devon Duff Gago. The report emphasized that "[w]hile supply chain is on everyone's mind," Piper Sandler's take away was that "FIGS [was] navigating these industry headwinds much better vs. peers . . . and ha[d] ample ability to reach its demand." Specifically, the report highlighted the Company's "Supply Chain As [a] Competitive Advantage For FIGS," stating in relevant part: "While every executive in the consumer industry is acutely aware of the current, global logistics headwinds, we see FIGS as having a unique supply chain that is weathering the storm better than most."

160. The report further underscored, under the same heading, that FIGS' mitigation efforts, including that the Company had relaxed "lead times" and that FIGS

- 56 -

was only using air freight "where necessary," provided an advantage over peers' ability to weather macro headwinds, stating in relevant part:

> FIGS is working on the following initiatives to maintain its competitive positioning into 2H and beyond: 1) it has increased its lead times across every leg of the supply chain; 2) it has the flexibility to move production (if need be) to alternate facilities and countries where necessary; 3) booking premium ocean freight where necessary; 4) rerouting shipments to Tacoma & NY; and 5) utilizing airfreight where necessary.

**D.     The SPO Documents Contained Untrue Statements of Material Fact and/or Omitted Facts Necessary to Make the Statements Made Therein Not Materially Misleading**

161.   Plaintiffs assert that all statements set forth below that are bolded and italicized were untrue statements of material fact.  Non-bolded and non-italicized statements are included for context.

**1.     FIGS Did Not Maintain Low Inventory Risk Because the Company Could Not Reliably Predict Buying Patterns and Was Rapidly Developing New Products for Which Demand Had Not Been Tested or Established**

162.   The SPO Documents repeated multiple false and misleading statements that were in the IPO Documents, such as:

> ***Our DTC strategy also gives us access to valuable real-time customer data that allows us to better acquire and retain customers and reliably predict buying patterns.   This leads to operational efficiencies throughout our supply chain, inventory management and new product development***.

163.   The Company continued to emphasize the tech-forward and data-heavy nature of its operations:

- 57 -

We maintain centralized Data Science and Data Engineering teams and de-centralized Data Analysts working directly within each key functional area of the company. ***This approach enables us to gather and manage extensive data, and rapidly and directly apply that data to deliver customer insights and improve our core operating activities and decision-making processes.***

164. Management's discussion of their business in the SPO Documents also emphasized FIGS' ability to manage its manufacturing, supply chain, and inventory. They wrote:

We directly and actively manage every step of our product development and production process to ensure that our extremely high quality standards are met. ***We have a highly efficient merchandising model. Due to the non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings.***

165. In the SPO Documents, FIGS further claimed, beneath a boldface header reading "***Our Data Analytics***":

In addition, we have established a unique approach to capturing and tracking precise and granular data from all stages of the order journey. ***These extensive data sets are used to build proprietary data science solutions applied to key functions across the company, including product, supply chain, merchandising and inventory management, marketing and customer experience.***

166. Under the boldface heading "***Supply Chain***," they continued:

***We have built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping. This deep integration enables extensive management and oversight of the product flow and also fuels a variety of prediction models (e.g., inventory***

- 58 -

*planning and analytics).  By combining the product lifecycle data integration with sophisticated demand predictions, we are able to continuously assess the supply chain and improve efficiency*.

167.   In the next paragraph, underneath the boldface heading "*Merchandising and Inventory Management*," the Company claimed:

Through our customer ontology, we develop precisely defined customer segments that roll-up into a mosaic representation of our customers. *This approach allows us to understand buying behaviors, preferred DTC channels (e.g., site, social, SMS), product preferences and decision drivers.  It also enables us to manage purchasing and inventory effectively and efficiently.  We use data-driven models to predict and anticipate demand for our products.  The high concentration of core scrub sales enables our merchandising and inventory models to be highly predictive, which reliably extends to limited edition product launches through advanced data science techniques.  Through our customer and demand predictions, we are able to anticipate optimal times for launch, including day of week and time of day*.

168.   The statements identified in ¶¶162-167 above contained untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading at the time they were made.  FIGS could not reliably predict buying patterns and was constantly executing highly discretionary, last-minute purchase decisions that resulted in high inventory risk, increased costs, and supply chain and product launch disruptions.  Neither operational efficiencies nor low inventory risk resulted from the Company's data analytics capabilities or the Company's core product strategy, as evidenced by the following:

(a)   Rather than relying upon its data analytics and non-discretionary core products that were subject to replenishment to maintain inventory efficiency,

4888-2061-5087.v1

1   FIGS was engaged in the rapid development of hundreds of new products for which

2   demand had not been demonstrated.  Moreover, advanced data science technologies

3   were not being used to anticipate optimal times to launch new products.  According to

4   CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment,

5   including their own "personal closets," rather than data analysis, customer insight,

6   observations from "the marketplace," or things seen as "on-trend."  Indeed, CW-2

7   stated: "There was nothing to back up why we were developing what we were

8   developing, a lot of times."  Additionally, CW-2 recalled within the first couple

9   months of CW-2's employment, Spear "dropped" a product line the night before it

10   was scheduled to launch simply because Spear changed her mind regarding the

11   product and decided she "didn't like it."  As a result, thousands of units of product

12   were left "just sitting in our warehouse."  CW-2 stated that such things "happened

13   fairly often."  CW-2 stated that "countless times" before placing an order, CW-2

14   would be told "Heather hates the fabric, or the color" and was instructed to change the

15   order.  According to CW-2, last-minute changes seemed to be an integral part of the

16   design process at FIGS.  CW-2 confirmed that this state of receiving last-minute

17   change orders existed prior to the IPO and intensified after it;

18         (b)    FIGS either did not have or was not using data analytics to reliably

19   predict demand and buying patterns and efficiently operate its supply chain, evidenced

20   by the Company's ballooning inventory throughout 2021 and increasing use of air

21   freight, and the following:

22         (i)    CW-1 stated it was "laughable at best" that FIGS had

23   integrated product lifecycle data with sophisticated demand predictions such that the

24   Company could continuously assess the supply chain and improve efficiency.

25   According to CW-1, "it was completely the opposite of what was really going on."

26   Instead, FIGS' systems "were neither proactive nor predictive."  CW-1 stated: "We

27   were behind and had to catch up every time."  CW-2 stated that during CW-2's tenure

28   at FIGS, the Company lacked its touted data analytics on the products side.  On the

4888-2061-5087.v1

product team, CW-2 "never heard about any systems that were trying to track trends or inventory levels.  It didn't seem like there were any systems in place."  With respect to production, "there were no processes at all."  CW-2 confirmed that FIGS lacked a PLM system at the time of its IPO and did not begin to integrate one until in or around February 2022 and that as a result: there were no systems that FIGS' manufacturers could access; the "history" of a product was not being retained; and FIGS depended on Google Slides and Excel spreadsheets that were "not very efficient" and risked data being changed;

(ii)     Even after there was a PLM system, according to CW-1, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel.  During CW-1's tenure, which began over one year after the SPO, in 2023, FIGS' PLM system only consisted of Centric's "Basic" tools, which were generally used by new companies lacking "international policies" and "little marketing strategy."  For the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions."  Without these, FIGS was left to manually perform such functions.  Indeed, CW-1 stated "if you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting."  And CW-1 confirmed that FIGS "never had them."  According to CW-1, demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off"; and

(iii)    Even if FIGS did have useful data from its DTC infrastructure, according to CW-1, it was not being utilized.  CW-1 stated that "having the data and utilizing the data are two completely different things.  As to whether FIGS could "predict buying patterns," CW-1 stated, "No."  Further, CW-1 stated that FIGS never had a demand planning system and the demand planning team consisted of only "one to two people," compared to the "10 to 20" that was required for the level

- 61 -

of inventory that FIGS was ordering.  CW-1 stated that CW-1 did not believe that FIGS "ever had" 10 to 20 demand planners, including at the time of the IPO;

(c)     Prior to the IPO, FIGS had begun to shift away from its core-products strategy and engaged in the rapid development of hundreds of new products for which demand had not been demonstrated, in contrast to the Company's purported low inventory risk.  The risky conditions associated with FIGS' strategy shift were due to: (i) the predictive value of FIGS' historical purchase data diminishing as the Company forayed into completely new product categories; (ii) the creation of entirely new competitive dynamics as FIGS entered new markets and competed with established brands for market share; and (iii) the seasonal nature of many new items, launch dates for which could not simply be pushed forward or backward;

(d)     FIGS' shift in focus away from its core products strategy and the Company's lack of data analytics solutions that optimized purchasing decisions and maintained inventory efficiency resulted in average days of inventory outstanding beginning to increase significantly before the IPO.  At a March 5, 2021 Board meeting, it was discussed that there was excess leftover non-core inventory, and as a result, FIGS had to "increase[] [its] . . . inventory reserve to account for the increase"; and

(e)     The Company's frequent use of costly air freight for shipping needs was due to FIGS not having, as it had claimed, a demand planning strategy that was driven by sophisticated data science and non-discretionary merchandising that resulted in greater efficiency and reliability, improved decision making, lower risk, or the ability to plan the launch of products down to the day of the week and time of day. Rather, CW-2 stated that last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure.  CW-2 also confirmed that air freight was used "most of the time" when such changes occurred.  In fact, CW-2 confirmed that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates."  Additionally, according to CW-2, late

- 62 -

changes "one hundred percent affected the need to use air freight" and that FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes.  CW-2 described ocean shipping during this time period as still "dependable."

### 2. FIGS Used Air Freight More Frequently and for Reasons Other than Disclosed in the SPO Documents

169.   In addition, the SPO Documents contained the following untrue statement, reiterated several times in substantially similar form, with respect to the Company's use of air freight and the reasons therefore:

We experienced increased demand in 2020 and in the six months ended June 30, 2021, while certain of our ocean freight providers, as well as some of our suppliers and manufacturers, particularly those operating in Vietnam, are experiencing delays, in the past have experienced shutdowns, and could experience delays and shutdowns again in the future due to the COVID-19 pandemic. ***In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time used faster but more expensive air freight during 2020 and in the six months ended June 30, 2021, which increased our cost of goods sold, and we may from time to time need to continue to use more expensive air freight in the future***.

170.   The SPO Documents also contained hypothetical and incomplete disclosures concerning risks to FIGS' shipping arrangements, an admittedly critical component of Company's business.  The SPO Documents misleadingly stated that FIGS' shipping arrangements and ability to inbound freight ***could*** or ***may*** be impacted by disruptions beyond FIGS' control, stating in relevant part:

***Shipping is a critical part of our business and any changes in, or disruptions to, our shipping arrangements could adversely affect our business, financial condition and results of operations***.

- 63 -

We currently rely on third-party global providers to deliver the products we offer on our website and mobile app. . . .  In addition, ***our ability to receive inbound inventory efficiently and ship merchandise to customers may be negatively affected by factors beyond our*** and these providers' ***control***, including pandemic, weather, fire, flood, power loss, earthquakes, acts of war or terrorism or other events specifically impacting other shipping partners, such as labor disputes, financial difficulties, system failures and other disruptions to the operations of the shipping companies on which we rely.  We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.  We are also subject to risks of damage or loss during delivery by our shipping vendors.

171.   The statements identified in ¶¶169-170 above contained untrue statements of material fact and/or omitted material facts necessary to make the statements therein not false or misleading at the time they were made, in that the Securities Act Defendants falsely attributed FIGS' increased use of "more expensive air freight" to COVID-related disruptions and to "factors beyond" the Company's "control."   In reality, the Company utilized air freight as a routine method of operations to compensate for their inability to properly predict demand trends and efficiently operate FIGS' supply chain, and to compensate for leadership-driven, last-minute change orders as evidenced by the following:

(a)    The Company needed to frequently use air freight for shipping needs because as discussed in ¶168, FIGS did not have, as it had claimed, the customer data and demand predictions to anticipate optimal launch times to launch products, down to the day of the week and time of day;

(b)    The Company's frequent use of air freight was not beyond FIGS' control but rather resulted from Hasson's and/or Spear's last-minute design changes:

- 64 -

(i)     According to CW-2, the product group was under constant pressure to meet deadlines, with much of this pressure coming from last-minute changes directed by Hasson or Spear.  CW-2 stated that "countless times" before placing an order, CW-2 would be told "Heather hates the fabric, or the color" and was instructed to change the order.  CW-2 recalled similar accounts concerning Spear.  CW-2 stated that "things like that happened fairly often."  According to CW-2, last-minute changes seemed to be an integral part of the design process at FIGS.  CW-2 stated that a lot of late changes occurred at the "big final meetings of the season," which took place on a quarterly basis, because it was "often" the Founders' "first time seeing the whole line together," and while changes would be made, it "was always too late in the season."  According to CW-2, last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure.

(ii)     CW-2 confirmed that this state of receiving last-minute change orders existed prior to the IPO and intensified after it.  CW-2 described the environment at FIGS throughout his/her tenure as "chaotic."  CW-2 stated that these late changes "one hundred percent affected the need to use air freight" and that air freight was used "most of the time" when such late changes occurred.  This was because at FIGS, launch dates were the least flexible aspect of the production process, and when last-minute changes occurred, launch dates were not moved.  CW-2 confirmed that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates."

(c)     The Company predetermined it would rely on air freight in the first instance and not simply in response to the pandemic.  During a March 5, 2021 Board meeting, Hasson, Spear, Willhite, Lawrence, and Tull discussed that port congestion was delaying ocean freight by a mere "3 weeks."  And at an August 10, 2021 Board meeting, Hasson, Spear, Willhite, Soenen, and Antrum discussed that "in-transit times [were] increasing by approximately 2 weeks" for ocean freight.  The pandemic was not mentioned as a reason for the delays.  Nevertheless, known delays of a few weeks

- 65 -

could be easily navigated if FIGS had the data analytics and tracking technology described in the IPO Documents.  Moreover, per CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes.   CW-2 described ocean shipping as still "dependable."  But during the March 5, 2021 meeting, it was clear that the Company had already decided "time-sensitive injection color style shipments" would ship via air freight when ocean shipping ahead of schedule or rerouting these shipments to alternative ports was not sufficient.  And it was stated that the Company would continue "to rely on more expensive air freight" so that FIGS could "hit [its] planned revenue targets" at the August 10, 2021 meeting.

## COUNT I
### for Violation of §11 of the Securities Act
### Against All Securities Act Defendants

172.   Plaintiffs repeat and reallege ¶¶1-5, 8-171 above as if fully set forth herein.

173.   This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of all persons or entities who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and who were damaged thereby.

174.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that the Securities Act Defendants acted with scienter or fraudulent intent.

175.   The IPO Documents and the SPO Documents contained untrue statements of material facts and omitted to state material facts required to be stated or necessary to make the statements not misleading.

- 66 -

176.   The defendants named in this Count are strictly liable to Plaintiffs and members of the Class who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or the SPO and who were damaged thereby for the misstatements and omissions in the IPO Documents and the SPO Documents.

177.   FIGS is the issuer and registrant for the Class A common stock offered in the IPO and SPO.   As such, FIGS is strictly liable for the false and misleading statements in the IPO Documents and SPO Documents.

178.   The Underwriter Defendants served as the underwriters of the offerings as detailed in ¶¶63-64 above.  The Underwriter Defendants participated in the drafting and dissemination of the IPO Documents and SPO Documents in connection with the IPO and SPO and, as such, are liable for each of the material false and misleading statements and omissions contained in (or incorporated by reference into) the IPO Documents and SPO Documents and the failure of the IPO Documents and SPO Documents to be complete and accurate.

179.   Defendants Hasson, Spear, Lawrence, Willhite, Antrum, and Soenen signed some or all of the IPO Documents.   Defendants Hasson, Spear, Antrum, Soenen, and Willhite were FIGS Directors or about to become FIGS Directors at the time of the IPO.   The defendants who signed the IPO Documents and/or were Directors or about to become Directors at the time of the IPO are liable for the false and misleading statements and omissions in the IPO Documents.

180.   Each of the Securities Act Defendants had a duty to make a reasonable and diligent investigation of the statements contained in the IPO Documents and ensure that they were true and that there were no omissions of material fact that were required to be stated therein or otherwise rendered the statements made in the IPO Documents either false or misleading.  None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Documents were true and without omissions of any material facts.  Had they done so, the Securities Act Defendants would have

4888-2061-5087.v1

known of the material misstatements and omissions alleged herein.  As such, each Securities Act Defendant is liable for the material omissions from and materially inaccurate statements contained in (or incorporated by reference into) the IPO Documents and the failure of the IPO Documents to be complete and accurate.

181.   Defendants Hasson, Spear, Lawrence, Willhite, Antrum, and Soenen signed the SPO Documents.  Defendants Hasson, Spear, Willhite, Antrum, and Soenen were FIGS Directors at the time of the SPO.

182.   Each of the Securities Act Defendants who signed the SPO Documents and/or were Directors at the time of the SPO are liable for each of the false and misleading statements and omissions in the SPO Documents.   Each of these defendants had a duty to make a reasonable and diligent investigation of the statements contained in the SPO Documents and ensure that they were true and that there were no omissions of material fact that were required to be stated therein or otherwise rendered the statements made in the SPO Documents either false or misleading.  None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Documents were true and without omissions of any material facts.  Had they done so, the Securities Act Defendants would have known of the material misstatements and omissions alleged herein.  As such, each Securities Act Defendant is liable for the material omissions from and materially inaccurate statements contained in (or incorporated by reference into) the SPO Documents and the failure of the SPO Documents to be complete and accurate.

183.   By reason of the conduct alleged herein, each defendant named in this Count violated §11 of the Securities Act.

184.   Plaintiffs Dr. Hoch, City of Pensacola, City of Warren, Kissimmee, and Pompano Beach and/or members of the Class acquired FIGS stock in and/or traceable to the IPO and/or SPO in which shares were offered and/or sold pursuant to the above-described Offering Documents.

4888-2061-5087.v1

185.   The value of FIGS common stock has declined substantially as a result of the Securities Act Defendants' violations, causing damage to those members of the Class who purchased or otherwise acquired FIGS common stock in and/or traceable to the IPO and/or SPO.

186.   At the time of their purchases of FIGS common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the IPO and the SPO and the time Plaintiffs commenced this action.

**COUNT II**
**for Violation of §12(a)(2) of the Securities Act**
**Against FIGS, Hasson, Spear, Tulco, and the Underwriter Defendants**

187.   Plaintiffs repeat and reallege ¶¶1-5, 8-186 above as if fully set forth herein.

188.   This Count is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of all members of the Class who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and who were damaged thereby.

189.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiffs do not allege that FIGS, Hasson, Spear, Tulco, or the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

- 69 -

190.    FIGS sold, offered, and/or solicited purchasers of its Class A common stock pursuant to the defective Offering Documents and directly solicited the purchase of its common stock through the means of the Offering Documents.

191.    Tulco offered and sold FIGS Class A common stock in both the IPO and SPO by means of the IPO Documents and the SPO Documents.   Tulco sold 25,707,953 shares of FIGS Class A common stock in the IPO and 6,366,670 shares of FIGS Class A common stock in the SPO.   Hasson sold 2,419,998 shares of FIGS Class A common stock in the SPO.   Spear sold 1,468,324 shares of FIGS Class A common stock in the SPO.

192.    Hasson, Spear, and Tulco sold, offered, and/or solicited purchasers of FIGS Class A common stock pursuant to the defective Offering Documents, and directly solicited the purchase of FIGS common stock through the means of the Offering Documents.   Acts of solicitation included participating in the preparation of, or signing, the false and misleading Offering Documents, and/or selling shares of stock pursuant to the false and misleading Offering Documents.   In addition, Hasson and Spear conducted a whirlwind media tour immediately after the IPO Registration Statement became effective, soliciting the purchase of shares in the IPO.   *See* ¶108, *supra*.

193.    The Underwriter Defendants sold, offered, or solicited purchasers of FIGS' Class A common stock in the IPO and SPO by means of the Offering Documents.

194.    By means of the defective Offering Documents used to complete the IPO and SPO, FIGS, Hasson, Spear, Tulco, and the Underwriter Defendants issued, promoted, and sold FIGS stock to Plaintiffs and other purchasers in the IPO and SPO for their own benefit and the benefit of those associated with them.

195.    The IPO Documents and SPO Documents contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.   Neither Hasson, Spear, Tulco,

- 70 -

nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of material facts that made the statements misleading.

196.  Less than one year elapsed between the time that Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

197.  Plaintiffs City of Warren and Pompano Beach and other members of the Class purchased FIGS stock in the IPO and SPO in which shares were offered and/or sold pursuant to the above-described Offering Documents.  At the time of their purchases, plaintiffs City of Warren and Pompano Beach and members of the Class were without knowledge of the facts concerning the misstatements and omissions alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

198.  Plaintiffs and other members of the Class have sustained damages, as the value of FIGS stock purchased or otherwise acquired pursuant to the materially false and misleading Offering Documents has declined substantially from the dates of the offerings to the date of this filing.

199.  By reason of the foregoing, FIGS, Hasson, Spear, Tulco, and the Underwriter Defendants are liable for violations of §12(a)(2) of the Securities Act to Plaintiffs and the other members of the Class who purchased or otherwise acquired FIGS common stock in and/or traceable to the IPO and/or SPO, and who were damaged thereby.

200.  Accordingly, members of the Class who hold the common stock issued pursuant to the defective Offering Documents have the right to rescind and recover the consideration paid for their shares and hereby tender their common stock to the defendants named in this Count, and members of the Class who have sold their

4888-2061-5087.v1

common stock that was issued pursuant to the defective Offering Documents seek damages to the extent permitted by law.

# COUNT III
### for Violation of §15 of the Securities Act Against Hasson, Spear, Lawrence, and the Tulco Defendants

201.   Plaintiffs repeat and reallege ¶¶1-5, 8-200 above as if fully set forth herein.

202.   This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of all members of the Class who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and who were damaged thereby.

203.   This Count does not sound in fraud.  With respect to this Count, Plaintiffs do not claim that any of the defendants named in this Count committed intentional acts or reckless misconduct or that any of the defendants named in this Count acted with scienter or fraudulent intent.   This claim is based on strict liability and negligence.

204.   Hasson, Spear, and Lawrence were controlling persons of FIGS by virtue of their positions as directors and/or senior officers of FIGS, and each was involved in the day-to-day operations of the Company prior to the IPO and SPO.  Hasson, Spear, and Lawrence were also involved in reviewing and providing the disclosures in the IPO Documents and SPO Documents, had the ability to control the contents thereof, and/or otherwise participated in the process which allowed the sale of shares of FIGS Class A common stock to be successfully completed.

205.   The Tulco Defendants acted as controlling persons of FIGS within the meaning of §15 of the Securities Act.  By reason of their voting power, ownership, rights as against FIGS, and/or specific acts, Tulco and Tull had the power to control FIGS' operations and its decision-making processes.   In addition, Tulco's representative Willhite served on FIGS' Board at all relevant times.  By reason of

- 72 -

such control, as further detailed above in ¶¶49, 53-62, which are incorporated by reference herein, the Tulco Defendants are liable under §15 of the Securities Act.

206.   As set forth above, FIGS violated §§11 and 12(a)(2) of the Securities Act in connection with the IPO and SPO.  By virtue of the conduct alleged herein, Hasson, Spear, Lawrence, and the Tulco Defendants are liable for the above-stated wrongful conduct and are liable to Plaintiffs and members of the Class who purchased or otherwise acquired FIGS Class A common stock in and/or traceable to the IPO and/or SPO and were damaged thereby for damages suffered.

## V.   EXCHANGE ACT CLAIMS

207.   The claims set forth below in Counts IV and V allege violations of §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  In contrast to the Securities Act Claims above, these Exchange Act Claims are based on intentional or reckless conduct.  As such, they are presented separate and apart from Counts I-III.

### A.   The Exchange Act Parties

#### 1.   Exchange Act Plaintiffs

208.   Plaintiff Dr. Ronald Hoch purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the Certification of Ronald Hoch Pursuant to Federal Securities Laws (ECF 88).

209.   Plaintiff City of Pensacola Police Officers' Retirement Plan purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88).

210.   Plaintiff City of Warren Police and Fire Retirement System purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88).

4888-2061-5087.v1

211.   Plaintiff Kissimmee Utility Authority Employees' Retirement Plan purchased FIGS Class A common stock during the Class Period and has been damaged thereby, as set forth in the Certification Pursuant to Federal Securities Laws signed on its behalf (ECF 88).

### 2.   Exchange Act Defendants

212.   FIGS, Hasson, Spear, Willhite, and Tulco (*see* ¶¶43, 44, 45, 49, and 53, *supra*) are realleged as defendants for the Exchange Act Claims.

213.   As co-CEO, Hasson signed the Company's Forms 10-Q and 10-K, and regularly spoke at events and on conference calls on behalf of the Company throughout the Class Period.

214.   As co-CEO, Spear signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Class Period, and regularly spoke at events and on conference calls on behalf of the Company throughout the Class Period.

215.   Defendant Daniella Turenshine ("Turenshine") has been FIGS' CFO since December 2021.  Prior to her role as CFO, Turenshine served as FIGS' Senior Vice President of Finance and Strategy from November 2018 to December 2021.  As CFO, Turenshine signed the Company's Forms 10-Q, 10-K, and 8-K, and certain press releases issued during the Class Period, and regularly spoke at events and on conference calls on behalf of the Company during the Class Period.  On February 28, 2024, FIGS filed a Form 8-K with the SEC announcing that Turenshine was resigning as FIGS' CFO, effective April 12, 2024.

216.   Defendants Hasson, Spear, and Turenshine are collectively referred to herein as the "Individual Exchange Act Defendants."

217.   The Individual Exchange Act Defendants and FIGS are collectively referred to herein as the "Exchange Act Defendants."

218.   Each of the Individual Exchange Act Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to non-public information concerning the Company and its business,

4888-2061-5087.v1

operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Exchange Act Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

219.   As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Exchange Act Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the Individual Exchange Act Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  The Exchange Act Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

220.   The Individual Exchange Act Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Exchange Act Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Exchange Act Defendant is responsible for the accuracy

1  of the public statements detailed herein and is, therefore, primarily liable for the

2  misrepresentations contained therein.

3      221.   In addition, Willhite and Tulco were control persons throughout the Class

4  Period, as alleged in ¶¶49 and 53-62, *supra*.

5      **B.    Factual Background Concerning Plaintiffs' Exchange Act Claims**[25]

6          **1.    FIGS' Strategy Shift and Inability to Reliably Predict Buying
7                Patterns Caused Sales Revenues and Margins to Suffer**

8      222.   According to the Exchange Act Defendants, in the apparel industry, a

9  company's "distribution model is almost as important as the products themselves."

10 FIGS claimed that it had mastered its model, finely calibrating supply to demand in

11 ways that were unparalleled by its competitors.  This was purportedly possible due to

12 FIGS' DTC model and unique data analytics, which allowed the Company to leverage

13 real-time insights about customer behaviors and preferences provided by the DTC

14 model.

15     223.   Further, the Company claimed its replenishment-driven, core-products

16 business mitigated inventory risk.  Indeed, as stated throughout the Class Period, FIGS

17 claimed its data-driven replenishment model allowed the Company to even pinpoint

18 the optimal day of the week and time of day to launch new products.

19     224.   These false and misleading claims were bolstered by FIGS' partnership

20 with Tulco.  Tulco established the model for FIGS to follow, and implemented this

21 model at FIGS through "its hands-on operational approach" to funding:

22         Tulco enables companies to unlock rapid, sustainable growth through the

23         application of advanced data science.  Tulco identifies industries with

---

[25]  Plaintiffs incorporate by reference into this §V. the facts set forth in ¶¶1-36, 55-62,
86-104, and 119-139, *supra*.

4888-2061-5087.v1

static business models and takes material stakes in companies ready to scale with the adoption of leading edge and proprietary technologies.[26]

225.    Prior to the Class Period, FIGS had pivoted from its touted low-risk core products strategy and adopted instead a high-volume new products strategy. But the hundreds of new products that FIGS churned out were not supported by historical data or sophisticated data analytics, as the Company publicly touted. Instead, FIGS was unable or unwilling to reliably predict and plan for customer buying patterns. As a result, the Company faced burgeoning inventory of non-core products, decreasing sales revenue resulting from stockouts of core scrubs, and deteriorating margins and operating cash flows due to exploding product design, warehousing, and freight costs.

### a.    FIGS' Core Products Stockouts Harmed the Company's Sales

226.    FIGS' pivot toward developing and launching an extreme number of new styles for which demand had not been validated caused the Company to lose revenue when core products were out of stock. For instance, during a March 7, 2022 Board meeting that Hasson, Spear, Turenshine, and Willhite attended, "key financial results and product launches as well as challenges" were discussed, including the "*[r]amp-down* of high waisted inventory to shift to new waistband" styles. Yet the next day, during FIGS' March 8, 2022 fiscal year ("FY") 2021 earnings call, Spear mentioned the high-waisted variation on "fan favorites" Zamora and Yola pants for women, noting that the high-waisted Zamora "made up about 40% of our Zamora sales in the second half of the year."

227.    This ramp down in inventory on high-waisted styles was disastrous for the Company. On May 10, 2022, Hasson, Spear, Turenshine, and Willhite again met with the Board and discussed "Q1 2022 challenges, including increased shipping delays, their impact on the product launch calendar and the ability to keep key

---

[26] Tulcoholdings.com, *Who We Are*, Tulco, LLC, https://www.tulcoholdings.com/about/ (last visited Apr. 6, 2023).

products in stock." Moreover, they discussed that one of the "Q1'22 Challenges" was that FIGS was "[o]ut of stock on high waisted inventory as we shifted to new waistband." The Exchange Act Defendants acknowledged as much two days later during the Company's May 12, 2022 earnings call. During the call, Spear stated that FIGS had failed "to keep core products in stock" during Q1 2022 and that "[a]s a result, [FIGS'] Q1 revenue growth was lower than expected." Turenshine also acknowledged that "we were . . . out of stock on some of our key core franchises like our high-waisted Zamora and Yola," resulting in "repeat frequency and order growth [being] lower than anticipated in the quarter." According to Turenshine, "these inventory constraints are the primary factor affecting our [reduced] outlook for the full year."

228. In other words, the Company experienced stockouts of core products throughout 2022 while inventory levels of non-core products were exploding. These stockouts were the result of FIGS departing from its low-risk, data-driven, core-product strategy, and exacerbated by the Company's inability to reliably predict buying patterns. Instead, FIGS relied on Hasson's and Spear's personal preferences rather than any purported data analytics. These stockouts harmed sales and caused the Company to incur additional expenses as it rushed to mitigate shortages.

**b.    FIGS' Margins Fell to Near Zero**

229. FIGS also experienced significant increases to its expenses as a result of departing from its core-product strategy, its inability to reliably predict buying patterns, design decisions driven by Hasson's and Spear's personal preferences which were not supported by data, and last-minute change orders. In particular, these expenses arose from increased air freight, warehousing, and inventory obsolescence costs.

230. *First*, the Company incurred a significant uptick in expenses as a result of its routine reliance on air freight. When the Exchange Act Defendants reported Q1 2022 results on May 12, 2022, they revealed that FIGS' gross margin decreased 0.4%

year-over-year.  The Company attributed this decrease to "higher air freight spend as well as increased ocean and air freight rates."  The Exchange Act Defendants also revealed that FIGS slashed its expected net revenues, gross margin, and EBITDA and lowered its 2022 financial guidance for net revenues.

231.  **Second**, the Company incurred significant inventory holding expenses. *See* ¶¶127-136, *supra*.  The glut of inventory required FIGS to obtain additional warehousing leases and incur additional warehousing and fulfillment expenses.  FIGS' selling expenses rose commensurately.  On FIGS' November 10, 2022 Q3 2022 earnings call, Turenshine discussed a 5% year-over-year increase in selling expenses as a percentage of net revenues, attributing the increase "primarily . . . to higher costs within fulfillment, including warehouse storage necessary to house inventory we pulled forward."  During FIGS' February 28, 2023 earnings call the following quarter, Turenshine again addressed increased selling expenses, stating that it was "largely due to warehouse storage necessary to house inventory we pulled forward."

232.  **Third**, FIGS' margins suffered even further when the Company implemented promotional pricing measures as a tool to "get inventory back in line." FIGS' promotional pricing measures, combined with increasing expenses, drove FIGS' previously healthy margins to near zero:

4888-2061-5087.v1

**Figure D**[27]



### c. FIGS' Operating Cash Flows Plummeted

233. FIGS' departure from its low-risk core-product strategy, inability to reliably predict demand using data-driven solutions, reliance on its Founders' personal preferences that were not supported by data, and last-minute change orders resulted in the Company's rapidly declining operational cash flows. As shown below in Figure E, the Company's operating cash flows plummeted in 2022.

---

[27] Q2 2021 margins in Figure D have been normalized to remove the expenses that FIGS explicitly identified in its Q2 2021 Form 10-Q as being related to the IPO.

**Figure E**



234.    As discussed in ¶132, *supra*, FIGS' replenishment of inventory in 2022 outpaced the Company's sales.  A large portion of those inventories were not core products, resulting in lost sales opportunities when core products were out of stock.  In addition, the Company's supposedly sophisticated and data-driven demand planning and inventory management capabilities were limited, and the ballooning non-core inventories were not selling, causing FIGS to incur additional expenses relating to warehousing.  As a result, FIGS' cash flows from operations plummeted because new inventory purchases and new expenses drastically outpaced sales revenues.  In sum, the drastic decline in FIGS' operating cash flows is primarily attributable to the Company's departure from its focus on core products, its inability to reliably predict buying patterns, reliance on Hasson and Spear's personal preferences which were not supported by data, and last-minute change orders.

### 2.    The Exchange Act Defendants Misrepresented FIGS' Core Operations and Data Analytics Capabilities

235.    Following the SPO, and in the face of deteriorating margins, FIGS' stock price experienced a steady decline for the remainder of 2021.  In 2022, the Exchange

1    Act Defendants defrauded FIGS investors by selling the public on a false narrative of

2    advanced data solutions and unique inventory and supply chain management

3    capabilities that, by that time, the Exchange Act Defendants knew or were reckless in

4    not knowing the Company did not have (or did not utilize).

5    236.   On March 8, 2022, the Company announced FY 2021 earnings.  At that

6    time, FIGS' Q1 2022 was 75% complete, and the Exchange Act Defendants were well

7    aware that they would soon be forced to announce disappointing Q1 results.  As this

8    quarter would be summed up two months later, the Company was facing many

9    "challenges" during Q1, "including increased shipping delays" and "the ability to keep

10   key products in stock."  Nevertheless, during the March 8, 2022 call, Spear stated that

11   FIGS had a "deeply analytical and data-driven approach."  And because the Company

12   had "seasonless" products and a "nondiscretionary" and "replenishment-driven"

13   business, the Exchange Act Defendants had "greater predictability and consistency."

14   237.   In truth, FIGS did not have sophisticated – or even baseline – data

15   analytics that would enable it to accurately or reliably predict customer demand or

16   manage its inventory.  During CW-2's tenure at the Company, CW-2 had never heard

17   of any systems at FIGS that tracked trends or inventory levels.  Indeed, for much of

18   CW-2's employment, there was no system that tracked a product's development or

19   production history.  CW-2 confirmed that CW-2 "never saw" a PLM system at FIGS

20   that integrated the product, merchandising, design, and development teams.  Instead,

21   FIGS only began to integrate the PLM system Centric "about a year" before CW-2 left

22   the Company in approximately February 2023 (*i.e.*, FIGS began to integrate Centric in

23   or around February 2022) and that as a result: there were no systems that FIGS'

24   manufacturers could access; the "history" of a product was not being retained; and

25   FIGS depended on Google Slides and Excel spreadsheets that were "not very

26   efficient" and risked data being changed.

27   238.   CW-1 corroborated CW-2's statements, stating that in 2023, FIGS was

28   still utilizing a "Basic" version of Centric as its PLM system.  The "Basic" tools were

- 82 -

insufficient for the complex type of demand planning FIGS wanted to do, and as a result, demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off."  In addition, CW-1 explained that "the way the PLM system was utilized was for 35 to 45 percent of capacity," meaning that "the majority of the spreadsheet" sent to FIGS' manufacturers was "not filled in." As a result, demand planning was performed "manually."  According to CW-1, the lack of demand planning and "split second decision making" resulted in what CW-1 described as "catastrophic workflow."  CW-1 believed FIGS "never had" advanced planning tools.  CW-1 stated that the assertion that FIGS had integrated product lifecycle data with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency was "laughable at best" and "completely the opposite of what was really going on."

239.   During the March 8, 2022 call, the Exchange Act Defendants also continued to (mis)represent FIGS' use of air freight as simply a transitory strategic decision necessitated by the pandemic, with Turenshine stating that "increasing transit times and the lack of reliability that we're seeing in the ocean freight market is resulting in the need for continued airfreight."  In truth, air freight was a crutch that the Exchange Act Defendants relied on in the first instance due to FIGS' inability to reliably plan for customer demands and manage the Company's inventory, and to compensate for Hasson's and/or Spear's last-minute design changes.  The Exchange Act Defendants recognized this internally.  During an August 10, 2021 Board meeting, the Exchange Act Defendants acknowledged that "[g]lobal supply chain imbalances" were resulting in "in-transit times" for ocean shipping merely "increasing by *approximately two weeks*."  With FIGS' supposed data analytics and resulting operational efficiencies, the Company should have been able to plan for these additional days of shipping time.  Instead, during a March 7, 2022 Board meeting, it was discussed that "[a]ir freight [was] elevated in Q4'21" and the Company "*expect[s] to continue to rely on more expensive air freight* as needed to ensure consistent

- 83 -

delivery."  And at a May 10, 2022 Board meeting, the Company committed to "***invest[ing] in more air freight*** to protect our inventory position" for the rest of FY 2022.  At an August 2, 2022 Board meeting, it was discussed that "[i]mproving ocean transit times during Q2, coupled with softer sales and a delay in the expansion of our warehouse space result[ed] in ***more on-hand inventory than planned and necessitat[ed] the use of overflow inventory holding facilities***."  Hasson, Spear, Willhite, and Turenshine were present at each of these Board meetings.

240.  CW-2 confirmed that during the Class Period, ocean shipping was "dependable" and FIGS could have planned for delays in ocean shipping absent last-minute changes to orders.  However, last-minute changes to orders were frequent at FIGS and necessitated the use of air freight.  Internally, FIGS would set the launch date for a new product.  These launch dates were "tight" and as short as two months.  Based on the launch date, employees would work backwards to create deadlines by when milestones needed to be met, such as when production would begin and when product must be placed on a vessel to arrive at the warehouse on time.  However, according to CW-2, it was a "constant" issue that changes to products were made last minute.  Such changes came directly from Hasson or Spear.  The changes were "definitely not" based on data analytics, per CW-2.  Rather, CW-2 believed the changes were based on Hasson's or Spear's "personal preferences."  According to CW-2, this is how things "existed before the IPO," and it "got more intense after the IPO."  In other words, rather than properly plan for the additional time that ocean shipping would require, the Exchange Act Defendants simply planned to rely on costly air freight in the first instance.

241.  In sum, the Exchange Act Defendants painted a rosy picture of FIGS on the March 8, 2022 call, with Turenshine extolling their "excite[ment] to continue to deliver strong top line growth" and "confiden[ce] in our strategic road map for 2022 and the years ahead."  In fact, when specifically asked about "February month-to-month trends," Spear responded:

- 84 -

In terms of our February trends, I can't share too much, but **we really aren't seeing any drop-off due to what's going on in the world and really feel strongly about our year going forward**. Daniella gave you some commentary around our outlook. **But we're really excited about the momentum we're seeing in our business. And 2022 is going to be another record year for us**.

The Exchange Act Defendants said nothing of the substantial challenges that FIGS was facing at the time they spoke and to which they would have to own up just two months later.

### 3.    The Truth Emerges

242.    On May 12, 2022, after the market closed, FIGS issued a press release announcing disappointing financial results for the first quarter of 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The press release revealed that FIGS' gross margin was 71.2%, which represented a 0.4% year-over-year decrease.  The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates," which it claimed was "partially offset by improvements in product costing."  The press release was a partial disclosure of the truth, as the complete disclosure did not occur until February 28, 2023.

243.    The press release also revealed that FIGS slashed its expected net revenues, gross margin, and EBITDA despite the Exchange Act Defendants having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 earnings call.  The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to $530 million based on purported "supply chain challenges and broader macroeconomic factors, including high inflation and shifts in consumer spending patterns."  The Company previously expected gross margin to be 70% or greater but lowered it to 67% to 68% "primarily due to a significant increase in the Company's use of air freight to help

- 85 -

mitigate supply chain challenges." While Adjusted EBITDA was previously expected to be upwards of 20%, the Company adjusted its expectations margin to 16 to 18%.

244. During the Company's earnings call that same day, Spear revealed that the Company lacked the visibility into inventory management that the Exchange Act Defendants professed to have, which resulted in the use of expensive air freight for less in-demand products while new color launches and stocked-out styles remained on ocean freight.

245. In response to this news, the price of FIGS stock declined by $3.21 per share, or nearly 25%, from a closing price of $12.85 per share on May 12, 2022, to a closing price of $9.64 per share on May 13, 2022.

246. On February 28, 2023, FIGS issued a press release announcing disappointing financial results for the fourth quarter and full year 2022 ("FY 2022 Press Release") that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K. The FY 2022 Press Release revealed that FIGS had a 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year-over-year to Q4 2021 and 9.1% compared year-over-year to FY 2021. FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment.

247. The FY 2022 Press Release further revealed a dismal financial outlook for 2023 with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11%-12%. Recognizing that these disappointing results stood in stark contrast to their Class Period misstatements, Turenshine attempted to allay investor concerns for the Company's future in the FY 2022 Press Release, stating in relevant part:

> Our growth outlook for 2023 is not representative of the growth we believe we can achieve long term. That is why we plan to keep investing while managing our business prudently through near term macro and cost challenges. We remain a distant leader in our industry and we are

4888-2061-5087.v1

confident that we can accelerate growth and deliver adjusted EBITDA
margin expansion in the future.

248.    In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023.  Notably, FIGS' stock price has never recovered from its Class Period freefall, closing at $4.89 on March 19, 2024. As Spear acknowledged during the May 12, 2022 earnings call, FIGS' "true value will be reflected over the long run" – not during the short-term artificially inflated prices at which investors purchased FIGS stock during the Class Period.

## C.    The Exchange Act Defendants' False and Misleading Statements and Omissions During the Class Period

249.    Throughout the Class Period, FIGS: (i) was engaged in a high-risk merchandising model that included developing numerous new styles per quarter for which demand was untested, was failing to consider data and analytics in making purchase orders, and did not have the data capabilities to reliably predict demand; (ii) was relying heavily on expensive air freight in order to compensate for inadequate demand planning and last-minute design changes; (iii) was experiencing rising levels of inventory, including of non-core products; and (iv) was incurring significant costs related to each of the above.  To conceal these issues from investors and to artificially inflate and maintain inflation of the Company's share price, the Exchange Act Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases, and other documents throughout the Class Period.  These material misstatements and omissions created the false impression that FIGS had a highly effective, low-risk merchandising model supported by unusually sophisticated data-related capabilities and a set of non-discretionary core styles, which enabled it to effectively manage inventory and primarily utilize ocean freight for freight-in except under exceptional circumstances related to the two-year-old COVID-19 pandemic.

- 87 -

250.   Plaintiffs assert that all statements set forth below that are bolded and italicized were materially false and/or misleading for the reasons set forth therein. Non-bolded and non-italicized statements are included for context.

### 1.   Statements Regarding Data Analytics

#### a.   FY 2021 Results

251.   On March 8, 2022 at 5:00 p.m. ET, after the market closed, Spear and Turenshine convened a conference call with investors and analysts to discuss FIGS' FY 2021 financial results.   During the call, Spear touted the Company's "data network":

> And as e-commerce continues to accelerate and demand shifts online, we are in the best position to capitalize on this momentum as the largest direct-to-consumer company in our space.   ***There is no one else in our industry who has a digital scale, speed and data to understand the needs of the health care professional***.   And that's because the vast majority operate through a wholesale model where they don't have any connection to the end customer.

252.   On March 10, 2022, FIGS filed with the SEC an annual report on Form 10-K ("2021 Annual Report"), which was signed by Hasson, Spear, Turenshine, and Willhite.   In the FY 2021 Annual Report, FIGS represented that its "***DTC strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising,*** customer acquisition and retention, ***demand forecasting and inventory optimization, leading to operational efficiencies throughout our supply chain, inventory management and new product development***."

253.   With respect to the Company's "limited edition colors and styles," the FY 2021 Annual Report highlighted FIGS' "disciplined buying approach," stating in relevant part:

- 88 -

*[W]e utilize a disciplined buying approach with shallow initial buys and data-driven repurchasing decisions to minimize inventory risk while creating scarcity*.  We launch limited edition colors, limited edition styles or new products almost every week, driving recurring traffic to our digital platform where customers often purchase limited edition products along with our core offerings.  These launches not only drive interest in the limited edition products themselves, they also drive our core business.  *This innovative, lower-risk merchandising strategy drives recurring demand while maintaining inventory efficiency*.

254.   The FY 2021 Annual Report misrepresented FIGS' "Supply Chain," stating that it had "*built a proprietary integration for our product lifecycle from purchase order to manufacturing to shipping*."  According to the FY 2021 Annual Report, "*This integration enables extensive management and oversight of the product flow and fuels a variety of prediction models.  By combining the product lifecycle data integration with sophisticated demand predictions, we can continuously assess the supply chain and improve efficiency*."

255.   The FY 2021 Annual Report continued falsely and/or misleadingly touting the Company's "Merchandising and Inventory Management," stating in relevant part:

Through our customer ontology, we develop precisely defined customer segments and a mosaic representation of our customers.  This approach enables us to understand buying behaviors, preferred DTC channels, product preferences and decision drivers.  *It also enables us to manage purchasing and inventory effectively and efficiently.  We also use data-driven models to predict demand for our products.  The high concentration of core scrubwear sales enables our models to be highly predictive, which reliably extends to limited edition launches, and we*

- 89 -

1        *are able to anticipate optimal times for launch, including day of week*

2        *and time of day*.

3    256.  The FY 2021 Annual Report also included several speculative and

4  contingent risk factors for risks that already transpired:

5        *If we are unable to accurately forecast customer demand,*

6      *manage our inventory and plan for future expenses, our results of*

7      *operations could be adversely affected*.

8        We base our current and future inventory needs and expense levels

9      on our operating forecasts and estimates of future demand.  To ensure

10     adequate inventory supply, we must be able to forecast inventory needs

11     and expenses and place orders sufficiently in advance with our suppliers

12     and manufacturers, based on our estimates of future demand for

13     particular products.  *Failure to accurately forecast demand may result*

14     *in inefficient inventory supply or increased costs*. . . .  Accordingly, *if*

15     *we fail to accurately forecast customer demand, we may experience*

16     *excess inventory levels or a shortage of products available for sale*.

17     Inventory levels in excess of customer demand may result in inventory

18     write-downs or write-offs and the sale of excess inventory at discounted

19     prices, which would cause our gross margins to suffer and could impair

20     the strength and premium nature of our brand.

21   257.  The statements detailed in ¶¶251-256 above were each false and

22 misleading when made.  The true facts which were known to or recklessly disregarded

23 by the Exchange Act Defendants include:

24     (a)  That, contrary to the Exchange Act Defendants' statements such as

25 that FIGS benefitted from "real-time customer data" and used "data-driven models to

26 predict demand for [its] products," the Company did not have or was not using the

27 necessary data analytics to reliably predict demand and buying patterns and efficiently

28 operate FIGS' supply chain:

4888-2061-5087.v1

(i)     CW-1 characterized it as "laughable at best" and "completely the opposite of what was really going on" that FIGS had integrated product lifecycle data with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency. CW-1 confirmed that FIGS did not utilize any data obtained from the Company's DTC infrastructure for demand planning purposes because "having the data and utilizing the data are two completely different things." Instead, FIGS' systems "were neither proactive nor predictive." CW-1 stated: "We were behind and had to catch up every time." CW-2 stated that during CW-2's tenure at FIGS, the Company lacked its touted data analytics on the products side. On the product team, CW-2 "never heard about any systems that were trying to track trends or inventory levels. It didn't seem like there were any systems in place." With respect to production, "there were no processes at all." CW-2 confirmed that FIGS lacked a PLM system until in or around February 2022 (*i.e.*, one month before the Exchange Act Defendants spoke) and as a result: there were no systems that FIGS' manufacturers could access; the "history" of a product was not being retained; and FIGS depended on Google Slides and Excel spreadsheets that were "not very efficient" and risked data being changed;

(ii)    Even after February 2022, CW-1 confirmed that FIGS had only a "Basic" PLM system that was not sufficient for FIGS' demand planning purposes. According to CW-1, for the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions." Without these, FIGS was left to manually perform such functions. Indeed, CW-1 stated "if you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting." CW-1 confirmed that demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off." CW-1 had "never heard of a public company at the beginner level" of Centric;

(iii)   CW-2 stated that FIGS' PLM system was never fully deployed, while CW-1 stated that the PLM system was utilized only for "35 to 45 percent of capacity" with the outputs from the system being incomplete with "gaps in information," which gaps affected budgeting and planning. As a result, CW-1 stated that demand planning was performed "manually." Instead of a systematized way of planning market demand and unit numbers, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel. Compounding issues, CW-1 stated that the ERP team's Snowflake system lacked any "connectivity" to Centric (which caused errors), and none of the Company's systems were used uniformly throughout FIGS' enterprise and personnel. In addition, CW-1 stated that FIGS had a demand planning team which consisted of only "one to two people," compared to the team of "10 to 20" that was required for the level of inventory that FIGS was ordering. As a result, FIGS' PLM system was of no use in helping the Company plan for manufacturing and inventory. As CW-1 stated: "Could they predict buying patterns? No." CW-1 stated that because of the lack of demand planning and "split second decision making," CW-1 observed "catastrophic workflow." Similar to CW-2's statements, CW-1 corroborated that there were frequently last-minute design changes after the purchase order had already gone out. This had a cascade of effects, including changes in information that were sent to the supplier and the warehouse, changes to shipping plans, and changes to inventory; and

(iv)   According to CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment, including their own "personal closets," rather than data analysis, customer insight, observations from "the marketplace," or things seen as "on-trend." Indeed, CW-2 stated that there was "nothing to back up why we were developing what we were developing, a lot of times." CW-2 believed that Hasson's and Spear's "personal preferences started to bleed into the product we were making." This view that product development at FIGS was based on intuition rather than data was "definitely" shared by more-senior

- 92 -

1 | employees, including the individuals who served as Chief Product Officer during CW-
2 | 2's tenure.

3 |        (b)     Rather than allowing FIGS to maintain a low-risk merchandising
4 | strategy, improve purchasing decisions, create and maintain greater efficiency in its
5 | supply chain, or plan the launch of products down to the day of the week and time of
6 | day, the Company's lack of a demand planning strategy driven by sophisticated data
7 | science and non-discretionary merchandising increased FIGS' reliance on costly air
8 | freight for shipping needs during the Class Period.  According to CW-2, FIGS could
9 | have feasibly planned for the extended shipping times that resulted from pandemic
10 | conditions were it not for the last-minute changes to inventory purchase orders.  CW-2
11 | described ocean shipping during this period as longer but still "dependable."  CW-2
12 | also described vessel freighting as "very reliable."  CW-2 stated that last-minute
13 | changes to inventory purchase orders were "definitely" the reason that air freight was
14 | used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to
15 | use air freight."  CW-2 stated that air freight was used "most of the time" when such
16 | changes occurred and that the use of air freight at FIGS instead of vessels to ship
17 | items was done "constantly in order to hit launch dates."  As was discussed at a March
18 | 7, 2022 Board meeting attended by Hasson, Spear, Turenshine, and Willhite, "[a]ir
19 | freight [was] elevated in Q4'21" and the Company "expect[s] to continue to rely on
20 | more expensive air freight as needed to ensure consistent delivery."

21 |        (c)     A further illustration of FIGS' lack of data analytics to predict
22 | demand was the Company's decision to "[r]amp-down" "high waisted inventory to
23 | shift to new waistband" styles, which was discussed during a March 7, 2022 Board
24 | meeting.  The decision could not have been based on the abundant data analytics that
25 | the Exchange Act Defendants claimed to purportedly use at FIGS because
26 | immediately following the decision, as would later be discussed during a May 10,
27 | 2022 Board meeting, FIGS being "out of stock on high waisted inventory as we shift

28 |

1   to new waistband" was a challenge in Q1 2022.  Hasson, Spear, Turenshine, and
2   Willhite attended both Board meetings.

3   (d)   As a result of (a)-(c), *supra*, FIGS did not "minimize inventory
4   risk," "manage purchasing and inventory effectively and efficiently," or leverage to
5   create "operational efficiencies throughout our supply chain, inventory management
6   and new product development."  FIGS was also then currently (not hypothetically)
7   "fail[ing] to accurately forecast customer demand" and "experienc[ing] [both] excess
8   inventory levels [and] a shortage of products available for sale."  As Turenshine
9   would admit just eight weeks later during the May 12, 2022 earnings call, "we began
10  to experience impacts on our business [such as core product stockouts] in early
11  March," *i.e.*, at the time the Exchange Act Defendants spoke.  Spear likewise
12  confirmed on May 12, 2022, that FIGS' business disruptions were known since the
13  "beginning of March."

### b.   Q1 2022 Results

15  258.   On May 12, 2022, FIGS filed with the SEC a quarterly report on Form
16  10-Q ("Q1 2022 Form 10-Q"), which was signed by Hasson, Spear, and Turenshine.
17  The Q1 2022 Form 10-Q stated that the Company "design[s] all of [its] products in-
18  house, leverage[s] third-party suppliers and manufacturers to produce our raw
19  materials and finished products, and ***utilize[s] shallow initial buys and data-driven***
20  ***repurchasing decisions to test new products***."

21  259.   The Q1 2022 Form 10-Q also included risk factors that were couched as
22  contingencies that had in fact already transpired:

23  ***If we are unable to accurately forecast customer demand,***
24  ***manage our inventory and plan for future expenses, our results of***
25  ***operations could be adversely affected***.

26  We base our current and future inventory needs and expense levels
27  on our operating forecasts and estimates of future demand.  To ensure
28  adequate inventory supply, we must be able to forecast inventory needs

- 94 -

and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . .  Accordingly, ***if we fail to accurately forecast customer demand, we may experience excess inventory levels or a shortage of products available for sale***.  Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margins to suffer and could impair the strength and premium nature of our brand.

260.  The statements detailed in ¶¶258-259 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include:

(a)  That, contrary to the Exchange Act Defendants' statements such as that FIGS' purchasing decisions were "data-driven," FIGS either did not have or was not using data analytics to reliably predict demand and buying patterns and efficiently operate FIGS' supply chain:

(i)  CW-1 characterized it as "laughable at best" and "completely the opposite of what was really going on" that FIGS had integrated product lifecycle data with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency.  CW-1 confirmed that FIGS did not utilize any data obtained from the Company's DTC infrastructure for demand planning purposes because "having the data and utilizing the data are two completely different things."  Instead, FIGS' systems "were neither proactive nor predictive."  CW-1 stated: "We were behind and had to catch up every time."  CW-2 stated that during CW-2's tenure at FIGS, the Company lacked its touted data analytics on the products side.  On the product team, CW-2 "never heard about any systems that were trying to track trends or inventory levels.  It didn't seem like there were any systems in place."  With respect to production, "there were no processes at

- 95 -

1   all." CW-2 confirmed that FIGS lacked a PLM system until in or around February

2   2022 (*i.e.*, three months before the Exchange Act Defendants spoke) and as a result:

3   there were no systems that FIGS' manufacturers could access; the "history" of a

4   product was not being retained; and FIGS depended on Google Slides and Excel

5   spreadsheets that were "not very efficient" and risked data being changed;

6           (ii)    Even after February 2022, CW-1 confirmed that FIGS had

7   only a "Basic" PLM system that was not sufficient for FIGS' demand planning

8   purposes.  According to CW-1, for the complex type of demand planning FIGS

9   wanted to do, "Basic" was insufficient because "when you have color libraries, raw

10  materials, costing, multiple channels, you need different functions."  Without these,

11  FIGS was left to manually perform such functions.  Indeed, CW-1 stated "if you don't

12  have them," and FIGS did not, then "it's manual, and you have trouble predicting."

13  CW-1 confirmed that demand planning decisions were made "on the fly, with no

14  logistical statistics" and "a lot of inventory" numbers were "thrown off."  CW-1 had

15  "never heard of a public company at the beginner level" of Centric;

16          (iii)   CW-2 stated that FIGS' PLM system was never fully

17  deployed, while CW-1 stated that the PLM system was utilized only for "35 to 45

18  percent of capacity" with the outputs from the system being incomplete with "gaps in

19  information," which gaps affected budgeting and planning.  As a result, CW-1 stated

20  that demand planning was performed "manually."  Instead of a systematized way of

21  planning market demand and unit numbers, "people pulled data out of the PLM" and

22  created local documents with Google Drive, Google Sheets, and Microsoft Excel.

23  CW-1 confirmed that FIGS did not utilize any data obtained from the Company's

24  DTC infrastructure for demand planning purposes because "having the data and

25  utilizing the data are two completely different things."  In addition, CW-1 stated that

26  FIGS had a demand planning team which consisted of only "one to two people,"

27  compared to the team of "10 to 20" that was required for the level of inventory that

28  FIGS was ordering.  As a result, FIGS' PLM system was of no use in helping the

- 96 -

1  Company plan for manufacturing and inventory. As CW-1 stated: "Could they predict
2  buying patterns? No." CW-1 stated that because of the lack of demand planning and
3  "split second decision making," CW-1 observed "catastrophic workflow." Similar to
4  CW-2's statements, CW-1 corroborated that there were frequently last-minute design
5  changes after the purchase order had already gone out. This had a cascade of effects,
6  including changes in information that were sent to the supplier and the warehouse,
7  changes to shipping plans, and changes to inventory; and

8           (iv)   According to CW-2, purchase orders were based on
9  Hasson's or Spear's personal taste or judgment, including their own "personal
10 closets," rather than data analysis, customer insight, observations from "the
11 marketplace," or things seen as "on-trend." Indeed, CW-2 stated that there was
12 "nothing to back up why we were developing what we were developing, a lot of
13 times." CW-2 believed that Hasson's and Spear's "personal preferences started to
14 bleed into the product we were making." This view that product development at FIGS
15 was based on intuition rather than data was "definitely" shared by more-senior
16 employees, including the individuals who served as Chief Product Officer during CW-
17 2's tenure.

18          (b)    As a result of the Company's lack of data-driven demand planning,
19 FIGS increasingly relied on costly air freight for shipping needs during the Class
20 Period. According to CW-2, FIGS could have feasibly planned for the extended
21 shipping times that resulted from pandemic conditions were it not for the last-minute
22 changes to inventory purchase orders. CW-2 described ocean shipping during this
23 period as longer but still "dependable." CW-2 also described vessel freighting as
24 "very reliable." CW-2 stated that last-minute changes to inventory purchase orders
25 were "definitely" the reason that air freight was used at FIGS throughout CW-2's
26 tenure and "one hundred percent affected the need to use air freight." CW-2 stated
27 that air freight was used "most of the time" when such changes occurred and that the
28 use of air freight at FIGS instead of vessels to ship items was done "constantly in

- 97 -

order to hit launch dates." Thus, as Turenshine admitted on the August 4, 2022 earnings call, "we made the decision at the beginning of the year to utilize more airfreight to bring stability to this product launch calendar."

(c)   As a result of (a)-(b), *supra*, FIGS was then currently (not hypothetically) "fail[ing] to accurately forecast customer demand" and "experienc[ing] [both] excess inventory levels [and] a shortage of products available for sale."

### c.   Q2 2022 Results

261.   On August 4, 2022, FIGS filed with the SEC a quarterly report on Form 10-Q ("Q2 2022 Form 10-Q"), signed by Spear and Turenshine. The Q2 2022 Form 10-Q stated that FIGS "design[s] all of [its] products in-house, leverage third-party suppliers and manufacturers to produce our raw materials and finished products, and *utilize[s] shallow initial buys and data-driven repurchasing decisions to test new products*."

262.   The Q2 2022 Form 10-Q also included many speculative and contingent risk factors for risks that already transpired:

> *If we are unable to accurately forecast customer demand, manage our inventory and plan for future expenses, our results of operations could be adversely affected*.
>
> We base our current and future inventory needs and expense levels on our operating forecasts and estimates of future demand. To ensure adequate inventory supply, we must be able to forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . . Accordingly, *if we fail to accurately forecast customer demand or if we experience increased volatility in shipping times from our suppliers and manufacturers, we may experience excess inventory levels or a shortage of products available for sale*. For

- 98 -

1   example, volatility in ocean freight transit times have from time to time

2   resulted in increased level of inventory on hand, which has from time to

3   time resulted in increased storage needs and costs.  Inventory levels in

4   excess of customer demand may also result in inventory write-downs or

5   write-offs and the sale of excess inventory at discounted prices, which

6   would cause our gross margins to suffer and could impair the strength

7   and premium nature of our brand.

8       263.   On August 4, 2022, Spear and Turenshine also convened a conference

9   call with investors and analysts to discuss FIGS' Q2 2022 financial results.  Spear

10  emphasized that "***[d]ata analytics is a core strength of FIGS.  We have extensive***

11  ***information about our customers, including what they want, when they want it, the***

12  ***quantity they wanted in and how they want to engage with us***."

13      264.   The statements detailed in ¶¶261-263 above were each false and

14  misleading when made.  The true facts which were known to or recklessly disregarded

15  by the Exchange Act Defendants include:

16          (a)     That, contrary to the Exchange Act Defendants' statements such as

17  that "[d]ata analytics is a core strength of FIGS," the Company either did not have or

18  was not using data analytics to reliably predict demand and buying patterns and

19  efficiently operate FIGS' supply chain:

20              (i)     CW-1 characterized it as "laughable at best" and

21  "completely the opposite of what was really going on" that FIGS had integrated

22  product lifecycle data with sophisticated demand predictions such that the Company

23  could continuously assess the supply chain and improve efficiency.  CW-1 confirmed

24  that FIGS did not utilize any data obtained from the Company's DTC infrastructure

25  for demand planning purposes because "having the data and utilizing the data are two

26  completely different things."  Instead, FIGS' systems "were neither proactive nor

27  predictive."  CW-1 stated: "We were behind and had to catch up every time."  CW-2

28  stated that during CW-2's tenure at FIGS, the Company lacked its touted data

- 99 -

analytics on the products side.  On the product team, CW-2 "never heard about any systems that were trying to track trends or inventory levels.  It didn't seem like there were any systems in place."  With respect to production, "there were no processes at all."  CW-2 confirmed that FIGS lacked a PLM system until in or around February 2022 (*i.e.*, six months before the Exchange Act Defendants spoke) and that as a result: there were no systems that FIGS' manufacturers could access; the "history" of a product was not being retained; and FIGS depended on Google Slides and Excel spreadsheets that were "not very efficient" and risked data being changed;

(ii)     Even after February 2022, CW-1 confirmed that FIGS had only a "Basic" PLM system that was not sufficient for FIGS' demand planning purposes.  According to CW-1, for the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions."  Without these, FIGS was left to manually perform such functions.  Indeed, CW-1 stated "if you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting." CW-1 confirmed that demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off."  CW-1 had "never heard of a public company at the beginner level" of Centric;

(iii)     CW-2 stated that FIGS' PLM system was never fully deployed, while CW-1 stated that the PLM system was utilized only for "35 to 45 percent of capacity" with the outputs from the system being incomplete with "gaps in information," which gaps affected budgeting and planning.  As a result, CW-1 stated that demand planning was performed "manually."  Instead of a systematized way of planning market demand and unit numbers, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel. Compounding issues, CW-1 stated that the ERP team's Snowflake system lacked any "connectivity" to Centric (which caused errors), and none of the Company's systems were used uniformly throughout FIGS' enterprise and personnel.  In addition, CW-1

- 100 -

1   stated that FIGS had a demand planning team which consisted of only "one to two
2   people," compared to the team of "10 to 20" that was required for the level of
3   inventory that FIGS was ordering.  As a result, FIGS' PLM system was of no use in
4   helping the Company plan for manufacturing and inventory.  As a result, CW-1 stated
5   that demand planning was performed "manually."  Instead of a systematized way of
6   planning market demand and unit numbers, "people pulled data out of the PLM" and
7   created local documents with Google Drive, Google Sheets, and Microsoft Excel.
8   CW-1 confirmed that FIGS did not utilize any data obtained from the Company's
9   DTC infrastructure for demand planning purposes because "having the data and
10  utilizing the data are two completely different things."  As CW-1 stated: "Could they
11  predict buying patterns?  No."  CW-1 stated that because of the lack of demand
12  planning and "split second decision making," CW-1 observed "catastrophic
13  workflow."  Similar to CW-2's statements, CW-1 corroborated that there were
14  frequently last-minute design changes after the purchase order had already gone out.
15  This had a cascade of effects, including changes in information that were sent to the
16  supplier and the warehouse, changes to shipping plans, and changes to inventory; and

17          (iv)    According to CW-2, purchase orders were based on
18  Hasson's or Spear's personal taste or judgment, including their own "personal
19  closets," rather than data analysis, customer insight, observations from "the
20  marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that there was
21  "nothing to back up why we were developing what we were developing, a lot of
22  times."  CW-2 believed that Hasson's and Spear's "personal preferences started to
23  bleed into the product we were making."  This view that product development at FIGS
24  was based on intuition rather than data was "definitely" shared by more-senior
25  employees, including the individuals who served as Chief Product Officer during CW-
26  2's tenure.

27          (b)     As a result of the Company's lack of data-driven demand planning,
28  FIGS increasingly relied on costly air freight for shipping needs during the Class

4888-2061-5087.v1

Period.  According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to inventory purchase orders.  CW-2 described ocean shipping during this period as longer but still "dependable."  CW-2 also described vessel freighting as "very reliable."  CW-2 stated that last-minute changes to inventory purchase orders were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight."  CW-2 stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates."  Thus, as Turenshine admitted on the August 4, 2022 earnings call, "***we made the decision at the beginning of the year to utilize more airfreight*** to bring stability to this product launch calendar."

(c)    As a result of (a)-(b), *supra*, FIGS was then currently (not hypothetically) "fail[ing] to accurately forecast customer demand" and "experienc[ing] [both] excess inventory levels [and] a shortage of products available for sale."  Moreover, if FIGS had customer data, "including what they want, when they want[ed] it, the quantity they wanted in and how they want to engage," then it would not have been experiencing the excessive inventory levels.

### d.    Q3 2022 Results

265.   On November 10, 2022, FIGS filed with the SEC a quarterly report on Form 10-Q ("Q3 2022 Form 10-Q"), which was signed by Spear and Turenshine.  The Q3 2022 Form 10-Q stated that the Company "design[s] all of our products in-house, leverage[s] third-party suppliers and manufacturers to produce our raw materials and finished products, and ***utilize[s] generally shallow initial buys and data-driven repurchasing decisions to test new products***."

266.   The Form 10-Q presented several risk factors as mere possibilities when those risks had in fact already come into fruition.  The Form 10-Q stated:

*If we are unable to accurately forecast customer demand, manage our inventory and plan for future expenses, our results of operations could be adversely affected*.

We base our current and future inventory needs and expense levels on our operating forecasts and estimates of future demand.  To ensure adequate inventory supply, we must be able to forecast inventory needs and expenses and place orders sufficiently in advance with our suppliers and manufacturers, based on our estimates of future demand for particular products. . . .  *Failure to accurately forecast demand may result in inefficient inventory supply or increased costs*.  This risk may be exacerbated by the fact that we may not carry a significant amount of inventory and may not be able to satisfy short-term demand increases. *In addition, if we experience increased volatility in shipping times from our suppliers and manufacturers or sales below our expectations, we may experience excess inventory levels or a shortage of products available for sale*.  For example, volatility in ocean freight transit times and sales below our expectations as a result of inflationary pressure on consumer spending have from time to time resulted in increased level of inventory on hand, which has from time to time resulted in increased storage needs and costs.  Inventory levels in excess of customer demand may also result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would cause our gross margin to suffer and could impair the strength and premium nature of our brand.

267.  Also on November 10, 2022, Spear and Turenshine convened a conference call with investors and analysts to discuss FIGS' Q3 2022 financial results. During her opening remarks, Spear highlighted FIGS' purported data analytics, stating: "*By leveraging the insights and data we receive from the health care*

- 103 -

1  ***community, we continue to improve at creating products with the feature and design***

2  ***solutions our customers want most***." Turenshine reiterated this sentiment later in the

3  call, stating that "***we're learning fast and we're leveraging our insights to evolve our***

4  ***strategy there***."

5  268.  On the call, an analyst questioned how FIGS uses data to test colors and

6  trends, in response to which Spear stated merely that "the data tells us that our

7  customers love our color launches":

8  [Adrienne Eugenia Yih-Tennant Barclays Bank PLC, Research

9  Division - MD, Senior eCommerce & Brand Retailing Analyst:] Trina, I

10  want to get back to the color.  You've historically done very well with

11  the color launches, and I'm sure that you'll continue to innovate with

12  [culling a] primary driver.  ***So I guess the question really is how do you***

13  ***use your data to do testing on what colors are going to uptrend and***

14  ***then to do more of a test and reorder, reading that demand such that in***

15  ***the future, you'll be creating the product that the demand warrants***?

16  *      *      *

17  [Spear:] Thank you.  So in terms of color drops, we continue to

18  see a lift in sales from our color drops.  ***And to your point, the data tells***

19  ***us that our customers love our color launches***.  But as we look forward,

20  it's really being more strategic and thoughtful about our drops.

21  269.  The statements detailed in ¶¶265-268 above were each false and

22  misleading when made.  The true facts which were known to or recklessly disregarded

23  by the Exchange Act Defendants include:

24  (a)  That, contrary to the Exchange Act Defendants' statements such as

25  that FIGS "leverag[es] the insights and data we received . . . to improve at creating

26  products with the feature design solutions our customers want most," the Company

27  either did not have or was not using data analytics to reliably predict demand and

28  buying patterns and efficiently operate FIGS' supply chain:

- 104 -

(i)     CW-1 characterized it as "laughable at best" and "completely the opposite of what was really going on" that FIGS had integrated product lifecycle data with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency. CW-1 confirmed that FIGS did not utilize any data obtained from the Company's DTC infrastructure for demand planning purposes because "having the data and utilizing the data are two completely different things." Instead, FIGS' systems "were neither proactive nor predictive." CW-1 stated: "We were behind and had to catch up every time." CW-2 stated that during CW-2's tenure at FIGS, the Company lacked its touted data analytics on the products side. On the product team, CW-2 "never heard about any systems that were trying to track trends or inventory levels. It didn't seem like there were any systems in place." With respect to production, "there were no processes at all." CW-2 confirmed that FIGS lacked a PLM system until in or around February 2022 and that as a result: there were no systems that FIGS' manufacturers could access; the "history" of a product was not being retained; and FIGS depended on Google Slides and Excel spreadsheets that were "not very efficient" and risked data being changed;

(ii)     Even after February 2022, CW-1 confirmed that FIGS had only a "Basic" PLM system that was not sufficient for FIGS' demand planning purposes. According to CW-1, for the complex type of demand planning FIGS wanted to do, "Basic" was insufficient because "when you have color libraries, raw materials, costing, multiple channels, you need different functions." Without these, FIGS was left to manually perform such functions. Indeed, CW-1 stated "if you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting." CW-1 confirmed that demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off." CW-1 had "never heard of a public company at the beginner level" of Centric;

1          (iii)   CW-2 stated that FIGS' PLM system was never fully

2   deployed, while CW-1 stated that the PLM system was utilized only for "35 to 45

3   percent of capacity" with the outputs from the system being incomplete with "gaps in

4   information," which gaps affected budgeting and planning.  As a result, CW-1 stated

5   that demand planning was performed "manually."  Instead of a systematized way of

6   planning market demand and unit numbers, "people pulled data out of the PLM" and

7   created local documents with Google Drive, Google Sheets, and Microsoft Excel.

8   Compounding issues, CW-1 stated that the ERP team's Snowflake system lacked any

9   "connectivity" to Centric (which caused errors), and none of the Company's systems

10  were used uniformly throughout FIGS' enterprise and personnel.  In addition, CW-1

11  stated that FIGS had a demand planning team which consisted of only "one to two

12  people," compared to the team of "10 to 20" that was required for the level of

13  inventory that FIGS was ordering.  As a result, FIGS' PLM system was of no use in

14  helping the Company plan for manufacturing and inventory.  As CW-1 stated: "Could

15  they predict buying patterns?  No."  CW-1 stated that because of the lack of demand

16  planning and "split second decision making," CW-1 observed "catastrophic

17  workflow."  Similar to CW-2's statements, CW-1 corroborated that there were

18  frequently last-minute design changes after the purchase order had already gone out.

19  This had a cascade of effects, including changes in information that were sent to the

20  supplier and the warehouse, changes to shipping plans, and changes to inventory; and

21          (iv)   According to CW-2, purchase orders were based on

22  Hasson's or Spear's personal taste or judgment, including their own "personal

23  closets," rather than data analysis, customer insight, observations from "the

24  marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that there was

25  "nothing to back up why we were developing what we were developing, a lot of

26  times."  CW-2 believed that Hasson's and Spear's "personal preferences started to

27  bleed into the product we were making."  This view that product development at FIGS

28  was based on intuition rather than data was "definitely" shared by more-senior

- 106 -

1  employees, including the individuals who served as Chief Product Officer during CW-
2  2's tenure.

3        (b)    As a result of the Company's lack of data-driven demand planning,
4  FIGS increasingly relied on costly air freight for shipping needs during the Class
5  Period.  According to CW-2, FIGS could have feasibly planned for the extended
6  shipping times that resulted from pandemic conditions were it not for the last-minute
7  changes to inventory purchase orders.  CW-2 described ocean shipping during this
8  period as longer but still "dependable."  CW-2 also described vessel freighting as
9  "very reliable."  CW-2 stated that last-minute changes to inventory purchase orders
10 were "definitely" the reason that air freight was used at FIGS throughout CW-2's
11 tenure and "one hundred percent affected the need to use air freight."  CW-2 stated
12 that air freight was used "most of the time" when such changes occurred and that the
13 use of air freight at FIGS instead of vessels to ship items was done "constantly in
14 order to hit launch dates."

15       (c)    As a result of (a)-(b), *supra*, FIGS was then currently (not
16 hypothetically)  "fail[ing]  to  accurately  forecast  customer  demand"  and
17 "experienc[ing] [both] excess inventory levels [and] a shortage of products available
18 for sale."

19       **2.**    **Statements Regarding Core Products Strategy**
20       **a.**    **FY 2021 Results**

21     270.  On the March 8, 2022 earnings call, Spear affirmed that FIGS' core
22 products strategy was key to maintaining a low-risk inventory model, stating in
23 relevant part:

24       *The fact that half of our revenues are seasonless, enables us to*
25       *produce large volumes further in advance and hold greater quantities*
26       *in  our  warehouse  with  almost  no  inventory  risk  compared  to*
27       *traditional apparel companies.  These differentiators are incredibly*
28       *important because as transit times fluctuate, freight rates rise and*

*labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%*.

271. Spear also touted the advantages that FIGS' core product strategy afforded the Company, stating in relevant part: "Our business is unique. *It's nondiscretionary and replenishment-driven, meaning greater predictability and consistency. This is a critical advantage for us* compared to other consumer brands as almost 75% of our revenue is retained in the next year, providing a solid base for us to build upon as we grow."

272. Turenshine reiterated Spear's sentiments during the call. Turenshine stated, "I think it's helpful to just remind everyone that as a uniform business, *our product is largely replenishment driven*." As to FIGS' core products, Turenshine commented that "*it's seasonless, always in stock and really limits our risk of obsolescence*."

273. The March 10, 2022 FY 2021 Annual Report emphasized that "[w]e have *developed a highly effective merchandising strategy, anchored by our recurring, functional offering of 13 core scrubwear styles*, which represented over 80% of our net revenues in 2021."

274. The FY 2021 Annual Report reiterated that FIGS had "a highly efficient merchandising model," and further noted that "*due to the non-discretionary, replenishment nature of healthcare apparel, [it] maintain[ed] low inventory risk* driven by a high volume of repeat purchases and a focus on our core scrubs offerings."

275. The FY 2021 Annual Report also stated:

Nearly 90% of our production utilizes our main scrubwear fabric technology FIONx and *almost half of our revenue is generated by our core scrubwear styles in core colors, which are in demand year-round*. As a result, we have been able to produce our raw materials and finished

- 108 -

1    products farther in advance and **hold greater inventory without**
2    **significant risk of obsolescence or exposure to seasonality**.

3    276.   The statements detailed in ¶¶270-275 above were each false and
4    misleading when made.  The true facts which were known to or recklessly disregarded
5    by the Exchange Act Defendants include:

6    (a)   That, contrary to the Exchange Act Defendants' statements such as
7    that FIGS' "replenishment-driven" business was centered on "seasonless,"
8    "nondiscretionary" core products, the Company had begun to shift away from its core-
9    products strategy and engaged in the rapid development of hundreds of new products
10   for which demand had not been demonstrated.  This created substantial inventory risk
11   because: (i) the Company forayed into new product categories for which the predictive
12   value of FIGS' historical purchase data was diminished; (ii) entry into new markets
13   created new competitive dynamics as FIGS competed with established brands for
14   market share; (iii) the launch dates of new seasonal items could not simply be pushed
15   forward or backward;

16   (b)   Moreover, according to CW-2, purchase orders were based on
17   Hasson's or Spear's personal taste or judgment, including their own "personal
18   closets," rather than data analysis, customer insight, observations from "the
19   marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that "there was
20   nothing to back up why we were developing what we were developing, a lot of times";

21   (c)   As a result of this shift in strategy and lack of data analytics (*see*
22   ¶257, *supra*), at the time the Exchange Act Defendants spoke (with only a few weeks
23   remaining in Q1 2022), the Company was experiencing excess inventory levels,
24   reaching 187 days during Q4 2021 and increasing to 271 days during Q1 2022, as
25   much as 22 weeks in excess of FIGS' "ideal" inventory levels of 16 to 20 weeks.
26   Indeed, it was discussed at a March 5, 2021 Board meeting attended by Hasson, Spear,
27   and Willhite that there was excess leftover non-core inventory; and

28

- 109 -

(d)     At the same time, FIGS was experiencing stockouts of core products due to its purchase order decisions that were not supported by data analytics or customer insights.  For instance, it was discussed at a March 7, 2022 Board meeting attended by Hasson, Spear, Turenshine, and Willhite that FIGS would "[r]amp-down" its core "high waisted inventory to shift to *new* waistband" styles.  This decision was made despite the Exchange Act Defendants recognizing one day later on the March 8, 2022 earnings call that "[t]hese variations on our fan favorites," the high-waisted Zamora pants for women, "made up about 40% of our Zamora sales in the second half of the year."

(e)     As a result of (a)-(d), *supra*, FIGS did not "maintain low inventory risk."  As Turenshine would admit just eight weeks later during the May 12, 2022 earnings call, "we began to experience impacts on our business [such as core product stockouts] in early March," *i.e.*, at the time the Exchange Act Defendants spoke. Spear likewise confirmed on May 12, 2022 that FIGS' business disruptions were known since the "beginning of March."

(f)     Rather than allowing FIGS to endure transit time fluctuations and maintain low inventory risk, the Company's shift away from its core-products strategy and rapid development of hundreds of new products based on the Founders' personal tastes for which demand had not been demonstrated increased FIGS' reliance on costly air freight for shipping needs during the Class Period.  According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to inventory purchase orders.   CW-2 described ocean shipping during this period as longer but still "dependable."  CW-2 also described vessel freighting as "very reliable."  CW-2 stated that last-minute changes to inventory purchase orders were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight."  CW-2 stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead

- 110 -

of vessels to ship items was done "constantly in order to hit launch dates."  As was discussed at a March 7, 2022 Board meeting attended by Hasson, Spear, Turenshine, and Willhite, "[a]ir freight [was] elevated in Q4'21" and the Company "expect[s] to continue to rely on more expensive air freight as needed to ensure consistent delivery."

(g)    The March 10, 2022 statement that FIGS "replenishment driven model has also been a key part of our ***ability to navigate [supply chain] challenges***" was false and misleading because on May 12, 2022 the Exchange Act Defendants conceded that Q1 2022 challenges were "primarily due to the supply chain challenges."

### b.    Q1 2022 Results

277.   The May 12, 2022 Q1 2022 Form 10-Q stated that FIGS "***ha[s] a highly efficient merchandising model – due to the largely non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***."

278.   On May 12, 2022, Spear and Turenshine also convened a conference call with investors and analysts to discuss FIGS' Q1 2022 financial results.  On the call, Spear reiterated that the Company's "***business model is based largely – based on a largely nondiscretionary replenishment-driven core product***."  Along the same lines, Turenshine stated that FIGS' "***growth will continue to be driven as a largely nondiscretionary replenishment-driven nature of our core product portfolio*** combined with increased adoption of our complete layering system."

279.   The statements detailed in ¶¶277-278 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include:

(a)    That, contrary to the Exchange Act Defendants' statements such as that FIGS' replenishment-driven" business was centered on "nondiscretionary," "recession-resilient" core products, the Company had shifted away from its core-

products strategy and engaged in the rapid development of hundreds of new products for which demand had not been demonstrated.  This created substantial inventory risk because: (i) the Company forayed into new product categories for which the predictive value of FIGS' historical purchase data was diminished; (ii) entry into new markets created new competitive dynamics as FIGS competed with established brands for market share; and (iii) the launch dates of new seasonal items could not simply be pushed forward or backward;

(b)      Moreover, according to CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment, including their own "personal closets," rather than data analysis, customer insight, observations from "the marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that "there was nothing to back up why we were developing what we were developing, a lot of times"; and

(c)      As a result of this shift in strategy and lack of data analytics (*see* ¶260, *supra*), at the time the Exchange Act Defendants spoke (with only a few weeks remaining in Q2 2022), the Company was experiencing excess inventory levels, reaching 271 days during Q1 2022 and increasing to 296 days during Q2 2022, as much as 26 weeks in excess of FIGS' "ideal" inventory levels of 16 to 20 weeks. Indeed, it was discussed at a March 5, 2021 Board meeting attended by Hasson, Spear, and Willhite that there was excess leftover non-core inventory; and

(d)      As a result of (a)-(c), *supra*, FIGS did not "maintain low inventory risk."  FIGS experienced these stockouts of core products due to its purchase order decisions which were based on Hasson's and Spear's personal tastes and not on data analytics or customer demand, rather than the purported supply chain challenges that they publicly touted.

280.   During the May 12, 2022 Q1 2022 earnings call, Turenshine explained why FIGS' "Q1 revenue growth came in lower than planned."  Despite Spear's March 8, 2022 assurances that FIGS' "business model is able to endure these near-term

pressures," according to Turenshine, the miss was "primarily due to the supply chain challenges affecting our scrubwear products":

> Our Q1 revenue growth came in lower than planned, primarily due to the supply chain challenges affecting our scrubwear products that Trina discussed earlier. *As a result of these impacts, primarily a color launch that moved out of the quarter and a delay in 2 of our most popular franchises, the high-waisted Zamora and Yola, which we transitioned to a new yoga waistband, our repeat frequency and order growth was lower than anticipated in the quarter.*

281.   Analysts were particularly interested in the difference between the reported financials and the guidance issued on March 8, 2022 near the end of Q1 2022, noting that "revenues obviously ended lower than planned for the full quarter." One analyst asked about "the cadence that you saw through the quarter, the exit rate? Must have been a fairly significant downturn at the end of the quarter." In response, Spear stated:

> What hasn't changed is that we're able to navigate through this uncertainty by controlling what we can. *So we're airing products so that we can meet the demands of our health care professionals. And we're also, as a reminder, we sell nondiscretionary products that health care professionals need, and are pretty recession-resilient.*

282.   Another analyst queried: "I was wondering if there's any dollar amount you can put around the color launch in the first quarter to just help us triangulate how much of the disappointment is relative to that launch relative to macro." Turenshine responded:

> Yes.  So as it relates to what we saw with the color launch and supply chain in the first quarter, a couple of factors for supply chain challenges in the first quarter, the first of which was the color launch that moved out. *But we were also out of stock on some of our key core*

- 113 -

4888-2061-5087.v1

*franchises like our high-waisted Zamora and Yola.  And so I'm not giving exact numbers, but the majority of the impact that we saw in the first quarter was related to the supply chain challenges*.  And we do believe that the macroeconomic factors were impacting us to a lesser extent, and that's what we expect to see in our full year outlook and how we're modeling it in our full year outlook.

283.   In her closing remarks, Spear attempted to alleviate investor concerns by repeating that FIGS' "*business model is based on a largely nondiscretionary and replenishment-driven core products, and we're in a recession-resistant industry*."

284.   The statements detailed in ¶¶280-283 were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include:

(a)     That, contrary to the Exchange Act Defendants' statements such as that FIGS' "business model is largely based on a largely nondiscretionary and replenishment-driven core products," the Company had shifted away from its core-products strategy and engaged in the rapid development of hundreds of new products for which demand had not been demonstrated.  This created substantial inventory risk because: (i) the Company forayed into new product categories for which the predictive value of FIGS' historical purchase data was diminished; (ii) entry into new markets created new competitive dynamics as FIGS competed with established brands for market share; and (iii) the launch dates of new seasonal items could not simply be pushed forward or backward;

(b)     Moreover, according to CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment, including their own "personal closets," rather than data analysis, customer insight, observations from "the marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that "there was nothing to back up why we were developing what we were developing, a lot of times";

4888-2061-5087.v1

(c)     At the same time, FIGS was experiencing stockouts of core products due to its purchase order decisions which were based on Hasson's and Spear's personal tastes and not on data analytics or customer demand, rather than the purported supply chain challenges that they publicly touted.  The repeated statements that supply chain challenges caused a color launch to move out of the quarter and a delay in high-waisted products were false and misleading because the Exchange Act Defendants' decision to move away from its core high-waisted product caused the products to be out of stock, not supply chain challenges.  During a March 7, 2022 Board meeting attended by Turenshine, Hasson, Spear, and Willhite, the Company made the decision to "[r]amp-down . . . high waisted inventory to shift to new waistband" styles.  Again, at a May 10, 2022 Board meeting attended by, among others, Turenshine, Hasson, Spear, and Willhite, the Board discussed that FIGS was "[o]ut on high waisted inventory as we shifted to new waistband."  This was determined to be one of the "Q1 22 challenges."  So the decision to move away from the high waistband product caused the stockout, not supply chain challenges.

(d)     As a result of FIGS' shift in strategy and lack of data analytics (*see* ¶260, *supra*), at the time the Exchange Act Defendants spoke (with only a few weeks remaining in Q2 2022), the Company was experiencing excess inventory levels, reaching 271 days during Q1 2022 and increasing to 296 days during Q2 2022, as much as 26 weeks in excess of FIGS' "ideal" inventory levels of 16 to 20 weeks.

(e)     The Company's shift away from its core-products strategy and rapid development of hundreds of new products based on the Founders' personal tastes for which demand had not been demonstrated increased FIGS' reliance on costly air freight for shipping needs during the Class Period, not supply chain challenges and uncertainties as the Exchange Act Defendants represented.  Indeed, according to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to inventory purchase orders.  CW-2 described ocean shipping during this period as

- 115 -

longer but still "dependable."  CW-2 also described vessel freighting as "very reliable."  CW-2 stated that last-minute changes to inventory purchase orders were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight."  CW-2 stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates."  As was discussed at a March 7, 2022 Board meeting attended by Hasson, Spear, Turenshine, and Willhite, "[a]ir freight [was] elevated in Q4'21" and the Company "expect[s] to continue to rely on more expensive air freight as needed to ensure consistent delivery."  Likewise, at a May 10, 2022 Board meeting, FIGS' "mitigation activities, such as launch calendar adjustments and increased use of air freight and the related elevated costs of air freight usage" were discussed. Specifically, the Board discussed that an "[i]ncrease in air freight for rest of year to ensure more consistent deliveries will reduce gross margin."  During the May 10, 2022 Board meeting, it was also discussed that the Company was committed to "invest[ing] in more air freight to protect our inventory position" for the rest of FY 2022.  Hasson, Spear, Turenshine, and Willhite attended the May 10, 2022 Board meeting.

### c.    Q2 2022 Results

285.   FIGS' August 4, 2022 Q2 2022 Form 10-Q touted that as a result of the Company's "***highly efficient merchandising model***" and "***the largely non-discretionary, replenishment nature of healthcare apparel, we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***."

286.   During the August 4, 2022 earnings call, Turenshine further claimed that FIGS "strategically utiliz[ed]" its balance sheet to increase its inventory and "ensure that we have the supply needed to hit future demand."  According to Turenshine: "***We are able to increase inventory with little of selection risk due to the seasonless alleys***

- 116 -

*and soft nature of our uniform products*."   She also stated that FIGS "feel[s] comfortable with this increased use of working capital given our healthy balance sheet and confidence in our ability to sell through this additional inventory."

287.   The statements detailed in ¶¶285-286 were each false and misleading when made.   The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include:

(a)   That, contrary to the Exchange Act Defendants' statements such as that FIGS' replenishment-driven business was centered on "seasonless" core products, the Company had shifted away from its core-products strategy and engaged in the rapid development of hundreds of new products for which demand had not been demonstrated.   This created substantial inventory risk because: (i) the Company forayed into new product categories for which the predictive value of FIGS' historical purchase data was diminished; (ii) entry into new markets created new competitive dynamics as FIGS competed with established brands for market share; and (iii) the launch dates of new seasonal items could not simply be pushed forward or backward;

(b)   Moreover, according to CW-2, purchase orders were based on Hasson's or Spear's personal taste or judgment, including their own "personal closets," rather than data analysis, customer insight, observations from "the marketplace," or things seen as "on-trend."   Indeed, CW-2 stated that "there was nothing to back up why we were developing what we were developing, a lot of times"; and

(c)   As a result of this shift in strategy and lack of data analytics (*see* ¶264, *supra*), at the time the Exchange Act Defendants spoke (with only a few weeks remaining in Q3 2022), the Company was experiencing excess inventory levels, reaching 296 days during Q2 2022 and increasing to a Class Period high of 365 days during Q3 2022, as much as 36 weeks in excess of FIGS' "ideal" inventory levels of 16 to 20 weeks.

(d)   As a result of (a)-(c), *supra*, FIGS did not "maintain low inventory risk."   Rather, as the Exchange Act Defendants internally recognized, excess inventory was harming FIGS' once-healthy margins.   At an August 2, 2022 Board meeting which Hasson, Spear, Turenshine, and Willhite attended, it was discussed that "[i]mproving ocean transit times during Q2, coupled with softer sales and a delay in the expansion of our warehouse space result[ed] in ***more on-hand inventory than planned and necessitat[ed] the use of overflow inventory holding facilities***."

### d.   Q3 2022 Results

288.   FIGS' November 10, 2022 Q3 2022 Form 10-Q stated that the Company has an "efficient merchandising model. ***Due to the non-discretionary, replenishment nature of [scrubwear], we maintain low inventory risk driven by a high volume of repeat purchases and a focus on our core scrubs offerings***."

289.   On the November 10, 2022 earnings call, Turenshine stated: "***as it relates to inventory, I think it's helpful to just remind everyone that as a uniform business, our product is largely replenishment driven.   Additionally, 50% is in our core offering.   So it's seasonless, always in stock and really limits our risk of obsolescence***."

290.   Turenshine repeated this point later in the call, stating: "***[O]ur product is largely replenishment-driven***.   ***It's a uniform.   So we would expect to have higher inventory days than a traditional apparel company***.   We want to make sure that we have this product.   It's always in stock, always in style, and we can serve our health care community."

291.   The statements detailed in ¶¶288-290 were each false and misleading when made.   The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include:

(a)   That, contrary to the Exchange Act Defendants' statements that FIGS' "replenishment-driven" business was centered on "seasonless," "largely non-discretionary" core products, the Company had shifted away from its core-products

- 118 -

1    strategy and engaged in the rapid development of hundreds of new products for which
2    demand had not been demonstrated.  This created substantial inventory risk because:
3    (i) the Company forayed into new product categories for which the predictive value of
4    FIGS' historical purchase data was diminished; (ii) entry into new markets created
5    new competitive dynamics as FIGS competed with established brands for market
6    share; and (iii) the launch dates of new seasonal items could not simply be pushed
7    forward or backward;

8            (b)    Moreover, according to CW-2, purchase orders were based on
9    Hasson's or Spear's personal taste or judgment, including their own "personal
10   closets," rather than data analysis, customer insight, observations from "the
11   marketplace," or things seen as "on-trend."  Indeed, CW-2 stated that "[t]here was
12   nothing to back up why we were developing what we were developing, a lot of times";
13   and

14           (c)    As a result of this shift in strategy and lack of data analytics (*see*
15   ¶269, *supra*), at the time the Exchange Act Defendants spoke (with only a few weeks
16   remaining in Q4 2022), the Company was experiencing excess inventory levels,
17   reaching a class period high of 365 days during Q3 2022 and remaining elevated at
18   350 days during Q4 2022, as much as 36 weeks in excess of FIGS' "ideal" inventory
19   levels of 16 to 20 weeks.

20           (d)    As a result of (a)-(c), *supra*, FIGS did not "maintain low inventory
21   risk."  Rather, as the Exchange Act Defendants internally recognized, excess
22   inventory was harming FIGS' once-healthy margins.  At an August 2, 2022 Board
23   meeting which Hasson, Spear, Turenshine, and Willhite attended, it was discussed that
24   "[i]mproving ocean transit times during Q2, coupled with softer sales and a delay in
25   the expansion of our warehouse space result[ed] in ***more on-hand inventory than***
26   ***planned and necessitat[ed] the use of overflow inventory holding facilities***."

27           (e)    Defendants' statement that "we would expect to have higher
28   inventory days than a traditional apparel company" was false and misleading for the

- 119 -

additional reason that, as Turenshine would later admit on February 28, 2023, FIGS' "ideal" inventory levels of 16 to 20 weeks was exactly in line with the inventory levels of competitor companies, including non-uniform apparel companies such as Lululemon.

### 3.  Statements Regarding Air Freight Usage

#### a.  FY 2021 Results

292.   FIGS' March 10, 2022 FY 2021 Annual Report contained hypothetical and incomplete disclosures concerning risks to the Company's shipping arrangements, an admittedly critical component of Company's business. The FY 2021 Annual Report misleadingly stated that FIGS' shipping arrangements and ability to inbound freight **could** or **may** be impacted by disruptions beyond FIGS' control, stating in relevant part:

> Shipping is a critical part of our business and **any changes in, or disruptions to, our shipping arrangements could adversely affect our business, financial condition and results of operations**.

> We currently rely on third-party global providers to deliver the products we offer on our website and mobile app. . . .  In addition, **our ability to receive inbound inventory efficiently** and ship merchandise to customers **may be negatively affected by factors beyond our** and these providers' **control**, including pandemic, weather, fire, flood, power loss, earthquakes, acts of war or terrorism or other events specifically impacting other shipping partners, such as labor disputes, financial difficulties, system failures and other disruptions to the operations of the shipping companies on which we rely.  We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.

4888-2061-5087.v1

293.   The FY 2021 Annual Report also falsely and/or misleadingly stated that FIGS used air freight as a mere stopgap measure to respond to COVID-19 and related macro conditions, stating in relevant part:

> The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays and unreliability, port congestion, increased ocean and air freight rates and labor shortages. . . .
>
> In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time, and may continue from time to time, to ship goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. ***We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future***.

294.   Similarly, the FY 2021 Annual Report stated:

> The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, reliability and capacity issues, port congestion, increased ocean and air freight rates and labor shortages. . . .
>
> As we seek to timely and cost effectively fulfill orders and ship products to our customers, we have been able to continue to produce our products without significant disruptions and have taken successful measures to mitigate these macroeconomic challenges to which we are not immune. For example, to meet our customers' expectations, we have from time to time shipped goods earlier when possible and adjusted shipments to alternate origin and destination ports to avoid delays. ***We have also from time to time used faster but more expensive air freight***

- 121 -

4888-2061-5087.v1

*in the quarter and year ended December 31, 2021, which increased our cost of goods sold*.

\*     \*     \*

We believe we have managed effectively through COVID-19 logistical challenges. ***We nevertheless expect we will continue to contend with*** elevated ocean and ***air freight rates***, unpredictable ocean transit times and other COVID-19 related logistical challenges.

295. The statements detailed in ¶¶292-294 above were each false and misleading when made. The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include that FIGS routinely relied on air freight in the first instance and not merely as a stopgap in response to the temporary COVID-19 pandemic, as a strategic decision to meet demand, or for "factors beyond" the Company's "control." In particular:

(a)     According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to purchase orders. CW-2 described ocean shipping as still "dependable" during this time period. CW-2 also described ocean shipping as "very reliable." CW-2 stated that last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight." This was because at FIGS, launch dates were the least flexible aspect of the production process, and when last-minute changes occurred, launch dates were not moved. According to CW-2, that launch dates were not moved "was the problem." CW-2 explained this by way of example: where a last-minute change order required moving the product's "ex-factory" date from March 1, as planned, to April 1, and if the launch date for that order was April 15, CW-2 stated "that's when you have to air it," which was what occurred "most of the time";

(b)     CW-2 also stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of vessels to ship

- 122 -

1   items was done "constantly in order to hit launch dates."  Indeed, as Turenshine would

2   later admit on August 4, 2022, "we made the decision at the beginning of the year to

3   utilize more airfreight to bring stability to this product launch calendar"; and

4           (c)     It was discussed during a November 9, 2021 Board meeting, which

5   Hasson, Spear, Turenshine, and Willhite attended, that FIGS would increasingly rely

6   on air freight "in order to hit [its] planned revenue targets."  And at a March 7, 2022

7   Board meeting attended by Hasson, Spear, Turenshine, and Willhite, it was discussed

8   that "[a]ir freight [was] elevated in Q4'21" and the Company "expect[s] to continue to

9   rely on more expensive air freight as needed to ensure consistent delivery."

### b.    Q1 2022 Results

10

11  296.   FIGS' May 10, 2022 Q1 2022 Form 10-Q contained hypothetical and

12  incomplete disclosures concerning risks to the Company's shipping arrangements, an

13  admittedly critical component of Company's business.  The Q1 2022 Form 10-Q

14  misleadingly stated that FIGS' shipping arrangements and ability to inbound freight

15  *could* or *may* be impacted by disruptions beyond FIGS' control, stating in relevant

16  part:

17          Shipping is a critical part of our business and **any changes in, or**

18          **disruptions to, our shipping arrangements could adversely affect our**

19          **business, financial condition and results of operations**.

20          We currently rely on third-party global providers to deliver the

21          products we offer on our website and mobile app. . . .

22          ***Our ability to receive inbound inventory efficiently and ship***

23          ***merchandise to customers***, including at costs to which we are

24          accustomed, ***may also be negatively affected by other factors beyond***

25          ***our*** and/or these providers' ***control***, including pandemic, weather, fire,

26          flood, power loss, earthquakes, acts of war or terrorism or other events

27          specifically impacting other shipping partners, such as labor disputes,

28          financial difficulties, system failures and other disruptions to the

- 123 -

operations of the shipping companies on which we rely. We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.

297.   The Q1 2022 Form 10-Q also falsely and/or misleadingly stated:

The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight reliability and capacity issues, increased volatility in ocean freight transit times, port congestion, increased ocean and air freight rates, labor shortages and ocean freight delays. . . .

In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time shipped, and may continue from time to time to ship, goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. *We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future*.

298.   During the May 12, 2022 earnings call, analysts were particularly interested in whether FIGS had received products relating to its stockout and delayed color launches.  For instance, one analyst asked, "if the delays of the color launch were – it sounds to me like a primary – a primary factor in the sales shortfall in Q1. So the question I have is, has that product now been delivered?"  Spear responded, stating that "*[w]e had aired in our products to meet the demand*, and it's been an incredibly strong week.  *I think there are other events throughout the rest of the year, where we are airing our product in to meet the demand*."

299.   Later in the call, Turenshine confirmed that while ocean shipping was taking longer, the Company had already "*extended our lead times to really account for the longer transit time*."

- 124 -

300.   The statements detailed in ¶¶296-299 above were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include that FIGS routinely relied on air freight in the first instance and not merely as a stopgap in response to the temporary COVID-19 pandemic, as a strategic decision to meet demand, or for "factors beyond" the Company's "control."  In particular:

(a)   According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to purchase orders.  CW-2 described ocean shipping as still "dependable" during this time period.  CW-2 also described ocean shipping as "very reliable."  CW-2 stated that last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight."  This was because at FIGS, launch dates were the least flexible aspect of the production process, and when last-minute changes occurred, launch dates were not moved.  According to CW-2, that launch dates were not moved "was the problem."  CW-2 explained this by way of example: where a last-minute change order required moving the product's "ex-factory" date from March 1, as planned, to April 1, and if the launch date for that order was April 15, CW-2 stated "that's when you have to air it," which was what occurred "most of the time";

(b)   CW-2 also stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates."  Indeed, as Turenshine would later admit on August 4, 2022, "we made the decision at the beginning of the year to utilize more airfreight to bring stability to this product launch calendar";

(c)   It was discussed during a November 9, 2021 Board meeting that FIGS would increasingly rely on air freight "in order to hit [its] planned revenue targets."  And at a March 7, 2022 Board meeting, it was discussed that "[a]ir freight [was] elevated in Q4'21" and the Company "expect[s] to continue to rely on more

- 125 -

expensive air freight as needed to ensure consistent delivery." Hasson, Spear, Turenshine, and Willhite attended both Board meetings; and

(d)     At a May 10, 2022 Board meeting that Hasson, Spear, Turenshine, and Willhite attended, FIGS' "mitigation activities, such as launch calendar adjustments and increased use of air freight and the related elevated costs of air freight usage" were discussed. Specifically, the Board discussed that an "[i]ncrease in air freight for rest of year to ensure more consistent deliveries will reduce gross margin." During the May 10, 2022 Board meeting, it was also discussed that the Company was committed to "invest[ing] in more air freight to protect our inventory position" for the rest of FY 2022.

### c.     Q2 2022 Results

301.   FIGS' August 4, 2022 Q2 2022 Form 10-Q couched the Company's use of air freight as a temporary response to COVID-19 and related macro conditions:

> The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight reliability and capacity issues, increased volatility in ocean freight transit times, port congestion, increased ocean and air freight rates, labor shortages and ocean freight delays. . . .
>
> In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time shipped, and may continue from time to time to ship, goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. ***We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future***.

302.   The Q2 2022 Form 10-Q also contained hypothetical and incomplete disclosures concerning risks to FIGS' shipping arrangements, an admittedly critical

- 126 -

component of Company's business.  The Q2 2022 Form 10-Q misleadingly stated that FIGS' shipping arrangements and ability to inbound freight *could* or *may* be impacted by disruptions beyond FIGS' control, stating in relevant part:

> Shipping is a critical part of our business and *any changes in, or disruptions to, our shipping arrangements could adversely affect our business, financial condition and results of operations*.
>
> We currently rely on third-party global providers to deliver the products we offer on our website and mobile app. . . .  *Our ability to receive inbound inventory efficiently* and ship merchandise to customers, including at costs to which we are accustomed, *may also be negatively affected by other factors beyond our* and/or these providers' *control*, including pandemic, weather, fire, flood, power loss, earthquakes, acts of war, or terrorism or other events specifically impacting other shipping partners, such as labor disputes or shortages, financial difficulties, system failures and other disruptions to the operations of the shipping companies on which we rely.  We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.

303.   During her opening remarks on the August 4, 2022 earnings call, Spear claimed that FIGS "*acted early and proactively as we leaned on airfreight to ensure we have the product to meet the needs of our health care professionals*."

304.   The statements detailed in ¶¶301-303 were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include that FIGS routinely relied on air freight in the first instance and not merely as a stopgap in response to the temporary COVID-19 pandemic, as a strategic decision to meet demand, or for "factors beyond" the Company's "control."  In particular:

4888-2061-5087.v1

(a)      According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes. CW-2 stated that last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight." This was because at FIGS, launch dates were the least flexible aspect of the production process, and when last-minute changes occurred, launch dates were not moved. According to CW-2, that launch dates were not moved "was the problem." CW-2 explained this by way of example: where a last-minute change order required moving the product's "ex-factory" date from March 1, as planned, to April 1, and if the launch date for that order was April 15, CW-2 stated "that's when you have to air it," which was what occurred "most of the time."

(b)      CW-2 also stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of vessels to ship items was done "constantly in order to hit launch dates." Indeed, Turenshine admitted on the August 4, 2022 earnings call that "we made the decision at the beginning of the year to utilize more airfreight to bring stability to this product launch calendar"; and

(c)      At a May 10, 2022 Board meeting that Hasson, Spear, Turenshine, and Willhite attended, FIGS' "mitigation activities, such as launch calendar adjustments and increased use of air freight and the related elevated costs of air freight usage" were discussed. Specifically, the Board discussed that an "[i]ncrease in air freight for rest of year to ensure more consistent deliveries will reduce gross margin." During the May 10, 2022 Board meeting, it was also discussed that the Company was committed to "invest[ing] in more air freight to protect our inventory position" for the rest of FY 2022.

### d.     Q3 2022 Results

305. FIGS' November 10, 2022 Q3 2022 Form 10-Q presented the Company's use of air freight as a temporary response to the COVID-19 pandemic and related macro conditions:

4888-2061-5087.v1

The ongoing COVID-19 pandemic has negatively impacted global supply chains and from time to time caused challenges to logistics, including causing ocean freight reliability and capacity issues, increased volatility in ocean freight transit times, port congestion, increased ocean and air freight rates, labor shortages and ocean freight delays. . . .

In order to manage the impact of these disruptions and meet our customers' expectations, we have from time to time shipped, and may continue from time to time to ship, goods earlier when possible and adjust shipments to alternate origin and destination ports to avoid delays. *We have also from time to time used faster but more expensive air freight, which has in the past increased our cost of goods sold, and we may from time to time continue to use more expensive air freight in the future*.

306.   The Q3 2022 Form 10-Q also contained hypothetical and incomplete disclosures concerning risks to FIGS' shipping arrangements, an admittedly critical component of Company's business.  The Q3 2022 Form 10-Q misleadingly stated that FIGS' shipping arrangements and ability to inbound freight may be impacted by disruptions beyond FIGS' control, stating in relevant part:

Shipping is a critical part of our business and *changes in, or disruptions to, our shipping arrangements have in the past and may in the future adversely affect our business, financial condition and results of operations*.

We currently rely on third-party global providers to deliver the products we offer on our website and mobile app.

\*       \*       \*

*Our ability to receive inbound inventory efficiently* and ship merchandise to customers, including at costs to which we are accustomed, *may also be negatively affected by other factors beyond*

- 129 -

4888-2061-5087.v1

*our* and/or these providers' ***control***, including pandemic, weather, fire, flood, power loss, earthquakes, acts of war, or terrorism or other events specifically impacting other shipping partners, such as labor disputes or shortages, financial difficulties, system failures and other disruptions to the operations of the shipping companies on which we rely.   For example, a strike by employees of any of our third-party global providers or a port worker strike, work slow-down or other transportation disruption in the ports of Los Angeles or Long Beach, California, where we generally import our products into the U.S., could significantly disrupt our business.  We have in the past experienced, and may in the future experience, shipping delays for reasons outside of our control.

307.   The statements detailed in ¶¶305-306 were each false and misleading when made.  The true facts which were known to or recklessly disregarded by the Exchange Act Defendants include that FIGS routinely relied on air freight in the first instance and not merely as a stopgap in response to the temporary COVID-19 pandemic, as a strategic decision to meet demand, or for "factors beyond" the Company's "control."  In particular:

(a)   According to CW-2, FIGS could have feasibly planned for the extended shipping times that resulted from pandemic conditions were it not for the last-minute changes to purchase orders.  CW-2 described ocean shipping as still "dependable" during this time period.  CW-2 also described ocean shipping as "very reliable."  CW-2 stated that last-minute changes were "definitely" the reason that air freight was used at FIGS throughout CW-2's tenure and "one hundred percent affected the need to use air freight."  This was because at FIGS, launch dates were the least flexible aspect of the production process, and when last-minute changes occurred, launch dates were not moved.  According to CW-2, that launch dates were not moved "was the problem."  CW-2 stated that air freight was used "most of the time" when such changes occurred and that the use of air freight at FIGS instead of

- 130 -

vessels to ship items was done "constantly in order to hit launch dates."  CW-2 explained this by way of example: where a last-minute change order required moving the product's "ex-factory" date from March 1, as planned, to April 1, and if the launch date for that order was April 15, CW-2 stated "that's when you have to air it," which was what occurred "most of the time";

(b)     It was discussed during a November 9, 2021 Board meeting that FIGS would increasingly rely on air freight "in order to hit [its] planned revenue targets."  And at a March 7, 2022 Board meeting, it was discussed that "[a]ir freight [was] elevated in Q4'21" and the Company "expect[s] to continue to rely on more expensive air freight as needed to ensure consistent delivery."  Hasson, Spear, Turenshine, and Willhite attended both Board meetings; and

(c)     At a May 10, 2022 Board meeting that Hasson, Spear, Turenshine, and Willhite attended, FIGS' "mitigation activities, such as launch calendar adjustments and increased use of air freight and the related elevated costs of air freight usage" were discussed.  Specifically, the Board discussed that an "[i]ncrease in air freight for rest of year to ensure more consistent deliveries will reduce gross margin." During the May 10, 2022 Board meeting, it was also discussed that the Company was committed to "invest[ing] in more air freight to protect our inventory position" for the rest of FY 2022.

## D.    Scienter Allegations

308.   As alleged herein, the Exchange Act Defendants acted with scienter in that they: (i) knew or recklessly disregarded that their publicly disseminated documents and statements were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The Exchange Act Defendants violated the securities laws alleged herein by virtue of their: (i) receipt of information reflecting the true facts regarding

- 131 -

FIGS' management, operations, and competitive landscape; (ii) control over, receipt of, and/or modification of FIGS' allegedly materially misleading misstatements; and/or (iii) associations with the Company, which made them privy to confidential proprietary information concerning FIGS.

309.   The Securities Exchange Act violations described in §V could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Exchange Act Defendants.   Given their executive-level positions with FIGS, the Individual Exchange Act Defendants controlled the contents of FIGS' public statements during the Class Period.   The Individual Exchange Act Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.   Due to their positions and access to material non-public information, the Individual Exchange Act Defendants knew or recklessly disregarded that the adverse facts specified herein were concealed from the public and that the positive representations that were being made were false and misleading.

310.   Plaintiffs also allege that scienter of the Individual Exchange Act Defendants (who, as directors and executive officers of the Company, knew or recklessly ignored facts related to the core operations of FIGS) can be imputed to FIGS.

**1.    The Exchange Act Defendants' False and Misleading Statements Concerned FIGS' Core Operations**

311.   FIGS does one thing: sell health care apparel.   Without question, selling core scrubs is the Company's core operation.   Prior to the IPO in 2020, approximately 82% of FIGS' net revenues came from core scrub products.   Hasson reiterated that, in 2021, "[o]ver 80% of our business is core scrubs" during the Company's March 8, 2022 earnings call.   The Exchange Act Defendants also consistently emphasized

throughout the Class Period that FIGS' business was dependent on its core scrubs (*see, e.g.*, §V.C.2., *supra*).

312.   Every facet of FIGS' business was therefore aimed at selling core scrubs to its customer base.  During a November 5, 2021 interview with Tech Thursday Podcast, Hasson expressly stated that "the number one thing is to make sure FIGS is delivered to our healthcare professionals so we will do anything and everything so that happens no matter what."[28]  To that end, Hasson and Spear were directly involved in managing every aspect of selling FIGS' core scrubs to customers.

### 2.   The Individual Exchange Act Defendants Acknowledged Their Deep, Institutional Knowledge of FIGS' Core Operations

313.   Throughout the Class Period, the Individual Exchange Act Defendants admitted their personal involvement in the Company's operations, highlighting that, as a "founder-led" company, Hasson and Spear were deeply involved in the Company's operations and had "deep institutional knowledge regarding all aspects of our Company."  And as the Company explained, its "culture, strategic vision and operational execution are driven by [its] visionary co-founders and co-Chief Executive Officers, Heather Hasson and Trina Spear."  Hasson and Spear were described as being "critical to the development of [FIGS'] business, future vision and strategic direction."

314.   Spear and Hasson acknowledged the same publicly.  For instance, in an August 12, 2021 interview with the *Los Angeles Times*, Spear recounted that she and Hasson "manage every single process" in their supply chain and noted that it "is a

---

[28]  Tech Thursday Podcast, *Tech Thursday Episode 8: Chat with Heather Hasson About FIGS* (Nov. 5 , 2021), https://shows.acast.com/60a5e01cc3fa8f0012954d7a/ episodes/tech-thursday-episode-8-chat-with-heather-hasson-about-figs.

1  really, really important part of [their] business."[29]  In line with this, Spear explained
2  that FIGS had the ability to track where their products were in real time.

3  315.  Hasson's and Spear's involvement in managing every single process in
4  FIGS' supply chain is further evidenced by their roles and final say over product
5  development.  For instance, CW-2 stated that "countless times" before placing an
6  order, CW-2 would be told "Heather hates the fabric, or the color" and was instructed
7  to change the order.  CW-2 recalled similar accounts concerning Spear.  As an
8  example, CW-2 recalled within the first couple months of CW-2's employment Spear
9  "dropped" a product launch of thousands of units simply because Spear changed her
10  mind regarding the product and decided she "didn't like it."  CW-2 stated that things
11  like that "happened fairly often."  Moreover, Spear or Hasson sometimes attended
12  quarterly milestone meetings, but CW-2 confirmed that when Spear or Hasson could
13  not attend, "there was a lot of things the team couldn't sign off on until they had the
14  Heather or Trina 'blessing' of the line or the color or whatever it was."

15  316.  Turenshine was also deeply involved in FIGS' operations.  For instance,
16  during the March 8, 2022 earnings call, Spear stated that "Daniella knows our
17  company inside and out" and attributed "[h]er deep knowledge and passion for the
18  brand, combined with [FIGS'] deeply analytical and data-driven approach" as
19  "help[ing] FIGS go from less than $55 million in revenue . . . to over $400 million."
20  Spear had also previously described Turenshine as having "played a critical role in
21  [FIGS'] rapid and profitable growth."[30]

22  317.  Further, Hasson, Spear, and Turenshine (as well as Willhite) routinely
23  attended FIGS Board meetings.  Hasson, Spear, and Willhite attended Board meetings

24  ---
24  [29]  Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times
25  (Aug. 12, 2021), https://www.latimes.com/business/story/2021-08-12/figs-trina-spear-heather-sasson-interview.

26  [30]  FIGS Announces Retirement of Chief Financial Officer, Jeffery Lawrence; FIGS'
27  Longtime Senior Vice President of Finance and Strategy, Daniella Turenshine,
    Appointed as Chief Financial Officer, Business Wire (Dec. 10, 2021),
28  http://tinyurl.com/Turenshineappointment.

4888-2061-5087.v1

on March 5, 2021, August 10, 2021, November 9, 2021, March 7, 2022, May 10, 2022, and August 2, 2022.  Turenshine was also present at the meetings held on August 10, 2021, November 9, 2021, March 7, 2022, May 10, 2022, and August 2, 2022.  These meetings often included discussions about FIGS' supply chain, including specific details of any delays in ocean freight shipping that the Company was experiencing.  For instance, on March 5, 2021, the Board discussed "the impact of port and shipping delays on the Company's operational activities."  The Board was also given a presentation during the March 5, 2021 meeting, which reported that "[p]ort congestion ha[d] led to inbound transit delays of up to 3 weeks and incremental freight costs."  Similarly, on August 10, 2021, the Board discussed that "[g]lobal supply chain imbalances ha[d] impacted the ocean freight market" but clarified that those "in-transit times" had only "increas[ed] by approximately 2 weeks."  The Board continued to discuss air freight and related costs during the March 7, 2022 and May 10, 2022 meetings.  *See* ¶239, *supra*.  Inventory management, including the timing of product launches and any issues with keeping product in stock, was also discussed during these meetings, including during the March 7, 2022, May 10, 2022, and August 2, 2022 Board meetings.  *See* ¶¶226-227, 239, *supra*.

318.   Accordingly, Spear's, Hasson's, and Turenshine's admitted personal knowledge of, and involvement in, FIGS' core business is strong evidence that they each knew that the false statements detailed herein were materially false and misleading when made and/or were reckless in making those statements.

**2.** **Either FIGS' Oft-Touted Data Analytics and Access to Real Time Data Informed the Exchange Act Defendants that Their Statements Were False and Misleading or the Exchange Act Defendants Recklessly Disregarded that FIGS' Technologies Were Incapable of Providing the Benefits that They Falsely Claimed**

**a.** **FIGS' Data Analytics and Access to Real Time Data Provided the Exchange Act Defendants with Knowledge that Their Statements Were False and Misleading**

319. Throughout the Class Period, FIGS sold its core scrubs to consumers through its DTC digital platform. This DTC model purportedly "differentiate[d]" the Company from other health care apparel manufacturers and "industry incumbents" because it allowed FIGS to collect data on its customers that it could then use to optimize its business. As the Company explained:

> Data is an essential and embedded capability throughout our organization. We have teams of data scientists, data engineers and data analysts working directly with each key functional area. This approach enables the harvesting and management of extensive data, the development of a suite of proprietary tools, and the direct and rapid application of data science in core operating activities and decision-making processes throughout the Company.

320. To that end, throughout the Class Period, the Exchange Act Defendants claimed that FIGS' "DTC Strategy also gives us access to valuable real-time customer data that we leverage in all aspects of our business, including apparel design and merchandising, customer acquisition and retention, demand forecasting and inventory optimization." Accordingly, the Exchange Act Defendants and FIGS then used the extensive data it harvested "to build proprietary data science solutions applied to key functions across the company, including:" "Product," "Supply Chain,"

- 136 -

1  "Merchandising and Inventory Management," "Marketing," and "Customer
2  Experience."

3      321.   Indeed, the Exchange Act Defendants touted FIGS' supply chain data
4  analytics in the 2021 Annual Report and throughout the Class Period, stating in
5  relevant part:

6          We have built a proprietary integration for our product lifecycle
7          from purchase order to manufacturing to shipping.  This integration
8          enables extensive management and oversight of the product flow and
9          fuels a variety of prediction models.  By combining the product lifecycle
10         data integration with sophisticated demand predictions, we can
11         continuously assess the supply chain and improve efficiency.

12     322.   FIGS claimed to use its "rich customer data set" to "develop proprietary
13 and customized data solutions designed to optimize our product innovation, inventory
14 analytics, marketing efforts and operational efficiency."  FIGS also purported to use
15 "real-time customer data" and "data-driven models to predict demand for [its]
16 products."  The Exchange Act Defendants represented throughout the Class Period
17 that this customer data "enable[d] [FIGS] to manage purchasing and inventory
18 effectively and efficiently," "to predict demand for our products," and "to anticipate
19 optimal times for launch, including day of week and time of day."

20     323.   FIGS purportedly used the harvested data in conjunction with
21 management systems, such as Flexport and Whiplash's warehouse management
22 system, to manage its supply chain, inventory, warehouse, fulfillment, distribution,
23 and freight operations.  Through Flexport and Whiplash's warehouse management
24 system, FIGS was supposed to have **real time insight into transport trajectory and**
25 **inventory levels at the Company's fulfillment center**.  For instance, in a September
26 19, 2022 partnership video, Spear lauded FIGS' "incredible" partnership with the
27 business Flexport, which provided the Company with real time data regarding the
28

4888-2061-5087.v1

current status of each purchase order, its expected delivery, and the transport trajectory, stating in relevant part:

Through our partnership with Flexport, **and it's been a number of years now**, and it's been an incredible partnership.  We have this dedicated account team, as well as dedicated ocean and air experts that have helped us develop strategies, navigating, finding alternative routes, finding the ways to get products to the people that need them.

*        *        *

What's really incredible about Flexport is the technology **where we have a real time platform to see, you know, where the products are at any given time.  We have over a hundred active shipments, and so being able to see where they are, and when they're going to arrive and where they're going, is, you know, is incredibly important**.[31]

324.    Similarly, Whiplash's warehouse management system purportedly provided the Company with "real-time inventory visibility" for the inventory that the Company had on hand at FIGS' sole fulfillment center.[32]  The Exchange Act Defendants therefore had "real-time inventory visibility"[33] through the Whiplash warehouse management system for the inventory that the Company had on hand at FIGS' sole fulfillment center.  The Exchange Act Defendants also had visibility into product performance and real time sales metrics including, *inter alia*, gross sales, returns, starting and ending inventory quantities, days of inventory on hand, and sell through rates, through its Shopify e-commerce platform-based website.

---

[31]  Flexport, *FIGS | Flexport.org Impact Partner Spotlight*, YouTube (Sept. 19, 2022), https://www.youtube.com/watch?v=Sz_vs5YpkRU.

[32]  RyderEcommerce by Whiplash, https://whiplash.com/capability/distribution/ (last visited Mar. 29, 2023).

[33]  *Id.*

325.    The Exchange Act Defendants also claimed that FIGS benefitted from its relationship with Shopify, an e-commerce platform that can integrate with websites of DTC sellers such as FIGS.  Through Shopify, FIGS purportedly has access to data concerning product performance and sales metrics that are "up to date" within about a minute, including, *inter alia*, gross sales, returns, starting and ending inventory quantities, days of inventory on hand, and sell-through rates.[34]

326.    Moreover, FIGS' data capabilities were not simply talking points for the Individual Exchange Act Defendants.  They were well attuned to and spoke in great detail about the Company's use of data to reliably predict demand, supply chain, and inventory management throughout the Class Period.  *See, e.g.*, §V.C.1., *supra*.

327.    The Exchange Act Defendants' access to data for each stage of FIGS' products' lifecycle, which supposedly allowed them to predict demand, know inventory levels they had on hand, and review FIGS' freight location in real-time, is strong evidence that the Exchange Act Defendants knew that the statements concerning demand, air freight, inventory, and the associated financial metrics detailed herein were materially false and misleading when made and/or were made with reckless disregard for the truth.  But if the Company did not have the ability to use data to manage every aspect of its products' lifecycles as the Exchange Act Defendants assured investors, then the Exchange Act Defendants' statements concerning these abilities were knowingly false and misleading.

> **b.    Confidential Witnesses Confirmed that the Exchange Act Defendants Knowingly or Recklessly Disregarded FIGS' Inability to Utilize and Gain Insight from Customer Data**

328.    Throughout the Class Period, the Exchange Act Defendants touted FIGS' DTC business model and data analytics capabilities.  According to the Exchange Act

---

[34]    Shopify Help Center, *Inventory Reports*, https://tinyurl.com/mr4b8wap (last visited Apr. 5, 2023); Shopify Help Center, *Sales Reports*, https://tinyurl.com/cfmade9x (last visited Apr. 5, 2023).

1  Defendants, representing that the Company's data enabled FIGS to efficiently manage
2  purchasing and inventory allowing FIGS to strategically plan its product launches.
3  The Exchange Act Defendants also highlighted that the Company used "data-driven
4  models to predict demand for our products" and "data-driven repurchasing decisions
5  to minimize inventory risk while creating scarcity."

6      329.  But contrary to FIGS' public misstatements, confidential witnesses
7  asserted that the Company lacked meaningful data analytics.  On the product team,
8  CW-2 "never heard about any systems that were trying to track trends or inventory
9  levels.  It didn't seem like there were any systems in place."  With respect to
10 production, "there were no processes.  At all."

11     330.  CW-2 stated that FIGS lacked a PLM system for most of CW-2's tenure,
12 and that although FIGS began to implement Centric approximately a year before CW-
13 2 left the Company (*i.e.*, in or around February 2022), it was never fully deployed.
14 According to CW-2, a "PLM system is everything" for an apparel company because it
15 "keeps all the styles" the company is designing and manufacturing and allows the
16 factory partners to "pull" the relevant manufacturing instructions and details right
17 from the system.  But "FIGS never had any of that."  Rather, CW-2 stated that FIGS
18 personnel used Google Slides and Microsoft Excel.  This meant that there were no
19 systems that FIGS' manufacturers could access.  Further, this lack of a PLM system
20 meant that the "history" of a product was not being retained.  CW-2 stated using Excel
21 spreadsheet documents was "not very efficient, and data can be changed easily."  CW-
22 2 did not know of any easily updated system at the Company where marketing,
23 production, and tech designs were housed.

24     331.  CW-1 corroborated CW-2 stating that during CW-1's tenure, FIGS' PLM
25 subscription consisted of Centric's "Basic" tools, which are generally used by new
26 companies lacking "international policies" and with "little marketing strategy."
27 Accordingly, for the complex type of demand planning FIGS wanted to do, "Basic"
28 was insufficient because "when you have color libraries, raw materials, costing,

- 140 -

multiple channels, you need different functions.  If you don't have them," and FIGS did not, then "it's manual, and you have trouble predicting."  CW-1 confirmed that FIGS was not willing to invest in more advanced demand planning tools due to cost concerns, and as a result demand planning decisions were made "on the fly, with no logistical statistics" and "a lot of inventory" numbers were "thrown off."

332.   Given Hasson's and Spear's hands-on involvement and final say in operating decisions, and Turenshine's knowledge of FIGS "inside and out" and "deep knowledge and passion for the brand," it can be presumed that they knew FIGS had not procured more advanced demand planning tools due to cost concerns, or, at a minimum, they knew FIGS did not own or license similar tools.

333.   CW-1 had "never heard of a public company at the beginner level" of Centric.  In response to a question about whether FIGS could have previously possessed advanced tools that it later got rid of, CW-1 stated: "They never had them."

334.   CW-1 stated that FIGS' demand planning team consisted of only "one to two people," when a team of "10 to 20" was required for the level of inventory that FIGS was ordering.  CW-1 stated that CW-1 did not believe that FIGS "ever had" 10 to 20 demand planners, including at the time of the IPO.  CW-1 further explained that because FIGS also lacked PLM data to fall back on, the Company's PLM was of no use in helping FIGS plan for manufacturing and inventory.

335.   As a result, CW-1 stated that demand planning was performed "manually."  Instead of a systematized way of planning market demand and unit numbers, "people pulled data out of the PLM" and created local documents with Google Drive, Google Sheets, and Microsoft Excel.  Compounding issues, CW-1 stated that the ERP team's Snowflake system lacked any "connectivity" to Centric (which caused errors) and none of the Company's systems were used uniformly throughout FIGS' enterprise and personnel.  Consistent with CW-1, CW-2's understanding is that, to this day, Centric still has not been fully deployed and that not enough employees have been trained on the use of Centric.

- 141 -

336.   CW-1 stated it was "laughable at best" that FIGS had integrated product lifecycle data integration with sophisticated demand predictions such that the Company could continuously assess the supply chain and improve efficiency. According to CW-1, "It was completely the opposite of what was really going on." Instead, FIGS' systems "were neither proactive nor predictive."   CW-1 stated: "We were behind and had to catch up every time."   CW-1 observed that the CEO's approach to planning was to "react and figure it out after the fact."

337.   CW-1 confirmed that FIGS was not able to utilize any data obtained from the Company's DTC infrastructure for demand planning purposes because "having the data and utilizing the data are two completely different things."   Moreover, CW-1 succinctly stated: "Could they predict buying patterns?  No."

338.   Accordingly, the Exchange Act Defendants either knew that FIGS lacked adequate product lifecycle management software and demand planning tools, making their statements concerning these abilities knowingly false and misleading when made, or were reckless in touting those capabilities when they were not fully implemented, operational, or being utilized as publicly represented.

**3.     The Temporal Proximity Between Spear's and Turenshine's Admissions on FIGS' May 12, 2022 Earnings Call and Conflicting Reassurances Made Just Two Months Prior Support Scienter**

339.   On March 8, 2022, with just three short weeks left before the end of Q1 2022, FIGS held an earnings call to address its Q4 and YE2021 results and discuss the current quarter and year ahead.   With supply chain disruptions of key interest for analysts, Spear stated:

*The fact that half of our revenues are seasonless, enables us to produce large volumes further in advance and hold greater quantities in our warehouse with almost no inventory risk compared to traditional apparel companies.  These differentiators are incredibly*

- 142 -

*important because as transit times fluctuate, freight rates rise and labor shortages persist, our business model is able to endure these near-term pressures and still deliver best-in-class annual gross margins above 70%.*

340.   Spear doubled down during the question and answer portion of the call, reiterating the Company's ability to sidestep any supply chain or logistics landmines and meet previous guidance for the quarter and year: "Going into your second question, so yes, as we mentioned, *gross margin, we're seeing a lot of headwinds still feel really confident in our ability to be above 70-plus percent*."

341.   Similarly, in response to an analyst question about shipping and logistics pressures, Hasson promised the Company's planned product launch schedule would not be impacted:

> [Nagel:] That's perfect.  Then my follow-up question, and I think we've discussed this in the past against the backdrop of the supply chain disruptions.   *Are the product – are you pushing ahead with your normally planned product launches for '22?*
>
> [Hasson:] *Yes.  I mean I think one of the amazing things about how we've navigated the supply chain is that we get our products, we get them into our warehouse, and we get them to our customers*.  And you've seen that over the past 2 years.  I don't know another company that's navigated the supply chain challenge better than FIGS.  And you see that in the numbers, and it's a testament to this incredible team that we have here.

342.   And FIGS' March 10, 2022 FY 2021 Annual Report stated:

> The ongoing COVID-19 pandemic has continued to negatively impact global supply chains and cause challenges to logistics, including causing ocean freight delays, reliability and capacity issues, port congestion, increased ocean and air freight rates and labor shortages.

- 143 -

4888-2061-5087.v1

1                              *      *      *

2          *Our replenishment-driven model has also been a key part of our*

3    *ability to navigate these challenges*.

4          343.   Yet, when the Company disclosed results for Q1 2022 on May 12, 2022,

5    a very different picture of the quarter emerged.  FIGS missed key projections for the

6    quarter, decreased guidance for the remainder of the year, and misleadingly blamed

7    the setbacks, in large part, on the volatility in ocean shipping times and the resulting

8    need to increasingly rely on air freight.  *See* §V.E., *infra*.

9          344.   The Company initially announced 2022 financial guidance in its March 8,

10   2022 press release, which consisted of net revenues between $550 and $560 million,

11   gross margin of 70% or higher, and an adjusted EBITDA margin of 20% or higher.

12   At that time, Q1 2022 was three weeks away from being complete, so the Exchange

13   Act Defendants could not have learned much more in the last three weeks of the

14   quarter that they did not already know on March 8, 2022.

15         345.   Spear and Turenshine admitted as much during the May 12, 2022

16   earnings call.  Spear revealed that in "early March" the Company had "reduced our

17   visibility into when our products will arrive."  Spear also explained, "*supply chain*

18   *disruptions have intensified significantly since the beginning of March*."  Indeed,

19   Hasson, Spear, Turenshine, and Willhite attended a Board meeting on March 7, 2022,

20   just one day before Hasson used the word "amazing" to describe how FIGS navigated

21   the supply chain.  During the Board meeting, they discussed "the Company's supply

22   chain, including ocean freight challenges, and related mitigation activities and related

23   costs."  During that same meeting, the Individual Exchange Defendants and Willhite

24   also discussed "key financial results and product launches as well as challenges,"

25   including the "[r]amp-down of high waisted inventory to shift to new waistband"

26   styles.

27         346.   Credit Suisse AG analyst Michael Charles Binetti noted during the May

28   12, 2022 earnings call that the Company "[m]ust have [had] a fairly significant

                                          - 144 -

downturn at the end of the quarter" given that revenues came in lower than the full quarter guidance provided just two months earlier.  When he asked for additional commentary around what FIGS saw through the quarter, Turenshine admitted the Company began to experience impacts in early March though she misleadingly attributed it to transit volatility, stating in relevant part:

> We began to experience impacts on our business **in early March**.  We started to really see increased unreliability and volatility around transit times.  And the biggest impact for the quarter was a color launch that was planned for the end of the quarter that actually moved into Q2.  So that had the largest impact for what we saw in Q1.

347.   Moreover, as they reiterated throughout the Class Period, Spear and Hasson had access to data analytics that provided them with a current picture of their financial results for the quarter up to that point and data concerning where all of FIGS' products were in real time.  Accordingly, they should have been aware of any supply chain challenges when they made the statements near the end of Q1 2022.

348.   Analysts picked up on the suspicious timing of the supposed Q1 freight issues and FIGS' failure to guide on the issues at the time of the March 8, 2022 earnings call.  For example, Morgan Stanley doubted the Exchange Act Defendants' explanations for the Q1 miss and decreased guidance for Q2 and full year.  As it explained in its May 13, 2022 report titled "Bruised: Lower PT to $12," Morgan Stanley stated: "FIGS provided guidance on March 8th with ~3 weeks of the quarter left to go and we would have expected management to have visibility into inventory availability."  Blaming the miss and decreased guidance on supply chain issues also ran counter to what Morgan Stanley was hearing from others, with generally "improving, not worsening, supply chain and freight commentary since late March."  In no uncertain terms, Morgan Stanley explained "[w]hile management claims the lower revenue outlook is entirely supply chain driven (late deliveries and out of stocks), we believe there is more at play here."

- 145 -

**4.    Hasson, Spear, and Turenshine Were Aware that a Decision to Reduce Inventory of High-Waisted Core Products Caused Q1 2022 Challenges**

349.    During a March 7, 2022 FIGS Board meeting, during a discussion about key financial results and product launches as well as challenges, it was revealed that the Company decided to "[r]amp-down . . . high waisted inventory to shift to new waistband" styles.  Nonetheless, without mentioning that FIGS was taking down inventory on core products, on March 8, 2022, Spear affirmed the core product strategy, stating the strategy "enables us to produce large volumes further in advance and hold greater quantities in our warehouse."  And Turenshine stated that the replenishment nature of FIGS' core product strategy allowed the Company to have the products "always in stock and really limits our risk of obsolescence."

350.    During a May 10, 2022 Board meeting, the Exchange Act Defendants again discussed that a challenge to Q1 2022 was indeed the fact that FIGS was "[o]ut of stock on high waisted inventory as we shifted to new waistband."  On May 12, 2022, the Exchange Act Defendants partially conceded this fact to investors, stating that growth was lower than planned and pointing to a lack of availability of "2 of our most popular franchises, the high-waisted Zamora and Yola."  Of course, the Exchange Act Defendants knew by March 7, 2022 that the ramp down in popular high-waisted inventory was going to be a challenge.  And the Exchange Act Defendants continued their false and misleading narrative by claiming supply chain challenges caused the lack of availability of these products, rather than it was cause by their decision to "ramp down" the core product.

**5.    Hasson's Abrupt Resignation from Her Position as Co-CEO as the Truth of the Fraud Was Revealed Supports a Strong Inference of Scienter**

351.    On August 4, 2022, FIGS issued a press release, concurrently filed with the SEC on Form 8-K, announcing that Hasson resigned as co-CEO and co-principal executive officer of the Company as of August 2, 2022.  The Company further stated

- 146 -

1    that the Board "appointed" Hasson as Executive Chair of the Board effective August

2    4, 2022.

3        352.   In an earnings call held that same day, Spear fielded a question from

4    Piper Sandler analyst Ed Yruma about Hasson's resignation, emphasizing that the

5    change in leadership would be "a great thing for the Company" and "provide a lot of

6    clarity," as follows:

7        In terms of Heather and myself, Heather has always been incredibly –

8        really an expert of – product genius, creative genius. This is really

9        where she adds the most value. She's going to really focus on product

10       innovation, and I'm going to be focused on the strategic direction and

11       overseeing the day-to-day operations of the business.

12         ***I think this is a great thing for the company. I do, to your point,***

13         ***think it's going to allow us to move very quickly, being nimble and***

14         ***provide a lot of clarity, both internally and externally***.

15        353.   This statement by Spear was in stark contrast to the way Spear and

16    Hasson described their co-CEO arrangement earlier in the Class Period. For example,

17    in an interview conducted by the *Los Angeles Times* published in August 2021,

18    Hasson stated: "I believe that having two at the helm, you're able to run a lot faster,

19    you're able to be more efficient. And you're also able to home [sic] in on certain

20    things. Like if I'm not doing something, Trina could just jump in there. I don't have

21    to do it, and vice versa."[35]

22        354.   Hasson's departure as the truth regarding the Exchange Act Defendants'

23    fraud was unraveling supports a strong inference of scienter.

24

25

26

27    [35]   Lawrence Darmiento, *How FIGS Co-CEOs Lead a Company Together*, L.A. Times (Aug. 12, 2021), https://www.latimes.com/business/story/2021-08-12/figs-trina-spear-

28    heather-sasson-interview.

**E.     Loss Causation and Economic Loss**

355.   The market for FIGS' common stock was open, well-developed, and efficient at all relevant times.  Throughout the Class Period, FIGS' Class A common stock traded at artificially inflated prices as a direct result of the Exchange Act Defendants' materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public.  Plaintiffs and other members of the Class purchased or otherwise acquired FIGS common stock relying upon the integrity of the market price for FIGS' common stock and market information relating to FIGS.  When the Exchange Act Defendants' prior misrepresentations and omissions were disclosed and became apparent to the market, the price of FIGS' Class A common stock declined significantly as the prior artificial inflation came out of the price of FIGS' Class A common stock, and Plaintiffs and other members of the Class were damaged thereby.

356.   By concealing from investors the adverse facts detailed herein, the Exchange Act Defendants presented a misleading picture of FIGS' business, prospects, and operations.  The Exchange Act Defendants' false and misleading statements had the intended effect and caused FIGS' Class A common stock to trade at artificially inflated levels throughout the Class Period, from $15.93 per share at market open on March 9, 2022 and a Class Period high of $23.25 per share on April 5, 2022.  FIGS stock fell to a closing price of $6.76 per share on March 1, 2023, representing a 70% drop from its most inflated point.

357.   As a result of their purchases of FIGS' Class A common stock at artificially inflated prices during the Class Period, Plaintiffs and the other members of the Class who purchased FIGS Class A common stock during the Class Period suffered economic loss, *i.e.*, damages, under the federal securities laws.

358.   Each time the truth about the Company was revealed to the market, the price of FIGS' Class A common stock fell significantly.  The declines began to remove the inflation from the price of FIGS' Class A common stock, causing real

economic loss to investors who had purchased FIGS' Class A common stock during the Class Period.  The declines in the price of FIGS' Class A common stock when the corrective disclosures came to light were a direct result of the nature and extent of the Exchange Act Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in FIGS' Class A common stock negate any inference that the losses suffered by Plaintiffs and the other members of the Class who purchased during the Class Period was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Exchange Act Defendants' fraudulent conduct.

359.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other members of the Class who purchased FIGS' Class A common stock during the Class Period was a direct result of the Exchange Act Defendants' fraudulent false and misleading statements that artificially inflated the price of FIGS' Class A common stock and the subsequent significant decline in the value of the Class A common stock when the Exchange Act Defendants' prior misrepresentations were revealed.

### 1.   May 12, 2022 Partial Corrective Disclosure

360.   On May 12, 2022, after the market closed, FIGS issued a press release announcing disappointing financial results for the first quarter of 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The press release revealed that FIGS' gross margin was 71.2%, which represented a 0.4% year-over-year decrease.  The Company attributed the decrease to "higher air freight spend as well as increased ocean and air freight rates."

361.   The press release also revealed that FIGS slashed its expected net revenues, gross margin, and Adjusted EBITDA margin despite the Exchange Act Defendants having expressed confidence in their ability to meet these targets just two months earlier during the March 8, 2022 earnings call.  The Company lowered its 2022 financial guidance for net revenues from $550 to $560 million to just $510 to $530 million based purportedly on "supply chain challenges and broader

macroeconomic factors, including high inflation and shifts in consumer spending patterns." The Company also lowered 2022 gross margins from 70% or over to 67 to 68%, "primarily due to a significant increase in the Company's use of air freight *to help mitigate supply chain challenges*." While Adjusted EBITDA margin was previously expected to be upwards of 20%, the Company adjusted its expectations to 16 to 18%.

362.   During the Company's earnings call that same day, Spear revealed that the Company lacked the visibility into inventory management that the Exchange Act Defendants professed to have, which resulted in the expensive air freight of less in-demand products while new color launches and stocked out styles remained on ocean freight, stating in relevant part:

> Now I'd like to share more about what we're seeing with our supply chain and customers since we last spoke to you in early March. As you may remember, beginning in Q3 of 2021, *we began implementing mitigation strategies to help us get ahead of port congestion and longer transit time. We adjusted our transit time assumption, increased our weeks of supply for our core colors – our core styles and core colors, and when necessary, utilized additional air freight. We built our 2022 plan based on these mitigation strategies and believe we were positioned well to navigate these challenges effectively*. We also expect to have less reliance on air freight in 2022 than we had, had at the end of 2021.
>
> However, since early March, we've seen an intense and persistent surge in the volatility of ocean transit times for receiving our products, largely due to vessels being unexpectedly rerouted by carriers while in transit. Shipping times began to vary, ranging from as fast as 30 days to upwards of 120 days, and it's difficult to see this unpredictability ending soon. The lack of reliability has – it reduced our visibility into when our

- 150 -

products will arrive, and without predictability, we are less able to mitigate these issues with longer lead times alone.

This has impacted our ability to keep core products in stock and execute our color and product drops that fuel our growth.  As a result, our Q1 revenue growth was lower than expected as we had to shift the planned color launch out of the quarter, and we're limited in our ability to keep in stock 2 of our most popular core franchise styles.

363.   Credit Suisse AG analyst Michael Charles Binetti noted during the earnings call that the Company "[m]ust have [had] a fairly significant downturn at the end of the quarter" given that revenues came in lower than the full quarter guidance provided just two months earlier.

364.   On the May 12, 2022 earnings call, despite the fact that Q1 2022 was nearly over when Hasson assured investors that the Company was moving forward with product launches as planned, Turenshine blamed the Q1 results on the supply chain:

Yes.  So as it relates to what we saw with the color launch and supply chain in the first quarter, a couple of factors for supply chain challenges in the first quarter, the first of which was the color launch that moved out.  But we were also out of stock on some of our key core franchises like our high-waisted Zamora and Yola.  And so I'm not giving exact numbers, but the majority of the impact that we saw in the first quarter was related to the supply chain challenges.  And we do believe that the macroeconomic factors were impacting us to a lesser extent, and that's what we expect to see in our full year outlook and how we're modeling it in our full year outlook.

365.   In response to this news, the price of FIGS stock declined by $3.21 per share, or nearly 25%, from a closing price of $12.85 per share on May 12, 2022, to a closing price of $9.64 per share on May 13, 2022, on unusually high trading volume.

In comparison, on the same day the CRSP Total Market Index increased 2.67% and the S&P 500 Apparel, Accessories and Luxury Goods Index increased 2.61%.

366.   FIGS' stock remained artificially inflated because the Exchange Act Defendants failed to fully disclose the Company's inability to forecast demand and control inventories, particularly in light of their risky decision to deviate from the Company's core products strategy.

367.   Indeed, analysts continued to be misled by the extent and magnitude of the Exchange Act Defendants' false and misleading assertions.  For instance, in its May 13, 2022 report, titled "Shaky Start to 2022," Credit Suisse cited FIGS' core strategy for why it "remain[ed] positive," stating in relevant part:

> **Why We Remain Positive**: Backing up, FIGS is still a highly differentiated "disruptor" with low market share (~4%) and strong consumer awareness momentum to fuel strong growth for several years despite 2 major supply chain missteps in the last 3 quarters.  ***The category is solid – with structural job growth, solid/predictable replacement cycles, and less sensitivity to fashion cycles that should offer better stability if FIGS can stabilize its supply chain and generate buy in that its medium-term targets are conservative***. . . .   While we lower our target multiple, we maintain our Outperform rating on our view that ***FIGS should still be able to grow profitably for several years once current supply chain headwinds abate***.

### 2.     February 28, 2023 Final Corrective Disclosure

368.   On February 28, 2023, FIGS filed its Annual Report on Form 10-K for the year ended December 31, 2022.  In the Form 10-K, the Company wrote: "[W]e also continued to experience elevated inventory on hand, as a result of improvements in ocean transit times ***and sales below our expectations earlier in the year, which in turn resulted in increased costs associated with storing such inventory***."   The Company also issued a press release that day, announcing disappointing financial

- 152 -

results for the fourth quarter and full year 2022 that was concurrently filed with the SEC as Exhibit 99.1 to its Form 8-K.  The FY 2022 Press Release revealed FIGS' 68.2% gross margin, which represented a 1.7% year-over-year decrease, while operating expenses increased 29% compared year-over-year with Q4 2021 and 9.1% compared year-over-year with FY 2021.  FIGS attributed the increase in operating expenses to higher selling expenses related to fulfillment increase.  Additionally, the Company revealed on its balance sheet that its net inventory had exploded from $86 million to $177 million year-over-year.  The FY 2022 Press Release further revealed a dismal financial outlook for 2023 with net revenues expected to experience only mid-single digit growth and an adjusted EBITDA margin of 11%-12%.

369.   In response to this news, the price of FIGS stock declined by $2.45 per share, or nearly 27%, from a closing price of $9.21 per share on February 28, 2023, to a closing price of $6.76 per share on March 1, 2023, on unusually high trading volume.  In comparison, on the same day, the CRSP Total Market Index declined only 0.40% and the S&P 500 Apparel, Accessories and Luxury Goods Index decreased only 0.12%.

370.   Analysts reacted negatively to FIGS' massive inventory stockpile and the anticipated length of time that the Company projected it would take to sell-through. For instance, in its February 28, 2023 report, titled "2023 Guide Overshadows 4Q Beat, Inflection Pushed to 2024," Credit Suisse expressed its "disappoint[ment] with FIGS' inventory management."  Credit Suisse was surprised at the length of time FIGS needed to resolve the inventory backlog "given the very basic nature of the core category" stating in relevant part:

> We're disappointed with FIGS' inventory management **(given FIGS had significant time to adjust to slowing order frequency metrics).  And we're disappointed that FIGS still plans to end 2023 with ~25 weeks of supply vs 16-20 normalized target range**.  While the company thinks inventory will peak in 1Q, we're disappointed a full year will go by

without inventories being back to normal (particularly given the very basic nature of the core category.

371.   Similarly, in its March 1, 2023 report, titled "4Q22 Earnings Review: 2023 Growth Algorithm Breaks Down," Barclays echoed that FIGS' "[e]xcess[ive] inventory may take the majority of the year to clear through" and further noted that the sizeable inventory ran "counter-cycle to the vast majority of the retail sector," stating in relevant part:

> FIGS embarks on a "corrective transition year" as growth story breaks down.  We see further potential risk to sales and margin drivers. **FIGS's growth algorithm has broken down beginning last quarter, as sales trends in early 4Q22 dropped off considerably against a backdrop of worsening inventory (which is counter-cycle to the vast majority of the retail sector)**.  Slowing demand, poor reception to color newness, slowing core product turns, and end-of-quarter inventory +107% y/y all point to 2023 as a "corrective transition year" with lack of visibility on the what the FIGS model looks like in a post-COVID world.  **Our primary concerns remain: 1) increasing Customer Acquisition Costs (CAC); 2) longer replenishment cycles; 3) "crowding out" of the consumer wallet by inflationary pressure; 4) the need for heightened promos; and 5) inventory levels that may take several quarters to a year to right size**.  Sales growth in 4Q22 of 13% is projected to fall to low-single-digit growth in 1Q23 before accelerating modestly to mid-single-digit growth for all of FY23.
>
> *      *      *
>
> **Excess inventory may take the majority of the year to clear through.  Inventory remains elevated (up over 100% y/y) with need for promotions.  Absolute inventory on the balance sheet came in $178 million at the end of 4Q22.  Based on our proprietary inventory**

- 154 -

4888-2061-5087.v1

*analysis, FIGS has posted five consecutive quarters of negative sales-to-inventory growth*.  In FY4Q22, the Inventory Management Spread was (11007) basis points and worsened from (9929) basis points in the prior quarter.  4Q22 sales growth was +13% versus average inventory growth +123%.  FIGS's GMROI has worsened for five consecutive quarters, and its OMROI has worsened for four consecutive quarters.

372.  BofA Securities emphasized that FIGS' "[l]ackluster guidance disappoints despite a sales beat" in its March 1, 2023 report, titled "Customer purchasing patterns change with challenging macro backdrop."  The report expressly cited FIGS "[o]verhang on costs from inv[entory]," stating in relevant part:

Overhang on costs from inv; continuing to invest for LT.

GM declined 170bp to 68.2% reflecting higher promotions and product mix shift, higher ocean freight costs, partly offset by lower air usage.  Inventory was up 107% exiting the quarter; the composition includes 60% basics and 15% new launches, *but the overage is expensive to manage and clear: extra warehousing costs required to house excess inventory will be a 250/180bp headwind in 1Q/2Q23. Mgmt sees 2023 as an investment year* and continues to invest for LT growth: new fabric and technological uses will result in launches in 2024.  Mgmt plans for slight G&A deleverage in F23 given investments in software, personnel, resources, and international growth.  There will also be $16-18mn (400-500bpE of pressure per quarter) of investments in 2H23-1H24 in warehousing and efficiencies.  We model GM -200bp to 68.1% in F23.

373.  Morgan Stanley questioned whether FIGS had "Spoiled?" in its March 1, 2023 report and further suggested that more than macro issues were at play for the Company's inventory surplus, stating in relevant part:

- 155 -

While we think there is some conservatism embedded in the guide, and we expected 1Q to be the weakest of the year, *the implied revenue growth and margin deterioration through the remainder as the year (especially as compares ease), suggests to us there may be more than 'COVID give back' and macro issues at play*. The inventory overhang and strategy is most concerning to us, with inventory +107% y/y at the end of 4Q vs. the +LSD 1Q and +MSD FY23 revenue growth guidance. Although FIGS has less obsolescence risk than a traditional apparel retailer, ~40% of this inventory is in non-core scrub styles and colors that will require higher discounting rates in order to clear through, likely pressuring gross margin through the course of the year. But we also worry the magnitude of core style/core color inventory relative to the level of demand FIGS is currently seeing is also at risk of markdowns, as we've already seen FIGS run 20% off core styles in 1QTD.

*Where to Go From Here?: FIGS is now squarely a show-me story. Management needs to regain investor confidence which could take several quarters. Additionally, we question whether or not FIGS needs a multi-year investment cycle to right size the infrastructure and talent for the size of the company that FIGS has grown into over the last three years*. We previously thought the normalized top-line growth rate of the business was mid-teens to 20% at a high teens to 20% EBITDA margin . . . but now believe it may be low- to mid-teens at a mid-teens margin. We stay Equal-weight on a wide range of potential outcomes from here, but see a negative risk/reward skew as we find it difficult to turn more constructive until FIGS works through its inventory overhang.

F.     **Presumption of Reliance**

374.   At all relevant times, the market for FIGS Class A common stock was an efficient market for the following reasons, among others:

(a)     FIGS common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, FIGS filed periodic public reports with the SEC and the NYSE;

(c)     FIGS regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     FIGS was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

375.   As a result of the foregoing, the market for FIGS common stock promptly digested current information regarding FIGS from all publicly available sources and reflected such information in the price of FIGS common stock.   Under these circumstances, all purchasers of FIGS common stock during the Class Period suffered similar injury through their purchase of common stock at artificially inflated prices and a presumption of reliance applies under the Supreme Court's holding in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

376.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Exchange Act Claims are, in large part, grounded on the Exchange Act Defendants' material misstatements and/or omissions.  Because this action involves the Exchange Act Defendants' failure to disclose material adverse

- 157 -

information regarding the Company's business operations and financial prospects – information that the Exchange Act Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT IV
### for Violation of §10(b) of the Exchange Act and
### SEC Rule 10b-5 Against the Exchange Act Defendants

377.  Plaintiffs repeat and reallege ¶¶1-36, 55-62, 86-104, 119-139, and 207-376 above as if fully set forth herein.

378.  During the Class Period, the Exchange Act Defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

379.  The Exchange Act Defendants knowingly and recklessly made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, thereby inflating the price of FIGS common stock during the Class Period.

380.  Plaintiffs and members of the Class who purchased or otherwise acquired FIGS Class A common stock during the Class Period and were damaged thereby have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FIGS common stock.  Plaintiffs and other Class members would not have purchased FIGS common stock at the prices they paid, or at

4888-2061-5087.v1

all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

381.   As a direct and proximate result of the aforementioned the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of FIGS common stock during the Class Period.

## COUNT V
### for Violation of §20(a) of the Exchange Act Against the Individual Exchange Act Defendants, Willhite, and Tulco

382.   Plaintiffs repeat and reallege ¶¶1-36, 55-62, 86-104, 119-139, and 207-381 above as if fully set forth herein.

383.   The Individual Exchange Act Defendants, Willhite, and Tulco acted as controlling persons of FIGS within the meaning of §20(a) of the Exchange Act.

384.   By virtue of their positions as officers and/or directors of FIGS, and/or their beneficial ownership of FIGS common stock, the Individual Exchange Act Defendants and Willhite had the power and authority to, and did, cause FIGS to engage in the wrongful conduct alleged.

385.   Tulco also acted as a controlling person of FIGS within the meaning of §20(a) of the Exchange Act by virtue of its share of ownership, power to appoint directors, including through the appointment and service of Tulco-associated personnel Willhite and Lafley as directors, and direct involvement in the day-to-day affairs of FIGS, as further described above.   As a result of the foregoing, the Individual Exchange Act Defendants, Willhite, and Tulco had the power and authority to, and did, cause FIGS to engage in the wrongful conduct alleged.

386.   As a direct and proximate result of the Individual Exchange Act Defendants', Willhite's, and Tulco's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of FIGS common stock during the Class Period.

- 159 -

387. By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## VI. SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE DO NOT APPLY

388. Neither the statutory safe harbor provided for forward-looking statements under the PSLRA nor the bespeaks caution doctrine apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Furthermore, to the extent that either the statutory safe harbor or bespeaks caution doctrine is determined to apply to any forward-looking statements pleaded herein, the defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of FIGS who knew that the statement was false when made.

## VII. CLASS ACTION ALLEGATIONS

389. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired: (i) FIGS Class A common stock pursuant and/or traceable to the Company's IPO conducted on or around May 27, 2021; (ii) FIGS Class A common stock pursuant and/or traceable to the Company's SPO conducted on or around September 16, 2021; and/or (iii) FIGS Class A common stock between March 9, 2022 and February 28, 2023, inclusive.

390.   The members of the Class are so numerous that joinder of all members is impracticable.   From the IPO through the end of the Class Period, FIGS Class A common stock was actively traded on the NYSE.   While the exact number of members in the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by FIGS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

391.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' wrongful conduct in violation of federal law that is complained of herein.

392.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

393.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by the defendants' acts as alleged herein;

(b)   whether the Securities Act Defendants made inaccurate statements and/or omitted material information in the IPO Documents and SPO Documents;

(c)   whether the Exchange Act Defendants made inaccurate statements and/or omitted material information in communicating with investors during the Class Period;

(d)   whether the defendants' statements to the investing public during the Class Period misrepresented and omitted material facts about FIGS' business, operations, and management;

- 161 -

1    (e)    whether the Individual Exchange Act Defendants acted with
2    scienter;

3    (f)    whether the price of FIGS Class A common stock was artificially
4    inflated because of the Exchange Act Defendants' conduct during the Class Period
5    described herein; and

6    (g)    whether members of the Class have sustained damages and the
7    proper measure of damages.

8    394.   A class action is superior to all other available methods for the fair and
9    efficient adjudication of this controversy since joinder of all members is
10   impracticable.  Furthermore, as the damages suffered by individual members of the
11   Class may be relatively small, the expense and burden of individual litigation make it
12   impossible for members of the Class to individually redress the wrongs done to them.
13   There will be no difficulty in the management of this action as a class action.

14   **VIII.  PRAYER FOR RELIEF**

15   WHEREFORE, Plaintiffs pray for judgment as follows:

16   A.    Determining that this action is a proper class action and certifying
17   Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil
18   Procedure;

19   B.    Awarding compensatory damages in favor of Plaintiffs and the other
20   Class members against all the defendants, jointly and severally, for all damages
21   sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial,
22   including interest thereon;

23   C.    Awarding Plaintiffs and the Class their reasonable costs and expenses
24   incurred in this action, including counsel fees and expert fees; and

25   D.    Awarding such other and further relief as the Court may deem just and
26   proper.

27   **IX.   JURY DEMAND**

28   Plaintiffs hereby demand a trial by jury.

- 162 -

1 | DATED:  March 19, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
RYAN A. LLORENS
ERIKA L. OLIVER

/s/ RYAN A. LLORENS
RYAN A. LLORENS

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
ryanl@rgrdlaw.com
eoliver@rgrdlaw.com

Lead Counsel for Lead Plaintiffs Public
Pension Plans and the Class

DATED:  March 19, 2024

LEVI & KORSINSKY, LLP
SHANNON L. HOPKINS (*pro hac vice*)
GREGORY M. POTREPKA (*pro hac vice*)
MORGAN M. EMBLETON
RACHEL BERGER

/s/ SHANNON L. HOPKINS
SHANNON L. HOPKINS

1111 Summer Street, Suite 403
Stamford, CT  06905
Telephone:  203/992-4523
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
rberger@zlk.com

LEVI & KORSINSKY, LLP
ADAM M. APTON (SBN 316506)
DAVID C. JAYNES (SBN 338917)
445 South Figueroa Street, 31st Floor
Los Angeles, CA  90071
Telephone:  213/985-7290
212/363-7171 (fax)
aapton@zlk.com
djaynes@zlk.com

Lead Counsel for Lead Plaintiff Dr. Hoch
and the Class

4888-2061-5087.v1

SUGARMAN SUSSKIND BRASWELL
 & HERRERA, P.A.
ROBERT A. SUGARMAN
PEDRO A. HERRERA
150 Alhambra Circle, Suite 725
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)
sugarman@sugarmansusskind.com
herrera@sugarmansusskind.com

CHRISTIANSEN & DEHNER, P.A.
SCOTT R. CHRISTIANSEN
63 Sarasota Center Blvd., Suite 107
Sarasota, FL  34240
Telephone:  941/377-2200
941/377-4848 (fax)

VANOVERBEKE, MICHAUD
 & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD (P42641)
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

## ATTESTATION PURSUANT TO LOCAL RULE 5-4.3.4(2)(i)

I, Ryan A. Llorens, am the ECF user whose identification and password are being used to file the First Amended Class Action Complaint for Violations of the Federal Securities Laws.  Pursuant to Local Rule 5-4.3.4(2)(i), I hereby attest that Shannon L. Hopkins concurs in this filing's content and has authorized the filing.

DATED: March 19, 2024                    /s/ RYAN A. LLORENS
                                                        RYAN A. LLORENS

ROBBINS GELLER RUDMAN
 & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

Email:  ryanl@rgrdlaw.com

- 164 -

4888-2061-5087.v1